No. 16-1567

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

————————

UNITED STATES OF AMERICA,
APPELLANT

V.

ALEX LEVIN,
DEFENDANT-APPELLEE

————————

ON APPEAL FROM AN ORDER SUPPRESSING EVIDENCE
IN A CRIMINAL CASE, ENTERED IN THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

————————

GOVERNMENT'S OPENING BRIEF

————————

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

KELLY BEGG LAWRENCE
ASSISTANT U.S. ATTORNEY
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
SUITE 9200
BOSTON, MASSACHUSETTS 02210
(617) 748-3162

<u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES.................................................................... iii

STATEMENT OF JURISDICTION....................................................1

STATEMENT OF ISSUES ...............................................................2

STATEMENT OF THE CASE............................................................2

     A.    Statement of facts............................................................ 2

     B.    Suppression proceedings ........................................... 10

     C.    NIT Warrant decisions ............................................. 17

SUMMARY OF ARGUMENT...........................................................19

ARGUMENT ...................................................................................22

I.    THE DISTRICT COURT ERRED IN HOLDING THAT THE MAGISTRATE JUDGE LACKED AUTHORITY UNDER RULE 41(b) TO ISSUE THE NIT WARRANT ....................................22

     A.    Standard of review ................................................... 23

     B.    Rule 41(b)(4) authorized the magistrate judge to issue the NIT Warrant...................................................... 23

II.    THE DISTRICT COURT ERRED IN HOLDING THAT THE PURPORTED RULE 41(b) VIOLATION REQUIRED SUPPRESSION ........................................................................32

     A.    Standard of review ................................................... 32

     B.    Suppression may not be used to remedy a non-constitutional Rule 41(b) violation absent a showing of prejudice or bad faith, neither of which exists here.................... 33

i

|  | 1. | The alleged Rule 41(b) violation was not of constitutional dimension | 34 |
|  | 2. | Levin was not prejudiced by the alleged Rule 41(b) error | 43 |

III. THE DISTRICT COURT ERRED WHEN IT SUPPRESSED EVIDENCE OF CHILD PORNOGRAPHY OBTAINED BY FEDERAL AGENTS ACTING IN OBJECTIVELY REASONABLE RELIANCE ON THE NIT WARRANT ................... 45

    A. Standard of review ................................................................. 46

    B. The district court erred in holding the good-faith exception to the exclusionary rule categorically inapplicable to warrants later deemed "void." ........................... 46

    C. The district court erred in finding that the agents did not act in objectively reasonable, good-faith reliance on the NIT Warrant ........................................................................ 57

CONCLUSION ........................................................................................ 64

CERTIFICATE OF COMPLIANCE ................................................... 65

CERTIFICATE OF SERVICE .............................................................. 66

ADDENDUM

## TABLE OF AUTHORITIES

### CASES

*Arizona v. Evans*,
    514 U.S. 1 (1995)..................................................................48, 60

*Dalia v. United States*,
    441 U.S. 238 (1979) .................................................................. 35

*Davis v. United States*,
    564 U.S. 229 (2011) ..................................................... *passim*

*Donovan v. Enter. Foundry, Inc.*,
    751 F.2d 30 (1st Cir. 1984)...................................................... 35

*Heien v. North Carolina*,
    135 S. Ct. 530 (2014) ............................................................... 59

*Herring v. United States*,
    555 U.S. 135 (2009) ....................................................... *passim*

*Hudson v. Michigan*,
    547 U.S. 586 (2006) ............................................................51, 55

*Illinois v. Gates*,
    462 U.S. 213 (1983) ............................................................47, 51

*Illinois v. Krull*,
    480 U.S. 340 (1987) .................................................................. 49

*In re Warrant to Search a Target Computer at Premises Unknown*,
    958 F. Supp. 2d 753 (S.D. Tex. 2013) ...............................29, 59

*Messerschmidt v. Millender*,
    132 S. Ct. 1235 (2012) ............................................................. 52

*Sanchez-Llamas v. Oregon*,
    548 U.S. 331 (2006) .................................................................. 42

*Shadwick v. City of Tampa*,
    407 U.S. 345 (1972) .................................................................. 35

*United States v. $64,000 in U.S. Currency*,
    722 F.2d 239 (5th Cir. 1984) ................................................................. 40

*United States v. Acevedo-Lemus*,
    No. 15-CR-137, 2016 WL 4208436 (C.D. Cal. Aug. 8, 2016)...... 18, 38, 64

*United States v. Adams*,
    No. 16-CR-11, 2016 WL 4212079 (M.D. Fla. Aug. 10, 2016)...........18, 38

*United States v. Allain*,
    No. 15-CR-10251, 2016 WL 5660452 (D. Mass. Sep. 29, 2016)....... *passim*

*United States v. Ammons*,
    No. 16-CR-11, 2016 WL 4926438 (W.D. Ky. Sep. 14, 2016) ...... 19, 56, 62

*United States v. Anderson*,
    851 F.2d 384 (D.C. Cir. 1988)................................................................. 33

*United States v. Anzalone*,
    No. 15-CR-10347, 2016 WL 5339723
    (D. Mass. Sep. 22, 2016)............................................................ 16, 18, 38

*United States v. Arterbury*,
    No. 15-CR-187 (N.D. Okla. May 12, 2016)............................................ 19

*United States v. Berkos*,
    543 F.3d 392 (7th Cir. 2008) ...................................................... 39, 41-43

*United States v. Bonner*,
    808 F.2d 864 (1st Cir. 1986)............................................................14, 44

*United States v. Britt*,
    959 F.2d 232 (4th Cir. 1992) ................................................................. 39

*United States v. Broy*,
    No. 16-CR-10030, 2016 WL 5172853 (C.D. Ill. Sep. 21, 2016) .........18, 56

*United States v. Burgos-Montes*,
    786 F.3d 92 (1st Cir.), *cert. denied*, 136 S. Ct. 599 (2015)................... *passim*

*United States v. Burke*,
    517 F.2d 377 (2d Cir. 1975) ............................................................34, 39

*United States v. Caceres*,
    440 U.S. 741 (1979) ............................................................... 42

*United States v. Cazares-Olivas*,
    515 F.3d 726 (7th Cir. 2008) ............................................... 41

*United States v. Chaar*,
    137 F.3d 359 (6th Cir. 1998) ............................................... 33

*United States v. Comstock*,
    805 F.2d 1194 (5th Cir. 1986) ...................................... 33, 39-40

*United States v. Croghan*,
    No. 15-CR-48, 2016 WL 4992105 (S.D. Iowa Sep. 19, 2016)............19, 59

*United States v. Curzi*,
    867 F.2d 36 (1st Cir. 1989)............................................... 56-57

*United States v. Darby*,
    No. 16-CR-36, 2016 WL 3189703 (E.D. Va. June 3, 2016) .............. *passim*

*United States v. Dzwonczyk*,
    No. 15-CR-3134 (D. Neb. Oct. 5, 2016) ..................................... 17, 24, 30

*United States v. Epich*,
    No. 15-CR-163, 2016 WL 953269 (E.D. Wisc. Mar. 14, 2016) .........16, 18

*United States v. Eure*,
    No. 16-CR-43, 2016 WL 4059663 (E.D. Va. July 28, 2016)........ 17, 24, 54

*United States v. Freeman*,
    897 F.2d 346 (8th Cir. 1990) ...........................................33, 39

*United States v. Gerber*,
    994 F.2d 1556 (11th Cir. 1993) ........................................... 33

*United States v. Glover*,
    736 F.3d 509 (D.C. Cir. 2013)........................................... 40-41

*United States v. Goff*,
    681 F.2d 1238 (9th Cir. 1982) ........................................... 40

*United States v. Henderson*,
No. 15-CR-565, 2016 WL 4549108 (N.D. Cal. Sep. 1, 2016) ............18, 38

*United States v. Hornick*,
815 F.2d 1156 (7th Cir. 1987) ...........................................................33, 42

*United States v. Jean*,
No. 15-CR-50087, 2016 WL 4771096 (W.D. Ark. Sep. 13, 2016) .... *passim*

*United States v. Johnson*,
No. 15-CR-340, 2016 WL 6136586 (W.D. Mo. Oct. 20, 2016) ........ *passim*

*United States v. Knights*,
534 U.S. 112 (2001) ............................................................................... 52

*United States v. Knotts*,
460 U.S. 276 (1983) ............................................................................... 27

*United States v. Knowles*,
No. 15-CR-875 (D.S.C. Sep. 14, 2016) .............................................18, 38

*United States v. Krueger*,
809 F.3d 1109 (10th Cir. 2015) ....................................................40, 43-44

*United States v. Kuc*,
737 F.3d 129 (1st Cir. 2013) ................................................................. 36

*United States v. Laurita*,
No. 13-CR-107, 2016 WL 4179365 (D. Neb. Aug. 5, 2016) ................... 58

*United States v. Leon*,
468 U.S. 897 (1984). ..................................................................... *passim*

*United States v. Levin*,
No. 15-CR-10271, 2016 WL 2596010 (D. Mass. May 5, 2016) .............. 12

*United States v. Libby-Tipton*,
No. 16-CR-236 (N.D. Ohio Oct. 19, 2016) ......................................18, 62

*United States v. Luk*,
859 F.2d 667 (9th Cir. 1988) ...........................................................33, 39

*United States v. Martinez-Zayas*,
   857 F.2d 122 (3d Cir. 1988) ...................................................... 33, 39, 45

*United States v. Master*,
   614 F.3d 236 (6th Cir. 2010) ......................................................... 54-57

*United States v. Matish*,
   No. 16-CR-16, 2016 WL 3545776
   (E.D. Va. June 23, 2016) ..................................................... 18, 24, 30, 38

*United States v. Michaud*,
   No. 15-CR-5351, 2016 WL 337263 (W.D. Wash. Jan. 28, 2016) ..... *passim*

*United States v. Monell*,
   801 F.3d 34 (1st Cir. 2015), *cert. denied*, 136 S. Ct. 864 (2016) ........... 46-47

*United States v. New York Tel. Co.*,
   434 U.S. 159 (1977) ........................................................................ 24-25

*United States v. Pennington*,
   635 F.2d 1387 (10th Cir. 1980) .......................................................33, 39

*United States v. Ritter*,
   752 F.2d 435 (9th Cir. 1985) ................................................................ 45

*United States v. Rivera*,
   No. 15-CR-266 (E.D. La. July 20, 2016) ............................................... 18

*United States v. Scarbrough*,
   No. 16-CR-35, 2016 WL 5900152 (E.D. Tenn. Oct. 11, 2016) ..........18, 56

*United States v. Schoenheit*,
   856 F.2d 74 (8th Cir. 1988) .................................................................. 37

*United States v. Scott*,
   260 F.3d 512 (6th Cir. 2001) .......................................................... 54-56

*United States v. Sevilla-Oyola*,
   770 F.3d 1 (1st Cir. 2014) .............................................................23, 33

*United States v. Simons*,
   206 F.3d 392 (4th Cir. 2000) ............................................................... 33

*United States v. Smith,*
    No. 15-CR-467 (S.D. Tex. Sep. 28, 2016) .............................. 17, 24, 30-32

*United States v. Stamper*,
    No. 15-CR-109 (S.D. Ohio Feb. 19, 2016) ........................................18, 38

*United States v. Stefanson,*
    648 F.2d 1231 (9th Cir. 1981) ............................................................... 33

*United States v. Torres*,
    751 F.2d 875 (7th Cir. 1984) ................................................................. 25

*United States v. Torres*,
    No. 16-CR-285, 2016 WL 4821223 (W.D. Tex. Sep. 9, 2016)...........18, 40

*United States v. Villegas*,
    899 F.2d 1324 (2d Cir. 1990) ................................................................ 25

*United States v. Werdene*,
    No. 15-CR-434, 2016 WL 3002376 (E.D. Pa. May 18, 2016)............18, 38

*United States v. Workman*,
    No. 15-CR-397, 2016 WL 5791209 (D. Colo. Sep. 6, 2016) ................... 19

*Utah v. Strieff,*
    136 S. Ct. 2056 (2016) .......................................................................... 61

## CONSTITUTIONAL AMENDMENTS

U.S. Const. amend. IV ................................................................... 35

## STATUTES AND RULES

18 U.S.C. §1030(a)(5) ................................................................... 15

18 U.S.C. §2252A(a)(5)(B) .......................................................... 10

18 U.S.C. §2518(3) ....................................................................... 41

18 U.S.C. §2703(a) ....................................................................... 41

18 U.S.C. §3117(b) ....................................................................... 27

18 U.S.C. §3231 .............................................................................. 1

18 U.S.C. §3731 .............................................................................. 1

28 U.S.C. §636 ...................................................... 11, 12, 15, 22

Fed. R. Crim. P. 41 ............................................................... *passim*

Fed. R. Crim. P. 52(a) .................................................................. 34

Fed. R. Crim. P. 57(b) ............................................................. 24-25

## OTHER AUTHORITIES

Oxford English Dictionary,
   https://en.oxforddictionaries.com/definition/device
   (last visited October 25, 2016)................................................... 27

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over the case because the indictment charged the defendant, Alex Levin, with an offense against the United States. 18 U.S.C. §3231. On April 20, 2016, the district court entered a *Memorandum & Order* suppressing evidence to be used in the trial against Levin (D.69); and on May 5, 2016, the court entered an *Amended Memorandum & Order* to correct a case citation appearing on page 19. D.82.[1] On May 13, 2016, the government filed a motion for reconsideration of both orders (D.86, 87), which the court denied in an electronic margin order entered on May 17, 2016. D.88.

On May 17, 2016, the United States filed a timely notice of appeal and certification from the orders granting suppression and denying reconsideration. D.89. This Court has jurisdiction over the government's appeal pursuant to 18 U.S.C. §3731.

---

[1] Citations are as follows: the district court docket is cited as "D"; the addendum is cited as "Add"; and the joint appendix is cited as "JA."

1

## STATEMENT OF ISSUES

1.    The district court erred in holding that the magistrate judge lacked authority under Rule 41(b) to issue the NIT Warrant.

2.    The district court erred in holding that the purported Rule 41(b) violation required suppression.

3.    The district court erred when it suppressed evidence of child pornography obtained by federal agents acting in objectively reasonable, good-faith reliance on the NIT Warrant.

## STATEMENT OF THE CASE

### A.    Statement of facts

In August 2015, Alex Levin was charged with possessing child pornography after law enforcement found several media files depicting prepubescent children engaged in sexually explicit conduct on his computer. Add:6; JA:15. The Federal Bureau of Investigation ("FBI") had identified Levin as a target during its investigation into Playpen, a global online forum through which registered users—including Levin—advertised, viewed, and distributed illegal child pornography.[2] Add:2-3; NIT Affidavit ¶6 (Add:54). The scale of

---

[2] To protect the security of the ongoing investigation, the actual name of the website was not disclosed in pertinent search warrant documents, but was

2

child exploitation on Playpen was massive: between August 2014 and February 2015, more than 150,000 total members accessed the site, which contained over 95,000 posts and over 9,000 topics related to child pornography. NIT Aff. ¶11. Images and videos shared through the site were highly categorized according to victim age and gender, and type of sexual activity depicted. NIT Aff. ¶14. The site also featured forums where users discussed issues related to child sexual abuse, including tips for grooming child victims and evading law enforcement. NIT Aff. ¶6.

Playpen operated on the anonymous internet network Tor (short for "The Onion Router"),[3] which allows users to access websites without revealing their actual internet protocol ("IP") address, geographic location, or other identifying information. Add:2-3; NIT Aff. ¶¶7-9. To access the Tor network, a user must first download and install the Tor software client. *See* www.torproject.org. The Tor software protects users' privacy online by routing their communications

alternately referenced as the "TARGET WEBSITE" or "Website A." NIT Affidavit ¶2 n.1. The name of the website has since been made public and will be referred to herein as Playpen.

[3] Tor was created by the United States Naval Research Laboratory as a means of protecting government communications and is now available to the public. NIT Aff. ¶7.

through a series of relay computers (called "nodes") run by volunteers around the world. NIT Aff. ¶8. When a Tor user visits a website, the IP address visible to that site is that of a Tor "exit node," not the user's actual IP address, which could otherwise be used to identify a user. NIT Aff. ¶8. There is no practical way to trace the user's actual IP address back through the Tor exit node. NIT Aff. ¶8.

Within the Tor network, certain websites, like Playpen, operate as "hidden services." NIT Aff. ¶9. Like open Internet websites, hidden services are hosted on computer servers that communicate through IP addresses; unlike open websites, the IP address for a computer hosting a hidden service is replaced with a Tor-based web address, which is a series of 16 algorithm-generated characters followed by the suffix ".onion." NIT Aff. ¶9. It is not possible to find a hidden service's IP address using public lookups; and since Tor hidden services are not indexed like open websites, it is not possible to find a hidden service using a Google-type search. NIT Aff. ¶¶9-10.  Accessing Playpen thus required several affirmative steps: downloading and installing the Tor software; acquiring the unique .onion address for Playpen from another user or targeted online postings; finding Playpen on the Tor network; and, once there, gaining access to the site's content by entering a username and password. NIT Aff. ¶¶9-10. Playpen visitors

4

were instructed not to enter a real name or post information that could be used to identify them, and were assured that Playpen could not see their actual IP addresses and would protect their privacy. NIT Aff. ¶¶12-13. It was thus extremely unlikely that any user could find Playpen inadvertently and access the site without knowledge of its child pornography content. NIT Aff. ¶¶10, 12-14.

In February 2015, the FBI seized control of the Playpen website and operated it for approximately two weeks from a government-controlled facility in the Eastern District of Virginia. Add:3; NIT Aff. ¶¶28-30. To identify and apprehend the anonymous users of Playpen, the FBI (1) obtained a warrant in the Eastern District of Virginia to monitor and intercept user communications on the site (Add:4; JA:49-110); (2) obtained a warrant in the Eastern District of Virginia to deploy a Network Investigative Technique ("NIT")—a set of computer instructions designed to transmit computer-related identifying information, including the actual IP address, from the computers of registered Playpen users to a government-controlled computer—to locate and identify individuals who had accessed Playpen to view and share child pornography (the "NIT Warrant") (Add:4; NIT Aff. ¶¶31-35); and (3) after identifying and locating residences associated with the IP addresses of users who had accessed Playpen, obtained warrants in districts across the country to search those

residences for evidence of child pornography (the "Residential Warrants"). Add:5-6.

FBI Special Agent Douglas Macfarlane submitted an affidavit in support of the NIT Warrant. The affidavit stated that Playpen was a website dedicated to the advertisement and distribution of child pornography (NIT Aff. ¶6); detailed its architecture and content (NIT Aff. ¶¶14-27); explained that the site operated as a hidden service on the Tor network, thereby masking users' actual IP addresses, their location, and identities (NIT Aff. ¶¶7-9); and described the numerous steps a user must take to locate Playpen and access its content (NIT Aff. ¶¶10, 12-13). The affidavit asserted that, given Playpen's patently illegal content and the affirmative steps required to access it, there was probable cause to believe that any user who accessed the site by entering a username and password did so with the intent to advertise, distribute, and/or view child pornography. NIT Aff. ¶¶6, 10. The affidavit further asserted that use of the NIT was necessary to identify and locate the users and administrators of Playpen, and that other investigative procedures usually employed in criminal investigations of this type had either failed or would likely fail if tried. NIT Aff. ¶31.

The affidavit also provided details about how the NIT operated and what information it would obtain from the computer of any user or administrator who logged into Playpen by entering a username and password (the "activating" computer). NIT Aff. ¶¶33-34. The computer code comprising the NIT would be added to the digital content on the Playpen website, residing on the government-controlled server in Newington, Virginia. NIT Aff. ¶33. After a user entered a username and password to access Playpen, the website would send, and that user's computer would download, the content of the website to display web pages on the user's computer. NIT Aff. ¶33. That content would be augmented by the NIT instructions, which would accompany the website content back to the user's "activating" computer, and once downloaded with that content, would cause the activating computer to send specific location-identifying information back to the government. NIT Aff. ¶¶33-34. The affidavit therefore requested that the court issue a search warrant authorizing the use of the NIT to "cause an activating computer—wherever located—to send to a computer controlled by or known to the government, network level messages containing information that may assist in identifying the computer, its location, other information about the computer and the user of the computer, as described above and in Attachment B." NIT Aff. ¶46.

A federal magistrate judge in the Eastern District of Virginia issued the NIT Warrant on February 20, 2015. NIT Warrant (Add:42). In describing the property to be searched, the warrant referred to Attachment A, which stated that the FBI was authorized to deploy the NIT on the government-controlled server hosting the Playpen website, located in the Eastern District of Virginia; and to use the NIT to obtain the information listed in Attachment B from "activating computers," which were defined as the computers "of any user or administrator who logs into [Playpen] by entering a username and password." Add:43. The property to be seized was described by reference to Attachment B, which listed seven pieces of information, including the actual IP address, to be retrieved from the activating computers. Add:44.

The FBI used the NIT to identify the IP addresses of hundreds of Playpen users located across the country (including in the Eastern District of Virginia), many of whom have since been charged with federal child pornography offenses. In this case, the NIT was used to identify an IP address associated with a Playpen user called "Manakaralupa." Residential Affidavit ¶27 (JA:33). On March 4, 2015, "Manakaralupa" accessed a Playpen forum entitled "Strawberry Shortcake Reuped on 03/04/2015," which contained a link to a picture collage that depicted a young girl, about five to seven years old, in a variety of poses

8

featuring the girl's vagina and anus, including one that had a penis placed against her mouth. Res. Aff. ¶25. That same day, "Manakaralupa" accessed a Playpen file entitled "Estefy (Latina Anal) Deep and crempie—asi se mama linda.3gp," which contained a collage of images depicting a prepubescent female performing oral and anal sex with an adult male. Res. Aff. ¶26. Using publicly available websites, the FBI determined that the IP address associated with "Manakaralupa" was operated by Verizon; the FBI served an administrative subpoena to Verizon and, based on information provided by Verizon and a database search of public records, determined that the IP address was assigned to a subscriber, Levin, who lived in Norwood, Massachusetts. Res. Aff. ¶¶28-34. The FBI then obtained a Residential Warrant from a federal magistrate judge in the District of Massachusetts to search Levin's home and computer. Add:5-6; JA:21.

On August 12, 2015, agents searched Levin's home and seized his computer. Add:6. A forensic review of Levin's computer revealed seven videos and one still image, all of which constitute child pornography; for example:

> *0-2010 pthc babyshivid frifam 5yo sally gets fucked by day (very excellent).avi*
>
> This video, which is 1 minute 20 seconds in duration, features a series of sexual encounters between a nude

prepubescent female child and a nude adult male, including the adult male inserting his penis into the child's vagina. The video also depicts the naked female child inserting or rubbing two "dildos" against her vaginal and anal areas.

*0-kiddy porn (asian lolita) 0708 – cambodian girl (11 yo) fucks 10 yo girl and man (excellent, pthc).mpg*

This video, which is 11 minutes 26 seconds in duration, depicts a prepubescent female being vaginally penetrated by an adult's penis, as well as a prepubescent female inserting a "dildo" into the vagina of a second prepubescent female.

*0_t-169754455-bibcam-pjk-pthc-kdv-rbv-pedo---01---sk—starskysh---boys-13yo-1.mpg*

This video, which is 15 minutes 4 seconds in duration, depicts two boys approximately 13 years of age masturbating and performing oral sex.

JA:15. On September 17, 2015, the grand jury returned an indictment charging Levin with one count of possession of child pornography, in violation of 18 U.S.C. §2252A(a)(5)(B). D.8; JA:17-20.

**B.    Suppression proceedings**

On February 19, 2016, Levin filed a motion to suppress all evidence seized during the August 2015 search of his home and computer, arguing that it was the fruit of the illegal search of his computer pursuant to the NIT Warrant. D.44;

JA:111-32.[4] Levin claimed the NIT Warrant was "no warrant at all" because neither the Federal Magistrates Act, 28 U.S.C. §636, nor Federal Rule of Criminal Procedure 41 authorized the magistrate judge in the Eastern District of Virginia to issue a warrant to search his computer in Massachusetts. JA:116-22. Levin asserted the Rule 41 violation was prejudicial, because "the search authorized by the Residential Warrant would never have occurred but for the information derived from the improperly issued NIT Warrant." JA:124. He further claimed the NIT Warrant "failed to comply with the Fourth Amendment's particularity requirements" because it inaccurately described the place to be searched as the Playpen server located in Virginia, rather than his computer in Massachusetts. JA:126.[5] Finally, Levin argued the government had not acted in good faith because it "was clearly aware that the NIT Warrant was not authorized when it made its application in February, 2015." JA:127-29.

The government argued that the magistrate judge had authority to issue the NIT Warrant pursuant to Rules 41(b)(1), (2), and (4) and its inherent

---

[4] Levin did not separately challenge the validity of the Residential Warrant or the legality of the search it authorized.

[5] Levin did not challenge the existence of probable cause for the NIT search.

authority to issue search warrants consistent with the Fourth Amendment. D.60; JA:147, 150-53. In any event, suppression is not an appropriate remedy for a Rule 41 violation absent a showing of prejudice, which Levin could not make. JA:148. Finally, even if the NIT Warrant was found defective, the evidence was admissible pursuant to the good-faith exception to the exclusionary rule. The government asserted that the Rule 41 error, if it was one, was made by the magistrate judge, not the FBI agents, and the agents acted in objectively reasonable reliance on the NIT Warrant in executing the NIT search. JA:153-55.

The district court (Young, J.) held a non-evidentiary motion hearing on March 28, 2016; and, on April 20, 2016, the court granted Levin's motion to suppress in a written *Memorandum & Order*. D.69.[6] The court first held that the NIT Warrant exceeded the magistrate judge's authority under Rule 41(b) and, by extension, 28 U.S.C. §636(a). Add:7-14. Relevant here, Rule 41(b) authorizes a magistrate judge to issue a warrant: for "a person or property located within

---

[6] On May 5, 2016, the court entered an *Amended Memorandum & Order*, which, save for a corrected case citation appearing on page 19, is identical to the *Memorandum & Order* entered on April 20, 2016. D.82. Hereafter, citations to the court's order suppressing evidence are to the *Amended Memorandum & Order*. Add:1-39. *See also United States v. Levin*, No. 15-CR-10271, 2016 WL 2596010 (D. Mass. May 5, 2016).

the district" (b)(1); for "a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed" (b)(2); and "to install within the district a tracking device," which may be used "to track the movement of a person or property located within the district, outside the district, or both" (b)(4). The court reasoned that (b)(1) and (b)(2) were inapplicable because the "property" searched was Levin's computer in Massachusetts, which was never "located" in the Eastern District of Virginia. Add:11-14. The court also held (b)(4) inapplicable because the NIT was not a "tracking device" and was "installed" in Massachusetts, not Virginia. Add:14 & n.9.

The court next held that the Rule 41(b) violation required suppression. Add:15-24. It acknowledged that courts have generally held that violations of Rule 41 do not require suppression unless the defendant is prejudiced or the violation was intentional. Add:16. But the court concluded that the violation at issue here was different because it was not merely "procedural" or "ministerial," but rather "substantive" or "jurisdictional." Add:16-18. The court reasoned that, since Rule 41(b) "involves the authority of the magistrate judge to issue the warrant, and consequently, the underlying validity of the warrant," a warrant issued in violation of Rule 41(b) is "void ab initio." Add:17-19. In the

13

alternative, the court held that suppression was required because Levin was prejudiced. Add:21-24. Citing this Court's prejudice test, which requires defendants to "show that they were subjected to a search that might not have occurred or would not have been so abrasive had [Rule 41] been followed," Add:22 (quoting *United States v. Bonner*, 808 F.2d 864, 869 (1st Cir. 1986)), the court reasoned that if Rule 41 had been followed here, the magistrate judge would not have issued the NIT Warrant, and therefore the search of Levin's computer might not have occurred. Add:22-23.

The court further held the good-faith exception to the exclusionary rule inapplicable because, in the court's view, it does not apply when law enforcement agents rely on a warrant that is "void." Add:24-34. And even if the good-faith exception could apply to void warrants, the court stated that it would not apply here because "it was not objectively reasonable for law enforcement . . . to believe that the NIT Warrant was properly issued considering the plain mandate of Rule 41(b)," and because the agents' conduct amounted to "systemic error or reckless disregard of constitutional requirements." Add:32-34. The court admitted that it had "considered whether, on this occasion—but never again under these circumstances—the evidence at issue ought to be let in under the good-faith exception," (Add:34 n.27; *see also* JA:161, 163, 174), but ultimately

14

concluded that good faith could never save a void warrant and thus suppression was required. Add:34.

Finally, discussing the "policy ramifications" of its suppression ruling, the court noted that a pending amendment to Rule 41(b), set to take effect on December 1, 2016 absent contrary Congressional action, would specifically allow searches like this one.[7] Add:20 n.13, 35; *see also* JA:205-07, 213-15. The court also posited that the government could have presented the NIT Warrant to a district court judge for approval, reasoning that the territorial limitations of §636(a) and Rule 41(b) only apply to magistrate judges. Add:35-36. "Of course," the court explained, the NIT Warrant "would still have to meet the [probable cause and particularity] requirements of the Fourth Amendment." Add:37. The

---

[7] Proposed Rule 41(b)(6) provides (JA:213-14):

> [A] magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district if: (A) the district where the media or information is located has been concealed through technological means; or (B) in an investigation of a violation of 18 U.S.C. §1030(a)(5), the media are protected computers that have been damaged without authorization and are located in five or more districts.

court did not comment on the existence of probable cause for the NIT Warrant, which Levin did not challenge, but stated that "at least two courts have determined that *this precise warrant* was sufficiently particular to pass constitutional muster." Add:38 (emphasis in original) (citing *United States v. Epich*, No. 15-CR-163, 2016 WL 953269, at *2 (E.D. Wisc. Mar. 14, 2016); and *United States v. Michaud*, No. 15-CR-5351, 2016 WL 337263, at **4-5 (W.D. Wash. Jan. 28, 2016)). Since *Levin* was decided, every federal court to have expressly addressed the issue has held that the NIT Warrant satisfied both the Fourth Amendment's particularity and probable cause requirements. *See, e.g., United States v. Anzalone*, No. 15-CR-10347, 2016 WL 5339723, at *7 (D. Mass. Sep. 22, 2016) ("Every court to consider this question has found the NIT search warrant sufficiently particular.").

The government filed a motion for reconsideration of the suppression order on May 13, 2016 (D.86, 87; JA:185-204), which the court denied without comment in an electronic order dated May 17, 2016. D.88. That same day, the government noticed an appeal from the court's orders granting suppression and denying reconsideration. D.89; JA:217-18.

## C.  <u>NIT Warrant decisions</u>

The FBI's execution of the NIT Warrant led to the identification of hundreds of Playpen users located across the country. Many of those individuals were charged with federal child pornography offenses based on evidence seized pursuant to Residential Warrants, and many, like Levin, moved to suppress that evidence on the ground that the NIT search was unlawful. To date, 27 of those motions have been resolved: in 23 cases, courts have denied suppression; in only four cases, including this one, courts have granted suppression. In the 23 cases denying suppression, including two in this Circuit, courts have reached different conclusions regarding whether Rule 41(b) was violated, but all have held the evidence admissible pursuant to the good-faith exception to the exclusionary rule. *See United States v. Johnson*, No. 15-CR-340, 2016 WL 6136586 (W.D. Mo. Oct. 20, 2016) (NIT Warrant authorized by Rule 41(b)(4); alternatively, evidence admissible under good-faith exception); *United States v. Dzwonczyk*, No. 15-CR-3134 (D.56, magistrate judge's report and recommendation) (D. Neb. Oct. 5, 2016) (same); *United States v. Smith*, No. 15-CR-467 (D.41) (S.D. Tex. Sep. 28, 2016) (same); *United States v. Jean*, No. 15-CR-50087, 2016 WL 4771096 (W.D. Ark. Sep. 13, 2016) (same); *United States v. Eure*, No. 16-CR-43, 2016 WL 4059663 (E.D. Va. July 28, 2016) (same); *United States v. Darby*, No. 16-CR-36,

17

2016 WL 3189703 (E.D. Va. June 3, 2016) (same); *United States v. Matish*, No. 16-CR-16, 2016 WL 3545776 (E.D. Va. June 23, 2016) (same). *See United States v. Libbey-Tipton*, No. 16-CR-236 (D.19) (N.D. Ohio Oct. 19, 2016) (NIT Warrant not authorized by Rule 41(b), but violation non-constitutional and non-prejudicial, and evidence admissible under good-faith exception); *United States v. Allain*, No. 15-CR-10251, 2016 WL 5660452 (D. Mass. Sep. 29, 2016) (same); *Anzalone*, 2016 WL 5339723 (same); *United States v. Knowles*, No. 15-CR-875 (D.62) (D.S.C. Sep. 14, 2016) (same); *United States v. Torres*, No. 16-CR-285, 2016 WL 4821223 (W.D. Tex. Sep. 9, 2016) (same); *United States v. Henderson*, No. 15-CR-565, 2016 WL 4549108 (N.D. Cal. Sep. 1, 2016) (same); *United States v. Adams*, No. 16-CR-11, 2016 WL 4212079 (M.D. Fla. Aug. 10, 2016) (same); *United States v. Acevedo-Lemus*, No. 15-CR-137, 2016 WL 4208436 (C.D. Cal. Aug. 8, 2016) (same); *United States v. Rivera*, No. 15-CR-266 (D.69) (E.D. La. July 20, 2016) (same); *United States v. Werdene*, No. 15-CR-434, 2016 WL 3002376 (E.D. Pa. May 18, 2016) (same); *Epich*, 2016 WL 953269 (same); *United States v. Stamper*, No. 15-CR-109 (D.48) (S.D. Ohio, Feb. 19, 2016) (same); *Michaud*, 2016 WL 337263 (same). *See United States v. Scarbrough*, No. 16-CR-35, 2016 WL 5900152 (E.D. Tenn. Oct. 11, 2016) (NIT Warrant void ab initio, but evidence admissible under good-faith exception); *United States v. Broy*, No. 16-

CR-10030, 2016 WL 5172853 (C.D. Ill. Sep. 21, 2016) (same); *United States v. Ammons*, No. 16-CR-11, 2016 WL 4926438 (W.D. Ky. Sep. 14, 2016) (same).

The district court in this case was the first to grant suppression; since then, only three other courts have followed *Levin*'s reasoning in holding the NIT Warrant void ab initio and refusing to apply the good-faith exception. *See United States v. Croghan*, No. 15-CR-48, 2016 WL 4992105 (S.D. Iowa Sep. 19, 2016); *United States v. Workman*, No. 15-CR-397, 2016 WL 5791209 (D. Colo. Sep. 6, 2016); *United States v. Arterbury*, No. 15-CR-182 (D.47) (N.D. Okla. May 12, 2016).[8]

## SUMMARY OF ARGUMENT

The district court suppressed child pornography found on Levin's computer after finding that, although the FBI had a warrant to use the NIT to track down Playpen users cloaked in anonymity by the Tor network, the warrant was issued by a magistrate judge in the wrong district and violated Rule 41(b). Twenty-three lower federal courts have upheld the NIT Warrant, finding it authorized under Rule 41 or executed in good faith. The district court erred in finding otherwise.

---

[8] The government has filed notices of appeal from the suppression orders in *Croghan* (D.40) and *Workman* (D.46).

*First*, the court erroneously concluded that Rule 41(b) did not authorize the NIT Warrant. Interpreted flexibly, as the Supreme Court has instructed, Rule 41(b)(4) empowered the magistrate judge to issue the warrant authorizing the use of the NIT as a tracking device. Although not a physical tracking device, like a beeper affixed to a car, the NIT operated similarly in the internet context: it augmented Playpen's child pornography content residing on the website server in the Eastern District of Virginia and, after a user made a virtual trip to that district to download Playpen content, the NIT followed that content back to the user's computer, where it caused the computer to send identifying information back to the government. Since Rule 41(b)(4) authorized the NIT Warrant, suppression was not warranted.

*Second*, the court misconstrued the nature of the alleged Rule 41(b) error in ordering suppression. Suppression is not an appropriate remedy for non-constitutional, non-prejudicial, and non-intentional violations of Rule 41, and the violation alleged here is none of those things. The magistrate judge's mistaken interpretation of Rule 41(b)'s venue provisions did not implicate, let alone violate, the Fourth Amendment, and therefore the alleged mistake was not of constitutional dimension. Non-constitutional violations of Rule 41 rarely, if ever, require suppression of evidence obtained from warrants, like the NIT

Warrant, that comply with the Fourth Amendment's probable cause, particularity, and judicial approval requirements.

*Finally*, and most significantly, the court manifestly erred by refusing to apply the good-faith exception to the exclusionary rule. The court reasoned that good faith could never apply to a warrant issued in violation of Rule 41(b), but that reasoning is illogical and contrary to Supreme Court precedent. If good faith applies to violations of the Fourth Amendment, as established by *United States v. Leon*, 468 U.S. 897 (1984), and its progeny, it makes no sense to say that good faith does not apply to mere violations of the Federal Rules of Criminal Procedure. The exclusionary rule is a remedy of last resort, applied only where it results in appreciable deterrence of flagrant, culpable law enforcement misconduct. Here, the error, if it was one, was made by the magistrate judge, not the FBI, making suppression an especially inapt and ineffective remedy in this case. Faced with the scourge of child pornography proliferating in the shadows of the dark web, the FBI devised the NIT to track down and apprehend anonymous Playpen users. The FBI detailed its Playpen investigation and the utility of the NIT in an affidavit; presented it to a magistrate judge in the district where the website was located and the NIT would be deployed; obtained judicial authorization for the search; and executed the NIT according to the warrant's

21

terms. That the NIT Warrant was later deemed invalid because the magistrate judge allegedly misapprehended her territorial authority does not vitiate the agents' objectively reasonable reliance on it. Allowing Levin to escape prosecution for a heinous crime that society has a significant interest in preventing simply because a judge made a non-constitutional, rule-based mistake offends basic concepts of justice and cannot be countenanced. Where, as here, the negligible, if any, benefits of deterrence do not remotely offset the significant costs to society and the justice system, exclusion does not pay its way. The order suppressing child pornography should be reversed.

## **ARGUMENT**

**I.    THE DISTRICT COURT ERRED IN HOLDING THAT THE MAGISTRATE JUDGE LACKED AUTHORITY UNDER RULE 41(b) TO ISSUE THE NIT WARRANT.**

The district court erroneously concluded that the magistrate judge lacked authority to issue the NIT Warrant under Rule 41(b).[9] Read flexibly, as the

---

[9] The district court also held that the magistrate judge did not have authority to issue the NIT Warrant under the Federal Magistrates Act, which confers authority in the district of appointment, other places the court may function, and to the extent provided "by law or by the Rules of Criminal Procedure." Add:8 (quoting 28 U.S.C. §636(a)(1)). The government contends that Rule 41 conferred the requisite authority, and thus the magistrate judge acted within the scope of her authority under §636(a)(1).

22

Supreme Court has instructed it to be, Rule 41(b)(4) conferred the requisite authority, and the magistrate judge properly issued the NIT Warrant authorizing the use of the NIT as a tracking device.

### A.    Standard of review

This Court reviews de novo the district court's interpretation of Rule 41(b). *United States v. Sevilla-Oyola*, 770 F.3d 1, 10 (1st Cir. 2014).

### B.    Rule 41(b)(4) authorized the magistrate judge to issue the NIT Warrant.

Contrary to the district court's ruling, the NIT Warrant was validly issued pursuant to Rule 41(b). Rule 41(b)(4) authorized the magistrate judge in the Eastern District of Virginia to issue a warrant to install the NIT on the government-controlled Playpen server located within the district, and that warrant properly authorized use of the NIT to track the movement of information—the digital child pornography content requested by users who logged into Playpen's website—as it traveled from the server in the Eastern District of Virginia through the encrypted Tor network to its final destination: the users' activating computers, wherever located. At that point, the NIT caused the activating computers to transmit specified network information back to the government over the open Internet, thus enabling the government to locate and

23

identify the user. *See Johnson*, 2016 WL 6136586, at \*\*3-7 (NIT Warrant authorized under Rule 41(b)(4)); *Dzwonczyk*, D.56 at 12-13 (same); *Smith*, D.41 at 14-15 (same); *Jean*, 2016 WL 4771096, at \*\*15-17 (same); *Eure*, 2016 WL 4059663, at \*8 (same); *Darby*, 2016 WL 3189703, at \*\*11-12 (same); *Matish*, 2016 WL 3545776, at \*\*17-18 (same). The district court found subdivision (4) inapplicable, stating, without explanation, that the NIT was not a tracking device. Add:14. The court's narrow interpretation of Rule 41(b)(4) does not withstand scrutiny.

The Supreme Court has urged a "flexible" interpretation of Rule 41 "to include within its scope electronic intrusions authorized upon a finding of probable cause."[10] *United States v. New York Tel. Co.*, 434 U.S. 159, 169 & n.16 (1977) (upholding a 20-day search warrant for a pen register to collect dialed telephone number information, despite the fact that Rule 41's definition of "property" did not, at that time, include such information and required that a search be conducted within 10 days). The Supreme Court explained that its flexible reading of Rule 41 was "reinforce[d]" by Rule 57(b), which provides,

---

[10] Here, as in *New York Tel. Co.*, there is no dispute that the NIT Warrant was supported by probable cause, and the warrant was otherwise consistent with the Fourth Amendment. 434 U.S. at 168-69.

"[i]f no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute." *New York Tel. Co.*, 434 U.S. at 170 (citing Fed. R. Crim. P. 57(b)). Stated another way, when presented with a constitutionally valid, and not statutorily prohibited, request for a search warrant, courts are empowered to read the language of Rule 41 broadly in determining whether the requested search falls within its scope. *Id.*; *see also United States v. Villegas*, 899 F.2d 1324, 1334 (2d Cir. 1990); *United States v. Torres*, 751 F.2d 875, 878 (7th Cir. 1984).

The Supreme Court's flexible approach to Rule 41 vindicates Fourth Amendment interests by encouraging law enforcement to seek a warrant, rather than resorting to warrantless searches justified by claims of exigency; and by allowing magistrate judges to issue warrants for searches that meet the requirements of the Fourth Amendment but may not fit neatly within Rule 41's parameters due to advances in technology. *See Torres*, 751 F.2d at 880 ("A holding that federal courts have no power to issue warrants authorizing television surveillance might . . . simply validate the conduct of such surveillance without warrants. This would be a Pyrrhic victory for those who view the search warrant as a protection of the values in the Fourth Amendment."). Rule 41(b)'s proposed new subdivision (6) (authorizing use of remote searches for electronic

25

information when "the district where the media or information is located has been concealed through technological means")—like existing subdivisions (2) (authorizing searches for a person or property that moves outside the district), (3) (authorizing searches outside the district in cases involving terrorism), (4) (authorizing tracking device searches outside the district), and (5) (authorizing searches on territorial and diplomatic lands)—recognizes that the appropriate venue for a search varies with the nature of the crime under investigation and the person or evidence being sought. These provisions confirm that a magistrate judge's authority is not strictly limited by the geographic boundaries of her judicial district.

Rather than read Rule 41(b) flexibly, as it was required to do, the district court interpreted its venue provisions rigidly, finding that none explicitly authorized the issuance of the NIT Warrant. The court's finding is contrary to the spirit of Rule 41(b) generally and reflects an overly technical interpretation of Rule 41(b)(4)'s tracking device provision specifically.

Rule 41(b)(4) allows a magistrate judge "to issue a warrant to install within the district a tracking device," which may be used "to track the movement of a person or property located within the district, outside the district, or both." The Rule defines a "tracking device" as "an electronic or mechanical device which

26

permits the tracking of the movement of a person or object." 18 U.S.C. §3117(b); *see* Fed. R. Crim. P. 41(a)(2)(E) (incorporating this definition). The Rule further defines "property" to include not only "tangible objects," but also "information." Fed. R. Crim. P. 41(a)(2)(A). Although the term "device" is not more specifically defined in the Rule, it is a word commonly used to describe "[a] thing made or adapted for a particular purpose." Oxford English Dictionary, https://en.oxforddictionaries.com/definition/device (last visited October 25, 2016).

Applying these definitions, which the court ignored, the NIT qualifies as a "tracking device" within the meaning of Rule 41(b)(4). As applied to older technologies, the Rule contemplates that a tracking device may be a mechanical tool used to track the movement of a tangible object—*e.g.*, a transmitter affixed to a container of chloroform placed in a vehicle traveling over public roadways, like the beeper in *United States v. Knotts*, 460 U.S. 276 (1983). As applied to newer technologies, the Rule envisions that a tracking device may be an electronic device used to track the movement of information—*e.g.*, computer instructions embedded in digital content traveling on data highways, like the NIT in this case. The NIT comprised a set of "computer instructions" "designed to cause the user's 'activating' computer to transmit certain information to a computer

27

controlled by or known to the government." NIT Aff. ¶33. The NIT would "augment" the digital content requested by Playpen users and, once a user's computer downloaded the requested content and the NIT, the NIT would "reveal to the government environmental variables and certain registry-type information that may assist in identifying the user's computer, its location, and the user of the computer." NIT Aff. ¶¶33-34.

Essentially, the NIT was designed to follow illegal child pornography content requested by a user who accessed Playpen in the Eastern District of Virginia, through the anonymous Tor network nodes, and back to the user's activating computer; at that point, the NIT caused the transmission of the location-identifying information back to the government over the open Internet, thus circumventing Tor's encryption and allowing the government to identify and locate the user. Similar to a transmitter affixed to an automobile that is programmed to send location-enabling signals (like GPS coordinates) back to a government-controlled receiver at pre-determined intervals, the NIT augmenting the digital content requested by a Playpen user was designed to send location-enabling information (like an actual IP address) back to a government-controlled computer when the illegal child pornography content reached its ultimate destination—the user's activating computer. Thus, although not a

28

physical beeper affixed to a tangible object, the NIT operated as a digital tracking device of intangible information within the meaning of Rule 41(b)(4).

The NIT also was installed in the Eastern District of Virginia, as required by Rule 41(b)(4). Subdivision (4) authorizes a magistrate judge to issue a warrant "to install within the district a tracking device." The district court incorrectly assumed the NIT was installed "at the site of each user's computer," rather than within the Eastern District of Virginia. Add:14-15 n.9. In making this assumption, the court relied on *In re Warrant to Search a Target Computer at Premises Unknown*, 958 F. Supp. 2d 753 (S.D. Tex. 2013), which denied the government's request for a warrant to send a different, more invasive NIT to a computer in an unknown location to discover the identity of criminal suspects. That court found it "plausible" that the NIT was a "tracking device," but decided it did not satisfy Rule 41(b)(4)'s installation requirement because there was "no showing that the installation of the 'tracking device' (*i.e.*, the software) would take place within the district. To the contrary, the software would be installed on a computer whose location could be anywhere on the planet." 958 F. Supp. 2d at 758.

Here, by contrast, the record establishes that the NIT was installed in the Eastern District of Virginia and only moved outside the district after a Playpen

user entered the district to retrieve the illegal website content it augmented. Agents deployed the NIT alongside Playpen's digital content on the government-controlled server in the Eastern District of Virginia. NIT Aff. ¶32. This deployment constituted installation of a tracking device under Rule 41, as users then retrieved the NIT from the Playpen server by logging on and downloading information from that server. Any person seeking to access Playpen's child pornography content thus had to make, "in computer language, 'a virtual trip' via the Internet to Virginia," where the server was located. *Matish*, 2016 WL 3545776, at \*18; *Dzwonczyk*, D.56 at 13 (same); *Smith*, D.41 at 14-15 (finding that defendant "entered the Eastern District of Virginia via the Internet"); *Darby*, 2016 WL 3189703, at \*12 ("Users of Playpen digitally touched down in the Eastern District of Virginia when they logged into the site."); *see also Jean*, 2016 WL 4771096, at \*\*16-17; *Johnson*, 2016 WL 6136586, at \*6. When an individual entered his username and password on the Playpen website, it triggered installation of the NIT; both of these actions occurred in the Eastern District of Virginia. NIT Aff. ¶33. In sum, the NIT was installed for purposes of Rule 41's tracking device provision at the location where it was obtained by a Playpen user (the Playpen server in the Eastern District of Virginia), not where the NIT ultimately disclosed the location-identifying

30

information (the user's computer). The NIT thus complied with Rule 41(b)(4)'s installation requirement.

The district court also erred by finding the NIT was not a tracking device because Playpen users "never controlled the government-controlled computer, unlike a car with a tracking device leaving a particular district." Add:14 n.9 (quoting *Michaud*, 2016 WL 337263, at *6). The court's analysis misses the point. A Playpen user logged into the Playpen server and sent commands directing the server to return information to him, and the server complied with those commands. That the user did not have administrator-level control over the computer server hosting the Playpen website does not mean that the user did not control his access to Playpen or its illegal content. Unless and until a user affirmatively logged onto the Playpen website in the Eastern District of Virginia, where the NIT had already been embedded, the NIT would not be deployed. *See Jean*, 2016 WL 4771096, at *17 (finding it "undisputed that but for [the defendant] electronically travelling in search of child pornography to the [Playpen server] in Virginia, the NIT could not have been deployed"); *Smith*, D.41 at 14-15 (finding defendant caused NIT's deployment by entering district via Internet to avail himself of Playpen's child pornography content).

31

In sum, Rule 41(b)(4) authorized the magistrate judge in the Eastern District of Virginia to issue the NIT Warrant, and to the extent the Court finds any ambiguity in the tracking device provision, Rule 41 must be read flexibly to accommodate the use of new law enforcement techniques necessary to unearth electronic evidence and ferret out criminals cloaked by anonymizing software. Because the magistrate judge validly exercised her authority to issue the NIT Warrant, the evidence obtained therefrom is admissible at Levin's trial. The district court erred in holding otherwise.

## II. THE DISTRICT COURT ERRED IN HOLDING THAT THE PURPORTED RULE 41(b) VIOLATION REQUIRED SUPPRESSION.

Rule 41(b)(4) authorized the issuance of the NIT Warrant; but even if it did not, the district court erred in ordering suppression because the alleged Rule 41 violation was not of constitutional dimension, did not prejudice Levin, and was not intentional.

### A. <u>Standard of review</u>

This Court reviews de novo the district court's legal findings concerning the nature of and appropriate remedy for the alleged Rule 41 violation. *Sevilla-Oyola*, 770 F.3d at 10.

**B.    Suppression may not be used to remedy a non-constitutional Rule 41(b) violation absent a showing of <u>prejudice or bad faith, neither of which exists here.</u>**

This Court and every other federal court of appeals has adopted essentially the same standard for determining whether suppression is required to remedy a Rule 41 violation: "unless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where, (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *United States v. Stefanson*, 648 F.2d 1231, 1235 (9th Cir. 1981) (internal quotations and citations omitted); *United States v. Burgos-Montes*, 786 F.3d 92, 109 (1st Cir.), *cert. denied*, 136 S. Ct. 599 (2015); *United States v. Simons*, 206 F.3d 392, 403 (4th Cir. 2000); *United States v. Chaar*, 137 F.3d 359, 362 (6th Cir. 1998); *United States v. Gerber*, 994 F.2d 1556, 1560 (11th Cir. 1993); *United States v. Freeman*, 897 F.2d 346, 350 (8th Cir. 1990); *United States v. Luk*, 859 F.2d 667, 671 (9th Cir. 1988); *United States v. Martinez-Zayas*, 857 F.2d 122, 136 (3d Cir. 1988); *United States v. Anderson*, 851 F.2d 384, 390 (D.C. Cir. 1988); *United States v. Hornick*, 815 F.2d 1156, 1158 (7th Cir. 1987); *United States v. Comstock*, 805 F.2d 1194, 1207 (5th Cir. 1986); *United States v. Pennington*, 635 F.2d 1387, 1390 (10th Cir. 1980);

33

*United States v. Burke*, 517 F.2d 377, 386-87 (2d Cir. 1975). *See also* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

In this case, the district court committed two critical errors in analyzing the nature of and remedy for the alleged Rule 41(b) violation. First, the court mistakenly found the alleged error, which was essentially one of venue, to be of constitutional magnitude and erroneously concluded that suppression was required without regard to prejudice or good faith. Second, the court misapplied the test for prejudice endorsed by this Court and other courts of appeals in making its alternative finding that Levin was actually prejudiced.

### 1. The alleged Rule 41(b) violation was not of constitutional dimension.

The threshold question in determining whether a Rule 41 violation may justify the harsh sanction of suppression is whether the error rises to the level of a Fourth Amendment violation. *See Burke*, 517 F.2d at 386 ("[C]ourts should be wary in extending the exclusionary rule in search and seizure cases to violations which are not of constitutional magnitude."). The alleged error in this case, which involved Rule 41(b)'s venue provisions, did not implicate, let alone violate, the Fourth Amendment's warrant requirements.

34

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. The Supreme Court has held that, to give proper effect to the Warrant Clause, all warrants must be issued by a "neutral and detached magistrate," meaning a person who is disengaged from the activities of law enforcement and capable of determining whether probable cause existed for the requested search or seizure. *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972). A warrant is therefore valid for purposes of the Fourth Amendment if it is (1) supported by probable cause, (2) sufficiently particular, and (3) issued by a neutral and detached magistrate. *See Dalia v. United States*, 441 U.S. 238, 255 (1979); *Donovan v. Enter. Foundry, Inc.*, 751 F.2d 30, 35 (1st Cir. 1984).

The NIT Warrant met all of the constitutional requirements. Levin has never disputed that the NIT Warrant established probable cause to search the computers of users who logged into Playpen with the intent to view, download, and disseminate child pornography. The district court assumed, without deciding, that the NIT Warrant was sufficiently particular (Add:38), as every

court to have decided the issue has since held. *See supra*, page 16.[11] And Levin has never claimed that the magistrate judge to whom the warrant was presented was not neutral and detached.

Notwithstanding the manifest constitutionality of the NIT Warrant, the district court deemed it "void ab initio" because it was allegedly issued "without jurisdiction" in violation of Rule 41(b). The court reasoned that, "because Rule 41(b) did not grant her authority to issue the NIT Warrant, the magistrate judge was without jurisdiction to do so," and thus "there simply was no judicial approval." Add:18-19. The court's reasoning is fundamentally flawed because it equates Rule 41(b)'s venue provisions with the Fourth Amendment's warrant

---

[11] Levin argued that the NIT Warrant was insufficiently particular because it described the place to be searched as the Playpen server, not "a computer in Massachusetts." JA:126-27. The warrant, however, stated that the NIT would be deployed on the Playpen server, and described the place to be searched as the "activating computers . . . of any user or administrator who logs into [Playpen] by entering a username and password," and things to be seized as seven discrete pieces of information. NIT Warrant, Attachments A & B. That description was constitutionally sufficient, for "it clearly limited which computers could be searched and what information could be obtained as a result of that search." *Allain*, 2016 WL 5660452, at *9 (quoting *United States v. Kuc*, 737 F.3d 129, 133 (1st Cir. 2013) (the Fourth Amendment "demands that a valid warrant: (1) . . . supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too broad in the sense that it includes items that should not be seized")).

requirements.[12] But the requirements of Rule 41 and the Fourth Amendment are not coextensive. *See United States v. Schoenheit*, 856 F.2d 74, 77 (8th Cir. 1988). While Rule 41(b) places limits on the territorial authority of magistrate judges to issue certain types of search warrants, the Fourth Amendment says nothing about where the magistrate's authority may be exercised. With respect to the issuing magistrate's authority, all the constitution requires is that the warrant be issued by a neutral and detached magistrate who is divorced from law enforcement activities and capable of determining probable cause. Here, the NIT Warrant was issued by a neutral and detached, duly appointed magistrate judge, who determined that the warrant was supported by probable cause and particularly described the place to be searched and things to be seized; it was, therefore, judicially approved for Fourth Amendment purposes. *See Knowles*, D.62 at 22 ("Because Magistrate Judge Buchanan was a neutral and detached judicial officer, authorized to issue search warrants and capable of determining whether probable cause existed, her approval of the search warrant was

---

[12] Proposed Rule 41(b)(6) changes the title of Rule 41(b) from "Authority to Issue a Warrant" to "Venue for a Warrant Application," a change that is "not substantive," but "makes clear that Rule 41(b) identifies the courts that may consider an application for a warrant, not the constitutional requirements for the issuance of a warrant, which must still be met." Advisory Committee Notes.

constitutionally sufficient judicial approval.").[13] Consequently, notwithstanding the district court's attempt to label it otherwise, the alleged Rule 41(b) violation was not of constitutional magnitude. *See, e.g.*, *Allain*, 2016 WL 5660452, at *11 n.8 (describing Rule 41(b) violation as running "afoul of a jurisdictional statute" and not "of constitutional dimension"); *Anzalone*, 2016 WL 5339723, at *10 (finding Rule 41(b) violation non-constitutional); *Johnson*, 2016 WL 6136586, at *7; *Knowles*, D.62 at 31-32; *Jean*, 2016 WL 4771096, at **17-18; *Henderson*, 2016 WL 4549108, at *5; *Adams*, 2016 WL 4212079, at *7; *Acevedo-Lemus*, 2016 WL 4208436, at *7; *Matish*, 2016 WL 3545776, at *24; *Werdene*, 2016 WL 3002376, at **10-11; *Stamper*, D.48 at 19; *Michaud*, 2016 WL 337263, at **6-7.

The soundness of this conclusion is reinforced by numerous decisions involving analogous Rule 41 provisions, in which courts held the violations non-constitutional and denied suppression. For example, courts have refused to suppress evidence where the warrant was issued by an unauthorized individual,

---

[13] Moreover, the magistrate judge plainly had authority—and thus jurisdiction—to issue the NIT Warrant for searches of activating computers within her district, *see* Rule 41(b)(1), and therefore the court's finding that the warrant was wholly void, entirely lacking judicial approval, is untenable. *Anzalone*, 2016 WL 5339723, at *11 (warrant not void at its issuance because magistrate judge had authority to issue warrant for search within her district); *Adams*, 2016 WL 4212079, at *6 (similar).

*see, e.g., United States v. Britt*, 959 F.2d 232 (4th Cir. 1992) (unpublished) (per curiam) (assuming issuance of warrant by unauthorized state judge violated Rule 41, "a technical breach of Rule 41, without more, does not mandate suppression of evidence" and since defendant "has not shown that the search violated fourth amendment principles . . . the exclusion of evidence would be inappropriate"); *Martinez-Zayas*, 857 F.2d at 136-37 (no plain error where federal warrant was issued by unauthorized individual in violation of Rule 41 because defendant's "Rule 41 claim is not of constitutional magnitude"); *Comstock*, 805 F.2d at 1207 (similar); and where the warrant was requested or executed by an unauthorized individual, *see, e.g., Freeman*, 897 F.2d at 348-50 (warrant requested by individual who was not "a federal law enforcement officer" violated Rule 41, but suppression not required because violation was non-fundamental and non-prejudicial); *Luk*, 859 F.2d at 673-74 (similar); *Pennington*, 635 F.2d at 1390 (similar); *Burke*, 517 F.2d at 386-87 (similar). Courts also have held, or stated in dicta, that suppression was not required where, as is alleged here, the warrant authorized a search that exceeded Rule 41's territorial limitations. *See, e.g., United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) (stating, in dicta, that a violation of Rule 41(b) caused by the issuance of a warrant that authorized a search in another judicial district would not require suppression); *United States v.*

39

*$64,000 in U.S. Currency*, 722 F.2d 239, 246 (5th Cir. 1984) (any Rule 41 violation that occurred when Louisiana judge issued warrant to search envelope seized in Utah and then brought to Louisiana did not warrant suppression); *United States v. Goff*, 681 F.2d 1238, 1240 & n.1 (9th Cir. 1982) (even if search warrant for items that were not yet in the district violated Rule 41, no suppression required); *Torres*, 2016 WL 4821223, at *7 ("[N]on-willful violations of Rule 41, where a search is executed pursuant to a warrant, properly supported by an affidavit showing probable cause, and issued by a competent and neutral magistrate judge, do not require suppression.") (citing *Comstock*, 805 F.2d at 200).

These authorities establish that the alleged Rule 41(b) error in this case was not of constitutional dimension, and suppression was not justified. The authorities relied upon by the district court to conclude otherwise are not to the contrary. *See* Add:17-18. In *Krueger*, the Tenth Circuit bypassed the question "whether the Fourth Amendment contains a within-district limitation on magistrate judges' warrant-issuing authority," because the court held that the defendant had established actual prejudice from the Rule 41(b) violation. *United States v. Krueger*, 809 F.3d 1109, 1115 (10th Cir. 2015). In *Glover*, which involved a challenge to the territorial provision of Title III, 18 U.S.C. §2518(3), the D.C. Circuit relied on Rule 41(b)(2) to inform its interpretation of §2518(3), but the

court held only that a violation of §2518(3) required suppression pursuant to Title III's statutory suppression provision; the court did not decide whether a violation of Rule 41(b)(2) required suppression under the Fourth Amendment. *United States v. Glover*, 736 F.3d 509, 515-16 (D.C. Cir. 2013). And in *Berkos*, the Seventh Circuit merely held Rule 41(b), which it said "deals with substantive judicial authority," inapplicable to 18 U.S.C. §2703(a), because it found that §2703(a) incorporated only the procedural provisions of Rule 41. *Berkos*, 543 F.3d at 398.

*Berkos*, in fact, severely undermines the court's conclusion that suppression was required in this case because of the purportedly "substantive" nature of a Rule 41(b) violation. Add:17-18. Although the Seventh Circuit characterized Rule 41(b) as "a substantive provision," it emphasized that "violations of federal rules do not justify the exclusion of evidence that has been seized on the basis of probable cause and with advance judicial approval." *Id.* at 396-97 (quoting *United States v. Cazares-Olivas*, 515 F.3d 726, 730 (7th Cir. 2008)). The court explained that "allowing a defendant to go free based on a violation of Rule 41's requirements for obtaining a proper search warrant would be wildly out of proportion to the wrong," and stated that, had the government made that

41

argument, the court would have affirmed the denial of the defendant's motion to suppress on that basis alone. *Id*. at 396 (quotations and citation omitted).

In this case, the government made that argument, and the district court erred in rejecting it. Add:18; JA:148. As the cases cited above, involving Rule 41 violations generally and this NIT Warrant specifically, demonstrate, non-constitutional violations of Rule 41 rarely, if ever, warrant suppression. *See also Hornick*, 815 F.2d at 1157–58 ("In light of *Leon,* it is difficult to anticipate any violation of Rule 41, short of a defect that also offends the Warrant Clause of the fourth amendment, that would call for suppression."). *Cf. Sanchez-Llamas v. Oregon*, 548 U.S. 331, 348 (2006) (violation of treaty provision that did not "implicate[] important Fourth and Fifth Amendment interests" did not trigger exclusionary rule, which applies "primarily to deter constitutional violations"); *United States v. Caceres*, 440 U.S. 741 (1979) (violation of statutory requirements that go beyond the Constitution's demands does not justify suppression unless the statute itself specifies this remedy). And, as this Court and others have consistently held, non-constitutional violations of Rule 41 certainly do not warrant suppression absent a showing of prejudice. *See, e.g.*, *Burgos-Montes*, 786 F.3d at 109 (requiring defendant to demonstrate legal prejudice from "ministerial," or non-constitutional, Rule 41(e)(2)(A) violation, and noting that

42

"[o]ther circuits have held the same applies to all the prerequisites of Rule 41"). The NIT Warrant fully complied with the Fourth Amendment, and the alleged Rule 41(b) error, which was essentially a mistake of venue, did not render the warrant unconstitutional. Under these circumstances, the remedy of suppression is "wildly out of proportion to the wrong," *Berkos*, 543 F.3d at 396, and the district court erred in ruling otherwise.

### 2. Levin was not prejudiced by the alleged Rule 41(b) error.

The district court also erred in finding that, if a showing of prejudice was required, Levin was actually prejudiced. Add:21-24. To establish prejudice from a Rule 41 violation, a defendant must show that he was "subjected to a search that would not have occurred or would not have been so abrasive had the rules been followed." *Burgos-Montes*, 786 F.3d at 109 (quotations and citation omitted). The district court reasoned that, "had Rule 41(b) been followed, the magistrate judge would not have issued the NIT Warrant, and therefore the search conducted pursuant to that Warrant might not have occurred." Add:22-23. The court's reasoning followed the Tenth Circuit's in *Krueger*, which narrowly focused on "whether the *issuing federal magistrate judge* could have complied with the Rule." 809 F.3d at 1116 (emphasis added). That "but for"

43

rule is illogical, however, because a particular magistrate who is found, *post hoc*, to have lacked jurisdiction to approve a warrant for an out-of-district search under Rule 41(b) could never have "complied with the Rule," and thus a defendant would always be prejudiced by a Rule 41(b) violation. *See Michaud*, 2016 WL 337263, at *6 (finding that *Krueger*'s "interpretation makes no sense, because under that interpretation, all searches executed on the basis of warrants in violation of Rule 41(b) would result in prejudice, no matter how small or technical the error might be. Such an interpretation would defeat the need to analyze prejudice separately from the Rule 41(b) violation.").

The operative question, therefore, is not whether the *same magistrate judge* could have issued the NIT Warrant in compliance with Rule 41(b), but whether the *search* would have occurred had the rules been followed. *Burgos-Montes*, 786 F.3d at 109; *Bonner*, 808 F.2d at 869. Given the evident constitutionality of the NIT Warrant, the answer here is yes. The NIT Warrant satisfied the Fourth Amendment's probable cause and particularity requirements and thus, had it been presented to a federal magistrate judge in the District of Massachusetts, Rule 41(b)(1) ("a magistrate judge with authority in the district . . . has authority to issue a warrant to search for . . . property located within the district") would have authorized the very same search of Levin's computer that occurred. *See*

44

*Darby*, 2016 WL3189703, at *12 (finding no prejudice because Rule 41(b)(1) authorized search of defendant's computer, located in Eastern District of Virginia). *Cf. Martinez-Zayas*, 857 F.2d at 136 ("this warrant could have been obtained from a federal magistrate"); *United States v. Ritter*, 752 F.2d 435, 441 (9th Cir. 1985) (declining to suppress evidence because there was "no indication that a federal magistrate would have handled the search differently than did the state judge").

The case law makes clear that suppression is not an appropriate remedy for a violation of Rule 41 that is not of constitutional dimension, not prejudicial, and not intentional. The alleged Rule 41(b) violation in this case was none of those things, and the district court erred in suppressing evidence obtained from the NIT Warrant.

## III. THE DISTRICT COURT ERRED WHEN IT SUPPRESSED EVIDENCE OF CHILD PORNOGRAPHY OBTAINED BY FEDERAL AGENTS ACTING IN OBJECTIVELY REASONABLE RELIANCE ON THE NIT WARRANT.

The district court erred as a matter of law and fact when it invoked the exclusionary rule to suppress evidence of child pornography found on Levin's computer. The court's determination that the good-faith exception to the exclusionary rule never applies to search warrants later deemed "void" is

45

contrary to Supreme Court precedent, and its finding that the agents did not act in good-faith reliance on the NIT Warrant is unsupported by the record.

### A. Standard of review

This Court reviews the district court's good faith determinations de novo and its factual findings for clear error. *United States v. Monell*, 801 F.3d 34, 38 (1st Cir. 2015), *cert. denied*, 136 S. Ct. 864 (2016).

### B. The district court erred in holding the good-faith exception to the exclusionary rule categorically inapplicable to warrants later deemed "void."

The district court fundamentally misconstrued controlling Supreme Court and First Circuit precedent when it held that the good-faith exception to the exclusionary rule never applies to warrants later deemed "void." The court's good-faith analysis was flawed, in large part, because it relied on an erroneous premise—that because Rule 41(b) did not authorize the issuance of the NIT Warrant, the warrant was "void at the outset[,] akin to no warrant at all." Add:30. As just discussed, the NIT Warrant was properly issued under Rule 41(b)(4), but even if it was not, suppression was not an appropriate remedy because the purported Rule 41 violation was non-constitutional and non-prejudicial. The Court need not decide those issues, however, because it is abundantly clear that the agents acted in objectively reasonable reliance on the

NIT Warrant and suppression would serve no deterrent purpose. *See Monell*, 801 F.3d at 41 (bypassing question of warrant's validity because, even assuming warrant was invalid, exclusionary rule did not apply).

Supreme Court precedent dictates that suppression is a remedy of last resort, to be used for the sole purpose of deterring future Fourth Amendment violations, and only when the deterrence benefits of suppression outweigh its heavy costs. *Davis v. United States*, 564 U.S. 229, 237 (2011); *Herring v. United States*, 555 U.S. 135, 140-41 (2009). "The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Id*. (citing *Illinois v. Gates*, 462 U.S. 213, 223 (1983)). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144.

These principles are reflected in the good-faith exception to the exclusionary rule articulated in *Leon*: when police act in "objectively reasonable reliance on a subsequently invalidated search warrant" obtained from a neutral and detached magistrate, "the marginal or nonexistent benefits produced by suppressing evidence . . . cannot justify the substantial costs of exclusion." 468

47

U.S. at 922. The good-faith exception thus recognizes that, "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope . . . there is no police illegality and thus nothing to deter." *Id.* at 920-21.

The district court refused to apply the good-faith exception in this case because, in its view, it simply does not apply when law enforcement agents rely on a warrant deemed "void." Add:24-32. The NIT Warrant was not "void," as explained above. In any event, the court's view is plainly contrary to Supreme Court precedent. *Herring*, for example, invoked the good-faith exception in a case involving the arrest of an individual pursuant to a rescinded, and therefore non-existent, arrest warrant; the Supreme Court held that suppression was inappropriate where "an officer reasonably believes there is an outstanding arrest warrant, but that belief turns out to be wrong," even though the error was due to police negligence. 555 U.S. at 137. Similarly, in *Arizona v. Evans*, 514 U.S. 1, 15-16 (1995), another case involving the arrest of an individual pursuant to a quashed, and therefore non-existent, warrant, the Court held that the arresting officer had acted "objectively reasonably when he relied upon the police computer record," which contained an error made by a court clerk, and that "the *Leon* framework supports a categorical exception to the exclusionary rule for

48

clerical errors of court employees." In *Davis*, the Court invoked the good-faith exception in a case involving the warrantless search of a car's driver incident to his arrest pursuant to binding legal precedent later overruled, 564 U.S. at 241; and in *Illinois v. Krull*, 480 U.S. 340, 354-57 (1987), the Court invoked the good-faith exception in a case involving the warrantless search of a junkyard pursuant to a state statute later declared unconstitutional. In all of those cases, the Supreme Court found that the warrantless search or arrest at issue violated the Fourth Amendment, and yet the Court found suppression inappropriate because law enforcement had acted in objectively reasonable reliance on the subsequently invalidated warrant, statute, or legal precedent that would have authorized the search or arrest, and exclusion therefore would not deter future police misconduct.

The facts of this case fall comfortably within this body of law and mandate the same result. Assuming arguendo that the NIT Warrant was void because the magistrate judge lacked territorial authority to issue it, and further assuming that the FBI's use of the NIT thereby amounted to an unconstitutional warrantless search or was somehow prejudicial, suppression is not warranted because the agents acted in objectively reasonable reliance on the subsequently invalidated warrant and were in no way culpable for the magistrate judge's purported error.

49

*See Davis*, 564 U.S. at 240 (noting that, "in 27 years of practice under *Leon*'s good-faith exception, we have never applied the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct") (internal quotations and citation omitted).

The district court's attempt to distinguish the Supreme Court's post-*Leon* good-faith cases, by arguing that none "involved a warrant that was void ab initio, and therefore none direct the conclusion that the good-faith exception ought to apply to this case" (Add:26-27), is unavailing. Foremost, the primary distinction on which the court relied—between warrants that are "voidable" due to "judicial error" and warrants that are "void" due to the absence of "judicial authority" (Add:30-31)—is irrelevant to the good-faith analysis. As *Leon* and its progeny make clear, the legal status of a warrant under the Fourth Amendment does not, as a categorical matter, limit the reach of the good-faith exception. Rather, application of the good-faith exception requires a "rigorous weighing of [the exclusionary rule's] costs and deterrence benefits," and "[t]he basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." *Davis*, 564 U.S. at 238 (quoting *Herring,* 555 U.S. at 143). Accordingly, a court's focus in conducting that cost-benefit analysis is on "the flagrancy of the police misconduct at issue."

50

*Davis*, 564 U.S. at 238 (internal quotations and citation omitted). Here, the district court erroneously focused only on the reasons why the NIT Warrant was supposedly "no warrant at all," which may explain why the court found the NIT search unconstitutional but says nothing about the agents' conduct, and therefore does not answer the critical question of whether suppression is an appropriate remedy. *Hudson v. Michigan*, 547 U.S. 586, 592 (2006) ("[B]ut-for causality is only a necessary, not a sufficient, condition for suppression."); *Gates*, 462 U.S. at 223 ("The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.").

In this case, the purported error rendering the NIT Warrant "void"—the absence of territorial authority to issue the warrant—was made by the magistrate judge, not law enforcement. The district court acknowledged that, under *Leon*, law enforcement may reasonably defer to (and not be punished for) a magistrate's determination of probable cause, even if that determination is later deemed erroneous, but reasoned that "*Leon* contains not the slightest suggestion, however, that the same deference ought [to] apply when magistrate judges determine their own jurisdiction." Add:24-25. This reasoning is unsound.

51

Although *Leon* involved a warrant invalidated for lack of probable cause, its analysis of the good-faith exception has been applied broadly "across a range of cases." *Davis*, 564 U.S. at 238. Thus, the fact that *Leon* did not address the precise issue presented here does not lessen the force of its reasoning. *See United States v. Knights*, 534 U.S. 112, 117 (2001) (criticizing as "dubious logic" the argument "that an opinion upholding the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it").

The Supreme Court has consistently expressed a "strong preference for warrants" and mandated "great deference" to a magistrate's determination that a warrant is constitutionally sufficient. *Leon*, 468 U.S. at 914; *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'") (quoting *Leon*, 468 U.S. at 922-23). It is just as much a question for the magistrate judge whether Rule 41(b) provides territorial authority to issue a warrant as it is whether the affidavit establishes probable cause; accordingly, if an officer may defer to a magistrate's determination that a warrant complies with the Fourth Amendment, he may surely defer to a

magistrate's determination that a warrant complies with the Federal Rules of Criminal Procedure. In both situations, the error, if any, is attributable to the judge, not the officer, leaving "no police illegality and thus nothing to deter." *Leon*, 468 U.S. at 921 (explaining that it is the magistrate's job to determine the constitutional sufficiency of the warrant, and officers ordinarily cannot be expected to question that judgment: "Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.") (quotations and citation omitted). Moreover, if "[p]enalizing the officer for the magistrate's error" in assessing compliance with the Fourth Amendment's probable cause requirement "cannot logically contribute to the deterrence of Fourth Amendment violations," *id.*, then penalizing the FBI for the magistrate's error in assessing compliance with Rule 41(b)'s venue provisions, which are not constitutionally required, likewise cannot deter future Fourth Amendment violations. *Burgos-Montes*, 786 F.3d at 109 (refusing to suppress evidence after finding that defendant was not prejudiced by Rule 41 violation, and reaffirming that "[t]he exclusionary rule should be limited to those situations where its remedial objectives are best served, *i.e.*, to deter illegal police conduct, not mistakes by judges and magistrates").

53

Simply put, in light of Supreme Court precedent applying the good-faith exception to violations of the Fourth Amendment, the district court's refusal to apply the good-faith exception to a violation of the Federal Rules of Criminal Procedure makes no sense. *Johnson*, 2016 WL 6136586, at *10 n.7; *Eure*, 2016 WL 4059663, at *8 ("*Herring* says that the exclusionary rule should only be applied when the actions of law enforcement are so culpable that exclusion can achieve meaningful deterrence that is worth the price paid by the justice system in suppressing evidence. This is true when a defendant alleges that his constitutional rights have been violated; it must also be true when he alleges merely that the Federal Rules of Criminal Procedure were not followed.").

Finally, in reaching its erroneous conclusion that suppression is the only remedy for an allegedly "void" warrant, the district court ignored the Supreme Court's admonition that "suppression is not an automatic consequence of a Fourth Amendment violation" and rejected its mandate that "the benefits of deterrence must outweigh the costs" of excluding evidence. *Herring*, 555 U.S. at 137, 141. Instead, the district court relied upon the dubious reasoning of the Sixth Circuit in *United States v. Scott*, 260 F.3d 512 (6th Cir. 2001), which was overruled in relevant part by *United States v. Master*, 614 F.3d 236 (6th Cir. 2010).

In both *Scott* and *Master*, the Sixth Circuit deemed the challenged warrants void ab initio because they had been issued by retired judges without authority to issue warrants under state law. *Scott*, 260 F.3d at 515; *Master*, 614 F.3d at 240-41. *Scott* held the good-faith exception inapplicable to the void warrant, saying it was "confident that *Leon* did not contemplate a situation where a warrant is issued by a person lacking the requisite legal authority." 260 F.3d at 515. Nine years later, in *Master*, the Sixth Circuit reversed course, stating that *Scott*'s "broad interpretation" of the exclusionary rule no longer "continues to be viable in light of more recent Supreme Court cases." 614 F.3d at 242 (citing *Herring* and *Hudson*). *Master* held that, to the extent the "decision in *Scott* is based on a reading of *Leon* that separates the requirements of the warrant itself and the requirements of the magistrate who issues the warrant," it was "no longer clearly consistent with current Supreme Court doctrine" because "the Supreme Court has since emphasized that the decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred." *Master,* 614 F.3d at 242 (citing *Herring*, 555 U.S. at 140). *Master* therefore concluded that "the issuing magistrate's lack of authority has no impact on police misconduct, if the officers mistakenly, but inadvertently, presented the warrant to an incorrect magistrate." *Id*.

55

The district court chose to ignore *Master* in favor of *Scott*, because it thought the "*Master* court read the Supreme Court's recent good-faith cases too broadly" (Add:28), but it was the district court, not the *Master* court, who misread the Supreme Court's exclusionary rule cases. *See, e.g., Ammons*, 2016 WL 4926438, at **8-9 (following *Master* and *Herring* and holding "good-faith exception is not foreclosed where the warrant relied upon is void ab initio"); *Scarbrough*, 2016 WL 5900152, at **1-2 (same). *Cf. Broy*, 2016 WL 5172853, at *9 (assuming warrant was void ab initio, but holding good-faith exception applicable in light of *Herring*).

The court also placed undue weight on this Court's statement in *United States v. Curzi*, 867 F.2d 36, 44 (1st Cir. 1989), that it had "not recognized a good-faith exception in respect to warrantless searches." Add:30. *Curzi*, however, involved a truly warrantless search, where law enforcement should have known that a warrant was necessary to enter and search a residence but did not even attempt to obtain one; this case, in contrast, involves a situation where law enforcement obtained judicial approval for a warrant authorizing the use of the NIT and executed the search in objectively reasonable reliance on the facially valid warrant that was only later deemed void based on the magistrate judge's allegedly mistaken interpretation of her territorial authority under Rule 41(b).

*Curzi*, which was decided 20 years before *Herring*, does not foreclose a finding that the good-faith exception is applicable to this case.

As *Master* and the Supreme Court precedent it relies on make clear, the decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred. Stated another way, suppression depends not on the nature of the constitutional violation, as the district court erroneously concluded, but on the culpability and severity of police (not judicial) misconduct and whether exclusion will deter future Fourth Amendment violations. *Herring*, 555 U.S. at 144. The district court thus erred in categorically refusing to apply the good-faith exception to warrants later deemed invalid due to judicial error.

### C.    The district court erred in finding that the agents did not act in objectively reasonable, good-faith reliance on the NIT Warrant.

The district court opined that, even if it were "to hold that the good-faith exception *could* apply to circumstances involving a search pursuant to a warrant issued without jurisdiction, it would decline to rule such exception applicable here." Add:32 (emphasis in original). Specifically, the court found that it was not objectively reasonable for law enforcement to have relied on the NIT Warrant, and that the error was "systemic" and reflected "reckless disregard of constitutional requirements." Add:32-34. The court's findings, which lack

record support and are contrary to controlling precedent, are unsound. Moreover, the court failed to engage in the requisite balancing of interests— whether the benefits of deterrence outweigh the costs of suppression—before invoking the exclusionary rule.

*First*, the court clearly erred in finding that "it was not objectively reasonable for law enforcement—particularly 'a veteran FBI agent with 19 years of federal law enforcement experience'—to believe that the NIT Warrant was properly issued considering the plain mandate of Rule 41(b)." Add:32 (internal record citation omitted). In fact, the record amply demonstrates that the agent acted reasonably: he prepared a thorough affidavit detailing what the NIT was, how it would be used, and why it was necessary; and he presented the affidavit to a magistrate judge in the district where the Playpen server was located and the NIT would be deployed. As discussed above, the agent reasonably believed that the warrant was constitutional and complied with Rule 41, specifically, subsection (b)(4).

Moreover, when the FBI sought judicial approval for this NIT Warrant, it had received judicial approval to use NITs in other cases. *See* D.63; JA:181-82. *See also, e.g., United States v. Laurita*, No. 13-CR-107, 2016 WL 4179365 (D. Neb. Aug. 5, 2016) (re-affirming use of similar NIT pursuant to warrant issued

in 2012); *but see In re Warrant*, 958 F. Supp. 2d 753 (denying warrant for use of far more invasive NIT). No federal appellate court has thus far addressed the validity of an NIT warrant under Rule 41(b), although since this NIT Warrant was issued, lower courts have differed on the question. *See, e.g.*, *Allain*, 2016 WL 5660452, at *12 n.10 (recognizing courts' differing views of the magistrate's authority to issue the NIT Warrant); *Jean*, 2016 WL 4771096, at **16-17 (no violation of Rule 41(b)); *Michaud*, 2016 WL 337263, at *6 (technical violation of Rule 41(b)); *Croghan*, 2016 WL 4992105, at *6 (jurisdictional violation of Rule 41(b)). The varying legal conclusions drawn by the 27 federal courts to have thus far rendered a decision on the validity of the NIT Warrant proves that the "mandate of Rule 41(b)" is not "plain." *See Heien v. North Carolina*, 135 S. Ct. 530, 540 (2014) (finding objectively reasonable officer's interpretation of ambiguous "stop lamp" law, which had not previously been construed by state appellate courts). It was therefore not unreasonable for the FBI agent to have deferred to and relied on the magistrate judge's determination of her territorial authority to issue the NIT Warrant. *Leon*, 468 U.S. at 914 (mandating deference to magistrate's decision where "[r]easonable minds" have differed on legal sufficiency of warrant).

59

*Second*, the district court's bald assertion that, "even analyzed under *Herring*, the conduct at issue here can be described as 'systemic error or reckless disregard of constitutional requirements'" is baffling. Add:33-34 (quoting *Herring*, 555 U.S. at 147). In *Herring*, the Supreme Court refused to find that a blatant recordkeeping error in a police department's arrest warrant database, which was made by a police department employee, constituted "deliberate, reckless, or grossly negligent conduct, or . . . systemic negligence." 555 U.S. at 144. The Supreme Court reasoned that, since the error appeared to be isolated and negligent, rather than pervasive and deliberate, it was not objectively unreasonable for the arresting officers to have relied on the warrant system. *Id*. at 146-47. The Court therefore concluded that, "when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.'" *Id*. at 147-48 (citation omitted).

The alleged error here is far less egregious than the error in *Herring*. Foremost, it involved a mistake by the magistrate judge, not the FBI agents, making the exclusionary rule an exceptionally ineffective remedy. *See Leon*, 468 U.S. at 921; *Evans*, 514 U.S. at 15. Moreover, it involved the use of an innovative investigative technique designed to combat criminal use of anonymizing

60

technology, for which the FBI appropriately sought and received advance judicial approval. Even if the alleged defect in the NIT Warrant could be attributed to the FBI, and it cannot, "more severe police misconduct is required than the mere absence of" territorial authority for the search to make the violation "flagrant." *Utah v. Strieff*, 136 S. Ct. 2056, 2064 (2016) (holding seizure without probable cause not flagrant Fourth Amendment violation). *See Allain*, 2016 WL 5660452, at *12 ("The FBI's investigation into Playpen involved sophisticated and novel technology—used both by the operators and users of Playpen as well as the federal investigators—and the FBI made a reasonable attempt to structure a search warrant that complied with rules that have not evolved as quickly as the technology.").

The district court did not explain why it found the alleged error in this case to be more serious than the one in *Herring*, nor did it point to anything in the record to support such a finding. In fact, the record establishes that the FBI committed no error at all: faced with the daunting task of apprehending possibly thousands of individuals engaged in repugnant child pornography crimes, but cloaked in anonymity by their use of Tor, the FBI developed a sophisticated NIT to unmask and locate suspected criminals; it presented a detailed warrant affidavit, explaining the NIT and its operation, establishing probable cause, and

61

describing the places to be searched and things to be seized with particularity, to a neutral and detached magistrate judge in the district with the strongest known connection to the criminal activity under investigation; it obtained and relied upon a facially valid warrant authorizing its use of the NIT; and it executed the search according to the terms of the warrant. *See Darby*, 2016 WL 3189703, at *13 (citing similar facts and concluding that FBI "did the right thing" and "should be applauded for its actions in this case"). That the warrant was later found defective because of the magistrate judge's mistaken interpretation of her territorial authority pursuant to Rule 41(b) does not render the agents' reliance on the warrant objectively unreasonable, just like it is not objectively unreasonable for a police officer to rely on a magistrate judge's mistaken assessment of probable cause. *Libbey-Tipton*, D.19 at 12 ("The FBI agents can hardly be faulted for failing to understand the intricacies of the jurisdiction of federal magistrates.") (quoting *Ammons*, 2016 WL 4926438, at *9). This case falls squarely within the bounds of the good-faith exception, as 23 of 27 federal courts have held, *see supra*, pages 17-19, and the district court erred in ruling otherwise.

*Finally*, the district court failed to engage in the requisite balancing of interests, namely, whether the benefits of deterrence outweigh the costs of

suppression. *Herring*, 555 U.S. at 141. That balance weighs decidedly in favor of the admission, not exclusion, of the evidence in this case. As has been discussed throughout, the FBI agents' conduct was neither deliberate nor culpable; and the Rule 41(b) violation, if it was one, was committed by the magistrate judge, leaving no future law enforcement misconduct to deter. *Davis*, 564 U.S. at 238-39 ("punishing the errors of judges is not the office of the exclusionary rule") (quotations, alteration, and citation omitted).[14]

The costs of suppression, on the other hand, are substantial. Foremost, the court's suppression order, if affirmed, would exclude "reliable, trustworthy evidence bearing on [Levin's] guilt or innocence," of an abhorrent crime that society has a significant interest in deterring. *Davis*, 564 U.S. at 237. The FBI's use of the NIT led to the identification of hundreds of Playpen users across the country, many of whom, like Levin, have been charged with a litany of federal child pornography offenses. Allowing Levin and other viewers and distributors of child pornography to evade capture and carry on abusing children in the dark shadows of Tor would be repugnant to justice. "Considering the unspeakable

---

[14] The absence of any deterrence benefit is underscored by the proposed amendment to Rule 41(b), which, if enacted on December 1, 2016, will expressly permit magistrate judges to authorize warrants for remote electronic searches such as the one in this case.

harm caused by child pornography, and the creative and limited conduct of the FBI that was undertaken to mitigate that harm, . . . suppression is entirely unwarranted here." *Acevedo-Lemus*, 2016 WL 4208436, at *8. Given these circumstances, "any marginal deterrence" that might be realized by suppressing evidence obtained in good-faith reliance on the NIT Warrant simply "does not pay its way." *Herring*, 555 U.S. at 147-48. This Court should therefore vacate the district court's suppression order and hold the evidence obtained from the NIT Warrant admissible at Levin's trial.

## CONCLUSION

For these reasons, the government respectfully requests that the Court reverse the district court's orders suppressing evidence and denying reconsideration.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    */s/ Kelly Begg Lawrence*
KELLY BEGG LAWRENCE
Assistant U.S. Attorney

64

## CERTIFICATE OF COMPLIANCE WITH
### Rule 32(a)

**Certificate of Compliance with Type-Volume Limitation
Typeface Requirements, and Type Style Requirements**

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **13,987** words (an opening or answering brief may not exceed 14,000 words, a reply brief may not exceed 7,000 words), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) (*i.e.*, the corporate disclosure statement, table of contents, table of citations, addendum, and certificates of counsel).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Calisto MT 14 point, in Microsoft Word version 2016.

 */s/ Kelly Begg Lawrence*
AUSA Kelly Begg Lawrence
Dated:  October 26, 2016

## <u>CERTIFICATE OF SERVICE</u>

I, Kelly Begg Lawrence, Assistant U.S. Attorney, hereby certify that on October 26, 2016, I electronically served a copy of the foregoing document, and served by first-class United States mail one copy of the joint appendix, on the following registered participants of the CM/ECF system: J. W. Carney, Jr., Esq., and Nathaniel Dolcort-Silver, Esq., Carney & Associates, 20 Park Plaza, Suite 1405, Boston, MA 02116.

<u>/s/ Kelly Begg Lawrence</u>
KELLY BEGG LAWRENCE

No. 16-1567

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————————

UNITED STATES OF AMERICA,
APPELLANT

v.

ALEX LEVIN,
DEFENDANT-APPELLEE

————————————

## Addendum Table of Contents

1.  *Amended Memorandum & Order* (D.82) .......................................... Add.1

2.  NIT Warrant and Affidavit ........................................................Add.41

3.  Federal Rule of Criminal Procedure 41 .......................................Add.81

4.  28 U.S.C. §636 ...........................................................................Add.95

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
| ) | |
| ) | |
| ) | |
| ) | CRIMINAL ACTION |
| v.     ) | NO. 15-10271-WGY |
| ) | |
| ALEX LEVIN,     ) | |
| ) | |
| Defendant.   ) | |
| ) | |

YOUNG, D.J.                                                  May 5, 2016

**AMENDED MEMORANDUM & ORDER**

I.   **INTRODUCTION**

Alex Levin is charged with possession of child pornography.
Compl. 1, ECF No. 1.  The government obtained evidence of
Levin's alleged crime in three steps.  First, it seized control
of a website that distributed the illicit material at issue
("Website A").  Next, it obtained a series of search warrants
that allowed the government to identify individual users who
were accessing content on Website A.  One of these warrants
involved the deployment of a Network Investigative Technique
(the "NIT Warrant").  Finally, the government searched[1] the
computers of certain of these individuals, including Levin.

---

[1] The government has waived any argument that its
investigative conduct here did not amount to a search by failing
to raise this argument in its memorandum.  The Court therefore
assumes that Levin had a reasonable expectation of privacy as to

[1]

**Add.1**

Levin has moved to suppress the evidence obtained as a result of the issuance of the NIT Warrant, arguing that the NIT Warrant is void for want of jurisdiction under the Federal Magistrates Act, 28 U.S.C. § 636(a), and additionally that it violated Federal Rule of Criminal Procedure 41(b).  Def.'s Mot. Suppress Evidence ("Def.'s Mot.") 5-6, ECF No. 44.  The government contends that the NIT Warrant was valid and that, in any event, suppression is not an appropriate remedy on these facts.  Gov't's Resp. Def.'s Mot. Suppress ("Gov't's Resp.") 1, ECF No. 60.

## II.  FACTUAL BACKGROUND

This case involves a far-reaching and highly publicized investigation conducted by the Federal Bureau of Investigation in early 2015 to police child pornography.[2]  The investigation focused on Website A, which was accessible to users only through

_____

the information obtained through the execution of the various warrants.

[2] For coverage of this investigation, see, for example, Ellen Nakashima, This is How the Government is Catching People Who Use Child Porn Sites, Wash. Post, Jan 21, 2016, https://www.washingtonpost.com/world/national-security/how-the-government-is-using-malware-to-ensnare-child-porn-users/2016/01/21/fb8ab5f8-bec0-11e5-83d4-42e3bceea902_story.html; Mary-Ann Russon, FBI Crack Tor and Catch 1,500 Visitors to Biggest Child Pornography Website on the Dark Web, Int'l Bus. Times, Jan. 6, 2016, http://www.ibtimes.co.uk/fbi-crack-tor-catch-1500-visitors-biggest-child-pornography-website-dark-web-1536417.

Add.2

the "Tor" network -- software designed to preserve users'
anonymity by masking their IP addresses.[3]  See Def.'s Mot., Ex.
3, Aff. Supp. Application Search Warrant ("Aff. Supp. NIT
Warrant") 10-12, ECF No. 44-3.

    As an initial step in their investigation, FBI agents
seized control of Website A in February 2015.  See id. at 21-23.
Rather than immediately shutting it down, agents opted to run
the site out of a government facility in the Eastern District of
Virginia for two weeks in order to identify -- and ultimately,
to prosecute -- users of Website A.  See id. at 23.  To do this

---

    [3] "Tor," which stands for "The Onion Router," is "the main
browser people use to access" the "Darknet" -- "a specific part
of th[e] hidden Web where you can operate in total anonymity."
Going Dark: The Internet Behind the Internet, Nat'l Pub. Radio,
May 25, 2014, http://www.npr.org/sections/alltechconsidered/
2014/05/25/315821415/going-dark-the-internet-behind-the-
internet.  Tor itself is lawful and has various legitimate uses.
See id.  Indeed, it was developed by the United States Navy,
which continues to use it "as a means of communicating with
spies and informants[.]"  John Lanchester, When Bitcoin Grows
Up, 28 London R. Books No. 8, http://www.lrb.co.uk/v38/n08/john-
lanchester/when-bitcoin-grows-up.  Tor has, however, produced
difficulties for law enforcement officials, "especially those
pursuing child pornography, Internet fraud and black markets,"
since it allows criminals to evade detection.  Martin Kaste,
When a Dark Web Volunteer Gets Raided by the Police, Nat'l Pub.
Radio, April 4, 2016, http://www.npr.org/sections/alltechconside
red/2016/04/04/4729 92023/when-a-dark-web-volunteer-gets-raided-
by-the-police; see also Lanchester, supra (describing Tor as
"the single most effective web tool for terrorists, criminals
and paedos" and noting that it "gives anonymity and geographical
unlocatability to all its users").  At the same time, its legal
users have raised concerns about the privacy implications of
government "sting" operations on the Tor network.  See Kaste,
supra.

[3]

**Add.3**

required the deployment of certain investigative tools.  See id.
at 23-24.

    To that end, the government sought and obtained a series of
warrants.  First, on February 20, 2015, the government procured
an order pursuant to Title III from a district judge in the
Eastern District of Virginia permitting the government to
intercept communications between Website A users.  Def.'s Mot.,
Ex. 2 ("Title III Warrant"), ECF No. 44-2.  Second, also on that
date, the government obtained a warrant from a magistrate judge
in the Eastern District of Virginia to implement a Network
Investigative Technique ("NIT") that would allow the government
covertly to transmit computer code to Website A users.[4]  NIT
Warrant, ECF No. 44-3.  This computer code then generated a
communication from those users' computers to the government-
operated server containing various identifying information,
including those users' IP addresses.[5]  See Aff. Supp. NIT Warrant
24-26.

---

    [4] For a discussion of the government's recent use of these
types of warrants, see Brian L. Owsley, Beware of Government
Agents Bearing Trojan Horses, 48 Akron L. Rev. 315 (2015).

    [5] The affidavit the government submitted in support of its
application for the NIT Warrant describes this process:

        In the normal course of operation, websites send
        content to visitors.  A user's computer downloads that
        content and uses it to display web pages on the user's
        computer.  Under the NIT authorized by this warrant,

[4]

**Add.4**

Through the use of the NIT, government agents determined
that a Website A user called "Manakaralupa" had accessed several
images of child pornography in early March 2015, and they traced
the IP address of that user to Levin's home address in Norwood,
Massachusetts.  Def.'s Mot., Ex. 1 ("Residential Warrant"), Aff.
Supp. Application for Search Warrant ("Aff. Supp. Residential

---

[Website A], which will be located . . . in the
Eastern District of Virginia, would augment that
content with additional computer instructions.  When a
user's computer successfully downloads those
instructions from [Website A] . . . the instructions,
which comprise the NIT, are designed to cause the
user's 'activating' computer to transmit certain
information to a computer controlled by or known to
the government.

Aff. Supp. NIT Warrant 24.  The particular information seized
pursuant to the NIT Warrant included:

1. the 'activating' computer's actual IP address, and
the date and time that the NIT determines what that IP
address is;
2. a unique identifier generated by the NIT (e.g., a
series of numbers, letters, and/or special characters)
to distinguish data from that of other 'activating'
computers, that will be sent with and collected by the
NIT;
3. the type of operating system running on the
computer, including type (e.g., Windows), version
(e.g., Windows 7), and architecture (e.g., x 86);
4. information about whether the NIT has already been
delivered to the 'activating' computer;
5. the 'activating' computer's Host Name;
6. the 'activating' computer's active operating system
username; and
7. the 'activating' computer's media access control
('MAC') address[.]

NIT Warrant, Attach. B (Information to be Seized).

[5]

**Add.5**

Warrant") 11-12, ECF No. 44-1.  On August 11, 2015, law
enforcement officials obtained a third and final warrant (the
"Residential Warrant") from Magistrate Judge Bowler in this
District to search Levin's home.  See Residential Warrant.
Agents executed the Residential Warrant on August 12, 2015, and
in their search of Levin's computer, identified eight media
files allegedly containing child pornography.  See Compl., Ex.
2, Aff. Supp. Application Criminal Compl. ¶ 7, ECF No. 1-2.

    Levin was subsequently indicted on one count of possession
of child pornography, 18 U.S.C. § 2252A(a)(5)(B).  Indictment,
ECF No. 8.  He has since moved to suppress all evidence seized
pursuant to the NIT Warrant and the Residential Warrant.[6]  Def.'s
Mot.  After holding a hearing on March 25, 2016, the Court took
Levin's motion under advisement.  See Elec. Clerk's Notes, ECF
No. 62.

## III. ANALYSIS

    In support of his motion to suppress, Levin contends that
the NIT Warrant violated the territorial restrictions on the
issuing magistrate judge's authority,[7] and further that the

---

    [6] The government does not contest Levin's argument that
absent the NIT Warrant, it would not have had probable cause to
support its Residential Warrant application, see Def.'s Mot. 14.
For the sake of simplicity, the Court uses the phrase "evidence
seized pursuant to the NIT Warrant" to include evidence seized
pursuant to the Residential Warrant because all of that evidence
is derivative of the NIT Warrant.

[ 6 ]

**Add.6**

evidence obtained pursuant to the NIT Warrant must be suppressed
in light of law enforcement agents' deliberate disregard for the
applicable rules and the prejudice Levin suffered as a
consequence.  See Def.'s Mot. 6-7.  The government refutes each
of these arguments, and additionally argues that the good-faith
exception to the exclusionary rule renders suppression
inappropriate.  See Gov't's Resp. 1.

### A.   Magistrate Judge's Authority Under the Federal Magistrates Act and Rule 41(b)

Levin argues that the issuance of the NIT Warrant ran afoul
of both Section 636(a) of the Federal Magistrates Act and Rule
41(b) of the Federal Rules of Criminal Procedure.  See Def.'s
Mot. 5-7, 12.  The conduct underlying each of these alleged
violations is identical: the magistrate judge's issuance of a
warrant to search property located outside of her judicial

---

[7] A more precise characterization of Levin's challenge would
be that the magistrate judge who issued the NIT Warrant had no
authority to do so under the relevant statutory framework and
federal rules -- not that the issuance of the warrant "violated"
these provisions, by, for example, failing to comply with
procedural requirements.  In the Court's view, this distinction
is meaningful, see infra Part III(B)(1), though it is one that
neither the parties nor other courts evaluating similar
challenges seem to appreciate, see, e.g., United States v.
Michaud, No. 3:15-cr-05351-RJB, 2016 WL 337263 at *5-*7 (W.D.
Wash. Jan. 28, 2016) (discussing whether the NIT Warrant
"violates" Federal Rule of Criminal Procedure 41(b)).  In the
interest of consistency with the parties' briefings and prior
caselaw, however, the Court continues the tradition of referring
to actions by a magistrate judge that fall outside the scope of
her authority as "violations" of the provisions that confer such
authority.

district.  See id.  Moreover, because Section 636(a) expressly
incorporates any authorities granted to magistrate judges by the
Federal Rules of Criminal Procedure, see infra Part III(A)(1),
the Court's analyses of whether the NIT Warrant was statutorily
permissible and whether it was allowed under Rule 41(b) are
necessarily intertwined.

### 1.  Federal Magistrates Act

Section 636(a) of the Federal Magistrates Act establishes
"jurisdictional limitations on the power of magistrate
judges[.]"  United States v. Krueger, 809 F.3d 1109, 1122 (10th
Cir. 2015) (Gorsuch, J., concurring).  It provides, in relevant
part:

> (a) Each United States magistrate judge serving under this
> chapter shall have within the district in which sessions
> are held by the court that appointed the magistrate judge,
> at other places where that court may function, and
> elsewhere as authorized by law--
>
> > (1) all powers and duties conferred or imposed . . .
> > by law or by the Rules of Criminal Procedure[.]

28 U.S.C. § 636(a).  Levin argues that the magistrate judge's
issuance of a warrant to search property outside of her judicial
district violated the territorial restrictions provided in the
first paragraph of Section 636(a).  Def.'s Mot. 12.  In other
words, because the NIT Warrant approved a search of property
outside the Eastern District of Virginia ("the district in which
sessions are held by the court that appointed the magistrate"),

[8]

Add.8

and neither of the other clauses in the first paragraph of
Section 636(a) applies, Levin contends that the magistrate judge
lacked jurisdiction to issue it.  <u>See</u> <u>id.</u>  The government, for
its part, notes that Levin does not meaningfully distinguish
between the requirements of the statute and of Rule 41(b), and
advances the same arguments to support the magistrate judge's
authority to issue the NIT Warrant under Section 636(a) and
under Rule 41(b).  Gov't's Resp. 21.

As discussed in more detail <u>infra</u> Part III(A)(2)(i), the
Court is persuaded by Levin's argument that the NIT Warrant
indeed purported to authorize a search of property located
outside the district where the issuing magistrate judge sat.
The magistrate judge had no jurisdiction to issue such a warrant
under the first paragraph of Section 636(a).  The Court also
concludes that Section 636(a)(1) is inapposite because Rule
41(b) did not confer on the magistrate judge authority to issue
the NIT Warrant Levin challenges here, <u>see</u> <u>infra</u> Part III(A)(2),
and the government points to no other "law or . . . Rule[] of
Criminal Procedure" on which the magistrate judge could have
based its jurisdiction pursuant to Section 636(a)(1), <u>see</u> <u>infra</u>
note 11.  Consequently, the Court holds that the Federal
Magistrates Act did not authorize the magistrate judge to issue
the NIT Warrant here.

2.   **Rule 41(b)**

[ 9 ]

Rule 41(b), titled "Authority to Issue a Warrant,"

provides as follows:

At the request of a federal law enforcement officer or
an attorney for the government:

(1) a magistrate judge with authority in the district
-- or if none is reasonably available, a judge of a
state court of record in the district -- has authority
to issue a warrant to search for and seize a person or
property located within the district;

(2) a magistrate judge with authority in the district
has authority to issue a warrant for a person or
property outside the district if the person or
property is located within the district when the
warrant is issued but might move or be moved outside
the district before the warrant is executed;

(3) a magistrate judge -- in an investigation of
domestic terrorism or international terrorism -- with
authority in any district in which activities related
to the terrorism may have occurred has authority to
issue a warrant for a person or property within or
outside that district;

(4) a magistrate judge with authority in the district
has authority to issue a warrant to install within the
district a tracking device; the warrant may authorize
use of the device to track the movement of a person or
property located within the district, outside the
district, or both; and

(5) a magistrate judge having authority in any
district where activities related to the crime may
have occurred, or in the District of Columbia, may
issue a warrant for property that is located outside
the jurisdiction of any state or district, but within
any of the following:

(A) a United States territory, possession, or
commonwealth;

(B) the premises -- no matter who owns them -- of
a United States diplomatic or consular mission in
a foreign state, including any appurtenant

[10]

**Add.10**

> building, part of a building, or land used for
> the mission's purposes; or
>
> (C) a residence and any appurtenant land owned or
> leased by the United States and used by United
> States personnel assigned to a United States
> diplomatic or consular mission in a foreign
> state.

Fed. R. Crim. P. 41(b).

The government argues for a liberal construction of Rule 41(b) that would authorize the type of search that occurred here pursuant to the NIT Warrant.  <u>See</u> Gov't's Resp. 18-20. Specifically, it argues that subsections (1), (2), and (4) of Rule 41(b) are each sufficient to support the magistrate judge's issuance of the NIT Warrant.  <u>Id.</u>  This Court is unpersuaded by the government's arguments.  Because the NIT Warrant purported to authorize a search of property located outside the Eastern District of Virginia, and because none of the exceptions to the general territorial limitation of Rule 41(b)(1) applies, the Court holds that the magistrate judge lacked authority under Rule 41(b) to issue the NIT Warrant.

### i.    Rule 41(b)(1)

The government advances two distinct lines of argument as to why Rule 41(b)(1) authorizes the NIT Warrant.  One is that all of the property that was searched pursuant to the NIT Warrant was actually located within the Eastern District of Virginia, where the magistrate judge sat: since Levin -- as a

[11]

**Add.11**

user of Website A -- "retrieved the NIT from a server in the
Eastern District of Virginia, and the NIT sent [Levin's] network
information back to a server in that district," the government
argues the search it conducted pursuant to the NIT Warrant
properly can be understood as occurring within the Eastern
District of Virginia.  Gov't's Resp. 20.  This is nothing but a
strained, after-the-fact rationalization.  In its explanation of
the "Place to be Searched," the NIT Warrant made clear that the
NIT would be used to "obtain[] information" from various
"activating computers[.]"[8]  NIT Warrant 32.  As is clear from
Levin's case -- his computer was located in Massachusetts -- at
least some of the activating computers were located outside of
the Eastern District of Virginia.  That the Website A server is
located in the Eastern District of Virginia is, for purposes of
Rule 41(b)(1), immaterial, since it is not the server itself
from which the relevant information was sought.  See United
States v. Michaud, No. 3:15-cr-05351-RJB, 2016 WL 337263 at *6
(W.D. Wash. Jan. 28, 2016) (examining the permissibility of the

---

[8] That the cover page of the NIT Warrant application
indicated that the property to be searched was located in the
Eastern District of Virginia, see NIT Warrant 1, does not alter
this conclusion.  See Michaud, 2016 WL 337263 at *4 (observing
that to read this NIT Warrant as authorizing a search of
property located exclusively within the Eastern District of
Virginia, on the basis of its cover page, is "an overly narrow
reading of the NIT Warrant that ignores the sum total of its
content.").

**Add.12**

same NIT Warrant and concluding that Rule 41(b)(1) did not authorize the search "because the object of the search and seizure was Mr. Michaud's computer, not located in the Eastern District of Virginia").

The government's other argument is that where, as here, it is impossible to identify in advance the location of the property to be searched, Rule 41(b)(1) ought be interpreted to allow "a judge in the district with the strongest known connection to the search" to issue a warrant. See Gov't's Resp. 20. This argument fails, though, because it adds words to the Rule. See Lopez-Soto v. Hawayek, 175 F.3d 170, 173 (1st Cir. 1999) ("Courts have an obligation to refrain from embellishing statutes by inserting language that Congress opted to omit.").

### ii. Rule 41(b)(2)

Rule 41(b)(2) confers on magistrate judges the authority "to issue a warrant of a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed." Fed. R. Crim. P. 41(b)(2). The government argues that because the NIT (i.e., the computer code used to generate the identifying information from users' computers) was located in the Eastern District of Virginia at the time the warrant was issued, this subsection applies. Gov't's Resp. 19. As discussed above, however, the

[13]

**Add.13**

actual property to be searched was not the NIT nor the server on which it was located, but rather the users' computers. Therefore, Rule 41(b)(2) is inapposite.

### iii. Rule 41(b)(4)

The Court is similarly unpersuaded by the government's argument regarding Rule 41(b)(4), which authorizes magistrate judges in a particular district "to issue a warrant to install within the district a tracking device," even where the person or property on whom the device is installed later moves outside the district, see Fed. R. Crim. P. 41(b)(4). The government likens the transmittal of the NIT to Website A users' computers to the installation of a tracking device in a container holding contraband, insofar as each permits the government to identify the location of illegal material that has moved outside the relevant jurisdiction. Gov't's Resp. 19-20. This analogy does not persuade the Court that the NIT properly may be considered a tracking device, regardless of where the "installation" occurred.[9]

---

[9] Indeed, as the court pointed out in Michaud, which involved the same NIT Warrant:

> If the 'installation' occurred on the government-controlled computer, located in the Eastern District of Virginia, applying the tracking device exception breaks down, because [users of Website A] never controlled the government-controlled computer, unlike a car with a tracking device leaving a particular district. If the installation occurred on [the

[14]

**Add.14**

## B.    Suppression

Having concluded that neither the Federal Magistrates Act
nor Rule 41(b) authorized the issuance of the NIT Warrant, the
Court now turns to the question of whether suppression of the
evidence obtained pursuant to the NIT Warrant is an appropriate
remedy.  Levin argues that this evidence ought be suppressed
because the magistrate judge lacked jurisdiction to issue the
NIT Warrant and because Levin was prejudiced by the Rule 41
violation.  Def.'s Mot. 13-14.  The government argues that even
if the issuance of the NIT Warrant was not sanctioned by Rule 41
or Section 636(a), suppression is too extreme a remedy, as any
violation of the relevant rule or statute was merely ministerial
and there was no resulting prejudice to Levin.  Gov't's Resp.

---

individual Website A user's] computer, applying the
tracking device exception again fails, because [the
user's] computer was never physically located within
the Eastern District of Virginia.

2016 WL 337263 at *6.  In any case, the Court is persuaded by
the Southern District of Texas's interpretation of
"installation."  See In re Warrant to Search a Target Computer
at Premises Unknown, 958 F.Supp.2d 753, 758 (S.D. Tex. 2013)
(rejecting government's application for a warrant remotely to
extract identifying information from a computer in an unknown
location, noting that "there is no showing that the installation
of the 'tracking device' (i.e. the software) would take place
within this district.  To the contrary, the software would be
installed on a computer whose location could be anywhere on the
planet.").  Under that approach, the "installation" of the NIT
occurred not within the Eastern District of Virginia, where the
server is located, but rather at the site of each user's
computer.  See id.

[15]

**Add.15**

16.   Further, the government contends that the good-faith exception to the exclusionary rule ought preclude suppression of the evidence seized.  <u>Id.</u> at 21-23.

The Court concludes that the violation at issue here is distinct from the technical Rule 41 violations that have been deemed insufficient to warrant suppression in past cases, and, in any event, Levin was prejudiced by the violation.  Moreover, the Court holds that the good-faith exception is inapplicable because the warrant at issue here was void <u>ab initio</u>.

### 1.    Nature of the Rule 41 Violation

A violation of Rule 41 that is purely technical or ministerial gives rise to suppression only where the defendant demonstrates that he suffered prejudice as a result of the violation.  <u>See</u> <u>United States</u> v. <u>Bonner</u>, 808 F.2d 864, 869 (1st Cir. 1986).  The government apparently submits that all Rule 41 violations "are essentially ministerial," and accordingly that suppression is an inappropriate remedy absent a showing of prejudice.  Gov't's Resp. 16 (citing <u>United States</u> v. <u>Burgos-Montes</u>, 786 F.3d 92, 109 (1st Cir. 2015)).

Rule 41, however, has both procedural and substantive provisions -- and the difference matters.  Courts faced with violations of Rule 41's <u>procedural</u> requirements have generally found such violations to be merely ministerial or technical, and

[16]

as a result have determined suppression to be unwarranted.[10]  By
contrast, this case involves a violation of Rule 41(b), which is
"a substantive provision[.]"  United States v. Berkos, 543 F.3d
392, 398 (7th Cir. 2008); see also United States v. Krueger, 809
F.3d 1109, 1115 n.7 (10th Cir. 2015) (noting that Rule 41(b)(1)
"is unique from other provisions of Rule 41 because it
implicates substantive judicial authority," and accordingly
concluding that past cases involving violations of other
subsections of Rule 41 "offer limited guidance") (internal
quotation marks and citation omitted).  Thus, it does not follow
from cases involving violations of Rule 41's procedural
provisions that the Rule 41(b) violation at issue here -- which
involves the authority of the magistrate judge to issue the
warrant, and consequently, the underlying validity of the

---

[10] These violations implicate the various subsections of
Rule 41, with the exception of subsection (b).  See, e.g.,
Burgos-Montes, 786 F.3d at 108-09 (magistrate judge's "failure .
. . to define the time period of the search when the form itself
provides that the search is to be completed within [10 days],
and . . . failure to designate a magistrate to whom the form
should be returned" was technical violation of Rule 41(e));
Bonner, 808 F.2d at 869 (officers' failure to comply with Rule
41(f) requirement of leaving a copy of the warrant at the place
to be searched was ministerial and did not call for suppression
of resulting evidence); United States v. Dauphinee, 538 F.2d 1,
3 (1st Cir. 1976) ("The various procedural steps required by
Rule 41(d) are basically ministerial[,]" and therefore
suppression of evidence obtained in violation of that provision
was not warranted absent showing of prejudice); United States v.
Pryor, 652 F.Supp. 1353, 1365-66, (D. Me. 1987) (violation of
Rule 41(c)'s procedural requirements regarding nighttime
searches did not call for suppression).

**Add.17**

warrant -- was simply ministerial.  See United States v. Glover,
736 F.3d 509, 515 (D.C. Cir. 2013) (concluding that a Rule 41(b)
violation constitutes a "jurisdictional flaw" that cannot "be
excused as a 'technical defect'").

Because the violation here involved "substantive judicial
authority" rather than simply "the procedures for obtaining and
issuing warrants," Krueger, 809 F.3d at 1115 n.7, the Court
cannot conclude that it was merely ministerial; in fact, because
Rule 41(b) did not grant her authority to issue the NIT warrant,
the magistrate judge was without jurisdiction to do so.[11]  The
government characterizes Levin's challenge as targeting "the
location of the search, not probable cause or the absence of
judicial approval."  Gov't's Resp. 16.  Here, however, because
the magistrate judge lacked authority, and thus jurisdiction, to
issue the NIT Warrant, there simply was no judicial approval.
See United States v. Houston, 965 F.Supp.2d 855, 902 n.12 (E.D.
Tenn. 2013) ("A search warrant issued by an individual without

---

[11] For the magistrate judge to have had jurisdiction to
issue the warrant under Section 636(a), she must have had
authority to do so under Rule 41(b), as the government has
pointed to no alternative statutory authority or federal rule
that could serve as the basis for such jurisdiction.  Moreover,
the government's argument regarding courts' inherent authority
to issue warrants, see Gov't's Resp. 20-21, does not extend to
magistrate judges, whose authority derives from -- and is
bounded by -- the specific statutory provisions and rules
discussed herein.

[18]

**Add.18**

legal authority to do so is 'void <u>ab initio</u>'") (quoting <u>United States</u> v. <u>Master</u>, 614 F.3d 236, 241 (6th Cir. 2010)); <u>United States</u> v. <u>Peltier</u>, 344 F.Supp.2d 539, 548 (E.D. Mich. 2004) ("A search warrant signed by a person who lacks the authority to issue it is void as a matter of law.") (citation omitted); <u>cf.</u> <u>State</u> v. <u>Surowiecki</u>, 440 A.2d 798, 799 (Conn. 1981) ("[A] lawful signature on the search warrant by the person authorized to issue it [is] essential to its issuance[,]" such that an unsigned warrant is void under state law and confers no authority to act, despite existence of probable cause).

NITs, while raising serious concerns,[12] are legitimate law enforcement tools.  Indeed, perhaps magistrate judges should have the authority to issue these types of warrants.  <u>See</u> <u>In re Warrant to Search a Target Computer at Premises Unknown</u>, 958 F.Supp.2d at 761 (noting that "there may well be a good reason

---

[12] The Court expresses no opinion on the use of this particular police tactic under these circumstances, but notes that its use in the context of investigating and prosecuting child pornography has given rise to significant debate.  <u>See, e.g.</u>, <u>The Ethics of a Child Pornography Sting</u>, N.Y. Times, Jan. 27, 2016, http://www.nytimes.com/roomfordebate/2016/01/27/the-ethics-of-a-child-pornography-sting.  The continuing harm to the victims of this hideous form of child abuse is the distribution of the photographs and videos in which the victims appear.  <u>See, e.g.</u>, <u>United States</u> v. <u>Kearney</u>, 672 F.3d 81, 94 (1st Cir. 2012) (internal citations omitted).  Unlike those undercover stings where the government buys contraband drugs to catch the dealers, here the government disseminated the child obscenity to catch the purchasers -- something akin to the government itself selling drugs to make the sting.

[19]

to update the territorial limits of [Rule 41] in light of
advancing computer search technology").[13]  Today, however, no

---

[13] Whether magistrate judges should have the authority to
issue warrants to search property located outside of their
districts under circumstances like the ones presented here has
been the subject of recent deliberations by the Advisory
Committee on Criminal Rules.  See Memorandum from Hon. Reena
Raggi, Advisory Committee on Criminal Rules, to Hon. Jeffrey S.
Sutton, Chair, Committee on Rules of Practice and Procedure
("Raggi Mem.") (May 5, 2014); Letter from Mythili Raman, Acting
Assistant Attorney General, to Hon. Reena Raggi, Chair, Advisory
Committee on the Criminal Rules ("Raman Letter") (Sept. 18,
2013); cf. Zach Lerner, A Warrant to Hack: An Analysis of the
Proposed Amendments to Rule 41 of the Federal Rules of Criminal
Procedure, 18 Yale J. L. & Tech. 26 (2016).  As Levin points out
in his motion, see Def.'s Mot. 18-19, the following proposed
amendment to Rule 41(b) is currently under consideration:

> (6)  a magistrate judge with authority in any district
>      where activities related to a crime may have
>      occurred has authority to issue a warrant to use
>      remote access to search electronic storage media
>      and to seize or copy electronically stored
>      information located within or outside that
>      district if:
>
>      (A)  the district where the media or information
>           is located has been concealed through
>           technological means; or
>
>      (B)  in an investigation of a violation of 18
>           U.S.C. § 1030(a)(5), the media are protected
>           computers that have been damaged without
>           authorization and are located in five or
>           more districts.

Preliminary Draft of Proposed Amendments to the Federal
Rules of Appellate, Bankruptcy, Civil, and Criminal
Procedure 337-38 ("Proposed Rule 41 Amendment"), Committee
on Rules of Practice and Procedure of the Judicial
Conference of the United States (August 2014),
http://www.uscourts.gov/file/preliminary-draft-proposed-
amendments-federal-rules-appellate-bankruptcy-civil-and-
criminal.

[20]

**Add.20**

magistrate judge has the authority to issue this NIT warrant.
Accordingly, the warrant here was void.

### 2. Prejudice

Even were the Court to conclude that the Rule 41(b)
violation was ministerial, suppression would still be
appropriate, as Levin has demonstrated that he suffered
prejudice. See Burgos-Montes, 786 F.3d at 109 (a Rule 41
violation "does not require suppression unless the defendant can
demonstrate prejudice") (emphasis added); cf. Krueger, 809 F.3d
at 1117 (affirming district court's order granting defendant's
motion to suppress "[b]ecause [the defendant] met his burden of
establishing prejudice and because suppression furthers the
purpose of the exclusionary rule by deterring law enforcement
from seeking and obtaining warrants that clearly violate Rule

---

Proponents of the amendment contend that it ought be
adopted in order "to address two increasingly common
situations: (1) where the warrant sufficiently describes
the computer to be searched but the district within which
that computer is located is unknown, and (2) where the
investigation requires law enforcement to coordinate
searches of numerous computers in numerous districts."
Raman Letter 1.

While the Advisory Committee on Criminal Rules
unanimously approved the proposed amendment, Raggi Mem. 5,
it has drawn criticism from stakeholders ranging from the
American Civil Liberties Union, see Letter from American
Civil Liberties Union to Members of the Advisory Committee
on Criminal Rules (Oct. 31, 2014), to Google, see Letter
from Richard Salgado, Director, Law Enforcement and
Information Security, Google Inc., to Judicial Conference
Advisory Committee on Criminal Rules (Feb. 13, 2015).

[21]

**Add.21**

41(b)(1)")".  "To show prejudice, defendants must show that they were subjected to a search that might not have occurred or would not have been so abrasive had Rule 41[] been followed."[14] Bonner, 808 F.2d at 869.  Here, had Rule 41(b) been followed, the magistrate judge[15] would not have issued the NIT Warrant, and therefore the search conducted pursuant to that Warrant might

---

[14] Courts outside this district faced with Rule 41(b) violations have considered (and in some cases, adopted) alternative formulations of the prejudice inquiry.  See, e.g., Krueger, 809 F.3d at 1116 (evaluating government's proposed prejudice standard, "which would preclude defendants from establishing prejudice in this context so long as the [g]overnment hypothetically could have obtained the warrant from a different federal magistrate judge with warrant-issuing authority under the Rule"); Michaud, 2016 WL 337263 at *6-7.  In Michaud, the court reasoned that the most "sensible interpretation" of the prejudice standard in this context is asking "whether the evidence obtained from a warrant that violates Rule 41(b) could have been available by other lawful means[.]"  2016 WL 337263 at *6 (emphasis added).  This Court respectfully declines to follow the Michaud court's approach, instead adhering to the prejudice standard generally applicable to Rule 41 violations.  Cf. Krueger, 809 F.3d at 1116 (rejecting government's proposed prejudice standard, which "would preclude defendants from establishing prejudice in this context so long as the Government hypothetically could have obtained the warrant from a different federal magistrate judge with warrant-issuing authority under the Rule[,]" reasoning that "[w]hen it comes to something as basic as who can issue a warrant, we simply cannot accept such a speculative approach" and that instead the standard "should be anchored to the facts as they actually occurred").

[15] This is not to say that a district judge could not have issued the NIT Warrant, since Rule 41(b) and Section 636(a) bear only on the authority of magistrate judges to issue warrants. See infra Part III(B)(4).

[22]

**Add.22**

not have occurred.[16] See Krueger, 809 F.3d at 1116 (holding that
defendant suffered prejudice as a result of having been
subjected to a search that violated Rule 41(b), since that
search "might not have occurred because the Government would not
have obtained [the warrant] had Rule 41(b)(1) been followed.").
Contrast United States v. Scott, 83 F.Supp.2d 187, 203 (D. Mass.
2000) (Rule 41(d) violation did not prejudice defendant, since
"the nature of the search would not have changed even if [the
defendant] had been given a copy of the warrant prior to the
search, as required under the rules); United States v. Jones,
949 F.Supp.2d 316, 323 (D. Mass. 2013) (Saris, C.J.) (law
enforcement officer's failure to leave the defendant with a copy
of the warrant, as required by Rule 41(f), was not prejudicial).

        To rebut Levin's prejudice argument, the government appears
to ignore the NIT Warrant altogether, baldly stating that
"[w]here there is probable cause, judicial approval, and the
computer server which the defendant accessed to view child
pornography was physically located in the jurisdiction where the
issuing magistrate was located, there can be no prejudice to the

---

[16] It follows from this that the government might not have
obtained the evidence it seized pursuant to the Residential
Warrant, since the application for that warrant was based on
information it acquired through the execution of the NIT
Warrant.  As the government itself points out, it "had no way to
know where the defendant was without first using the NIT[.]"
Gov't's Resp. 15.

[23]

defendant." Gov't's Resp. 16. Simply put, this is not the standard for determining prejudice, and the government directs the Court to no authority to support its assertion. Moreover, as discussed above, the Rule 41(b) violation here had the effect of vitiating the purported judicial approval so, even by this standard, the government's argument against prejudice must fail.

### 3. Good-Faith Exception

Finally, the government argues that, even if the NIT Warrant violated the Federal Magistrates Act and Rule 41(b), the Court ought not exclude the evidence seized pursuant to the NIT Warrant because the law enforcement officers here acted in good faith. See Gov't's Resp. 21 (citing United States v. Leon, 468 U.S. 897, 918, 926 (1984)). Whether the good-faith exception applies where a warrant was void is a question of first impression in this Circuit, and an unresolved question more broadly. See Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 1.3(f) n.60 ("It is unclear whether the [Leon good-faith] rule extends to a warrant 'that was essentially void ab initio' because of 'the issuing court's lack of jurisdiction to authorize the search in the first instance.'") (quoting United States v. Baker, 894 F.2d 1144, 1147 (10th Cir. 1990)). This Court holds that it does not.

In Leon, the Supreme Court held that suppression was unwarranted where evidence was obtained pursuant to a search

[24]

Add.24

warrant that was later determined to be unsupported by probable cause, since the executing officers acted in objectively reasonable reliance on the warrant's validity.  See 468 U.S. at 922.  In reaching this conclusion, the Supreme Court observed that "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate judge's determination."  Id. at 914 (internal quotation marks and citation omitted).

Leon contains not the slightest suggestion, however, that the same deference ought apply when magistrate judges determine their own jurisdiction.  Indeed, the Supreme Court's conclusion presupposes that the issuing magistrate judge was authorized to issue the challenged warrant.  Cf. United States v. Houston, No. 3:13-09-DCR, 2014 WL 259085 at *26 n.14 (E.D. Tenn. Jan. 23, 2014) (where a warrant is "void ab initio . . . the [c]ourt never reaches the question of whether the search warrant is supported by probable cause") (internal citation omitted).  Moreover, Leon deals explicitly with a "subsequently invalidated warrant," 468 U.S. at 918 (emphasis added), rather than a warrant that was void at the time of its issuance.  The latter

[ 25 ]

raises qualitatively different concerns, as several post-<u>Leon</u>

courts have recognized.[17]

Over the years since <u>Leon</u>, the Supreme Court has expanded

the good-faith exception to contexts beyond those <u>Leon</u>

specifically addressed.[18]  None of the Supreme Court's post-<u>Leon</u>

good-faith cases, however, involved a warrant that was void <u>ab</u>

<u>initio</u>, and therefore none direct the conclusion that the good-

---

[17] Courts interpreting the scope of <u>Leon</u> have repeatedly
held or acknowledged in dicta that where evidence is obtained
pursuant to a warrant that is void <u>ab initio</u>, the good-faith
exception has no application.  <u>See, e.g.</u>, <u>State</u> v. <u>Wilson</u>, 618
N.W.2d 513, 520 (S.D. 2000) (holding that good-faith exception
could not save evidence obtained pursuant to warrant issued by
state judge acting outside territorial jurisdiction, since
"[a]ctions by a police officer cannot be used to create
jurisdiction, even when done in good faith"); <u>State</u> v. <u>Nunez</u>,
634 A.2d 1167, 1171 (R.I. 1993) (stating in dicta that <u>Leon</u>
good-faith exception "would be inapplicable to this case
because" it involved a warrant issued by a retired judge without
authority to do so, and thus was "void <u>ab initio</u>"); <u>Commonwealth</u>
v. <u>Shelton</u>, 766 S.W.2d 628, 629-30 (Ky. 1989) (noting in dicta
that <u>Leon</u> would not be applicable since "in the case at bar, we
are not confronted with a technical deficiency; but rather a
question of jurisdiction"); <u>United States</u> v. <u>Vinnie</u>, 683 F.Supp.
285, 288-89 (D. Mass. 1988) (Skinner, J.) (holding <u>Leon</u>'s good-
faith exception inapplicable since the case involved not the
"determination of what quantum of evidence constitutes probable
cause" but rather "the more fundamental problem of a magistrate
judge acting without subject matter jurisdiction").

[18] <u>Leon</u>, along with its companion case, <u>Massachusetts</u> v.
<u>Sheppard</u>, 468 U.S. 981 (1984), "contemplated two circumstances:
one in which a warrant is issued and is subsequently found to be
unsupported by probable cause and the other in which a warrant
is supported by probable cause, but is technically deficient."
<u>Vinnie</u>, 683 F.Supp. at 288.

[26]

**Add.26**

faith exception ought apply to this case.[19]  This Court is aware
of only one federal circuit court to address the question of
whether Leon's good-faith exception applies in these
circumstances: the Sixth Circuit.  See Master, 614 F.3d 236;
United States v. Scott, 260 F.3d 512 (6th Cir. 2001).  Scott
involved a search warrant issued by a retired judge who lacked
authority to do so.  260 F.3d at 513.  After holding that such
warrant was necessarily void ab initio, id. at 515, the court
concluded that, "[d]espite the dearth of case law, we are
confident that Leon did not contemplate a situation where a

---

[19] The good-faith exception has been held to apply where
officers execute a warrant in reliance on existing law.  See
Davis v. United States, 131 S. Ct. 2419 (2011) (good-faith
exception precluded suppression of evidence obtained through a
search incident to arrest that was proper under binding
appellate precedent at the time of the search but which was
later held to be unlawful); Illinois v. Krull, 480 U.S. 340
(1987) (good-faith exception applied to a warrantless
administrative search conducted pursuant to a statute later
found to be unconstitutional, where the officer's reliance on
the constitutionality of the statute was objectively
reasonable).  Unlike in those cases, here there was no
"intervening change in the law that made the good-faith
exception relevant."  United States v. Wurie, 728 F.3d 1 (1st
Cir. 2013).
     The Supreme Court has also applied the good-faith exception
in circumstances involving one-off mistakes of fact that
implicate the validity of a warrant at the time of its
execution.  See Herring v. United States, 555 U.S. 135 (2009)
(good-faith exception applied to evidence improperly obtained as
a result of law enforcement's negligent record-keeping
practices); Arizona v. Evans, 514 U.S. 1 (1995) (evidence seized
in violation of the Fourth Amendment as a result of a clerical
error on the part of court personnel was covered by good-faith
exception and thus did not warrant suppression).  Here, in
contrast, the warrant was void at its inception.

**Add.27**

warrant is issued by a person lacking the requisite legal authority." Id.

Nine years later, the Sixth Circuit effectively reversed itself in Master, which involved a warrant issued by a state judge to search property outside his district, which was unauthorized under Tennessee law. 614 F.3d at 239. The court held that the warrant was invalid for the same reason as was the warrant in Scott,[20] id. at 240, but that the good-faith exception to the exclusionary rule applied because Scott's reasoning was "no longer clearly consistent with current Supreme Court doctrine." Id. at 242. In particular, it noted that "[t]he Supreme Court has effectively created a balancing test by requiring that in order for a court to suppress evidence following the finding of a Fourth Amendment violation, 'the benefits of deterrence must outweigh the costs.'" Id. at 243 (quoting Herring v. United States, 555 U.S. 135, 142 (2009)).

The Master court read the Supreme Court's recent good-faith cases too broadly.[21] This Court is persuaded instead by the

---

[20] The difference between the issuer of the warrant in Scott and in Master -- namely, a retired judge with "no authority to approve any warrants," and an active judge with authority to issue warrants within his district, respectively -- was "immaterial" for the purpose of determining whether the warrant was valid. Master, 614 F.3d at 240.

[21] Even in Master, it should be noted, the court acknowledged that the recent Supreme Court cases addressing the

[28]

**Add.28**

rationale in Scott and cases applying the holding of that
decision, see, e.g., United States v. Neering, 194 F.Supp.2d 620
(E.D. Mich. 2002) (warrant issued by an official who was not
properly appointed and therefore lacked issuing authority was
void, and under Scott, the good-faith exception did not apply).
Neither Hudson nor Herring -- both of which the Master court
cited in support of its conclusion that Scott's holding is no
longer tenable, see 614 F.3d at 242 -- requires the conclusion
that the good-faith exception applies to evidence seized
pursuant to a warrant that was void ab initio.[22]

--------

good-faith exception "do[] not directly overrule our previous
decision in Scott." 614 F.3d at 243.

[22] In Hudson, 547 U.S. 586 (2006), the Supreme Court held
that suppression was not an appropriate remedy for a violation
of the knock-and-announce rule. See id. at 599. In reaching
this conclusion, the plurality explicitly distinguished the
interests protected by the warrant requirement and the knock-
and-announce requirement. See id. at 593. With respect to the
warrant requirement, it noted that "[u]ntil a valid warrant has
issued, citizens are entitled to shield their persons, houses,
papers, and effects . . . from the government's scrutiny[,]" and
that "[e]xclusion of the evidence obtained by a warrantless
search vindicates that entitlement." Id. (internal quotation
marks and citations omitted) (emphasis added). As no valid
warrant was ever issued here, and the government does not argue
that an exception to the warrant requirement applies, exclusion
is appropriate.
    Herring, too, is distinguishable. There, law enforcement
officers executed an arrest warrant that had been rescinded.
555 U.S. at 138. The Supreme Court held that since the mistake
was attributable to "isolated negligence attenuated from the
arrest" -- specifically, a recordkeeping error -- the good-faith
exception to the exclusionary rule applied. Id. at 137.
Although that case makes much of the connection between the
exclusionary rule and the goal of deterrence and culpability of

Because a warrant that was void at the outset is akin to no
warrant at all, cases involving the application of the good-
faith exception to evidence seized pursuant to a warrantless
search are especially instructive.  In United States v. Curzi,
867 F.2d 36 (1st Cir. 1989), the First Circuit declined to
"recognize[] a good-faith exception in respect to warrantless
searches."  Id. at 44.[23]  To hold that the good-faith exception
is applicable here would collapse the distinction between a
voidable and a void warrant.  But this distinction is
meaningful: the former involves "judicial error," such as
"misjudging the sufficiency of the evidence or the warrant

---

law enforcement, see id. at 141-43, it says nothing about
whether the same calculus ought apply where there was never
jurisdiction to issue a valid warrant in the first place.

[23] While no case has directly disturbed this holding, the
First Circuit has since held that the good-faith exception may
exempt from exclusion evidence seized pursuant to an
unconstitutional warrantless search "'conducted in objectively
reasonable reliance on binding appellate precedent[.]'"  United
States v. Sparks, 711 F.3d 58, 62 (1st Cir. 2013) (quoting
Davis, 131 S.Ct. at 2434).  Cases like Sparks, though, are
readily distinguishable: the officers in Sparks were entitled to
rely on circuit precedent indicating that they could conduct the
challenged search without a warrant; by contrast, here no
binding appellate precedent authorized the officers to undertake
the search either without a warrant or pursuant to one that was
void at the outset.  To determine whether the good-faith
exception applied in Sparks, the court asked: "what universe of
cases can the police rely on?  And how clearly must those cases
govern the current case for that reliance to be objectively
reasonable?"  711 F.3d at 64.  Such questions are wholly
inapposite here.

[30]

**Add.30**

application's fulfillment of the statutory requirements[,]"
while the latter involves "judicial <u>authority</u>," <u>i.e.</u>, a judge
"act[ing] outside of the law, outside of the authority granted
to judges in the first place."  <u>State</u> v. <u>Hess</u>, 770 N.W.2d 769,
776 (Ct. App. Wis. 2009) (emphasis added); <u>cf.</u> <u>Scott</u>, 260 F.3d
at 515 ("<u>Leon</u> presupposed that the warrant was issued by a
magistrate or judge clothed in the proper legal authority,
defining the issue as whether the exclusionary rule applied to
'evidence obtained by officers acting in reasonable reliance on
a search warrant <u>issued by a detached and neutral magistrate</u> but
ultimately found to be unsupported by probable cause.'")
(quoting <u>Leon</u>, 468 U.S. at 900); <u>State</u> v. <u>Vickers</u>, 964 P.2d 756,
762 (Mont. 1998) (distinguishing <u>Leon</u> and concluding that "[i]f
a search warrant is void <u>ab initio</u>, the inquiry stops and all
other issues pertaining to the validity of the search warrant,
such as whether the purpose of the exclusionary rule is served,
are moot.").  Were the good-faith exception to apply here,
courts would have to tolerate evidence obtained when an officer
submitted something that reasonably looked like a valid warrant
application, to someone who, to the officer, appeared to have
authority to approve that warrant application.  <u>Cf.</u> <u>Krueger</u>, 809
F.3d at 1126 (Gorsuch, J., concurring).  This Court holds that

such an expansion of the good-faith exception is improvident, and not required by current precedent.[24]

Even were the Court to hold that the good-faith exception could apply to circumstances involving a search pursuant to a warrant issued without jurisdiction, it would decline to rule such exception applicable here.  For one, it was not objectively reasonable for law enforcement -- particularly "a veteran FBI agent with 19 years of federal law enforcement experience[,]" Gov't's Resp. 7-8 -- to believe that the NIT Warrant was properly issued considering the plain mandate of Rule 41(b). See Glover, 736 F.3d at 516 ("[I]t is quite a stretch to label the government's actions in seeking a warrant so clearly in violation of Rule 41 as motivated by 'good faith.'"); cf. United States v. McKeever, 894 F.2d 712, 717 (5th Cir. 1990) (good-faith exception did not apply where sheriff "who was the prime mover in obtaining and executing the search . . . knew both that

---

[24] While the exclusionary rule has its detractors, see, e.g., Akhil Reed Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 785-800 (1994) (arguing that suppression is an "awkward and embarrassing remedy" that is unsupported by the text of the Fourth Amendment), "when a criminal conviction is predicated on a violation of the Constitution's criminal procedure requirements, including the Fourth Amendment, the conviction works an ongoing deprivation of liberty without due process," Richard M. Re, The Due Process Exclusionary Rule, 127 Harv. L. Rev. 1885, 1887 (2014); see also Carol S. Steiker, Second Thoughts About First Principles, 107 Harv. L. Rev. 820, 848-852 (1994).

[32]

**Add.32**

he had to obtain a warrant from a court of record . . . and that [the issuing judge] was not a judge of a court of record.").[25] Moreover, even analyzed under <u>Herring</u>, the conduct at issue here can be described as "systemic error or reckless disregard of

---

[25] In its oral argument opposing this motion, Elec. Clerk's Notes, ECF No. 62, the government indicated that the particular officers executing the search cannot be charged with the knowledge that the warrant was issued in violation of the Federal Magistrates Act and Rule 41(b). But it would be incongruous to view these officers' conduct in isolation. As Professor Amsterdam articulated:

> [S]urely it is unreal to treat the offending officer as a private malefactor who just happens to receive a government paycheck. It is the government that sends him out on the streets with the job of repressing crime and of gathering criminal evidence in order to repress it. It is the government that motivates him to conduct searches and seizures as a part of his job, empowers him and equips him to conduct them. If it also receives the products of those searches and seizures without regard to their constitutionality and uses them as the means of convicting people whom the officer conceives it to be his job to get convicted, it is not merely tolerating but inducing unconstitutional searches and seizures.

Anthony G. Amsterdam, <u>Perspectives on the Fourth Amendment</u>, 58 Minn. L. Rev. 349, 432 (1974).

**Add.33**

constitutional requirements,"[26] 555 U.S. at 147, and the Court

thus concludes that suppression is appropriate.[27]

### 4.    Policy Ramifications

Notwithstanding the Court's doctrinal analysis -- which has

now concluded -- the Court is mindful of the thorny practical

questions this motion raises.  The government asserts that to

hold that the magistrate judge lacked authority to issue the NIT

---

[26] The Supreme Court does not define "systemic negligence," Herring, 555 U.S. at 144, or "systemic error," id. at 147, and the former, at least, is apparently a new term in the Supreme Court's lexicon, see Wayne R. Lafave, The Smell of Herring: A Critique of the Supreme Court's Latest Assault on the Exclusionary Rule, 99 J. Crim. L. & Criminology 757, 784 (2009). It is difficult to ascertain the frequency with which similar warrants -- i.e., warrants to conduct remote searches of property located outside a magistrate judge's judicial district -- are granted, since these warrants are typically issued and remain under seal.  See Owsley, supra note 4, at 4-5. Nonetheless, it is clear to the Court that this is far from the sole instance in which the government has sought and obtained an NIT warrant.  See id. (listing cases involving NIT warrants or similar); Gov't's Resp. 23.

[27] The Court acknowledges that suppression is an extreme remedy, and consequently it considered whether, on this occasion -- but never again under these circumstances -- the evidence at issue ought be let in under the good-faith exception.  See State v. Hardy, No. 16964, 1998 WL 543368, at *6-7 (Ct. App. Ohio Aug. 28, 1998) (Fain, J., concurring in the judgment) (concluding that good-faith exception should apply to evidence obtained pursuant to a warrant issued without proper jurisdiction, but noting that "[o]nce we allow time for reasonable police officers within this jurisdiction to become acquainted with the territorial limits upon a magistrate judge's authority to issue search warrants, however, claims of good-faith exceptions to the warrant requirement are likely to be unavailing.").  Upon further deliberation, however, the Court concluded that to hold that Leon's good-faith exception applies here, where there never existed a valid warrant, would stretch that exception too far.

[34]

**Add.34**

Warrant, and accordingly to suppress the evidence obtained
pursuant thereto, would create "an insurmountable legal barrier"
to law enforcement efforts in this realm.  Gov't's Resp. 16.
The Court is unmoved by the government's argument for two
reasons.

First, it cannot fairly be said that the legal barrier to
obtaining this type of NIT Warrant from a magistrate judge is
"insurmountable," because the government itself has come up with
a way of surmounting it -- namely, to change Rule 41(b), see
supra note 13.

Second, it does not follow from this opinion that there was
no way for the government to have obtained the NIT Warrant.
Section 636(a) and Rule 41(b) limit the territorial scope of
magistrate judges -- they say nothing about the authority of
district judges to issue warrants to search property located
outside their judicial districts.  Indeed, the quotation from
United States v. Villegas, 899 F.2d 1324 (2d Cir. 1990),
included in the government's own brief, is revealing: "Rule 41
does not define the extent of the court's power to issue a
search warrant. . . . Given the Fourth Amendment's warrant
requirements and assuming no statutory prohibition, the courts
must be deemed to have inherent power to issue a warrant when
the requirements of that Amendment are met."  Gov't's Resp. 20-
21 (quoting Villegas, 899 F.2d at 1334).  With respect to

[35]

**Add.35**

district judges, neither Rule 41(b) nor Section 636(a) of the Federal Magistrates Act restricts their inherent authority to issue warrants consistent with the Fourth Amendment.  See Krueger, 809 F.3d at 1125 n.6 (noting that analysis of a magistrate judge's lack of statutory authority to issue warrants to search outside his district has no bearing on "the statutory authorities of a district judge to issue a warrant for an out-of-district search[,]" and pointing out that "[u]nlike magistrates, the jurisdiction of district courts is usually defined by subject matter and parties rather than strictly by geography."); cf. Matter of Application and Affidavit for a Search Warrant, 923 F.2d 324, 326 (4th Cir. 1991) (contrasting a district judge's "inherent power" with a magistrate's power, which is either delegated by a district judge or expressly provided by statute).[28]

---

[28] Surprisingly, a number of courts have apparently understood Rule 41(b) to apply to district judges.  See, e.g., United States v. Golson, 743 F.3d 44, 51 (3d Cir. 2014) ("Rule 41(b) grants the authority to issue search warrants to federal judges and judges of state courts of record."); Glover, 736 F.3d at 515 (concluding that a warrant issued by a district judge to search property outside that judge's district violated Rule 41(b)(2)); cf. United States v. Krawiec, 627 F.2d 577, 580 (1st Cir. 1980) (indicating that all "federal warrants" are required to comply with Rule 41).  On its face, however, Rule 41(b) applies only to "a magistrate judge" and "a judge of a state court of record."  The authority of district judges to issue warrants arises elsewhere, see Villegas, 899 F.2d at 1334; 18 U.S.C. § 3102, and district judges are not subject to the limitations set forth in Rule 41(b).

**Add.36**

The magistrate judge who issued this warrant sits primarily in Alexandria, Virginia.  <u>See</u> NIT Warrant.  Four district judges and three senior judges sit routinely in that courthouse.  <u>See</u> <u>Alexandria Courthouse, United States District Court Eastern</u> <u>District of Virginia</u>, http://www.vaed.uscourts.gov/locations/al e.htm (last visited Apr. 20, 2016).  Here, the government had already involved one of those district judges in its investigation, albeit to obtain the Title III warrant.  <u>See</u> Title III Warrant.

Of course, were the government to present its NIT Warrant application to a district judge, it would still have to meet the requirements of the Fourth Amendment, which guarantees that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched."  U.S. Const. amend. IV.  Of special concern here is the particularity requirement, since, as the government points out, "the defendant's use of the Tor hidden service made it impossible for investigators to know what other districts, if any, the execution of the warrant would take place in," Gov't's Resp. 20.[29]  While this Court need not decide whether the

---

[29] Indeed, objectors to the proposed amendment to Rule 41(b), <u>see</u> <u>supra</u> note 13, have argued that a warrant that permitted law enforcement to remotely search computers at unknown locations would violate the Fourth Amendment's particularity requirement.  <u>See, e.g.,</u> <u>Written Statement of the</u>

**Add.37**

particularity requirement was met here, it notes that despite
the difficulty highlighted by the government, at least two
courts have determined that <u>this precise warrant</u> was
sufficiently particular to pass constitutional muster.  <u>See
United States</u> v. <u>Epich</u>, No. 15-CR-163-PP, 2016 WL 953269, at *2
(E.D. Wis. Mar. 14, 2016); <u>United States</u> v. <u>Michaud</u>, No. 3:15-
cr-05351-RJB, 2016 WL 337263 at *4-*5 (W.D. Wash. Jan. 28,
2016).  <u>But cf.</u> <u>In re Warrant to Search a Target Computer at
Premises Unknown</u>, 958 F.Supp.2d at 755-58 (warrant to
"surreptitiously install[] software designed . . . to extract
certain stored electronic records" from "an unknown computer at
an unknown location" did not satisfy Fourth Amendment
particularity requirement).

**IV.   CONCLUSION**

    Based on the foregoing analysis, the Court concludes that
the NIT Warrant was issued without jurisdiction and thus was
void <u>ab initio</u>.  It follows that the resulting search was
conducted as though there were no warrant at all.  Since
warrantless searches are presumptively unreasonable, and the
good-faith exception is inapplicable, the evidence must be
excluded.  Accordingly, Levin's motion to suppress, ECF No. 44,
is GRANTED.

---

<u>Center for Democracy & Technology Before the Judicial Conference
Advisory Committee on Criminal Rules</u> 2, Oct. 24, 2014.

**Add.38**

SO ORDERED.

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

**Add.39**

AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

FEB 2 0 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
OF COMPUTERS THAT ACCESS
upf45jv3bziuctml.onion

)
)
)
)
)
)

Case No. 1:15-SW-89

# UNDER SEAL

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252A(g); 2251(d) (1) and/or (e); 2252A(a)(2)(A) and (b)(1); 2252A(a)(5)(B) and (b)(2) | Engaging in a Child Exploitation Enterprise, Advertising and Conspiracy to Advertise Child Pornography; Receipt and Distribution of, and Conspiracy to Receive and Distribute Child Pornography; Knowing Access or Attempted Access With Intent to View Child Pornography |

The application is based on these facts:
See attached affidavit.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

AUSA Whitney Dougherty Russell

*Applicant's signature*

Douglas Macfarlane, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Theresa Carroll Buchanan
United States Magistrate Judge

Date: _____02/20/2015_____

*Judge's signature*

City and state: Alexandria, Virginia

Honorable Theresa Carroll Buchanan,  U.S. Magistrate Judge
*Printed name and title*

Add.41

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Virginia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 1:15-SW-89 |
| OF COMPUTERS THAT ACCESS | ) | |
| upf45jv3bzluctml.onion | ) | **UNDER SEAL** |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____Virginia_____
*(identify the person or describe the property to be searched and give its location)*:
See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before ___March 6, 2015___
*(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10 p.m. ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
___Honorable Theresa Carroll Buchanan___ .
*(name)*

☒ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☒ for ___30___ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of _____ .

| | |
|---|---|
| Date and time issued: 2/20/2015 11:45 | /s/ |
| | Theresa Carroll Buchanan |
| | United States Magistrate Judge |
| | *Judge's signature* |
| City and state:     Alexandria, Virginia | Honorable Theresa Carroll Buchanan, U.S. Magistrate Judge |
| | *Printed name and title* |

# Add.42

**ATTACHMENT A**

**Place to be Searched**

This warrant authorizes the use of a network investigative technique ("NIT") to be deployed on the computer server described below, obtaining information described in Attachment B from the activating computers described below.

The computer server is the server operating the Tor network child pornography website referred to herein as the TARGET WEBSITE, as identified by its URL -upf45jv3bziuctml.onion - which will be located at a government facility in the Eastern District of Virginia.

The activating computers are those of any user or administrator who logs into the TARGET WEBSITE by entering a username and password. The government will not employ this network investigative technique after 30 days after this warrant is authorized, without further authorization.

**Add.43**

## ATTACHMENT B

### Information to be Seized

From any "activating" computer described in Attachment A:

1.      the "activating" computer's actual IP address, and the date and time that the NIT determines what that IP address is;

2.      a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish data from that of other "activating" computers, that will be sent with and collected by the NIT;

3.      the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86);

4.      information about whether the NIT has already been delivered to the "activating" computer;

5.      the "activating" computer's Host Name;

6.      the "activating" computer's active operating system username; and

7.      the "activating" computer's media access control ("MAC") address;

that is evidence of violations of 18 U.S.C. § 2252A(g), Engaging in a Child Exploitation Enterprise; 18 U.S.C. §§ 2251(d)(1) and or (e), Advertising and Conspiracy to Advertise Child Pornography; 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1), Receipt and Distribution of, and Conspiracy to Receive and Distribute Child Pornography; and/or 18 U.S.C. § 2252A(a)(5)(B) and (b)(2), Knowing Access or Attempted Access With Intent to View Child Pornography.

2

**Add.44**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

Alexandria Division

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH | ) | **FILED UNDER SEAL** |
| OF COMPUTERS THAT ACCESS | ) | |
| upf45jv3bziuctml.onion | ) | **Case No. 1:15-SW-89** |

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Douglas Macfarlane, being first duly sworn, hereby depose and state:

### INTRODUCTION

1.       I have been employed as a Special Agent ("SA") with the Federal Bureau of

Investigation ("FBI") since April, 1996, and I am currently assigned to the FBI's Violent Crimes

Against Children Section, Major Case Coordination Unit ("MCCU"). I currently investigate federal

violations concerning child pornography and the sexual exploitation of children and have gained

experience through training in seminars, classes, and everyday work related to these types of

investigations. I have participated in the execution of numerous warrants involving the search and

seizure of computers, computer equipment, software, and electronically stored information, in

conjunction with criminal investigations pertaining to child pornography the sexual exploitation of

children. I have received training in the area of child pornography and child exploitation, and have

had the opportunity to observe and review numerous examples of child pornography (as defined in

18 U.S.C. § 2256) in all forms of media including computer media. I am an "investigative or law

enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United

States Code, and am empowered by law to conduct investigations of, and to make arrests for,

offenses enumerated in Section 2516 of Title 18, United States Code.

**Add.45**

2.       I make this affidavit in support of an application for a search warrant to use a network investigative technique ("NIT") to investigate the users and administrators of the website upf45jv3bziuctml.onion (hereinafter "TARGET WEBSITE") as further described in this affidavit and its attachments.[1]

3.       The statements contained in this affidavit are based in part on: information provided by FBI Special Agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, including foreign law enforcement agencies as described below; information gathered from the service of subpoenas; the results of physical and electronic surveillance conducted by federal agents; independent investigation and analysis by FBI agents/analysts and computer forensic professionals; my experience, training and background as a Special Agent with the FBI, and communication with computer forensic professionals assisting with the design and implementation of the NIT. This affidavit includes only those facts that I believe are necessary to establish probable cause and does not include all of the facts uncovered during the investigation.

## RELEVANT STATUTES

4.       This investigation concerns alleged violations of: 18 U.S.C. § 2252A(g), Engaging in a Child Exploitation Enterprise; 18 U.S.C. §§ 2251(d)(1) and (e), Advertising and Conspiracy to Advertise Child Pornography; 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1), Receiving and Distributing/Conspiracy to Receive and Distribute Child Pornography; and 18 U.S.C. §

---

[1]  The common name of the TARGET WEBSITE is known to law enforcement. The site remains active and disclosure of the name of the site would potentially alert users to the fact that law enforcement action is being taken against the site, potentially provoking users to notify other users of law enforcement action, flee, and/or destroy evidence. Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms.

**Add.46**

2252A(a)(5)(B) and (b)(2), Knowing Possession, Access or Attempted Access With Intent to View Child Pornography.

a.    18 U.S.C. § 2252A(g) prohibits a person from engaging in a child exploitation enterprise. A person engages in a child exploitation enterprise if the person violates, inter alia, federal child pornography crimes listed in Title 18, Chapter 110, as part of a series of felony violations constituting three or more separate incidents and involving more than one victim, and commits those offenses in concert with three or more other persons;

b.    18 U.S.C. §§ 2251(d)(1) and (e) prohibits a person from knowingly making, printing or publishing, or causing to be made, printed or published, or conspiring to make, print or publish, any notice or advertisement seeking or offering: (A) to receive, exchange, buy, produce, display, distribute, or reproduce, any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct, or (B) participation in any act of sexually explicit conduct by or with any minor for the purpose of producing a visual depiction of such conduct;

c.    18 U.S.C. §§ 2252A(a)(2) and (b)(1) prohibits a person from knowingly receiving or distributing, or conspiring to receive or distribute, any child pornography or any material that contains child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; and

3

**Add.47**

    d.    18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) prohibits a person from knowingly possessing or knowingly accessing with intent to view, or attempting to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS OF TECHNICAL TERMS USED IN THIS AFFIDAVIT

5.    The following definitions apply to this Affidavit:

    a.    "Bulletin Board" means an Internet-based website that is either secured (accessible with a password) or unsecured, and provides members with the ability to view postings by other members and make postings themselves. Postings can contain text messages, still images, video images, or web addresses that direct other members to specific content the poster wishes. Bulletin boards are also referred to as "internet forums" or "message boards." A "post" or "posting" is a single message posted by a user. Users of a bulletin board may post messages in reply to a post. A message "thread," often labeled a "topic," refers to a linked series of posts and reply messages. Message threads or topics often contain a title, which is generally selected by the user who posted the first message of the thread. Bulletin boards often also provide the ability for members to communicate on a one-to-one basis through "private messages." Private

4

**Add.48**

messages are similar to e-mail messages that are sent between two members of a bulletin board.  They are accessible only by the user who sent/received such a message, or by the bulletin board administrator.

b.      "Child erotica," as used herein, means any material relating to minors that serves a sexual purpose for a given individual, including fantasy writings, letters, diaries, books, sexual aids, souvenirs, toys, costumes, drawings, and images or videos of minors that are not sexually explicit.

c.      "Child Pornography," as used herein, is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d.      "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

e.      "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users.  A "web server," for example, is a

5

Add.49

computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

f.    "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital

**Add.50**

form. It commonly includes programs to run operating systems, applications, and utilities.

h.    "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i.    "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j.    "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

k.    The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet,

7

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

l.    "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber.  By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

m.    "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be "dynamic," meaning that the Internet Service Provider ("ISP") assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static,"

8

if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are also used by computer servers, including web servers, to communicate with other computers.

n. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

o. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

p. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of

9

any person.  See 18 U.S.C. § 2256(2).

q.       "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

r.       "Website" consists of textual pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language ("HTML") and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol ("HTTP").

## PROBABLE CAUSE

6.       The targets of the investigative technique described herein are the administrators and users of the TARGET WEBSITE - upf45jv3bziuctml.onion - which operates as a "hidden service" located on the Tor network, as further described below.  The TARGET WEBSITE is dedicated to the advertisement and distribution of child pornography, the discussion of matters pertinent to child sexual abuse, including methods and tactics offenders use to abuse children, as well as methods and tactics offenders use to avoid law enforcement detection while perpetrating online child sexual exploitation crimes such as those described in paragraph 4 of this affidavit.  The administrators and users of the TARGET WEBSITE regularly send and receive illegal child pornography via the website.

### The Tor Network

7.       The TARGET WEBSITE operates on an anonymity network available to Internet users known as "The Onion Router" or "Tor" network.  Tor was originally designed, implemented, and deployed as a project of the U.S. Naval Research Laboratory for the primary purpose of

10

**Add.54**

protecting government communications. It is now available to the public at large. Information documenting what Tor is and how it works is provided on the publicly accessible Tor website at www.torproject.org. In order to access the Tor network, a user must install Tor software either by downloading an add-on to the user's web browser or by downloading the free "Tor browser bundle" available at www.torproject.org.[2]

8.    The Tor software protects users' privacy online by bouncing their communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual IP address which could otherwise be used to identify a user. It prevents someone attempting to monitor an Internet connection from learning what sites a user visits, prevents the sites the user visits from learning the user's physical location, and it lets the user access sites which could otherwise be blocked. Because of the way Tor routes communications through other computers, traditional IP identification techniques are not viable. When a user on the Tor network accesses a website, for example, the IP address of a Tor "exit node," rather than the user's actual IP address, shows up in the website's IP log. An exit node is the last computer through which a user's communications were routed. There is no practical way to trace the user's actual IP back through that Tor exit node IP. In that way, using the Tor network operates similarly to a proxy server -- that is, a computer through which communications are routed to obscure a user's true location.

9.    Tor also makes it possible for users to hide their locations while offering various kinds of services, such as web publishing, forum/website hosting, or an instant messaging server. Within the Tor network itself, entire websites can be set up as "hidden services." "Hidden services,"

_____

2 Users may also access the Tor network through so-called "gateways" on the open Internet such as "onion.to" and "tor2web.org," however, use of those gateways does not provide users with the anonymizing benefits of the Tor network.

like other websites, are hosted on computer servers that communicate through IP addresses and operate the same as regular public websites with one critical exception. The IP address for the web server is hidden and instead is replaced with a Tor-based web address, which is a series of algorithm-generated characters, such as "asdlk8fs9dflku7f" followed by the suffix ".onion." A user can only reach these "hidden services" if the user is using the Tor client and operating in the Tor network. And unlike an open Internet website, is not possible to determine through public lookups the IP address of a computer hosting a Tor "hidden service." Neither law enforcement nor users can therefore determine the location of the computer that hosts the website through those public lookups.

<u>Finding and Accessing the TARGET WEBSITE</u>

10.     Because the TARGET WEBSITE is a Tor hidden service, it does not reside on the traditional or "open" Internet. A user may only access the TARGET WEBSITE through the Tor network. Even after connecting to the Tor network, however, a user must know the web address of the website in order to access the site. Moreover, Tor hidden services are not indexed like websites on the traditional Internet. Accordingly, unlike on the traditional Internet, a user may not simply perform a Google search for the name of one of the websites on Tor to obtain and click on a link to the site. A user might obtain the web address directly from communicating with other users of the board, or from Internet postings describing the sort of content available on the website as well as the website's location. For example, there is a Tor "hidden service" page that is dedicated to pedophilia and child pornography. That "hidden service" contains a section with links to Tor hidden services that contain child pornography. The TARGET WEBSITE is listed in that section. Accessing the TARGET WEBSITE therefore requires numerous affirmative steps by the user, making it extremely unlikely that any user could simply stumble upon the TARGET WEBSITE without understanding its

12

**Add.56**

purpose and content. In addition, upon arrival at the TARGET WEBSITE, the user sees images of prepubescent females partially clothed and whose legs are spread with instructions for joining the site before one can enter. Accordingly, there is probable cause to believe that, for the reasons described below, any user who successfully accesses the TARGET WEBSITE has knowingly accessed with intent to view child pornography, or attempted to do so.

<u>Description of the TARGET WEBSITE and Its Content</u>

11.     Between September 16, 2014 and February 3, 2015, FBI Special Agents operating in the District of Maryland connected to the Internet via the Tor Browser and accessed the Tor hidden service the TARGET WEBSITE at its then-current Uniform Resource Locator ("URL") muff7i44irws3mwu.onion.[3] The TARGET WEBSITE appeared to be a message board website whose primary purpose is the advertisement and distribution of child pornography. According to statistics posted on the site, the TARGET WEBSITE contained a total of 95,148 posts, 9,333 total topics, and 158,094 total members. The website appeared to have been operating since approximately August 2014 which is when the first post was made on the message board.

12.     On the main page of the site, located to either side of the site name were two images depicting partially clothed prepubescent females with their legs spread apart, along with the text underneath stating, "No cross-board reposts, .7z preferred, encrypt filenames, include preview, Peace out." Based on my training and experience, I know that: "no cross-board reposts" refers to a prohibition against material that is posted on other websites from being "re-posted" to

---

3 As of February 18, 2015, the URL of the TARGET WEBSITE had changed from muff7i44irws3mwu.onion to upf45jv3bziuctml.onion. I am aware from my training and experience that it is possible for a website to be moved from one URL to another without altering its content or functionality. I am also aware from the instant investigation that the administrator of the TARGET WEBSITE occasionally changes the location and URL of the TARGET WEBSITE in an effort to , in part, avoid law enforcement detection. On February 18, 2015, I accessed the TARGET

13

the TARGET WEBSITE; and ".7z" refers to a preferred method of compressing large files or

sets of files for distribution.  Two data-entry fields with a corresponding "Login" button were

located to the right of the site name.  Located below the aforementioned items was the message,

"Warning! Only registered members are allowed to access the section. Please login below or

'register an account' (a hyperlink to the registration page) with [TARGET WEBSITE name]."

Below this message was the "Login" section, consisting of four data-entry fields with the

corresponding text, "Username, Password, Minutes to stay logged in, and Always stay logged

in."

       13.     Upon accessing the "register an account" hyperlink, the following message was

displayed:

> "VERY IMPORTANT. READ ALL OF THIS PLEASE.
>
> I will add to this as needed.
>
> The software we use for this forum requires that new users enter an email address, and checks that what you enter looks approximately valid. We can't turn this off but the forum operators do NOT want you to enter a real address, just something that matches the xxx@yyy.zzz pattern. No confirmation email will be sent. This board has been intentionally configured so that it WILL NOT SEND EMAIL, EVER. Do not forget your password, you won't be able to recover it.
>
> After you register and login to this forum you will be able to fill out a detailed profile. For your security you should not post information here that can be used to identify you.
>
> Spam, flooding, advertisements, chain letters, pyramid schemes, and solicitations are forbidden on this forum.
>
> Note that it is impossible for the staff or the owners of this forum to confirm the true identity of users or monitor in realtime all messages posted, and as such we are not responsible for the content posted by those users. You remain solely responsible for the content of your posted messages.

---

WEBSITE in an undercover capacity at its new URL, and determined that  its content has not changed.

**Add.58**

The forum software places a cookie, a text file containing bits of information (such as your username and password), in your browser's cache. This is ONLY used to keep you logged in/out. This website is not able to see your IP and can not collect or send any other form of information to your computer except what you expressly upload. For your own security when browsing or Tor we also recomend that you turn off javascript and disable sending of the 'referer' header."

14.     After accepting the above terms, registration to the message board then requires a user to enter a username, password, and e-mail account; although a valid e-mail account was not required as described above.  After successfully registering and logging into the site, the following sections, forums, and sub-forums, along with the corresponding number of topics and posts in each, were observed:

| Section – Forum | Topics | Posts | |
|---|---|---|---|
| General Category | | | |
| [the TARGET WEBSITE] information and rules | | 25 | 236 |
| How to | 133 | 863 | |
| Security & Technology discussion | 281 | 2,035 | |
| Request | 650 | 2,487 | |
| General Discussion | 1,390 | 13,918 | |
| The INDEXES | 10 | 119 | |
| Trash Pen | 87 | 1,273 | |
| [the TARGET WEBSITE] Chan | | | |
| Jailbait[4] – Boy | 58 | 154 | |
| Jailbait – Girl | 271 | 2,334 | |
| Preteen – Boy | 32 | 257 | |
| Preteen – Girl | 264 | 3,763 | |
| Jailbait Videos | | | |
| Girls | 643 | 8,282 | |
| Boys | 34 | 183 | |
| Jailbait Photos | | | |
| Girls | 339 | 2,590 | |
| Boys | 6 | 39 | |

---

[4] Based on my training and experience, I know that "jailbait" refers to underage but post-pubescent minors.

15

**Add.59**

| Pre-teen Videos | | |
|---|---|---|
| Girls HC[5] | 1,427 | 20,992 |
| Girls SC/NN | 514 | 5,635 |
| Boys HC | 87 | 1,256 |
| Boys SC/NN | 48 | 193 |

| Pre-teen Photos | | |
|---|---|---|
| Girls HC | 433 | 5,314 |
| Girls SC/NN | 486 | 4,902 |
| Boys HC | 38 | 330 |
| Boys SC/NN | 31 | 135 |

| Webcams | | |
|---|---|---|
| Girls | 133 | 2,423 |
| Boys | 5 | 12 |

| Potpourri | | |
|---|---|---|
| Family [TARGET WEBSITE] -- Incest | 76 | 1,718 |
| Toddlers | 106 | 1,336 |
| Artwork | 58 | 314 |

| Kinky Fetish | | |
|---|---|---|
| Bondage | 16 | 222 |
| Chubby | 27 | 309 |
| Feet | 30 | 218 |
| Panties, nylons, spandex | 30 | 369 |
| Peeing | 101 | 865 |
| Scat | 17 | 232 |
| Spanking | 28 | 251 |
| Vintage | 84 | 878 |
| Voyeur | 37 | 454 |
| Zoo | 25 | 222 |

| Other Languages | | |
|---|---|---|
| Italiano | 34 | 1,277 |
| Portugues | 69 | 905 |
| Deutsch | 66 | 570 |
| Espanol | 168 | 1,614 |
| Nederlands | 18 | 264 |
| Pyccknn -- Russian | 8 | 239 |

---

[5] Based on my training and experience, I know that the following abbreviations respectively mean: HC -- hardcore, i.e., depictions of penetrative sexually explicit conduct; SC -- softcore, i.e., depictions of non-penetrative sexually explicit conduct; NN -- non-nude, i.e., depictions of subjects who are fully or partially clothed.

16

**Add.60**

| Stories | | |
|---|---|---|
| Fiction | 99 | 505 |
| Non-fiction | 122 | 675 |

15.     An additional section and forum was also listed in which members could exchange usernames on a Tor-network-based instant messaging service that I know, based upon my training and experience, to be commonly used by subjects engaged in the online sexual exploitation of children.

16.     A review of the various topics within the above forums revealed each topic contained a title, the author, the number of replies, the number of views, and the last post. The last post section included the date and time of the post as well as the author. Upon accessing a topic, the original post appeared at the top of the page, with any corresponding replies to the original post included the post thread below it. Typical posts appeared to contain text, images, thumbnail-sized previews of images, compressed files (such as Roshal Archive files, commonly referred to as ".rar" files, which are used to store and distribute multiple files within a single file), links to external sites, or replies to previous posts.

17.     A review of the various topics within the "[the TARGET WEBSITE] information and rules," "How to," "General Discussion," and "Security & Technology discussion" forums revealed the majority contained general information in regards to the site, instructions and rules for how to post, and welcome messages between users.

18.     A review of topics within the remaining forums revealed the majority contained discussions, as well as numerous images that appeared to depict child pornography ("CP") and child erotica of prepubescent females, males, and toddlers. Examples of these are as follows:

On February 3, 2015, the user "Mr. Devi" posted a topic entitled "Buratino-06" in

17

**Add.61**

the forum "Pre-teen – Videos - Girls HC" that contained numerous images depicting CP of a prepubescent or early pubescent female. One of these images depicted the female being orally penetrated by the penis of a naked male.

On January 30, 2015, the user "MoDoM" posted a topic entitled "Sammy" in the forum "Pre-teen  Photos – Girls HC" that contained hundreds of images depicting CP of a prepubescent female. One of these images depicted the female being orally penetrated by the penis of a male.

On September 16, 2014, the user "tutu01" posted a topic entitled "9yo Niece - Horse.mpg" in the "Pre-teen Videos - Girls HC" forum that contained four images depicting CP of a prepubescent female and a hyperlink to an external website that contained a video file depicting what appeared to be the same prepubescent female. Among other things, the video depicted the prepubescent female, who was naked from the waist down with her vagina and anus exposed, lying or sitting on top of a naked adult male, whose penis was penetrating her anus.

19.    A list of members, which was accessible after registering for an account, revealed that approximately 100 users made at least 100 posts to one or more of the forums. Approximately 31 of these users made at least 300 posts. Analysis of available historical data seized from the TARGET WEBSITE, as described below, revealed that over 1,500 unique users visited the website daily and over 11,000 unique users visited the website over the course of a week.

20.    A private message feature also appeared to be available on the site, after registering, that allowed users to send other users private messages, referred to as "personal messages or PMs," which are only accessible to the sender and recipient of the message. Review of the site demonstrated that the site administrator made a posting on January 28, 2015, in response to another user in which he stated, among other things, "Yes PMs should now be fixed. As far as a limit, I have not deleted one yet and I have a few hundred there now…."

21.    Further review revealed numerous additional posts referencing private messages

18

**Add.62**

or PMs regarding topics related to child pornography, including one posted by a user stating, "Yes i can help if you are a teen boy and want to fuck your little sister. write me a private message."

22.     Based on my training and experience and the review of the site by law enforcement agents, I believe that the private message function of the site is being used to communicate regarding the dissemination of child pornography and to share information among users that may assist in the identification of the users.

23.     The TARGET WEBSITE also includes a feature referred to as "[the TARGET WEBSITE] Image Hosting". This feature of the TARGET WEBSITE allows users of the TARGET WEBSITE to upload links to images of child pornography that are accessible to all registered users of the TARGET WEBSITE. On February 12, 2015, an FBI Agent accessed a post on the TARGET WEBSITE titled "Giselita" which was created by the TARGET WEBSITE user "Dark Ghost". The post contained links to images stored on "[the TARGET WEBSITE] Image Hosting". The images depicted a prepubescent female in various states of undress. Some images were focused on the nude genitals of a prepubescent female. Some images depicted an adult male's penis partially penetrating the vagina of a prepubescent female.

24.     The TARGET WEBSITE also includes a feature referred to as "[the TARGET WEBSITE] File Hosting". This feature of the TARGET WEBSITE allows users of the TARGET WEBSITE to upload videos of child pornography that are in turn, only accessible to users of the TARGET WEBSITE. On February 12, 2015, an FBI Agent accessed a post on the TARGET WEBSITE titled "Vicky Coughing Cum" which was created by the TARGET WEBSITE user "clitflix". The post contained a link to a video file stored on "[the TARGET WEBSITE] File

Hosting". The video depicted an adult male masturbating and ejaculating into the mouth of a nude, prepubescent female.

25.    The TARGET WEBSITE also includes a feature referred to as "[the TARGET WEBSITE] Chat". On February 6, 2015, an FBI Special Agent operating in the District of Maryland accessed "[the TARGET WEBSITE] Chat" which was hosted on the same URL as the TARGET WEBSITE. The hyperlink to access "[the TARGET WEBSITE] Chat" was located on the main index page of the TARGET WEBSITE. After logging in to [the TARGET WEBSITE] Chat, over 50 users were observed to be logged in to the service. While logged in to [the TARGET WEBSITE] Chat, the following observations were made:

> User "gabs" posted a link to an image that depicted four females performing oral sex on each other. At least two of the females depicted were prepubescent.
>
> User "Rusty" posted a link to an image that depicted a prepubescent female with an amber colored object inserted into her vagina.
>
> User "owlmagic" posted a link to an image that depicted two prepubescent females laying on a bed with their legs in the air exposing their nude genitals.

Other images that appeared to depict child pornography were also observed.

26.    The images described above, as well as other images, were captured and are maintained as evidence.

THE TARGET WEBSITE SUB-FORUMS

27.    While the entirety of the TARGET WEBSITE is dedicated to child pornography, the following sub-forums of the TARGET WEBSITE were reviewed and determined to contain the most egregious examples of child pornography and/or dedicated to retellings of real world

20

**Add.64**

hands on sexual abuse of children.

- Pre-teen Videos - Girls HC

- Pre-teen Videos - Boys HC

- Pre-teen Photos - Girls HC

- Pre-teen Photos - Boys HC

- Potpourri - Toddlers

- Potpourri - Family Play Pen - Incest

- Spanking

- Kinky Fetish - Bondage

- Peeing

- Scat[6]

- Stories - Non-Fiction

- Zoo

- Webcams - Girls

- Webcams - Boys

<u>Identification and Seizure of the Computer Server Hosting the TARGET WEBSITE</u>

28.     In December of 2014, a foreign law enforcement agency advised the FBI that it

suspected IP address 192.198.81.106, which is a United States-based IP address, to be associated

with the TARGET WEBSITE. A publicly available website provided information that the IP Address

192.198.81.106 was owned by Centrilogic, a server hosting company headquartered at 801 Main

Street NW, Lenoir, NC 28645-3907.  Through further investigation, FBI verified that the TARGET

21

**Add.65**

WEBSITE was hosted from the previously referenced IP address. A Search Warrant was obtained and executed at Centrilogic in January 2015 and a copy of the server (hereinafter the "TARGET SERVER") that was assigned IP Address 192.198.81.106 was seized. FBI Agents reviewed the contents of the Target Server and observed that it contained a copy of the TARGET WEBSITE. A copy of the TARGET SERVER containing the contents of the TARGET WEBSITE is currently located on a computer server at a government facility in Newington, VA, in the Eastern District of Virginia. Further investigation has identified a resident of Naples, FL, as the suspected administrator of the TARGET WEBSITE, who has administrative control over the computer server in Lenoir, NC, that hosts the TARGET WEBSITE.

29. While possession of the server data will provide important evidence concerning the criminal activity that has occurred on the server and the TARGET WEBSITE, the identities of the administrators and users of the TARGET WEBSITE would remain unknown without use of additional investigative techniques. Sometimes, non-Tor-based websites have IP address logs that can be used to locate and identify the board's users. In such cases, a publicly available lookup would be performed to determine what ISP owned the target IP address, and a subpoena would be sent to that ISP to determine the user to which the IP address was assigned at a given date and time. However, in the case of the TARGET WEBSITE, the logs of member activity will contain only the IP addresses of Tor "exit nodes" utilized by board users. Generally, those IP address logs cannot be used to locate and identify the administrators and users of the TARGET WEBSITE.[7]

30. Accordingly, on February 19, 2015, FBI personnel executed a court-authorized

---

6 Based on my training and experience, "scat" refers to sexually explicit activity involving defecation and/or feces.
[7] Due to a misconfiguration of the TARGET WEBSITE that existed for an unknown period of time, the true IP Addresses of a small number of users of the TARGET WEBSITE (that amounted to less than 1% of registered users

**Add.66**

search at the Naples, FL, residence of the suspected administrator of the TARGET WEBSITE. That individual was apprehended and the FBI has assumed administrative control of the TARGET WEBSITE. The TARGET WEBSITE will continue to operate from the government-controlled computer server in Newington, Virginia, on which a copy of TARGET WEBSITE currently resides. These actions will take place for a limited period of time, not to exceed 30 days, in order to locate and identify the administrators and users of TARGET WEBSITE through the deployment of the network investigative technique described below. Such a tactic is necessary in order to locate and apprehend the TARGET SUBJECTS who are engaging in the continuing sexual abuse and exploitation of children, and to locate and rescue children from the imminent harm of ongoing abuse and exploitation.

## THE NETWORK INVESTIGATIVE TECHNIQUE

31.    Based on my training and experience as a Special Agent, as well as the experience of other law enforcement officers and computer forensic professionals involved in this investigation, and based upon all of the facts set forth herein, to my knowledge a network investigative technique ("NIT") such as the one applied for herein consists of a presently available investigative technique with a reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt the actual location and identity of those users and administrators of the TARGET WEBSITE described in Attachment A who are engaging in the federal offenses enumerated in paragraph 4. Due to the unique nature of the Tor network and the method by which the network protects the anonymity of its users by routing communications through multiple other computers or "nodes," as described herein, other investigative procedures that are usually employed in criminal investigations of this

---

of the TARGET WEBSITE) were captured in the log files stored on the Centrilogic server.

**Add.67**

type have been tried and have failed or reasonably appear to be unlikely to succeed if they are tried.

32.      Based on my training, experience, and the investigation described above, I have concluded that using a NIT may help FBI agents locate the administrators and users of the TARGET WEBSITE. Accordingly, I request authority to use the NIT, which will be deployed on the TARGET WEBSITE, while the TARGET WEBSITE operates in the Eastern District of Virginia, to investigate any user or administrator who logs into the TARGET WEBSITE by entering a username and password.[8]

33.      In the normal course of operation, websites send content to visitors. A user's computer downloads that content and uses it to display web pages on the user's computer. Under the NIT authorized by this warrant, the TARGET WEBSITE, which will be located in Newington, Virginia, in the Eastern District of Virginia, would augment that content with additional computer instructions. When a user's computer successfully downloads those instructions from the TARGET WEBSITE, located in the Eastern District of Virginia, the instructions, which comprise the NIT, are designed to cause the user's "activating" computer to transmit certain information to a computer controlled by or known to the government. That information is described with particularity on the warrant (in Attachment B of this affidavit), and the warrant authorizes obtaining no other information. The NIT will not deny the user of the "activating" computer access to any data or functionality of the user's computer.

34.      The NIT will reveal to the government environmental variables and certain registry-

---

[8] Although this application and affidavit requests authority to deploy the NIT to investigate any user who logs in to the TARGET WEBSITE with a username and password, in order to ensure technical feasibility and avoid detection of the technique by suspects under investigation, in executing the requested warrant, the FBI may deploy the NIT more discretely against particular users, such as those who have attained a higher status on Website I by engaging in substantial posting activity, or in particular areas of TARGET WEBSITE, such as the TARGET WEBSITE sub-

24

**Add.68**

type information that may assist in identifying the user's computer, its location, and the user of the computer, as to which there is probable cause to believe is evidence of violations of the statutes cited in paragraph 4. In particular, the NIT will only reveal to the government the following items, which are also described in Attachment B:

a.  The "activating" computer's actual IP address, and the date and time that the NIT determines what that IP address is;

b.  A unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish the data from that of other "activating" computers. That unique identifier will be sent with and collected by the NIT;

c.  The type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86);

d.  Information about whether the NIT has already been delivered to the "activating" computer;

e.  The "activating" computer's "Host Name." A Host Name is a name assigned to a device connected to a computer network that is used to identify the device in various forms of electronic communication, such as communications over the Internet;

f.  the "activating" computer's active operating system username; and

g.  The "activating" computer's Media Access Control ("MAC") address. The equipment that connects a computer to a network is commonly referred to as a network adapter. Most network adapters have a MAC address assigned by the

---

forums described in Paragraph 27.

manufacturer of the adapter that is designed to be a unique identifying number. A unique MAC address allows for proper routing of communications on a network. Because the MAC address does not change and is intended to be unique, a MAC address can allow law enforcement to identify whether communications sent or received at different times are associated with the same adapter.

35.     Each of these categories of information described above, and in Attachment B, may constitute evidence of the crimes under investigation, including information that may help to identify the "activating" computer and its user.  The actual IP address of a computer that accesses the TARGET WEBSITE can be associated with an ISP and a particular ISP customer.  The unique identifier and information about whether the NIT has already been delivered to an "activating" computer will distinguish the data from that of other "activating" computers.  The type of operating system running on the computer, the computer's Host Name, active operating system username, and the computer's MAC address can help to distinguish the user's computer from other computers located at a user's premises.

36.     During the up to thirty day period that the NIT is deployed on the TARGET WEBSITE, which will be located in the Eastern District of Virginia, each time that any user or administrator logs into the TARGET WEBSITE by entering a username and password, this application requests authority for the NIT authorized by this warrant to attempt to cause the user's computer to send the above-described information to a computer controlled by or known to the government that is located in the Eastern District of Virginia.

37.     In the normal course of the operation of a web site, a user sends "request data" to the web site in order to access that site.  While the TARGET WEBSITE operates at a government

26

**Add.70**

facility, such request data associated with a user's actions on the TARGET WEBSITE will be collected. That data collection is not a function of the NIT. Such request data can be paired with data collected by the NIT, however, in order to attempt to identify a particular user and to determine that particular user's actions on the TARGET WEBSITE.

### REQUEST FOR DELAYED NOTICE

38.     Rule 41(f)(3) allows for the delay of any notice required by the rule if authorized by statute. 18 U.S.C. § 3103a(b)(1) and (3) allows for any notice to be delayed if "the Court finds reasonable grounds to believe that providing immediate notification of the execution of the warrant may have an adverse result (as defined in 18 U.S.C. § 2705) . . . ," or where the warrant "provides for the giving of such notice within a reasonable period not to exceed 30 days after the date of its execution, or on a later date certain if the facts of the case justify a longer period of delay." Because there are legitimate law enforcement interests that justify the unannounced use of a NIT, I ask this Court to authorize the proposed use of the NIT without the prior announcement of its use. Announcing the use of the NIT could cause the users or administrators of the TARGET WEBSITE to undertake other measures to conceal their identity, or abandon the use of the TARGET WEBSITE completely, thereby defeating the purpose of the search.

39.     The government submits that notice of the use of the NIT, as otherwise required by Federal Rule of Criminal Procedure 41(f), would risk destruction of, or tampering with, evidence, such as files stored on the computers of individuals accessing the TARGET WEBSITE. It would, therefore, seriously jeopardize the success of the investigation into this conspiracy and impede efforts to learn the identity of the individuals that participate in this conspiracy, and collect evidence

**Add.71**

of, and property used in committing, the crimes (an adverse result under 18 U.S.C. §3103a(b)(1) and 18 U.S.C. § 2705).

40.   · Furthermore, the investigation has not yet identified an appropriate person to whom such notice can be given. Thus, the government requests authorization, under 18 U.S.C. §3103a, to delay any notice otherwise required by Federal Rule of Criminal Procedure 41(f), until 30 days after any individual accessing the TARGET WEBSITE has been identified to a sufficient degree as to provide notice, unless the Court finds good cause for further delayed disclosure.

41.   The government further submits that, to the extent that use of the NIT can be characterized as a seizure of an electronic communication or electronic information under 18 U.S.C. § 3103a(b)(2), such a seizure is reasonably necessary, because without this seizure, there would be no other way, to my knowledge, to view the information and to use it to further the investigation. Furthermore, the NIT does not deny the users or administrators access to the TARGET WEBSITE or the possession or use of the information delivered to the computer controlled by or known to the government, nor does the NIT permanently alter any software or programs on the user's computer.

## TIMING OF SEIZURE/REVIEW OF INFORMATION

42.   Rule 41(e)(2) requires that the warrant command FBI "to execute the warrant within a specified period of time no longer than fourteen days" and to "execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time." After the server hosting the TARGET WEBSITE is seized, it will remain in law enforcement custody. Accordingly, the government requests authority to employ the NIT onto the TARGET WEBSITE at any time of day, within fourteen days of the Court's authorization. The NIT will be used on the TARGET WEBSITE for not more than 30-days from the date of the issuance of the warrant.

**Add.72**

43.    For the reasons above and further, because users of the TARGET WEBSITE communicate on the board at various hours of the day, including outside the time period between 6:00 a.m. and 10:00 p.m., and because the timing of the user's communication on the board is solely determined by when the user chooses to access the board, rather than by law enforcement, I request authority for the NIT to be employed at any time a user's computer accesses the TARGET WEBSITE, even if that occurs outside the hours of 6:00 a.m. and 10:00 p.m.  Further, I seek permission to review information transmitted to a computer controlled by or known to the government, as a result of the NIT, at whatever time of day or night the information is received.

44.    The government does not currently know the exact configuration of the computers that may be used to access the TARGET WEBSITE.  Variations in configuration, e.g., different operating systems, may require the government to send more than one communication in order to get the NIT to activate properly.  Accordingly, I request that this Court authorize the government to continue to send communications to the activating computers for up to 30 days after this warrant is authorized.

45.    The Government may, if necessary, seek further authorization from the Court to employ the NIT on the TARGET WEBSITE beyond the 30-day period authorized by this warrant.

## SEARCH AUTHORIZATION REQUESTS

46.    Accordingly, it is respectfully requested that this Court issue a search warrant authorizing the following:

  a.    the NIT may cause an activating computer – wherever located – to send to a computer controlled by or known to the government, network level messages containing information that may assist in identifying the computer, its location,

29

**Add.73**

other information about the computer and the user of the computer, as described

above and in Attachment B;

b.    the use of multiple communications, without prior announcement, within 30 days

from the date this Court issues the requested warrant;

c.    that the government may receive and read, at any time of day or night, within 30

days from the date the Court authorizes of use of the NIT, the information that

the NIT causes to be sent to the computer controlled by or  known to the

government;

d.    that, pursuant to 18 U.S.C. § 3103a(b)(3), to satisfy the notification requirement

of Rule 41(f)(3) of the Federal Rules of Criminal Procedure, the government may

delay providing a copy of the search warrant and the receipt for any property

taken for thirty (30) days after a user of an "activating" computer that accessed

the TARGET WEBSITE has been identified to a sufficient degree as to provide

notice, unless notification is further delayed by court order.

## REQUEST FOR SEALING OF APPLICATION/AFFIDAVIT

47.    I further request that this application and the related documents be filed under seal.
This information to be obtained is relevant to an ongoing investigation.  Premature disclosures of this
application and related materials may jeopardize the success of the above-described investigation.
Further, this affidavit describes a law enforcement technique in sufficient detail that disclosure of
this technique could assist others in thwarting its use in the future.  Accordingly, I request that the
affidavit remain under seal until further order of the Court.[9]

---

[9] The United States considers this technique to be covered by law enforcement privilege.  Should the Court wish to

30

**Add.74**

## CONCLUSION

48.     Based on the information identified above, information provided to me, and my experience and training, I have probable cause to believe there exists evidence, fruits, and instrumentalities of criminal activity related to the sexual exploitation of children on computers that access the TARGET WEBSITE, in violation of 18 U.S.C. §§ 2251 and 2252A.

49.     Based on the information described above, there is probable cause to believe that the information described in Attachment B constitutes evidence and instrumentalities of these crimes.

50.     Based on the information described above, there is probable cause to believe that employing a NIT on the TARGET WEBSITE, to collect information described in Attachment B, will result in the FBI obtaining the evidence and instrumentalities of the child exploitation crimes described above.

Sworn to under the pains and penalties of perjury.

Douglas Macfarlane
Special Agent

Sworn to and subscribed before me
this 20 day of February        /s/
                 Theresa Carroll Buchanan
                 United States Magistrate Judge
Honorable Theresa Carroll Buchanan
UNITED STATES MAGISTRATE JUDGE

issue any written opinion regarding any aspect of this request, the United States requests notice and an opportunity to be heard with respect to the issue of law enforcement privilege.

**Add.75**

## ATTACHMENT A

### Place to be Searched

This warrant authorizes the use of a network investigative technique ("NIT") to be deployed on the computer server described below, obtaining information described in Attachment B from the activating computers described below.

The computer server is the server operating the Tor network child pornography website referred to herein as the TARGET WEBSITE, as identified by its URL -upf45jv3bziuctml.onion - which will be located at a government facility in the Eastern District of Virginia.

The activating computers are those of any user or administrator who logs into the TARGET WEBSITE by entering a username and password. The government will not employ this network investigative technique after 30 days after this warrant is authorized, without further authorization.

**Add.76**

**ATTACHMENT B**

**Information to be Seized**

From any "activating" computer described in Attachment A:

1.      the "activating" computer's actual IP address, and the date and time that the NIT determines what that IP address is;

2.      a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish data from that of other "activating" computers, that will be sent with and collected by the NIT;

3.      the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86);

4.      information about whether the NIT has already been delivered to the "activating" computer;

5.      the "activating" computer's Host Name;

6.      the "activating" computer's active operating system username; and

7.      the "activating" computer's media access control ("MAC") address;

that is evidence of violations of 18 U.S.C. § 2252A(g), Engaging in a Child Exploitation Enterprise; 18 U.S.C. §§ 2251(d)(1) and or (e), Advertising and Conspiracy to Advertise Child Pornography; 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1), Receipt and Distribution of, and Conspiracy to Receive and Distribute Child Pornography; and/or 18 U.S.C. § 2252A(a)(5)(B) and (b)(2), Knowing Access or Attempted Access With Intent to View Child Pornography.

**Add.77**

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Virginia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 1:15-SW-89 |
| OF COMPUTERS THAT ACCESS | ) | |
| upf45jv3bziuctml.onion | ) | **UNDER SEAL** |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____Virginia_____
*(identify the person or describe the property to be searched and give its location)*:
See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____March 6, 2015_____
                                                                                                                          *(not to exceed 14 days)*
☐ in the daytime  6:00 a.m. to 10 p.m. ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge _____Honorable Theresa Carroll Buchanan_____ .
                                                                        *(name)*

☑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☑ for ___30___ days *(not to exceed 30)*.
                                                            ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: __2/20/2015  11:45__                    _____
                                                                                                          *Judge's signature*

City and state:     __Alexandria, Virginia__                    __Honorable Theresa Carroll Buchanan, U.S. Magistrate Judge__
                                                                                                          *Printed name and title*

# Add.78

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>1:15-SW-89 | Date and time warrant executed:<br>Between 2/20/15 and 3/4/15 | Copy of warrant and inventory left with:<br>N/A |
| Inventory made in the presence of :<br>N/A | | |
| Inventory of the property taken and name of any person(s) seized: | | |

Data from computers that accessed TARGET WEBSITE

between 2/20/15 and 3/4/15

**Certification**

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: March 31, 2015

_____
*Executing officer's signature*

Special Agent FBI Daniel I. Alfin
*Printed name and title*

**Add.79**

COMMITTEE NOTES ON RULES—2002 AMENDMENT

The language of Rule 40 has been amended as part of the general restyling of the Criminal Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Rule 40 has been completely revised. The Committee believed that it would be much clearer and more helpful to locate portions of Rule 40 in Rules 5 (initial appearances), 5.1 (preliminary hearings), and 32.1 (revocation or modification of probation or supervised release). Accordingly, current Rule 40(a) has been relocated in Rules 5 and 5.1. Current Rule 40(b) has been relocated in Rule 5(c)(2)(B) and current Rule 40(c) has been moved to Rule 5(c)(2)(F).

Current Rule 40(d) has been relocated in Rule 32.1(a)(5). The first sentence of current Rule 40(e) is now located in revised Rule 40(a). The second sentence of current Rule 40(e) is now in revised Rule 40(b) and current Rule 40(f) is revised Rule 40(f).

COMMITTEE NOTES ON RULES—2006 AMENDMENT

*Subdivision (a).* Rule 40 currently refers only to a person arrested for failing to appear in another district. The amendment is intended to fill a perceived gap in the rule that a magistrate judge in the district of arrest lacks authority to set release conditions for a person arrested only for violation of conditions of release. *See, e.g., United States v. Zhu,* 215 F.R.D. 21, 26 (D. Mass. 2003). The Committee believes that it would be inconsistent for the magistrate judge to be empowered to release an arrestee who had failed to appear altogether, but not to release one who only violated conditions of release in a minor way. Rule 40(a) is amended to expressly cover not only failure to appear, but also violation of any other condition of release.

*Changes Made After Publication and Comment.* The Committee made minor clarifying changes in the published rule at the suggestion of the Style Committee.

COMMITTEE NOTES ON RULES—2011 AMENDMENT

*Subdivision (d).* The amendment provides for video teleconferencing in order to bring the rule into conformity with Rule 5(f).

*Changes Made to Proposed Amendment Released for Public Comment.* The amendment was rephrased to track precisely the language of Rule 5(f), on which it was modeled.

AMENDMENT BY PUBLIC LAW

1984—Subd. (d)(1). Pub. L. 98–473, §215(d), substituted "3605" for "3653".

Subd. (f). Pub. L. 98–473, §209(c), substituted "Release or Detention" for "Bail" as the subdivision heading and, in text, substituted "If a person was previously detained or conditionally released, pursuant to chapter 207 of title 18, United States Code," for "If bail was previously fixed", "decision previously made" for "amount of bail previously fixed", "by that decision" for "by the amount of bail previously fixed", and "amends the release or detention decision or alters the conditions of release" for "fixes bail different from that previously fixed".

1979—Subd. (d)(1). Pub. L. 96–42, §1(2)(A), struck out "in accordance with Rule 32.1(a)" after "Proceed in".

Subd. (d)(2). Pub. L. 96–42, §1(2)(B), struck out "in accordance with Rule 32.1(a)(1)" after "Hold a prompt preliminary hearing".

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by section 215(d) of Pub. L. 98–473 effective Nov. 1, 1987, and applicable only to offenses committed after the taking effect of such amendment, see section 235(a)(1) of Pub. L. 98–473, set out as an Effective Date note under section 3551 of this title.

## Rule 41. Search and Seizure

(a) SCOPE AND DEFINITIONS.

(1) *Scope.* This rule does not modify any statute regulating search or seizure, or the issuance and execution of a search warrant in special circumstances.

(2) *Definitions.* The following definitions apply under this rule:

(A) "Property" includes documents, books, papers, any other tangible objects, and information.

(B) "Daytime" means the hours between 6:00 a.m. and 10:00 p.m. according to local time.

(C) "Federal law enforcement officer" means a government agent (other than an attorney for the government) who is engaged in enforcing the criminal laws and is within any category of officers authorized by the Attorney General to request a search warrant.

(D) "Domestic terrorism" and "international terrorism" have the meanings set out in 18 U.S.C. §2331.

(E) "Tracking device" has the meaning set out in 18 U.S.C. §3117(b).

(b) AUTHORITY TO ISSUE A WARRANT. At the request of a federal law enforcement officer or an attorney for the government:

(1) a magistrate judge with authority in the district—or if none is reasonably available, a judge of a state court of record in the district—has authority to issue a warrant to search for and seize a person or property located within the district;

(2) a magistrate judge with authority in the district has authority to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed;

(3) a magistrate judge—in an investigation of domestic terrorism or international terrorism—with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district;

(4) a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both; and

(5) a magistrate judge having authority in any district where activities related to the crime may have occurred, or in the District of Columbia, may issue a warrant for property that is located outside the jurisdiction of any state or district, but within any of the following:

(A) a United States territory, possession, or commonwealth;

(B) the premises—no matter who owns them—of a United States diplomatic or consular mission in a foreign state, including any appurtenant building, part of a building, or land used for the mission's purposes; or

(C) a residence and any appurtenant land owned or leased by the United States and used by United States personnel assigned to

a United States diplomatic or consular mission in a foreign state.

(c) PERSONS OR PROPERTY SUBJECT TO SEARCH OR SEIZURE. A warrant may be issued for any of the following:

(1) evidence of a crime;

(2) contraband, fruits of crime, or other items illegally possessed;

(3) property designed for use, intended for use, or used in committing a crime; or

(4) a person to be arrested or a person who is unlawfully restrained.

(d) OBTAINING A WARRANT.

(1) *In General.* After receiving an affidavit or other information, a magistrate judge—or if authorized by Rule 41(b), a judge of a state court of record—must issue the warrant if there is probable cause to search for and seize a person or property or to install and use a tracking device.

(2) *Requesting a Warrant in the Presence of a Judge.*

(A) *Warrant on an Affidavit.* When a federal law enforcement officer or an attorney for the government presents an affidavit in support of a warrant, the judge may require the affiant to appear personally and may examine under oath the affiant and any witness the affiant produces.

(B) *Warrant on Sworn Testimony.* The judge may wholly or partially dispense with a written affidavit and base a warrant on sworn testimony if doing so is reasonable under the circumstances.

(C) *Recording Testimony.* Testimony taken in support of a warrant must be recorded by a court reporter or by a suitable recording device, and the judge must file the transcript or recording with the clerk, along with any affidavit.

(3) *Requesting a Warrant by Telephonic or Other Reliable Electronic Means.* In accordance with Rule 4.1, a magistrate judge may issue a warrant based on information communicated by telephone or other reliable electronic means.

(e) ISSUING THE WARRANT.

(1) *In General.* The magistrate judge or a judge of a state court of record must issue the warrant to an officer authorized to execute it.

(2) *Contents of the Warrant.*

(A) *Warrant to Search for and Seize a Person or Property.* Except for a tracking-device warrant, the warrant must identify the person or property to be searched, identify any person or property to be seized, and designate the magistrate judge to whom it must be returned. The warrant must command the officer to:

(i) execute the warrant within a specified time no longer than 14 days;

(ii) execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time; and

(iii) return the warrant to the magistrate judge designated in the warrant.

(B) *Warrant Seeking Electronically Stored Information.* A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

(C) *Warrant for a Tracking Device.* A tracking-device warrant must identify the person or property to be tracked, designate the magistrate judge to whom it must be returned, and specify a reasonable length of time that the device may be used. The time must not exceed 45 days from the date the warrant was issued. The court may, for good cause, grant one or more extensions for a reasonable period not to exceed 45 days each. The warrant must command the officer to:

(i) complete any installation authorized by the warrant within a specified time no longer than 10 days;

(ii) perform any installation authorized by the warrant during the daytime, unless the judge for good cause expressly authorizes installation at another time; and

(iii) return the warrant to the judge designated in the warrant.

(f) EXECUTING AND RETURNING THE WARRANT.

(1) *Warrant to Search for and Seize a Person or Property.*

(A) *Noting the Time.* The officer executing the warrant must enter on it the exact date and time it was executed.

(B) *Inventory.* An officer present during the execution of the warrant must prepare and verify an inventory of any property seized. The officer must do so in the presence of another officer and the person from whom, or from whose premises, the property was taken. If either one is not present, the officer must prepare and verify the inventory in the presence of at least one other credible person. In a case involving the seizure of electronic storage media or the seizure or copying of electronically stored information, the inventory may be limited to describing the physical storage media that were seized or copied. The officer may retain a copy of the electronically stored information that was seized or copied.

(C) *Receipt.* The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property.

(D) *Return.* The officer executing the warrant must promptly return it—together with a copy of the inventory—to the magistrate judge designated on the warrant. The officer may do so by reliable electronic means. The judge must, on request, give a copy of the inventory to the person from whom, or from whose premises, the property was taken and to the applicant for the warrant.

(2) *Warrant for a Tracking Device.*

(A) *Noting the Time*. The officer executing a tracking-device warrant must enter on it the exact date and time the device was installed and the period during which it was used.

(B) *Return*. Within 10 days after the use of the tracking device has ended, the officer executing the warrant must return it to the judge designated in the warrant. The officer may do so by reliable electronic means.

(C) *Service*. Within 10 days after the use of the tracking device has ended, the officer executing a tracking-device warrant must serve a copy of the warrant on the person who was tracked or whose property was tracked. Service may be accomplished by delivering a copy to the person who, or whose property, was tracked; or by leaving a copy at the person's residence or usual place of abode with an individual of suitable age and discretion who resides at that location and by mailing a copy to the person's last known address. Upon request of the government, the judge may delay notice as provided in Rule 41(f)(3).

(3) *Delayed Notice*. Upon the government's request, a magistrate judge—or if authorized by Rule 41(b), a judge of a state court of record—may delay any notice required by this rule if the delay is authorized by statute.

(g) MOTION TO RETURN PROPERTY. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

(h) MOTION TO SUPPRESS. A defendant may move to suppress evidence in the court where the trial will occur, as Rule 12 provides.

(i) FORWARDING PAPERS TO THE CLERK. The magistrate judge to whom the warrant is returned must attach to the warrant a copy of the return, of the inventory, and of all other related papers and must deliver them to the clerk in the district where the property was seized.

(As amended Dec. 27, 1948, eff. Oct. 20, 1949; Apr. 9, 1956, eff. July 8, 1956; Apr. 24, 1972, eff. Oct. 1, 1972; Mar. 18, 1974, eff. July 1, 1974; Apr. 26 and July 8, 1976, eff. Aug. 1, 1976; Pub. L. 95–78, §2(e), July 30, 1977, 91 Stat. 320, eff. Oct. 1, 1977; Apr. 30, 1979, eff. Aug. 1, 1979; Mar. 9, 1987, eff. Aug. 1, 1987; Apr. 25, 1989, eff. Dec. 1, 1989; May 1, 1990, eff. Dec. 1, 1990; Apr. 22, 1993, eff. Dec. 1, 1993; Pub. L. 107–56, title II, §219, Oct. 26, 2001, 115 Stat. 291; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 12, 2006, eff. Dec. 1, 2006; Apr. 23, 2008, eff. Dec. 1, 2008; Mar. 26, 2009, eff. Dec. 1, 2009; Apr. 26, 2011, eff. Dec. 1, 2011.)

NOTES OF ADVISORY COMMITTEE ON RULES—1944

This rule is a codification of existing law and practice.

*Note to Subdivision* (a). This rule is a restatement of existing law, 18 U.S.C. [former] 611.

*Note to Subdivision* (b). This rule is a restatement of existing law, 18 U.S.C. [former] 612; *Conyer v. United States*, 80 F.2d 292 (C.C.A. 6th). This provision does not supersede or repeal special statutory provisions permitting the issuance of search warrants in specific circumstances. See Subdivision (g) and Note thereto, *infra*.

*Note to Subdivision* (c). This rule is a restatement of existing law, 18 U.S.C. [former] 613–616, 620; *Dumbra v. United States*, 268 U.S. 435.

*Note to Subdivision* (d). This rule is a restatement of existing law, 18 U.S.C. [former] 621–624.

*Note to Subdivision* (e). This rule is a restatement of existing law and practice, with the exception hereafter noted, 18 U.S.C. [former] 625, 626; *Weeks v. United States*, 232 U.S. 383; *Silverthorne Lumber Co. v. United States*, 251 U.S. 385; *Agello v. United States*, 269 U.S. 20; *Gouled v. United States*, 255 U.S. 298. While under existing law a motion to suppress evidence or to compel return of property obtained by an illegal search and seizure may be made either before a commissioner subject to review by the court on motion, or before the court, the rule provides that such motion may be made only before the court. The purpose is to prevent multiplication of proceedings and to bring the matter before the court in the first instance. While during the life of the Eighteenth Amendment when such motions were numerous it was a common practice in some districts for commissioners to hear such motions, the prevailing practice at the present time is to make such motions before the district court. This practice, which is deemed to be preferable, is embodied in the rule.

*Note to Subdivision* (f). This rule is a restatement of existing law, 18 U.S.C. [former] 627; Cf. Rule 5(c) (last sentence).

*Note to Subdivision* (g). While Rule 41 supersedes the general provisions of 18 U.S.C. 611–626 [now 18 U.S.C. 3105, 3109], relating to search warrants, it does not supersede, but preserves, all other statutory provisions permitting searches and seizures in specific situations. Among such statutes are the following:

U.S.C., Title 18:

Section 287 [former] (Search warrant for suspected counterfeiture)

U.S.C., Title 19:

Section 1595 (Customs duties; searches and seizures)

U.S.C., Title 26:

Section 3117 [now 5557] (Officers and agents authorized to investigate, issue search warrants, and prosecute for violations)

For statutes which incorporate by reference 18 U.S.C. [former] 98, and therefore are now controlled by this rule, see, e. g.:

U.S.C., Title 18:

Section 12 [former] (Subversive activities; undermining loyalty, discipline, or morale of armed forces; searches and seizures)

U.S.C., Title 26:

Section 3116 [now 7302] (Forfeitures and seizures)

Statutory provision for a warrant for detention of war materials seized under certain circumstances is found in 22 U.S.C. 402 [see 401] (Seizure of war materials intended for unlawful export.)

Other statutes providing for searches and seizures or entry without warrants are the following:

U.S.C., Title 19:

Section 482 (Search of vehicles and persons)

U.S.C., Title 25:

Section 246 [now 18 U.S.C. 3113] (Searches and seizures)

U.S.C., Title 26:

Section 3601 [now 7606] (Entry of premises for examination of taxable objects)

U.S.C., Title 29:

Section 211 (Investigations, inspections, and records)

U.S.C., Title 49:

Section 781 [now 80302] (Unlawful use of vessels, vehicles, and aircrafts; contraband article defined)
Section 782 [now 80303] (Seizure and forfeiture)
Section 784 [now 80306] (Application of related laws)

NOTES OF ADVISORY COMMITTEE ON RULES—1948 AMENDMENT

Subdivision (b)(3).—The amendment is to substitute proper reference to Title 18 in place of the repealed acts.

Subdivision (g).—To eliminate reference to sections of the Act of June 15, 1917, c. 30, which have been repealed by the Act of June 25, 1948, c. 645, which enacted Title 18.

NOTES OF ADVISORY COMMITTEE ON RULES—1972 AMENDMENT

Subdivision (a) is amended to provide that a search warrant may be issued only upon the request of a federal law enforcement officer or an attorney for the government. The phrase "federal law enforcement officer" is defined in subdivision (h) in a way which will allow the Attorney General to designate the category of officers who are authorized to make application for a search warrant. The phrase "attorney for the government" is defined in rule 54.

The title to subdivision (b) is changed to make it conform more accurately to the content of the subdivision. Subdivision (b) is also changed to modernize the language used to describe the property which may be seized with a lawfully issued search warrant and to take account of a recent Supreme Court decision (*Warden v. Haden*, 387 U.S. 294 (1967)) and recent congressional action (18 U.S.C. §3103a) which authorize the issuance of a search warrant to search for items of solely evidential value. 18 U.S.C. §3103a provides that "a warrant may be issued to search for and seize any property that constitutes evidence of a criminal offense. . . ."

Recent state legislation authorizes the issuance of a search warrant for evidence of crime. See, *e.g.*, Cal. Penal Code §1524(4) (West Supp. 1968); Ill.Rev.Stat. ch. 38, §108–3 (1965); LSA C.Cr.P. art. 161 (1967); N.Y. CPL §690.10(4) (McKinney, 1971); Ore.Rev.Stat. §141.010 (1969); Wis.Stat. §968.13(2) (1969).

The general weight of recent text and law review comment has been in favor of allowing a search for evidence. 8 Wigmore, Evidence §2184a. (McNaughton rev. 1961); Kamisar, The Wiretapping-Eavesdropping Problem: A professor's View, 44 Minn.L.Rev. 891 (1960); Kaplan, Search and Seizure: A No-Man's Land in the Criminal Law, 49 Calif.L.Rev. 474 (1961); Comments: 66 Colum.L.Rev. 355 (1966), 45 N.C.L.Rev. 512 (1967), 20 U.Chi.L.Rev. 319 (1953).

There is no intention to limit the protection of the fifth amendment against compulsory self-incrimination, so items which are solely "testimonial" or "communicative" in nature might well be inadmissible on those grounds. *Schmerber v. California*, 384 U.S. 757 (1966). The court referred to the possible fifth amendment limitation in *Warden v. Hayden*, *supra*:

This case thus does not require that we consider whether there are items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure. [387 U.S. at 303].

See ALI Model Code of Pre-Arraignment Procedure §551.03(2) and commentary at pp. 3–5 (April 30, 1971).

It seems preferable to allow the fifth amendment limitation to develop as cases arise rather than attempt to articulate the constitutional doctrine as part of the rule itself.

The amendment to subdivision (c) is intended to make clear that a search warrant may properly be based upon a finding of probable cause based upon hearsay. That a search warrant may properly be issued on the basis of hearsay is current law. See, *e.g.*, *Jones v. United States*, 362 U.S. 257 (1960); *Spinelli v. United States*, 393 U.S. 410 (1969). See also *State v. Beal*, 40 Wis.2d 607, 162 N.W.2d 640 (1968), reversing prior Wisconsin cases which held that a search warrant could not properly issue on the basis of hearsay evidence.

The provision in subdivision (c) that the magistrate may examine the affiant or witnesses under oath is intended to assure him an opportunity to make a careful decision as to whether there is probable cause. It seems desirable to do this as an incident to the issuance of the warrant rather than having the issue raised only later on a motion to suppress the evidence. See L. Tiffany, D. McIntyre, and D. Rotenberg, Detection of Crime 118 (1967). If testimony is taken it must be recorded, transcribed, and made part of the affidavit or affidavits. This is to insure an adequate basis for determining the sufficiency of the evidentiary grounds for the issuance of the search warrant if that question should later arise.

The requirement that the warrant itself state the grounds for its issuance and the names of any affiants, is eliminated as unnecessary paper work. There is no comparable requirement for an arrest warrant in rule 4. A person who wishes to challenge the validity of a search warrant has access to the affidavits upon which the warrant was issued.

The former requirement that the warrant require that the search be conducted "forthwith" is changed to read "within a specified period of time not to exceed 10 days." The former rule contained an inconsistency between subdivision (c) requiring that the search be conducted "forthwith" and subdivision (d) requiring execution "within 10 days after its date." The amendment resolves this ambiguity and confers discretion upon the issuing magistrate to specify the time within which the search may be conducted to meet the needs of the particular case.

The rule is also changed to allow the magistrate to authorize a search at a time other than "daytime," where there is "reasonable cause shown" for doing so. To make clear what "daytime" means, the term is defined in subdivision (h).

Subdivision (d) is amended to conform its language to the Federal Magistrates Act. The language "The warrant may be executed and returned only within 10 days after its date" is omitted as unnecessary. The matter is now covered adequately in proposed subdivision (c) which gives the issuing officer authority to fix the time within which the warrant is to be executed.

The amendment to subdivision (e) and the addition of subdivision (f) are intended to require the motion to suppress evidence to be made in the trial court rather than in the district in which the evidence was seized as now allowed by the rule. In *DiBella v. United States*, 369 U.S. 121 (1962), the court, in effect, discouraged motions to suppress in the district in which the property was seized:

There is a decision in the Second Circuit, *United States v. Klapholz*, 230 F.2d 494 (1956), allowing the Government an appeal from an order granting a post-indictment motion to suppress, apparently for the single reason that the motion was filed in the district of seizure rather than of trial; but the case was soon thereafter taken by a District Court to have counseled declining jurisdiction of such motions for reasons persuasive against allowing the appeal: "This course will avoid a needless duplication of effort by two courts and provide a more expeditious resolution of the controversy besides avoiding the risk of determining prematurely and inadequately the admissibility of evidence at the trial. . . . A piecemeal adjudication such as that which would necessarily follow from a disposition of the motion here might conceivably result in prejudice either to the Government or the defendants, or both." *United States v. Lester*, 21 F.R.D. 30, 31 (D.C.S.D.N.Y. 1957). Rule 41(e), of course, specifically provides for making of the motion in the district of seizure On a summary hearing, however, the ruling there is likely always to be tentative. We think it accords most satisfactorily with sound administration of the Rules to treat such rulings as interlocutory. [369 U.S. at 132–133.]

As amended, subdivision (e) provides for a return of the property if (1) the person is entitled to lawful pos-

session *and* (2) the seizure was illegal. This means that the judge in the district of seizure does not have to decide the legality of the seizure in cases involving contraband which, even if seized illegally, is not to be returned.

The five grounds for returning the property, presently listed in the rule, are dropped for two reasons—(1) substantive grounds for objecting to illegally obtained evidence (*e.g.*, *Miranda*) are not ordinarily codified in the rules and (2) the categories are not entirely accurate. See *United States v. Howard*, 138 F.Supp. 376, 380 (D.Md. 1956).

A sentence is added to subdivision (e) to provide that a motion for return of property, made in the district of trial, shall be treated also as a motion to suppress under rule 12. This change is intended to further the objective of rule 12 which is to have all pretrial motions disposed of in a single court appearance rather than to have a series of pretrial motions made on different dates, causing undue delay in administration.

Subdivision (f) is new and reflects the position that it is best to have the motion to suppress made in the court of the district of trial rather than in the court of the district in which the seizure occurred. The motion to suppress in the district of trial should be made in accordance with the provisions of rule 12.

Subdivision (g) is changed to conform to subdivision (c) which requires the return to be made before a federal judicial officer even though the search warrant may have been issued by a nonfederal magistrate.

Subdivision (h) is former rule 41(g) with the addition of a definition of the term "daytime" and the phrase "federal law enforcement officer."

NOTES OF ADVISORY COMMITTEE ON RULES—1974 AMENDMENT

The amendment restores the words "court of record" which were inadvertently omitted from the amended text of the subdivision which was transmitted by the Judicial Conference to the Supreme Court and prescribed by the Court on April 24, 1972.

NOTES OF ADVISORY COMMITTEE ON RULES—1977 AMENDMENT

Rule 41(c)(2) is added to establish a procedure for the issuance of a search warrant when it is not reasonably practicable for the person obtaining the warrant to present a written affidavit to a magistrate or a state judge as required by subdivision (c)(1). At least two states have adopted a similar procedure, Ariz.Rev.Stat. Ann. §§13–1444(c)–1445(c) (Supp. 1973); Cal.Pen. Code §§1526(b), 1528(b) (West Supp. 1974), and comparable amendments are under consideration in other jurisdictions. See Israel, Legislative Regulation of Searches and Seizures: The Michigan Proposals, 73 Mich.L.Rev. 221, 258–63 (1975); Nakell, Proposed Revisions of North Carolina's Search and Seizure Law, 52 N.Car.L.Rev. 277, 306–11 (1973). It has been strongly recommended that "every State enact legislation that provides for the issuance of search warrants pursuant to telephoned petitions and affidavits from police officers." National Advisory Commission on Criminal Justice Standards and Goals, Report on Police 95 (1973). Experience with the procedure has been most favorable. Miller, Telephonic Search Warrants: The San Diego Experience, 9 The Prosecutor 385 (1974).

The trend of recent Supreme Court decisions has been to give greater priority to the use of a search warrant as the proper way of making a lawful search:

It is a cardinal rule that, in seizing goods and articles, law enforcement agents must secure and use search warrants whenever reasonably practicable. . . . This rule rests upon the desirability of having magistrates rather than police officers determine when searches and seizures are permissible and what limitations should be placed upon such activities. *Trupiano v. United States*, 334 U.S. 699, 705 (1948), quoted with approval in *Chimel v. California*, 395 U.S. 752, 758 (1969).

See also *Coolidge v. New Hampshire*, 403 U.S. 443 (1971); Note, Chambers v. Maroney: New Dimensions in the Law of Search and Seizure, 46 Indiana L.J. 257, 262 (1971).

Use of search warrants can best be encouraged by making it administratively feasible to obtain a warrant when one is needed. One reason for the nonuse of the warrant has been the administrative difficulties involved in getting a warrant, particularly at times of the day when a judicial officer is ordinarily unavailable. See L. Tiffany, D. McIntyre, and D. Rotenberg, Detection of Crime 105–116 (1967); LaFave, Improving Police Performance Through the Exclusionary Rule, 30 Mo.L.Rev. 391, 411 (1965). Federal law enforcement officers are not infrequently confronted with situations in which the circumstances are not sufficiently "exigent" to justify the serious step of conducting a warrantless search of private premises, but yet there exists a significant possibility that critical evidence would be lost in the time it would take to obtain a search warrant by traditional means. See, e.g., *United States v. Johnson*,—F.2d—(D.C. Cir. June 16, 1975).

Subdivision (c)(2) provides that a warrant may be issued on the basis of an oral statement of a person not in the physical presence of the federal magistrate. Telephone, radio, or other electronic methods of communication are contemplated. For the warrant to properly issue, four requirements must be met:

(1) The applicant—a federal law enforcement officer or an attorney for the government, as required by subdivision (a)—must persuade the magistrate that the circumstances of time and place make it reasonable to request the magistrate to issue a warrant on the basis of oral testimony. This restriction on the issuance of a warrant recognizes the inherent limitations of an oral warrant application, the lack of demeanor evidence, and the lack of a written record for the reviewing magistrate to consider before issuing the warrant. See Comment, Oral Search Warrants: A New Standard of Warrant Availability, 21 U.C.L.A. Law Review 691, 701 (1974). Circumstances making it reasonable to obtain a warrant on oral testimony exist if delay in obtaining the warrant might result in the destruction or disappearance of the property [see *Chimel v. California*, 395 U.S. 752, 773–774 (1969) (White, dissenting); Landynski, The Supreme Court's Search for Fourth Amendment Standards: The Warrantless Search, 45 Conn.B.J. 2, 25 (1971)]; or because of the time when the warrant is sought, the distance from the magistrate of the person seeking the warrant, or both.

(2) The applicant must orally state facts sufficient to satisfy the probable cause requirement for the issuance of the search warrant. (See subdivision (c)(1).) This information may come from either the applicant federal law enforcement officer or the attorney for the government or a witness willing to make an oral statement. The oral testimony must be recorded at this time so that the transcribed affidavit will provide an adequate basis for determining the sufficiency of the evidence if that issue should later arise. See Kipperman, Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence, 84 Harv.L.Rev. 825 (1971). It is contemplated that the recording of the oral testimony will be made by a court reporter, by a mechanical recording device, or by a verbatim contemporaneous writing by the magistrate. Recording a telephone conversation is no longer difficult with many easily operated recorders available. See 86:2 L.A. Daily Journal 1 (1973); Miller, Telephonic Search Warrants: The San Diego Experience, 9 The Prosecutor 385, 386 (1974).

(3) The applicant must read the contents of the warrant to the federal magistrate in order to enable the magistrate to know whether the requirements of certainty in the warrant are satisfied. The magistrate may direct that changes be made in the warrant. If the magistrate approves the warrant as requested or as modified by the magistrate, he then issues the warrant by directing the applicant to sign the magistrate's name to the duplicate original warrant. The magistrate then causes to be made a written copy of the approved

warrant. This constitutes the original warrant. The magistrate enters the time of issuance of the duplicate original warrant on the face of the original warrant.

(4) Return of the duplicate original warrant and the original warrant must conform to subdivision (d). The transcript of the sworn oral testimony setting forth the grounds for issuance of the warrant must be signed by affiant in the presence of the magistrate and filed with the court.

Because federal magistrates are likely to be accessible through the use of the telephone or other electronic devices, it is unnecessary to authorize state judges to issue warrants under subdivision (c)(2).

Although the procedure set out in subdivision (c)(2) contemplates resort to technology which did not exist when the Fourth Amendment was adopted, the Advisory Committee is of the view that the procedure complies with all of the requirements of the Amendment. The telephonic search warrant process has been upheld as constitutional by the courts, e.g., *People v. Peck*, 38 Cal.App.3d 993, 113 Cal.Rptr. 806 (1974), and has consistently been so viewed by commentators. See Israel, Legislative Regulation of Searches and Seizures: The Michigan Proposals, 73 Mich.L.Rev. 221, 260 (1975); Nakell, Proposed Revisions of North Carolina's Search and Seizure Law, 52 N.Car.L.Rev. 277, 310 (1973); Comment, Oral Search Warrants: A New Standard of Warrant Availability, 21 U.C.L.A.Rev. 691, 697 (1973).

Reliance upon oral testimony as a basis for issuing a search warrant is permissible under the Fourth Amendment. *Campbell v. Minnesota*, 487 F.2d 1 (8th Cir. 1973); *United States ex rel. Gaugler v. Brierley*, 477 F.2d 516 (3d Cir. 1973); *Tabasko v. Barton*, 472 F.2d 871 (6th Cir. 1972); *Frazier v. Roberts*, 441 F.2d 1224 (8th Cir. 1971). Thus, the procedure authorized under subdivision (c)(2) is not objectionable on the ground that the oral statement is not transcribed in advance of the issuance of the warrant. *People v. Peck*, 38 Cal.App.3d 993, 113 Cal.Rptr. 806 (1974). Although it has been questioned whether oral testimony will suffice under the Fourth Amendment if some kind of contemporaneous record is not made of that testimony, see dissent from denial of certiorari in *Christofferson v. Washington*, 393 U.S. 1090 (1969), this problem is not present under the procedure set out in subdivision (c)(2).

The Fourth Amendment requires that warrants issue "upon probable cause, supported by Oath or affirmation." The significance of the oath requirement is "that someone must take the responsibility for the facts alleged, giving rise to the probable cause for the issuance of a warrant." *United States ex rel. Pugh v. Pate*, 401 F.2d 6 (7th Cir. 1968); See also *Frazier v. Roberts*, 441 F.2d 1224 (8th Cir. 1971). This is accomplished under the procedure required by subdivision (c)(2); the need for an oath under the Fourth Amendment does not "require a face to face confrontation between the magistrate and the affiant." *People v. Chavez*, 27 Cal.App.3d 883, 104 Cal.Rptr. 247 (1972). See also *People v. Aguirre*, 26 Cal.App.3d 7, 103 Cal.Rptr. 153 (1972), noting it is unnecessary that "oral statements [be] taken in the physical presence of the magistrate."

The availability of the procedure authorized by subdivision (c)(2) will minimize the necessity of federal law enforcement officers engaging in other practices which, at least on occasion, might threaten to a greater extent those values protected by the Fourth Amendment. Although it is permissible for an officer in the field to relay his information by radio or telephone to another officer who has more ready access to a magistrate and who will thus act as the affiant, *Lopez v. United States*, 370 F.2d 8 (5th Cir. 1966); *State v. Banks*, 250 N.C. 728, 110 S.E.2d 322 (1959), that procedure is less desirable than that permitted under subdivision (c)(2), for it deprives "the magistrate of the opportunity to examine the officer at the scene, who is in a much better position to answer questions relating to probable cause and the requisite scope of the search." Israel, Legislative Regulation of Searches and Seizures: The Michigan Proposals, 73 Mich.L.Rev. 221, 260 (1975). Or, in the absence of the subdivision (c)(2) procedure, offi-

cers might take "protective custody" of the premises and occupants for a significant period of time while a search warrant was sought by traditional means. The extent to which the "protective custody" procedure may be employed consistent with the Fourth Amendment is uncertain at best; see Griswold, Criminal Procedure, 1969—Is It a Means or an End?, 29 Md.L.Rev. 307, 317 (1969). The unavailability of the subdivision (c)(2) procedure also makes more tempting an immediate resort to a warrantless search in the hope that the circumstances will later be found to have been sufficiently "exigent" to justify such a step. See Miller, Telephonic Search Warrants: The San Diego Experience, 9 The Prosecutor 385, 386 (1974), noting a dramatic increase in police utilization of the warrant process following enactment of a telephonic warrant statute.

NOTES OF COMMITTEE ON THE JUDICIARY, SENATE REPORT NO. 95–354; 1977 AMENDMENTS PROPOSED BY THE SUPREME COURT

The committee agrees with the Supreme Court that it is desirable to encourage Federal law enforcement officers to seek search warrants in situations where they might otherwise conduct warrantless searches by providing for a telephone search warrant procedure with the basic characteristics suggested in the proposed Rule 41(c)(2). As the Supreme Court has observed, "It is a cardinal rule that, in seizing goods and articles, law enforcement agents must secure and use search warrants whenever reasonably practicable." After consideration of the Supreme Court version and a proposal set forth in H.R. 7888, the committee decided to use the language of the House bill as the vehicle, with certain modifications.

A new provision, as indicated in subparagraph (c)(2)(A), is added to establish a procedure for the issuance of a search warrant where the circumstances make it reasonable to dispense with a written affidavit to be presented in person to a magistrate. At least two States have adopted a similar procedure—Arizona and California—and comparable amendments are under consideration in other jurisdictions. Such a procedure has been strongly recommended by the National Advisory Commission on Criminal Justice Standards and Goals and State experience with the procedure has been favorable. The telephone search warrant process has been upheld as constitutional by the courts and has consistently been so viewed by commentators.

In recommending a telephone search warrant procedure, the Advisory Committee note on the Supreme Court proposal points out that the preferred method of conducting a search is with a search warrant. The note indicates that the rationale for the proposed change is to encourage Federal law enforcement officers to seek search warrants in situations when they might otherwise conduct warrantless searches. "Federal law enforcement officers are not infrequently confronted with situations in which the circumstances are not sufficiently 'exigent' to justify the serious step of conducting a warrantless search of private premises, but yet there exists a significant possibility that critical evidence would be lost in the time it would take to obtain a search warrant by traditional means."

Subparagraph (c)(2)(B) provides that the person requesting the warrant shall prepare a "duplicate original warrant" which will be read and recorded verbatim by the magistrate on an "original warrant." The magistrate may direct that the warrant be modified.

Subparagraph (c)(2)(C) provides that, if the magistrate is satisfied that the circumstances are such as to make it reasonable to dispense with a written affidavit and that grounds for the application exist or there is probable cause to believe that they exist, he shall order the issuance of the warrant by directing the requestor to sign the magistrate's name on the duplicate original warrant. The magistrate is required to sign the original warrant and enter the time of issuance thereon. The finding of probable cause may be based on the same type of evidence appropriate for a warrant upon affidavit.

Subparagraph (c)(2)(D) requires the magistrate to place the requestor and any witness under oath and, if a voice recording device is available, to record the proceeding. If a voice recording is not available, the proceeding must be recorded verbatim stenographically or in longhand. Verified copies must be filed with the court as specified.

Subparagraph (c)(2)(E) provides that the contents of the warrant upon oral testimony shall be the same as the contents of a warrant upon affidavit.

Subparagraph (c)(2)(F) provides that the person who executes the warrant shall enter the exact time of execution on the face of the duplicate original warrant. Unlike H.R. 7888, this subparagraph does not require the person who executes the warrant to have physical possession of the duplicate original warrant at the time of the execution of the warrant. The committee believes this would make an unwise and unnecessary distinction between execution of regular warrants issued on written affidavits and warrants issued by telephone that would limit the flexibility and utility of this procedure for no useful purpose.

Finally, subparagraph (c)(2)(G) makes it clear that, absent a finding of bad faith by the government, the magistrate's judgment that the circumstances made it reasonable to dispense with a written affidavit—a decision that does not go to the core question of whether there was probable cause to issue a warrant—is not a ground for granting a motion to suppress evidence.

CONGRESSIONAL MODIFICATION OF PROPOSED 1977
AMENDMENT

Section 2(e) of Pub. L. 95–78 provided in part that the amendment by the Supreme Court [in its order of Apr. 26, 1976] to subdivision (c) of rule 41 of the Federal Rules of Criminal Procedure [subd. (c) of this rule] is approved in a modified form.

NOTES OF ADVISORY COMMITTEE ON RULES—1979
AMENDMENT

This amendment to Rule 41 is intended to make it possible for a search warrant to issue to search *for* a person under two circumstances: (i) when there is probable cause to arrest that person; or (ii) when that person is being unlawfully restrained. There may be instances in which a search warrant would be required to conduct a search in either of these circumstances. Even when a search warrant would not be required to enter a place to search for a person, a procedure for obtaining a warrant should be available so that law enforcement officers will be encouraged to resort to the preferred alternative of acquiring "an objective predetermination of probable cause" *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in this instance, that the person sought is at the place to be searched.

That part of the amendment which authorizes issuance of a search warrant to search for a person unlawfully restrained is consistent with ALI Model Code of Pre-Arraignment Procedure §SS 210.3(1)(d) (Proposed Official Draft, 1975), which specifies that a search warrant may issue to search for "an individual * * * who is unlawfully held in confinement or other restraint." As noted in the Commentary thereto, id. at p. 507:

> Ordinarily such persons will be held against their will and in that case the persons are, of course, not subject to "seizure." But they are, in a sense, "evidence" of crime, and the use of search warrants for these purposes presents no conceptual difficulties.

Some state search warrant provisions also provide for issuance of a warrant in these circumstances. See, e. g., Ill.Rev.Stat. ch. 38, §108–3 ("Any person who has been kidnapped in violation of the laws of this State, or who has been kidnapped in another jurisdiction and is now concealed within this State").

It may be that very often exigent circumstances, especially the need to act very promptly to protect the life or well-being of the kidnap victim, would justify an immediate warrantless search for the person restrained. But this is not inevitably the case. Moreover, as noted above there should be available a process whereby law enforcement agents may acquire in advance a judicial determination that they have cause to intrude upon the privacy of those at the place where the victim is thought to be located.

That part of the amendment which authorizes issuance of a search warrant to search for a person to be arrested is also consistent with ALI Model Code of Pre-Arraignment Procedure §SS 210.3(1)(d) (Proposed Official Draft, 1975), which states that a search warrant may issue to search for "an individual for whose arrest there is reasonable cause." As noted in the Commentary thereto, id. at p. 507, it is desirable that there be "explicit statutory authority for such searches." Some state search warrant provisions also expressly provide for the issuance of a search warrant to search for a person to be arrested. See, e. g., Del.Code Ann. tit. 11, §2305 ("Persons for whom a warrant of arrest has been issued"). This part of the amendment to Rule 41 covers a defendant or witness for whom an arrest warrant has theretofore issued, or a defendant for whom grounds to arrest exist even though no arrest warrant has theretofore issued. It also covers the arrest of a deportable alien under 8 U.S.C. §1252, whose presence at a certain place might be important evidence of criminal conduct by another person, such as the harboring of undocumented aliens under 8 U.S.C. §1324(a)(3).

In *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the Court once again alluded to "the still unsettled question" of whether, absent exigent circumstances, officers acting without a warrant may enter private premises to make an arrest. Some courts have indicated that probable cause alone ordinarily is sufficient to support an arrest entry. *United States v. Fernandez*, 480 F.2d 726 (2d Cir. 1973); *United States ex rel. Wright v. Woods*, 432 F.2d 1143 (7th Cir. 1970). There exists some authority, however, that except under exigent circumstances a warrant is required to enter the defendant's own premises, *United States v. Calhoun*, 542 F.2d 1094 (9th Cir. 1976); *United States v. Lindsay*, 506 F.2d 166 (D.C.Cir. 1974); *Dorman v. United States*, 435 F.2d 385 (D.C.Cir. 1970), or, at least, to enter the premises of a third party, *Virgin Islands v. Gereau*, 502 F.2d 914 (3d Cir. 1974); *Fisher v. Volz*, 496 F.2d 333 (3d Cir. 1974); *Huotari v. Vanderport*, 380 F.Supp. 645 (D.Minn. 1974).

It is also unclear, assuming a need for a warrant, what kind of warrant is required, although it is sometimes assumed that an arrest warrant will suffice, e. g., *United States v. Calhoun*, supra; *United States v. James*, 528 F.2d 999 (5th Cir. 1976). There is a growing body of authority, however, that what is needed to justify entry of the premises of a third party to arrest is a search warrant, e. g., *Virgin Islands v. Gereau*, supra; *Fisher v. Volz*, supra. The theory is that if the privacy of this third party is to be protected adequately, what is needed is a probable cause determination by a magistrate that the wanted person is presently within that party's premises. "A warrant for the arrest of a suspect may indicate that the police officer has probable cause to believe the suspect committed the crime; it affords no basis to believe the suspect is in some stranger's home." *Fisher v. Volz*, supra.

It has sometimes been contended that a search warrant should be required for a nonexigent entry to arrest even when the premises to be entered are those of the person to be arrested. Rotenberg & Tanzer, Searching for the Person to be Seized, 35 Ohio St.L.J. 56, 69 (1974). Case authority in support is lacking, and it may be that the protections of a search warrant are less important in such a situation because ordinarily "rudimentary police procedure dictates that a suspect's residence be eliminated as a possible hiding place before a search is conducted elsewhere." *People v. Sprovieri*, 95 Ill.App.2d 10, 238 N.E.2d 115 (1968).

Despite these uncertainties, the fact remains that in some circuits under some circumstances a search warrant is required to enter private premises to arrest. Moreover, the law on this subject is in a sufficient state of uncertainty that this position may be taken by other courts. It is thus important that Rule 41 clearly

express that a search warrant for this purpose may issue. And even if future decisions head the other direction, the need for the amendment would still exist. It is clear that law enforcement officers "may not constitutionally enter the home of a private individual to search for another person, though he be named in a valid arrest warrant in their possession, absent probable cause to believe that the named suspect is present within at the time." *Fisher v. Volz*, supra. The cautious officer is entitled to a procedure whereby he may have this probable cause determination made by a neutral and detached magistrate in advance of the entry.

### NOTES OF ADVISORY COMMITTEE ON RULES—1987 AMENDMENT

The amendments are technical. No substantive change is intended.

### NOTES OF ADVISORY COMMITTEE ON RULES—1989 AMENDMENT

The amendment to Rule 41(e) conforms the rule to the practice in most districts and eliminates language that is somewhat confusing. The Supreme Court has upheld warrants for the search and seizure of property in the possession of persons who are not suspected of criminal activity. See, e.g., *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978). Before the amendment, Rule 41(e) permitted such persons to seek return of their property if they were aggrieved by an unlawful search and seizure. But, the rule failed to address the harm that may result from the interference with the lawful use of property by persons who are not suspected of wrongdoing. Courts have recognized that once the government no longer has a need to use evidence, it should be returned. See, e.g., *United States v. Wilson*, 540 F.2d 1100 (D.C. Cir. 1976). Prior to the amendment, Rule 41(e) did not explicitly recognize a right of a property owner to obtain return of lawfully seized property even though the government might be able to protect its legitimate law enforcement interests in the property despite its return—e.g., by copying documents or by conditioning the return on government access to the property at a future time. As amended, Rule 41(e) provides that an aggrieved person may seek return of property that has been unlawfully seized, and a person whose property has been lawfully seized may seek return of property when aggrieved by the government's continued possession of it.

No standard is set forth in the rule to govern the determination of whether property should be returned to a person aggrieved either by an unlawful seizure or by deprivation of the property. The fourth amendment protects people from unreasonable seizures as well as unreasonable searches, *United States v. Place*, 462 U.S. 696, 701 (1983), and reasonableness under all of the circumstances must be the test when a person seeks to obtain the return of property. If the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable. But, if the United States' legitimate interests can be satisfied even if the property is returned, continued retention of the property would become unreasonable.

The amendment deletes language dating from 1944 stating that evidence shall not be admissible at a hearing or at a trial if the court grants the motion to return property under Rule 41(e). This language has not kept pace with the development of exclusionary rule doctrine and is currently only confusing. The Supreme Court has now held that evidence seized in violation of the fourth amendment, but in good faith pursuant to a warrant, may be used even against a person aggrieved by the constitutional violation. *United States v. Leon*, 468 U.S. 897 (1984). The Court has also held that illegally seized evidence may be admissible against persons who are not personally aggrieved by an illegal search or seizure. *Rakas v. Illinois*, 439 U.S. 128 (1978). Property that is inadmissible for one purpose (e.g., as part of the government's case-in-chief) may be admissible for another purpose (e.g., impeachment, *United States v. Havens*, 446

U.S. 620 (1980)). Federal courts have relied upon these decisions and permitted the government to retain and to use evidence as permitted by the fourth amendment.

Rule 41(e) is not intended to deny the United States the use of evidence permitted by the fourth amendment and federal statutes, even if the evidence might have been unlawfully seized. See, e.g., *United States v. Calandra*, 414 U.S. 338, 349 n.6 (1978) ("Rule 41(e) does not constitute a statutory expansion of the exclusionary rule."); *United States v. Roberts*, 852 F.2d 671 (2nd Cir. 1988) (exceptions to exclusionary rule applicable to Rule 41(e)). Thus, the exclusionary provision is deleted, and the scope of the exclusionary rule is reserved for judicial decisions.

In opting for a reasonableness approach and in deleting the exclusionary language, the Committee rejects the analysis of *Sovereign News Co. v. United States*, 690 F.2d 569 (6th Cir. 1982), cert. denied, 464 U.S. 814 (1983), which held that the United States must return photocopies of lawfully seized business records unless it could demonstrate that the records were "necessary for a specific investigation." As long as the government has a law enforcement purpose in copying records, there is no reason why it should be saddled with a heavy burden of justifying the copying. Although some cases have held that the government must return copies of records where the originals were illegally seized—See, e.g., *United States v. Wallace & Tiernan Co.*, 336 U.S. 793, 801 (1948); *Goodman v. United States*, 369 F.2d 166 (9th Cir. 1966)—these holdings are questionable in situations in which the government is permitted under Supreme Court decisions to use illegally seized evidence, and their reasoning does not apply to legally seized evidence.

As amended, Rule 41(e) avoids an all or nothing approach whereby the government must either return records and make no copies or keep originals notwithstanding the hardship to their owner. The amended rule recognizes that reasonable accommodations might protect both the law enforcement interests of the United States and the property rights of property owners and holders. In many instances documents and records that are relevant to ongoing or contemplated investigations and prosecutions may be returned to their owner as long as the government preserves a copy for future use. In some circumstances, however, equitable considerations might justify an order requiring the government to return or destroy all copies of records that it has seized. See, e.g., *Paton v. LaPrade*, 524 F.2d 862, 867–69 (3rd Cir. 1975). The amended rule contemplates judicial action that will respect both possessory and law enforcement interests.

The word "judge" is changed to "court" in the second sentence of subdivision (e) to clarify that a magistrate may receive evidence in the course of making a finding or a proposed finding for consideration by the district judge.

### NOTES OF ADVISORY COMMITTEE ON RULES—1990 AMENDMENT

Rule 41(a). The amendment to Rule 41(a) serves several purposes. First, it furthers the constitutional preference for warrants by providing a mechanism whereby a warrant may be issued in a district for a person or property that is moving into or through a district or might move outside the district while the warrant is sought or executed. Second, it clarifies the authority of federal magistrates to issue search warrants for property that is relevant to criminal investigation being conducted in a district and, although located outside the United States, that is in a place where the United States may lawfully conduct a search.

The amendment is not intended to expand the class of persons authorized to request a warrant and the language "upon request of a federal law enforcement officer," modifies all warrants covered by Rule 41. The amendment is intended to make clear that judges of state courts of record within a federal district may issue search warrants for persons or property located within that district. The amendment does not prescribe

the circumstances in which a warrant is required and is not intended to change the law concerning warrant requirements. Rather the rule provides a mechanism for the issuance of a warrant when one is required, or when a law enforcement officer desires to seek a warrant even though warrantless activity is permissible.

Rule 41(a)(1) permits anticipatory warrants by omitting the words "is located," which in the past required that in all instances the object of the search had to be located within the district at the time the warrant was issued. Now a search for property or a person within the district, or expected to be within the district, is valid if it otherwise complies with the rule.

Rule 41(a)(2) authorizes execution of search warrants in another district under limited circumstances. Because these searches are unusual, the rule limits to federal magistrates the authority to issue such warrants. The rule permits a federal magistrate to issue a search warrant for property within the district which is moving or may move outside the district. The amendment recognizes that there are inevitable delays between the application for a warrant and its authorization, on the one hand, and the execution of the warrant, on the other hand. The amendment also recognizes that when property is in motion, there may be good reason to delay execution until the property comes to rest. The amendment provides a practical tool for federal law enforcement officers that avoids the necessity of their either seeking several warrants in different districts for the same property or their relying on an exception to the warrant requirement for search of property or a person that has moved outside a district.

The amendment affords a useful warrant procedure to cover familiar fact patterns, like the one typified by *United States v. Chadwick*, 433 U.S. 1 (1976). In *Chadwick*, agents in San Diego observed suspicious activities involving a footlocker carried onto a train. When the train arrived in Boston, the agents made an arrest and conducted a warrantless search of the footlocker (which the Supreme Court held was invalid). Under the amended rule, agents who have probable cause in San Diego would be able to obtain a warrant for a search of the footlocker even though it is moving outside the district. Agents, who will not be sure exactly where the footlocker will be unloaded from the train, may execute the warrant when the journey ends. *See also United States v. Karo*, 468 U.S. 705 (1984) (rejecting argument that obtaining warrant to monitor beeper would not comply with requirement of particularity because its final destination may not be known); *United States v. Knotts*, 460 U.S. 276 (1983) (agents followed beeper across state lines). The Supreme Court's holding in *Chadwick* permits law enforcement officers to seize and hold an object like a footlocker while seeking a warrant. Although the amended rule would not disturb this holding, it provides a mechanism for agents to seek a probable cause determination and a warrant before interfering with the property and seizing it. It encourages reliance on warrants.

The amendment is not intended to abrogate the requirements of probable cause and prompt execution. At some point, a warrant issued in one district might become stale when executed in another district. But staleness can be a problem even when a warrant is executed in the district in which it was issued. *See generally United States v. Harris*, 403 U.S. 573, 579, 589 (1971). And at some point, an intervening event might make execution of a warrant unreasonable. *Cf. Illinois v. Andreas*, 463 U.S. 765, 772 (1983). Evaluations of the execution of a warrant must, in the nature of things, be made after the warrant is issued.

Nor does the amendment abrogate the requirement of particularity. Thus, it does not authorize searches of premises other than a particular place. As recognized by the Supreme Court in *Karo, supra*, although agents may not know exactly where moving property will come to rest, they can still describe with particularity the object to be searched.

The amendment would authorize the search of a particular object or container provided that law enforce-

ment officials were otherwise in a lawful position to execute the search without making an impermissible intrusion. For example, it would authorize the search of luggage moving aboard a plane.

Rule 41(a)(3) [The Supreme Court did not adopt the addition of a subsection (3) to Rule 41(a)] provides for warrants to search property outside the United States. No provision for search warrants for persons is made lest the rule be read as a substitute for extradition proceedings. As with the provision for searches outside a district, *supra*, this provision is limited to search warrants issued by federal magistrates. The phrase "relevant to criminal investigation" is intended to encompass all of the types of property that are covered by Rule 41(b), which is unchanged by the amendment. That phrase also is intended to include those investigations which begin with the request for the search warrant.

Some searches and seizures by federal officers outside the territory of the United States may be governed by the fourth amendment. *See generally* Saltzburg, the Reach of the Bill of Rights Beyond the Terra Firma of the United States, 20 Va., J. Int'l L. 741 (1980). Prior to the amendment of the rule, it was unclear how federal officers might obtain warrants authorizing searches outside the district of the issuing magistrate. Military Rule of Evidence 315 provided guidance for searches of military personnel and property and nonmilitary property in a foreign country. But it had no civilian counterpart. *See generally* S. Saltzburg, L. Schinasi, & D. Schlueter, *Military Rules of Evidence Manual* 274–95 (2d ed. 1986).

Although the amendment rests on the assumption that the Constitution applies to some extraterritorial searches, *cf United States v. Verdugo-Urquidez*, 110 S. Ct. 1056, 494 U.S. 259 (1990) (fourth amendment inapplicable to extraterritorial searches of property owned by non-resident aliens), it does not address the question of when the Constitution requires a warrant. Nor does it address the issue of whether international agreements or treaties or the law of a foreign nation might be applicable. *See United States v. Patterson*, 812 F. 2d 486 (9th Cir. 1987). Instead, the amendment is intended to provide necessary clarification as to how a warrant may be obtained when law enforcement officials are required, or find it desirable, to do so.

NOTES OF ADVISORY COMMITTEE ON RULES—1993
AMENDMENT

The amendment to Rule 41(c)(2)(A) is intended to expand the authority of magistrates and judges in considering oral requests for search warrants. It also recognizes the value of, and the public's increased dependence on facsimile machines to transmit written information efficiently and accurately. As amended, the Rule should thus encourage law enforcement officers to seek a warrant, especially when it is necessary, or desirable, to supplement oral telephonic communications by written materials which may now be transmitted electronically as well. The magistrate issuing the warrant may require that the original affidavit be ultimately filed. The Committee considered, but rejected, amendments to the Rule which would have permitted other means of electronic transmission, such as the use of computer modems. In its view, facsimile transmissions provide some method of assuring the authenticity of the writing transmitted by the affiant.

The Committee considered amendments to Rule 41(c)(2)(B), Application, Rule 41(c)(2)(C), Issuance, and Rule 41(g), Return of Papers to Clerk, but determined that allowing use of facsimile transmissions in those instances would not save time and would present problems and questions concerning the need to preserve facsimile copies.

The Rule is also amended to conform to the Judicial Improvements Act of 1990 [P.L. 101–650, Title III, Section 321] which provides that each United States magistrate appointed under section 631 of title 28, United States Code, shall be known as a United States magistrate judge.

COMMITTEE NOTES ON RULES—2002 AMENDMENT

The language of Rule 41 has been amended as part of the general restyling of the Criminal Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only, except as otherwise noted below. Rule 41 has been completely reorganized to make it easier to read and apply its key provisions.

Rule 41(b)(3) is a new provision that incorporates a congressional amendment to Rule 41 as a part of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001. The provision explicitly addresses the authority of a magistrate judge to issue a search warrant in an investigation of domestic or international terrorism. As long as the magistrate judge has authority in a district where activities related to terrorism may have occurred, the magistrate judge may issue a warrant for persons or property not only within the district, but outside the district as well.

Current Rule 41(c)(1), which refers to the fact that hearsay evidence may be used to support probable cause, has been deleted. That language was added to the rule in 1972, apparently to reflect emerging federal case law. *See* Advisory Committee Note to 1972 Amendments to Rule 41 (citing cases). Similar language was added to Rule 4 in 1974. In the intervening years, however, the case law has become perfectly clear on that proposition. Thus, the Committee believed that the reference to hearsay was no longer necessary. Furthermore, the limited reference to hearsay evidence was misleading to the extent that it might have suggested that other forms of inadmissible evidence could not be considered. For example, the rule made no reference to considering a defendant's prior criminal record, which clearly may be considered in deciding whether probable cause exists. *See, e.g., Brinegar v. United States*, 338 U.S. 160 (1949) (officer's knowledge of defendant's prior criminal activity). Rather than address that issue, or any other similar issues, the Committee believed that the matter was best addressed in Rule 1101(d)(3), Federal Rules of Evidence. That rule explicitly provides that the Federal Rules of Evidence do not apply to ''preliminary examinations in criminal cases, . . . issuance of warrants for arrest, criminal summonses, and search warrants . . . .'' The Advisory Committee Note accompanying that rule recognizes that: ''The nature of the proceedings makes application of the formal rules of evidence inappropriate and impracticable.'' The Committee did not intend to make any substantive changes in practice by deleting the reference to hearsay evidence.

Current Rule 41(d) provides that the officer taking the property under the warrant must provide a receipt for the property and complete an inventory. The revised rule indicates that the inventory may be completed by an officer present during the execution of the warrant, and not necessarily the officer actually executing the warrant.

COMMITTEE NOTES ON RULES—2006 AMENDMENT

The amendments to Rule 41 address three issues: first, procedures for issuing tracking device warrants; second, a provision for delaying any notice required by the rule; and third, a provision permitting a magistrate judge to use reliable electronic means to issue warrants.

*Subdivision (a).* Amended Rule 41(a)(2) includes two new definitional provisions. The first, in Rule 41(a)(2)(D), addresses the definitions of ''domestic terrorism'' and ''international terrorism,'' terms used in Rule 41(b)(2). The second, in Rule 41(a)(2)(E), addresses the definition of ''tracking device.''

*Subdivision (b).* Amended Rule 41(b)(4) is a new provision, designed to address the use of tracking devices. Such searches are recognized both by statute, *see* 18 U.S.C. §3117(a) and by caselaw, *see, e.g., United States v.*

*Karo*, 468 U.S. 705 (1984); *United States v. Knotts*, 460 U.S. 276 (1983). Warrants may be required to monitor tracking devices when they are used to monitor persons or property in areas where there is a reasonable expectation of privacy. *See, e.g., United States v. Karo, supra* (although no probable cause was required to install beeper, officers' monitoring of its location in defendant's home raised Fourth Amendment concerns). Nonetheless, there is no procedural guidance in current Rule 41 for those judicial officers who are asked to issue tracking device warrants. As with traditional search warrants for persons or property, tracking device warrants may implicate law enforcement interests in multiple districts.

The amendment provides that a magistrate judge may issue a warrant, if he or she has the authority to do so in the district, to install and use a tracking device, as that term is defined in 18 U.S.C. §3117(b). The magistrate judge's authority under this rule includes the authority to permit entry into an area where there is a reasonable expectation of privacy, installation of the tracking device, and maintenance and removal of the device. The Committee did not intend by this amendment to expand or contract the definition of what might constitute a tracking device. The amendment is based on the understanding that the device will assist officers only in tracking the movements of a person or property. The warrant may authorize officers to track the person or property within the district of issuance, or outside the district.

Because the authorized tracking may involve more than one district or state, the Committee believes that only federal judicial officers should be authorized to issue this type of warrant. Even where officers have no reason to believe initially that a person or property will move outside the district of issuance, issuing a warrant to authorize tracking both inside and outside the district avoids the necessity of obtaining multiple warrants if the property or person later crosses district or state lines.

The amendment reflects the view that if the officers intend to install or use the device in a constitutionally protected area, they must obtain judicial approval to do so. If, on the other hand, the officers intend to install and use the device without implicating any Fourth Amendment rights, there is no need to obtain the warrant. *See, e.g., United States v. Knotts, supra*, where the officers' actions in installing and following tracking device did not amount to a search under the Fourth Amendment.

*Subdivision (d).* Amended Rule 41(d) includes new language on tracking devices. The tracking device statute, 18 U.S.C. §3117, does not specify the standard an applicant must meet to install a tracking device. The Supreme Court has acknowledged that the standard for installation of a tracking device is unresolved, and has reserved ruling on the issue until it is squarely presented by the facts of a case. *See United States v. Karo*, 468 U.S. 705, 718 n. 5 (1984). The amendment to Rule 41 does not resolve this issue or hold that such warrants may issue only on a showing of probable cause. Instead, it simply provides that if probable cause is shown, the magistrate judge must issue the warrant. And the warrant is only needed if the device is installed (for example, in the trunk of the defendant's car) or monitored (for example, while the car is in the defendant's garage) in an area in which the person being monitored has a reasonable expectation of privacy.

*Subdivision (e).* Rule 41(e) has been amended to permit magistrate judges to use reliable electronic means to issue warrants. Currently, the rule makes no provision for using such media. The amendment parallels similar changes to Rules 5 and 32.1(a)(5)(B)(i).

The amendment recognizes the significant improvements in technology. First, more counsel, courts, and magistrate judges now routinely use facsimile transmissions of documents. And many courts and magistrate judges are now equipped to receive filings by electronic means. Indeed, some courts encourage or require that certain documents be filed by electronic

means. Second, the technology has advanced to the state where such filings may be sent from, and received at, locations outside the courthouse. Third, electronic media can now provide improved quality of transmission and security measures. In short, in a particular case, using facsimiles and electronic media to transmit a warrant can be both reliable and efficient use of judicial resources.

The term ''electronic'' is used to provide some flexibility to the rule and make allowance for further technological advances in transmitting data. Although facsimile transmissions are not specifically identified, the Committee envisions that facsimile transmissions would fall within the meaning of ''electronic means.''

While the rule does not impose any special requirements on use of facsimile transmissions, neither does it presume that those transmissions are reliable. The rule treats all electronic transmissions in a similar fashion. Whatever the mode, the means used must be ''reliable.'' While the rule does not further define that term, the Committee envisions that a court or magistrate judge would make that determination as a local matter. In deciding whether a particular electronic means, or media, would be reliable, the court might consider first, the expected quality and clarity of the transmission. For example, is it possible to read the contents of the warrant in its entirety, as though it were the original or a clean photocopy? Second, the court may consider whether security measures are available to insure that the transmission is not compromised. In this regard, most courts are now equipped to require that certain documents contain a digital signature, or some other similar system for restricting access. Third, the court may consider whether there are reliable means of preserving the document for later use.

Amended Rule 41(e)(2)(B) is a new provision intended to address the contents of tracking device warrants. To avoid open-ended monitoring of tracking devices, the revised rule requires the magistrate judge to specify in the warrant the length of time for using the device. Although the initial time stated in the warrant may not exceed 45 days, extensions of time may be granted for good cause. The rule further specifies that any installation of a tracking device authorized by the warrant must be made within ten calendar days and, unless otherwise provided, that any installation occur during daylight hours.

*Subdivision (f).* Current Rule 41(f) has been completely revised to accommodate new provisions dealing with tracking device warrants. First, current Rule 41(f)(1) has been revised to address execution and delivery of warrants to search for and seize a person or property; no substantive change has been made to that provision. New Rule 41(f)(2) addresses execution and delivery of tracking device warrants. That provision generally tracks the structure of revised Rule 41(f)(1), with appropriate adjustments for the particular requirements of tracking device warrants. Under Rule 41(f)(2)(A) the officer must note on the warrant the time the device was installed and the period during which the device was used. And under new Rule 41(f)(2)(B), the officer must return the tracking device warrant to the magistrate judge designated in the warrant, within 10 calendar days after use of the device has ended.

Amended Rule 41(f)(2)(C) addresses the particular problems of serving a copy of a tracking device warrant on the person who has been tracked, or whose property has been tracked. In the case of other warrants, current Rule 41 envisions that the subjects of the search typically know that they have been searched, usually within a short period of time after the search has taken place. Tracking device warrants, on the other hand, are by their nature covert intrusions and can be successfully used only when the person being investigated is unaware that a tracking device is being used. The amendment requires that the officer must serve a copy of the tracking device warrant on the person within 10 calendar days after the tracking has ended. That service may be accomplished by either personally serving the person, or both by leaving a copy at the person's

residence or usual abode and by sending a copy by mail. The Rule also provides, however, that the officer may (for good cause) obtain the court's permission to delay further service of the warrant. That might be appropriate, for example, where the owner of the tracked property is undetermined, or where the officer establishes that the investigation is ongoing and that disclosure of the warrant will compromise that investigation.

Use of a tracking device is to be distinguished from other continuous monitoring or observations that are governed by statutory provisions or caselaw. *See* Title III, Omnibus Crime Control and Safe Streets Act of 1968, *as amended* by Title I of the 1986 Electronic Communications Privacy Act [Electronic Communications Privacy Act of 1986], 18 U.S.C. §§2510–2520 [sic]; *United States v. Biasucci,* 786 F.2d 504 (2d Cir. 1986) (video camera); *United States v. Torres,* 751 F.2d 875 (7th Cir. 1984) (television surveillance).

Finally, amended Rule 41(f)(3) is a new provision that permits the government to request, and the magistrate judge to grant, a delay in any notice required in Rule 41. The amendment is co-extensive with 18 U.S.C. §3103a(b). That new provision, added as part of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, authorizes a court to delay any notice required in conjunction with the issuance of any search warrants.

*Changes Made After Publication and Comment.* The Committee agreed with the NADCL [sic] proposal that the words ''has authority'' should be inserted in Rule 41(c)(3), and (4) to parallel similar language in Rule 41(c)(1) and (2). The Committee also considered, but rejected, a proposal from NADCL [sic] to completely redraft Rule 41(d), regarding the finding of probable cause. The Committee also made minor clarifying changes in the Committee Note.

COMMITTEE NOTES ON RULES—2008 AMENDMENT

*Subdivision (b)(5).* Rule 41(b)(5) authorizes a magistrate judge to issue a search warrant for property located within certain delineated parts of United States jurisdiction that are outside of any State or any federal judicial district. The locations covered by the rule include United States territories, possessions, and commonwealths not within a federal judicial district as well as certain premises associated with United States diplomatic and consular missions. These are locations in which the United States has a legally cognizable interest or in which it exerts lawful authority and control. The rule is intended to authorize a magistrate judge to issue a search warrant in any of the locations for which 18 U.S.C. §7(9) provides jurisdiction. The difference between the language in this rule and the statute reflect the style conventions used in these rules, rather than any intention to alter the scope of the legal authority conferred. Under the rule, a warrant may be issued by a magistrate judge in any district in which activities related to the crime under investigation may have occurred, or in the District of Columbia, which serves as the default district for venue under 18 U.S.C. §3238.

Rule 41(b)(5) provides the authority to issue warrants for the seizure of property in the designated locations when law enforcement officials are required or find it desirable to obtain such warrants. The Committee takes no position on the question whether the Constitution requires a warrant for searches covered by the rule, or whether any international agreements, treaties, or laws of a foreign nation might be applicable. The rule does not address warrants for persons, which could be viewed as inconsistent with extradition requirements.

*Changes Made to Proposed Amendment Released for Public Comment.* With the assistance of the Style Consultant, the Committee revised (b)(5)(B) and (C) for greater clarity and compliance with the style conventions governing these rules. Because the language no longer tracks precisely the statute, the Committee Note was revised to state that the proposed rule is intended to

have the same scope as the jurisdictional provision upon which it was based, 18 U.S.C. §7(9).

COMMITTEE NOTES ON RULES—2009 AMENDMENT

The time set in the former rule at 10 days has been revised to 14 days. See the Committee Note to Rule 45(a).

*Subdivision (e)(2).* Computers and other electronic storage media commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location. This rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant.

The term "electronically stored information" is drawn from Rule 34(a) of the Federal Rules of Civil Procedure, which states that it includes "writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained." The 2006 Committee Note to Rule 34(a) explains that the description is intended to cover all current types of computer-based information and to encompass future changes and developments. The same broad and flexible description is intended under Rule 41.

In addition to addressing the two-step process inherent in searches for electronically stored information, the Rule limits the 10 [14] day execution period to the actual execution of the warrant and the on-site activity. While consideration was given to a presumptive national or uniform time period within which any subsequent off-site copying or review of the media or electronically stored information would take place, the practical reality is that there is no basis for a "one size fits all" presumptive period. A substantial amount of time can be involved in the forensic imaging and review of information. This is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs. The rule does not prevent a judge from imposing a deadline for the return of the storage media or access to the electronically stored information at the time the warrant is issued. However, to arbitrarily set a presumptive time period for the return could result in frequent petitions to the court for additional time.

It was not the intent of the amendment to leave the property owner without an expectation of the timing for return of the property, excluding contraband or instrumentalities of crime, or a remedy. Current Rule 41(g) already provides a process for the "person aggrieved" to seek an order from the court for a return of the property, including storage media or electronically stored information, under reasonable circumstances.

Where the "person aggrieved" requires access to the storage media or the electronically stored information earlier than anticipated by law enforcement or ordered by the court, the court on a case by case basis can fashion an appropriate remedy, taking into account the time needed to image and search the data and any prejudice to the aggrieved party.

The amended rule does not address the specificity of description that the Fourth Amendment may require in a warrant for electronically stored information, leaving the application of this and other constitutional standards concerning both the seizure and the search to ongoing case law development.

*Subdivision (f)(1).* Current Rule 41(f)(1) does not address the question of whether the inventory should include a description of the electronically stored information contained in the media seized. Where it is impractical to record a description of the electronically stored information at the scene, the inventory may list the physical storage media seized. Recording a description of the electronically stored information at the scene is likely to be the exception, and not the rule, given the large amounts of information contained on electronic storage media and the impracticality for law

enforcement to image and review all of the information during the execution of the warrant. This is consistent with practice in the "paper world." In circumstances where filing cabinets of documents are seized, routine practice is to list the storage devices, i.e., the cabinets, on the inventory, as opposed to making a document by document list of the contents.

*Changes Made to Proposed Amendment Released for Public Comment.* The words "copying or" were added to the last line of Rule 41(e)(2)(B) to clarify that copying as well as review may take place off-site.

The Committee Note was amended to reflect the change to the text and to clarify that the amended Rule does not speak to constitutional questions concerning warrants for electronic information. Issues of particularity and search protocol are presently working their way through the courts. *Compare United States v. Carey,* 172 F.3d 1268 (10th Cir. 1999) (finding warrant authorizing search for "documentary evidence pertaining to the sale and distribution of controlled substances" to prohibit opening of files with a .jpg suffix) *and United States v. Fleet Management Ltd.,* 521 F. Supp. 2d 436 (E.D. Pa. 2007) (warrant invalid when it "did not even attempt to differentiate between data that there was probable cause to seize and data that was completely unrelated to any relevant criminal activity") *with United States v. Comprehensive Drug Testing, Inc.,* 513 F.3d 1085 (9th Cir. 2008) (the government had no reason to confine its search to key words; "computer files are easy to disguise or rename, and were we to limit the warrant to such a specific search protocol, much evidence could escape discovery simply because of [the defendants'] labeling of the files"); *United States v. Brooks,* 427 F.3d 1246 (10th Cir. 2005) (rejecting requirement that warrant describe specific search methodology).

Minor changes were also made to conform to style conventions.

COMMITTEE NOTES ON RULES—2011 AMENDMENT

*Subdivisions (d)(3) and (e)(3).* The amendment deletes the provisions that govern the application for and issuance of warrants by telephone or other reliable electronic means. These provisions have been transferred to new Rule 4.1, which governs complaints and warrants under Rules 3, 4, 9, and 41.

*Subdivision (e)(2).* The amendment eliminates unnecessary references to "calendar" days. As amended effective December 1, 2009, Rule 45(a)(1) provides that all periods of time stated in days include "every day, including intermediate Saturdays, Sundays, and legal holidays[.]"

*Subdivisions (f)(1) and (2).* The amendment permits any warrant return to be made by reliable electronic means. Requiring an in-person return can be burdensome on law enforcement, particularly in large districts when the return can require a great deal of time and travel. In contrast, no interest of the accused is affected by allowing what is normally a ministerial act to be done electronically. Additionally, in subdivision (f)(2) the amendment eliminates unnecessary references to "calendar" days. As amended effective December 1, 2009, Rule 45(a)(1) provides that all periods of time stated in days include "every day, including intermediate Saturdays, Sundays, and legal holidays[.]"

*Changes Made to Proposed Amendment Released for Public Comment.* Obsolescent references to "calendar" days were deleted by a technical and conforming amendment not included in the rule as published. No other changes were made after publication.

AMENDMENT BY PUBLIC LAW

2001—Subd. (a). Pub. L. 107–56 inserted before period at end "and (3) in an investigation of domestic terrorism or international terrorism (as defined in section 2331 of title 18, United States Code), by a Federal magistrate judge in any district in which activities related to the terrorism may have occurred, for a search of property or for a person within or outside the district".

**Add.92**

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment of this rule by order of the United States Supreme Court on Apr. 26, 1976, modified and approved by Pub. L. 95–78, effective Oct. 1, 1977, see section 4 of Pub. L. 95–78, set out as an Effective Date of Pub. L. 95–78 note under section 2074 of Title 28, Judiciary and Judicial Procedure.

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment of subd. (c)(1) by order of the United States Supreme Court of Apr. 26, 1976, effective Aug. 1, 1976, see section 1 of Pub. L. 94–349, set out as a note under section 2074 of Title 28, Judiciary and Judicial Procedure.

EFFECTIVE DATE OF 1956 AMENDMENT

Amendment by Order of April 9, 1956, became effective 90 days thereafter.

## Rule 42. Criminal Contempt

(a) DISPOSITION AFTER NOTICE. Any person who commits criminal contempt may be punished for that contempt after prosecution on notice.

(1) *Notice.* The court must give the person notice in open court, in an order to show cause, or in an arrest order. The notice must:

(A) state the time and place of the trial;

(B) allow the defendant a reasonable time to prepare a defense; and

(C) state the essential facts constituting the charged criminal contempt and describe it as such.

(2) *Appointing a Prosecutor.* The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. If the government declines the request, the court must appoint another attorney to prosecute the contempt.

(3) *Trial and Disposition.* A person being prosecuted for criminal contempt is entitled to a jury trial in any case in which federal law so provides and must be released or detained as Rule 46 provides. If the criminal contempt involves disrespect toward or criticism of a judge, that judge is disqualified from presiding at the contempt trial or hearing unless the defendant consents. Upon a finding or verdict of guilty, the court must impose the punishment.

(b) SUMMARY DISPOSITION. Notwithstanding any other provision of these rules, the court (other than a magistrate judge) may summarily punish a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies; a magistrate judge may summarily punish a person as provided in 28 U.S.C. §636(e). The contempt order must recite the facts, be signed by the judge, and be filed with the clerk.

(As amended Mar. 9, 1987, eff. Aug. 1, 1987; Apr. 29, 2002, eff. Dec. 1, 2002.)

NOTES OF ADVISORY COMMITTEE ON RULES—1944

The rule-making power of the Supreme Court with respect to criminal proceedings was extended to proceedings to punish for criminal contempt of court by the Act of November 21, 1941 (55 Stat. 779), 18 U.S.C. 689.

*Note to Subdivision* (a). This rule is substantially a restatement of existing law, *Ex parte Terry*, 128 U.S. 289; *Cooke v. United States*, 267 U.S. 517, 534.

*Note to Subdivision* (b). 1. This rule is substantially a restatement of the procedure prescribed in 28 U.S.C. 386–390 [now 18 U.S.C. 401, 402, 3285, 3691], and 29 U.S.C. 111 [now 18 U.S.C. 3692].

2. The requirement in the second sentence that the notice shall describe the criminal contempt as such is intended to obviate the frequent confusion between criminal and civil contempt proceedings and follows the suggestion made in *McCann v. New York Stock Exchange*, 80 F.2d 211 (C.C.A. 2d). See also *Nye v. United States*, 313 U.S. 33, 42–43.

3. The fourth sentence relating to trial by jury preserves the right to a trial by jury in those contempt cases in which it is granted by statute, but does not enlarge the right or extend it to additional cases. The respondent in a contempt proceeding may demand a trial by jury as of right if the proceeding is brought under the Act of March 23, 1932, c. 90, sec. 11, 47 Stat. 72, 29 U.S.C. 111 [now 18 U.S.C. 3692] (Norris-La Guardia Act), or the Act of October 15, 1914, c. 323, sec. 22, 38 Stat. 738, 28 U.S.C. 387 (Clayton Act).

4. The provision in the sixth sentence disqualifying the judge affected by the contempt if the charge involves disrespect to or criticism of him, is based, in part, on 29 U.S.C. former §112 (Contempts; demand for retirement of judge sitting in proceeding) and the observations of Chief Justice Taft in *Cooke v. United States*, 267 U.S. 517, 539, 45 S.Ct. 390, 69 L.Ed. 767.

5. Among the statutory provisions defining criminal contempts are the following:

U.S.C., Title 7:

Section 499m (Perishable Agricultural Commodities Act; investigation of complaints; procedure; penalties; etc.—(c) Disobedience to subpenas; remedy; contempt)

U.S.C., Title 9:

Section 7 (Witnesses before arbitrators; fees, compelling attendance)

U.S.C., Title 11:

Section 69 [former] (Referees; contempts before)

U.S.C., Title 15:

Section 49 (Federal Trade Commission; documentary evidence; depositions; witnesses)

Section 78u (Regulation of Securities Exchanges; investigation; injunctions and prosecution of offenses)

Section 100 (Trademarks; destruction of infringing labels; service of injunction, and proceedings for enforcement)

Section 155 (China Trade Act; authority of registrar in obtaining evidence)

U.S.C., Title 17:

Section 36 [now 502] (Injunctions; service and enforcement)

U.S.C., Title 19:

Section 1333 (Tariff Commission; testimony and production of papers—(b) Witnesses and evidence)

U.S.C., Title 22:

Section 270f (International Bureaus; Congresses, etc.; perjury; contempts; penalties)

U.S.C., Title 28:

Section 385 [now 459; 18 U.S.C. 401] (Administration of oaths; contempts)

Section 386 [now 18 U.S.C. 402, 3691] (Contempts; when constituting also criminal offense)

Section 387 [now 18 U.S.C. 402] (Same; procedure; bail; attachment; trial; punishment) (Clayton Act; jury trial; section)

Section 388 [former] (Same; review of conviction)

Section 389 [now 18 U.S.C. 402, 3691] (Same; not specifically enumerated)

Section 390 [now 18 U.S.C. 3285] (Same; limitations)

Section 390a [now 18 U.S.C. 402] ("Person" or "persons" defined)

Section 648 [now Rule 17(f), FRCP, 18 U.S.C., Appendix; Rule 45(d), FRCP, 28 U.S.C., Appendix]

**Add.93**

magistrate judges for actual expenses necessarily incurred by them in the performance of their duties under this chapter. Such reimbursement may be made, at rates not exceeding those prescribed by such regulations, for expenses incurred by such part-time magistrate judges for clerical and secretarial assistance, stationery, telephone and other communications services, travel, and such other expenses as may be determined to be necessary for the proper performance of the duties of such officers: *Provided, however,* That no reimbursement shall be made for all or any portion of the expense incurred by such part-time magistrate judges for the procurement of office space.

(June 25, 1948, ch. 646, 62 Stat. 917; Pub. L. 90–578, title I, § 101, Oct. 17, 1968, 82 Stat. 1112; Pub. L. 96–82, § 8(a), Oct. 10, 1979, 93 Stat. 646; Pub. L. 101–650, title III, § 321, Dec. 1, 1990, 104 Stat. 5117.)

### HISTORICAL AND REVISION NOTES

*Prior section 663.*—Based on title 28, U.S.C., 1940 ed., §§ 597, 597a, 597b, 597c (May 28, 1896, ch. 252, §§ 21, 24, 29 Stat. 184, 186; Aug. 1, 1946, ch. 721, §§ 1–4, 60 Stat. 752, 753).

The provision of section 597c of title 28, U.S.C., 1940 ed., excepting commissioners in the Territory of Alaska was omitted as unnecessary since this exception is implicit in the revised section. The words "in each judicial district" limit the section to the commissioners in the districts enumerated in chapter 5 which includes Hawaii, Puerto Rico, and District of Columbia but omits Alaska, Canal Zone, [Guam] and Virgin Islands.

Salaries of park commissioners are provided by section 634 of this title.

Changes were made in phraseology.

### AMENDMENTS

1979—Subsec. (a). Pub. L. 96–82 inserted reference to the compensation of such legal assistants as the Judicial Conference, on the basis of the recommendations of the judicial councils of the circuits, considers necessary.

1968—Pub. L. 90–578 substituted provisions relating to expenses for provisions prescribing residence for park commissioners. See section 631(b)(3) of this title.

### CHANGE OF NAME

Words "magistrate judges" and "magistrate judge" substituted for "magistrates" and "magistrate", respectively, wherever appearing in text pursuant to section 321 of Pub. L. 101–650, set out as a note under section 631 of this title.

### EFFECTIVE DATE OF 1968 AMENDMENT

Amendment by Pub. L. 90–578 effective Oct. 17, 1968, except when a later effective date is applicable, which is the earlier of date when implementation of amendment by appointment of magistrates [now United States magistrate judges] and assumption of office takes place or third anniversary of enactment of Pub. L. 90–578 on Oct. 17, 1968, see section 403 of Pub. L. 90–578, set out as a note under section 631 of this title.

## § 636. Jurisdiction, powers, and temporary assignment

(a) Each United States magistrate judge serving under this chapter shall have within the district in which sessions are held by the court that appointed the magistrate judge, at other places where that court may function, and elsewhere as authorized by law—

(1) all powers and duties conferred or imposed upon United States commissioners by law or by the Rules of Criminal Procedure for the United States District Courts;

(2) the power to administer oaths and affirmations, issue orders pursuant to section 3142 of title 18 concerning release or detention of persons pending trial, and take acknowledgements, affidavits, and depositions;

(3) the power to conduct trials under section 3401, title 18, United States Code, in conformity with and subject to the limitations of that section;

(4) the power to enter a sentence for a petty offense; and

(5) the power to enter a sentence for a class A misdemeanor in a case in which the parties have consented.

(b)(1) Notwithstanding any provision of law to the contrary—

(A) a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.

(B) a judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A), of applications for posttrial[1] relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.

(C) the magistrate judge shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.

Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

(2) A judge may designate a magistrate judge to serve as a special master pursuant to the applicable provisions of this title and the Federal Rules of Civil Procedure for the United States district courts. A judge may designate a magistrate judge to serve as a special master in any civil case, upon consent of the parties, without

---

[1] So in original. Probably should be "post-trial".

regard to the provisions of rule 53(b) of the Federal Rules of Civil Procedure for the United States district courts.

(3) A magistrate judge may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States.

(4) Each district court shall establish rules pursuant to which the magistrate judges shall discharge their duties.

(c) Notwithstanding any provision of law to the contrary—

(1) Upon the consent of the parties, a full-time United States magistrate judge or a part-time United States magistrate judge who serves as a full-time judicial officer may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves. Upon the consent of the parties, pursuant to their specific written request, any other part-time magistrate judge may exercise such jurisdiction, if such magistrate judge meets the bar membership requirements set forth in section 631(b)(1) and the chief judge of the district court certifies that a full-time magistrate judge is not reasonably available in accordance with guidelines established by the judicial council of the circuit. When there is more than one judge of a district court, designation under this paragraph shall be by the concurrence of a majority of all the judges of such district court, and when there is no such concurrence, then by the chief judge.

(2) If a magistrate judge is designated to exercise civil jurisdiction under paragraph (1) of this subsection, the clerk of court shall, at the time the action is filed, notify the parties of the availability of a magistrate judge to exercise such jurisdiction. The decision of the parties shall be communicated to the clerk of court. Thereafter, either the district court judge or the magistrate judge may again advise the parties of the availability of the magistrate judge, but in so doing, shall also advise the parties that they are free to withhold consent without adverse substantive consequences. Rules of court for the reference of civil matters to magistrate judges shall include procedures to protect the voluntariness of the parties' consent.

(3) Upon entry of judgment in any case referred under paragraph (1) of this subsection, an aggrieved party may appeal directly to the appropriate United States court of appeals from the judgment of the magistrate judge in the same manner as an appeal from any other judgment of a district court. The consent of the parties allows a magistrate judge designated to exercise civil jurisdiction under paragraph (1) of this subsection to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Nothing in this paragraph shall be construed as a limitation of any party's right to seek review by the Supreme Court of the United States.

(4) The court may, for good cause shown on its own motion, or under extraordinary circumstances shown by any party, vacate a reference of a civil matter to a magistrate judge under this subsection.

(5) The magistrate judge shall, subject to guidelines of the Judicial Conference, determine whether the record taken pursuant to this section shall be taken by electronic sound recording, by a court reporter, or by other means.

(d) The practice and procedure for the trial of cases before officers serving under this chapter shall conform to rules promulgated by the Supreme Court pursuant to section 2072 of this title.

(e) CONTEMPT AUTHORITY.—

(1) IN GENERAL.—A United States magistrate judge serving under this chapter shall have within the territorial jurisdiction prescribed by the appointment of such magistrate judge the power to exercise contempt authority as set forth in this subsection.

(2) SUMMARY CRIMINAL CONTEMPT AUTHORITY.—A magistrate judge shall have the power to punish summarily by fine or imprisonment, or both, such contempt of the authority of such magistrate judge constituting misbehavior of any person in the magistrate judge's presence so as to obstruct the administration of justice. The order of contempt shall be issued under the Federal Rules of Criminal Procedure.

(3) ADDITIONAL CRIMINAL CONTEMPT AUTHORITY IN CIVIL CONSENT AND MISDEMEANOR CASES.—In any case in which a United States magistrate judge presides with the consent of the parties under subsection (c) of this section, and in any misdemeanor case proceeding before a magistrate judge under section 3401 of title 18, the magistrate judge shall have the power to punish, by fine or imprisonment, or both, criminal contempt constituting disobedience or resistance to the magistrate judge's lawful writ, process, order, rule, decree, or command. Disposition of such contempt shall be conducted upon notice and hearing under the Federal Rules of Criminal Procedure.

(4) CIVIL CONTEMPT AUTHORITY IN CIVIL CONSENT AND MISDEMEANOR CASES.—In any case in which a United States magistrate judge presides with the consent of the parties under subsection (c) of this section, and in any misdemeanor case proceeding before a magistrate judge under section 3401 of title 18, the magistrate judge may exercise the civil contempt authority of the district court. This paragraph shall not be construed to limit the authority of a magistrate judge to order sanctions under any other statute, the Federal Rules of Civil Procedure, or the Federal Rules of Criminal Procedure.

(5) CRIMINAL CONTEMPT PENALTIES.—The sentence imposed by a magistrate judge for any criminal contempt provided for in paragraphs (2) and (3) shall not exceed the penalties for a Class C misdemeanor as set forth in sections 3581(b)(8) and 3571(b)(6) of title 18.

(6) CERTIFICATION OF OTHER CONTEMPTS TO THE DISTRICT COURT.—Upon the commission of any such act—

(A) in any case in which a United States magistrate judge presides with the consent of the parties under subsection (c) of this

**Add.96**

section, or in any misdemeanor case proceeding before a magistrate judge under section 3401 of title 18, that may, in the opinion of the magistrate judge, constitute a serious criminal contempt punishable by penalties exceeding those set forth in paragraph (5) of this subsection, or

(B) in any other case or proceeding under subsection (a) or (b) of this section, or any other statute, where—

(i) the act committed in the magistrate judge's presence may, in the opinion of the magistrate judge, constitute a serious criminal contempt punishable by penalties exceeding those set forth in paragraph (5) of this subsection,

(ii) the act that constitutes a criminal contempt occurs outside the presence of the magistrate judge, or

(iii) the act constitutes a civil contempt,

the magistrate judge shall forthwith certify the facts to a district judge and may serve or cause to be served, upon any person whose behavior is brought into question under this paragraph, an order requiring such person to appear before a district judge upon a day certain to show cause why that person should not be adjudged in contempt by reason of the facts so certified. The district judge shall thereupon hear the evidence as to the act or conduct complained of and, if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before a district judge.

(7) APPEALS OF MAGISTRATE JUDGE CONTEMPT ORDERS.—The appeal of an order of contempt under this subsection shall be made to the court of appeals in cases proceeding under subsection (c) of this section. The appeal of any other order of contempt issued under this section shall be made to the district court.

(f) In an emergency and upon the concurrence of the chief judges of the districts involved, a United States magistrate judge may be temporarily assigned to perform any of the duties specified in subsection (a), (b), or (c) of this section in a judicial district other than the judicial district for which he has been appointed. No magistrate judge shall perform any of such duties in a district to which he has been temporarily assigned until an order has been issued by the chief judge of such district specifying (1) the emergency by reason of which he has been transferred, (2) the duration of his assignment, and (3) the duties which he is authorized to perform. A magistrate judge so assigned shall not be entitled to additional compensation but shall be reimbursed for actual and necessary expenses incurred in the performance of his duties in accordance with section 635.

(g) A United States magistrate judge may perform the verification function required by section 4107 of title 18, United States Code. A magistrate judge may be assigned by a judge of any United States district court to perform the verification required by section 4108 and the appointment of counsel authorized by section 4109 of title 18, United States Code, and may perform such functions beyond the territorial limits of the United States. A magistrate judge assigned such functions shall have no authority to perform any other function within the territory of a foreign country.

(h) A United States magistrate judge who has retired may, upon the consent of the chief judge of the district involved, be recalled to serve as a magistrate judge in any judicial district by the judicial council of the circuit within which such district is located. Upon recall, a magistrate judge may receive a salary for such service in accordance with regulations promulgated by the Judicial Conference, subject to the restrictions on the payment of an annuity set forth in section 377 of this title or in subchapter III of chapter 83, and chapter 84, of title 5 which are applicable to such magistrate judge. The requirements set forth in subsections (a), (b)(3), and (d) of section 631, and paragraph (1) of subsection (b) of such section to the extent such paragraph requires membership of the bar of the location in which an individual is to serve as a magistrate judge, shall not apply to the recall of a retired magistrate judge under this subsection or section 375 of this title. Any other requirement set forth in section 631(b) shall apply to the recall of a retired magistrate judge under this subsection or section 375 of this title unless such retired magistrate judge met such requirement upon appointment or reappointment as a magistrate judge under section 631.

(June 25, 1948, ch. 646, 62 Stat. 917; Pub. L. 90–578, title I, § 101, Oct. 17, 1968, 82 Stat. 1113; Pub. L. 92–239, §§ 1, 2, Mar. 1, 1972, 86 Stat. 47; Pub. L. 94–577, § 1, Oct. 21, 1976, 90 Stat. 2729; Pub. L. 95–144, § 2, Oct. 28, 1977, 91 Stat. 1220; Pub. L. 96–82, § 2, Oct. 10, 1979, 93 Stat. 643; Pub. L. 98–473, title II, § 208, Oct. 12, 1984, 98 Stat. 1986; Pub. L. 98–620, title IV, § 402(29)(B), Nov. 8, 1984, 98 Stat. 3359; Pub. L. 99–651, title II, § 201(a)(2), Nov. 14, 1986, 100 Stat. 3647; Pub. L. 100–659, § 4(c), Nov. 15, 1988, 102 Stat. 3918; Pub. L. 100–690, title VII, § 7322, Nov. 18, 1988, 102 Stat. 4467; Pub. L. 100–702, title IV, § 404(b)(1), title X, § 1014, Nov. 19, 1988, 102 Stat. 4651, 4669; Pub. L. 101–650, title III, §§ 308(a), 321, Dec. 1, 1990, 104 Stat. 5112, 5117; Pub. L. 104–317, title II, §§ 201, 202(b), 207, Oct. 19, 1996, 110 Stat. 3848–3850; Pub. L. 106–518, title II, §§ 202, 203(b), Nov. 13, 2000, 114 Stat. 2412, 2414; Pub. L. 107–273, div. B, title III, § 3002(b), Nov. 2, 2002, 116 Stat. 1805; Pub. L. 109–63, § 2(d), Sept. 9, 2005, 119 Stat. 1995; Pub. L. 111–16, § 6(1), May 7, 2009, 123 Stat. 1608.)

HISTORICAL AND REVISION NOTES

*Prior jurisdiction, powers, and procedure provisions in section 632.*—Based on sections 27, 66, 67, 68, 80f, 100, 117e, 129, 172, 181b, 204e, 256d, 376, 395e, 403c–5, 403c–6, 403h–5, 404c–5, and 408m of title 16, U.S.C., 1940 ed., Conservation (May 7, 1894, ch. 72, § 5, 28 Stat. 74; Apr. 20, 1904, ch. 1400, § 6, 33 Stat. 188; Mar. 2, 1907, ch. 2516, §§ 1, 2, 34 Stat. 1218; Mar. 3, 1911, ch. 230, 36 Stat. 1086; Mar. 3, 1911, ch. 231, § 291, 36 Stat. 1167; Aug. 22, 1914, ch. 264, § 6, 38 Stat. 700; June 30, 1916, ch. 197, § 6, 39 Stat. 245; Aug. 21, 1916, ch. 368, § 6, 39 Stat. 523; June 2, 1920, ch. 218, §§ 7, 8, 41 Stat. 733; Apr. 25, 1928, ch. 434, § 6, 45 Stat. 460; Apr. 26, 1928, ch. 438, § 6, 45 Stat. 464; Apr. 19, 1930, ch. 200, § 6, 4 Stat. 228; May 2, 1932, ch. 155, § 3, 47 Stat. 145; June 25, 1935, ch. 309, § 1, 49 Stat. 422; Aug. 19, 1937, ch. 703, § 5, 6, 50 Stat. 702; June 25, 1938, ch. 684, § 1, 52 Stat. 1164; June 28, 1938, ch. 778, § 1, 52 Stat. 1213; Mar. 4, 1940, ch. 40, § 2, 54 Stat. 43; Mar. 6, 1942, ch. 150, § 5, 56 Stat. 134; Mar. 6, 1942, ch. 151, § 5, 56 Stat. 137; Apr. 29, 1942, ch. 264, § 5, 56 Stat. 260; June 5, 1942, ch. 341, § 5, 56 Stat. 318; Apr.

23, 1946, ch. 202, §2, 60 Stat. 120; June 24, 1946, ch. 463, §2, 60 Stat. 303).

Section consolidates provisions of sections 27, 66, 67, 68, 80f, 100, 117e, 129, 172, 181b, 204e, 256d, 376, 395e, 403c–5, 403c–6, 403h–5, 404c–5 and 408m of title 16, U.S.C., 1940 ed., relating to jurisdiction and powers of park commissioners with necessary changes in arrangement and phraseology. For other provisions of such sections, see Distribution Table.

The provisions of sections 27, 66, 67, 68, 100, 117e, 129, 172, 181b, 204e, 256d, 376, 395e, 403c–5, 403c–6, 403h–5, 404c–5 and 408m of title 16, U.S.C., 1940 ed., relating to the powers of park commissioners respecting issuance of warrants of arrest and other process were omitted and are recommended for repeal as covered by sections 3041 and 3141 of revised title 18 (H.R. 1600, 80th Cong.), and Rules, 4, 5(c), and 9 of the new Federal Rules of Criminal Procedure.

Provisions in sections 27, 66, 67, 68, 100, 117e, 129, 172, 181b, 204e, 256d, 376, 395e, 403c–5, 403c–6, 403h–5, 404c–5 and 408m of title 16, U.S.C., 1940 ed., for arrest without warrant for violation of law or regulation within a national park were also omitted and are recommended for repeal as covered by section 3054 of revised title 18 (H.R. 2200, 79th Cong.), Rule 4 of the Federal Rules of Criminal Procedure and Rule 4 of the Federal Rules of Civil Procedure.

SENATE REVISION AMENDMENT

As finally enacted, section 158b of Title 16, U.S.C., which was derived from act May 15, 1947, ch. 55, §2, 61 Stat. 92, was an additional source of this section, and such act was accordingly included by Senate amendment in the schedule of repeals. No change in the text of the section was necessary as the result of inclusion of such section 158b. See 80th Congress Senate Report No. 1559.

As finally enacted, act May 15, 1947, ch. 57, 61 Stat. 92, which amended section 403c–5 of Title 16, U.S.C., was an additional source of this section, and such act was accordingly included by Senate amendment in the schedule of repeals. See 80th Congress Senate Report No. 1559.

*Prior oaths, acknowledgments, affidavits, and depositions provisions in section 637.*—Based on title 28, U.S.C., 1940 ed., §§525, 758 (R.S. §945; May 28, 1896, ch. 252, §19, 29 Stat. 184; Mar. 2, 1901, ch. 814, 31 Stat. 956; Mar. 3, 1911, ch. 231, §291, 36 Stat. 1167).

This section consolidates part of section 525 with section 758 of title 28, U.S.C., 1940 ed. The provision of said section 525 empowering clerks and deputy clerks to administer oaths is incorporated in section 953 of this title. The provision of said section 758 that acknowledgments of bail and affidavits should have the same effect as if taken before judges was omitted as surplusage.

The exception as to Alaska, provided in section 591 of title 28, U.S.C., 1940 ed., and referred to in section 525 of title 28, U.S.C., 1940 ed., was omitted as unnecessary since section 108 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and section 1119 of the Compiled Laws of Alaska, 1933, give commissioners all powers of notaries public. See also reviser's notes to sections 631 and 633 of this title.

Word "acknowledgments" was inserted to make it clear that commissioners, like justices of the peace, can take acknowledgments as well as oaths, affidavits, etc.

The authority to take depositions was included to conform to Federal Rules of Civil Procedure, Rule 28.

Changes were made in phraseology.

REFERENCES IN TEXT

The Rules of Criminal Procedure for the United States District Courts, referred to in subsecs. (a)(1) and (e)(2)–(4), are set out in the Appendix to Title 18, Crimes and Criminal Procedure.

The Federal Rules of Civil Procedure for the United States district courts, referred to in subsecs. (b)(2), (c)(3), and (e)(4), are set out in the Appendix to this title.

AMENDMENTS

2009—Subsec. (b)(1). Pub. L. 111–16 substituted "fourteen days" for "ten days" in concluding provisions.

2005—Subsec. (a). Pub. L. 109–63 substituted "district in which sessions are held by the court that appointed the magistrate judge, at other places where that court may function, and elsewhere as authorized by law—" for "territorial jurisdiction prescribed by his appointment—" in introductory provisions.

2002—Subsec. (e)(2). Pub. L. 107–273, §3002(b)(1), inserted ", or both," after "fine or imprisonment".

Subsec. (e)(3). Pub. L. 107–273, §3002(b)(2), inserted "or both," after "fine or imprisonment,".

2000—Subsec. (a)(4), (5). Pub. L. 106–518, §203(b), added pars. (4) and (5) and struck out former pars. (4) and (5) which read as follows:

"(4) the power to enter a sentence for a petty offense that is a class B misdemeanor charging a motor vehicle offense, a class C misdemeanor, or an infraction; and

"(5) the power to enter a sentence for a class A misdemeanor, or a class B or C misdemeanor not covered by paragraph (4), in a case in which the parties have consented."

Subsec. (e). Pub. L. 106–518, §202, amended subsec. (e) generally. Prior to amendment, subsec. (e) specified conduct before a magistrate judge which constituted contempt of court and prescribed procedure for adjudicating and punishing contempts.

1996—Subsec. (a)(3). Pub. L. 104–317, §202(b)(1), substituted a semicolon for ", and" at end.

Subsec. (a)(4), (5). Pub. L. 104–317, §202(b)(2), added pars. (4) and (5) and struck out former par. (4) which read as follows: "the power to enter a sentence for a misdemeanor or infraction with the consent of the parties."

Subsec. (c)(3). Pub. L. 104–317, §207(1)(A), substituted "The consent of the parties" for "In this circumstance, the consent of the parties".

Subsec. (c)(4) to (7). Pub. L. 104–317, §207(1)(B), (C), redesignated pars. (6) and (7) as (4) and (5) and struck out former pars. (4) and (5) which read as follows:

"(4) Notwithstanding the provisions of paragraph (3) of this subsection, at the time of reference to a magistrate, the parties may further consent to appeal on the record to a judge of the district court in the same manner as on an appeal from a judgment of the district court to a court of appeals. Wherever possible the local rules of the district court and the rules promulgated by the conference shall endeavor to make such appeal inexpensive. The district court may affirm, reverse, modify, or remand the magistrate's judgment.

"(5) Cases in the district courts under paragraph (4) of this subsection may be reviewed by the appropriate United States court of appeals upon petition for leave to appeal by a party stating specific objections to the judgment. Nothing in this paragraph shall be construed to be a limitation on any party's right to seek review by the Supreme Court of the United States."

Subsec. (d). Pub. L. 104–317, §207(2), struck out ", and for the taking and hearing of appeals to the district courts," after "officers serving under this chapter".

Subsec. (f). Pub. L. 104–317, §201, substituted "subsection (a), (b), or (c)" for "subsection (a) or (b)" in first sentence.

1990—Subsec. (c)(2). Pub. L. 101–650 substituted "the availability of a magistrate to exercise" for "their right to consent to the exercise of" in first sentence and amended third sentence generally. Prior to amendment, third sentence read as follows: "Thereafter, neither the district judge nor the magistrate shall attempt to persuade or induce any party to consent to reference of any civil matter to a magistrate."

1988—Subsec. (a)(4). Pub. L. 100–690 added par. (4).

Subsec. (c)(7). Pub. L. 100–702, §1014, amended par. (7) generally. Prior to amendment, par. (7) read as follows: "The magistrate shall determine, taking into account the complexity of the particular matter referred to the magistrate, whether the record in the proceeding shall be taken, pursuant to section 753 of this title, by elec-

tronic sound recording means, by a court reporter appointed or employed by the court to take a verbatim record by shorthand or by mechanical means, or by an employee of the court designated by the court to take such a verbatim record. Notwithstanding the magistrate's determination, (A) the proceeding shall be taken down by a court reporter if any party so requests, (B) the proceeding shall be recorded by a means other than a court reporter if all parties so agree, and (C) no record of the proceeding shall be made if all parties so agree. Reporters referred to in this paragraph may be transferred for temporary service in any district court of the judicial circuit for reporting proceedings under this subsection, or for other reporting duties in such court.''

Subsec. (d). Pub. L. 100–702, §404(b)(1), substituted ''section 2072 of this title'' for ''section 3402 of title 18, United States Code''.

Subsec. (h). Pub. L. 100–659 inserted ''section 377 of this title or in'' after ''annuity set forth in'' and ''which are applicable to such magistrate'' after ''title 5'' in second sentence.

1986—Subsec. (h). Pub. L. 99–651 added subsec. (h).

1984—Subsec. (a)(2). Pub. L. 98–473 substituted ''issue orders pursuant to section 3142 of title 18 concerning release or detention of persons pending trial'' for ''impose conditions of release under section 3146 of title 18''.

Subsec. (c)(4). Pub. L. 98–620 struck out ''expeditious and'' before ''inexpensive''.

1979—Subsec. (c). Pub. L. 96–82, §2(2), added subsec. (c). Former subsec. (c) redesignated (d).

Subsecs. (d) to (g). Pub. L. 96–82, §2(1), redesignated former subsecs. (c) to (f) as (d) to (g), respectively.

1977—Subsec. (f). Pub. L. 95–144 added subsec. (f).

1976—Subsec. (b). Pub. L. 94–577 completely revised provisions under which additional duties may be assigned to a United States Magistrate by allowing, among other additional duties, the assignment of pretrial matters, dispositive motions, and service as a special master.

1972—Pub. L. 92–239, §2, substituted ''Jurisdiction, powers, and temporary assignment'' for ''Jurisdiction and powers'' in section catchline.

Subsec. (e). Pub. L. 92–239, §1, added subsec. (e).

1968—Pub. L. 90–578 substituted provisions declaratory of jurisdiction and powers of United States magistrates for prior provisions respecting rendition of accounts by United States commissioners.

CHANGE OF NAME

Words ''magistrate judge'', ''magistrate judge's'', and ''magistrate judges'' substituted for ''magistrate'', ''magistrate's'', and ''magistrates'', respectively, wherever appearing in text pursuant to section 321 of Pub. L. 101–650, set out as a note under section 631 of this title.

EFFECTIVE DATE OF 2009 AMENDMENT

Amendment by Pub. L. 111–16 effective Dec. 1, 2009, see section 7 of Pub. L. 111–16, set out as a note under section 109 of Title 11, Bankruptcy.

EFFECTIVE DATE OF 1988 AMENDMENTS

Amendment by section 404(b)(1) of Pub. L. 100–702 effective Dec. 1, 1988, see section 407 of Pub. L. 100–702, set out as a note under section 2071 of this title.

Amendment by Pub. L. 100–659 effective Nov. 15, 1988, and applicable to bankruptcy judges and magistrate judges who retire on or after Nov. 15, 1988, with exception for bankruptcy judges and magistrate judges retiring on or after July 31, 1987, see section 9 of Pub. L. 100–659, as amended, set out as an Effective Date note under section 377 of this title.

EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–651 effective Jan. 1, 1987, see section 203 of Pub. L. 99–651, set out as a note under section 155 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–620 not applicable to cases pending on Nov. 8, 1984, see section 403 of Pub. L. 98–620,

set out as an Effective Date note under section 1657 of this title.

EFFECTIVE DATE OF 1968 AMENDMENT

Amendment by Pub. L. 90–578 effective Oct. 17, 1968, except when a later effective date is applicable, which is the earlier of date when implementation of amendment by appointment of magistrates [now United States magistrate judges] and assumption of office takes place or third anniversary of enactment of Pub. L. 90–578 on Oct. 17, 1968, see section 403 of Pub. L. 90–578, set out as a note under section 631 of this title.

## § 637. Training

The Federal Judicial Center shall conduct periodic training programs and seminars for both full-time and part-time United States magistrate judges, including an introductory training program for new magistrate judges, to be held within one year after initial appointment.

(June 25, 1948, ch. 646, 62 Stat. 917; Pub. L. 90–578, title I, §101, Oct. 17, 1968, 82 Stat. 1114; Pub. L. 101–650, title III, §321, Dec. 1, 1990, 104 Stat. 5117.)

AMENDMENTS

1968—Pub. L. 90–578 substituted provisions for periodic training programs and seminars for United States magistrates for prior authorization of United States commissioners to administer oaths and take bail, acknowledgements, affidavits, and depositions, now incorporated in section 636(a)(2) of this title.

CHANGE OF NAME

Words ''magistrate judges'' substituted for ''magistrates'' wherever appearing in text pursuant to section 321 of Pub. L. 101–650, set out as a note under section 631 of this title.

EFFECTIVE DATE OF 1968 AMENDMENT

Amendment by Pub. L. 90–578 effective Oct. 17, 1968, except when a later effective date is applicable, which is the earlier of date when implementation of amendment by appointment of magistrates [now United States magistrate judges] and assumption of office takes place or third anniversary of enactment of Pub. L. 90–578 on Oct. 17, 1968, see section 403 of Pub. L. 90–578, set out as a note under section 631 of this title.

## § 638. Dockets and forms; United States Code; seals

(a) The Director shall furnish to United States magistrate judges adequate docket books and forms prescribed by the Director. The Director shall also furnish to each such officer a copy of the current edition of the United States Code.

(b) All property furnished to any such officer shall remain the property of the United States and, upon the termination of his term of office, shall be transmitted to his successor in office or otherwise disposed of as the Director orders.

(c) The Director shall furnish to each United States magistrate judge appointed under this chapter an official impression seal in a form prescribed by the conference. Each such officer shall affix his seal to every jurat or certificate of his official acts without fee.

(June 25, 1948, ch. 646, 62 Stat. 917; Pub. L. 90–578, title I, §101, Oct. 17, 1968, 82 Stat. 1114; Pub. L. 101–650, title III, §321, Dec. 1, 1990, 104 Stat. 5117.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §§528, 528a (June 28, 1906, ch. 3573, 34 Stat. 546; July 10, 1946, ch. 548, 60 Stat. 525).

**Add.99**