

**U.S. Department of Justice**

**_William D. Weinreb_**
_Acting United States Attorney_
_District of Massachusetts_

---

_Main Reception: (617) 748-3100_

_John Joseph Moakley United States Courthouse_
_1 Courthouse Way_
_Suite 9200_
_Boston, Massachusetts 02210_

May 1, 2017

<u>Filed Electronically</u>

Margaret Carter, Esq.
Clerk of Court
Court of Appeals for the First Circuit
John Joseph Moakley United States Courthouse
One Courthouse Way, Suite 2500
Boston, Massachusetts 02210

   **Re:**  **_United States v. Levin_**
      **Appeal No. 16-1567**

Dear Ms. Carter:

   This case is scheduled for oral argument on May 3, 2017, before Judges Torruella, Selya, and Lynch. I write pursuant to FRAP 28(j) to bring to the panel's attention eight NIT Warrant decisions issued after the government filed its reply brief on March 17, 2017.

   In seven of the eight decisions, the courts denied or recommended denying motions to suppress evidence obtained as a result of the same NIT Warrant at issue in this case. _See United States v. Dorosheff_, No. 16-CR-30049 (C.D. Ill. Apr. 27, 2017) (D.26) (finding NIT Warrant not authorized by Rule 41(b) but holding evidence admissible pursuant to good-faith exception); _United States v. Scanlon_, No. 16-CR-73 (D. Vt. Apr. 26, 2017) (D.30) (assuming without deciding that NIT Warrant not authorized by Rule 41(b) and holding evidence admissible pursuant to good-faith exception); _United States v. Allen_, No. 15-CR-221 (D. Conn. Mar. 30, 2017) (D.54) (finding NIT Warrant void ab initio but holding evidence admissible pursuant to good-faith exception); _United States v. Schuster_, No. 16-CR-51, 2017 WL 1154088 (S.D. Ohio Mar. 28, 2017) (bypassing Rule 41(b) and Fourth Amendment analysis and holding evidence admissible pursuant to good-faith exception); _United States v. Gaver_, No. 16-CR-88, 2017 WL 1134814 (S.D. Ohio Mar. 27, 2017) (finding NIT Warrant void ab initio but holding evidence admissible pursuant to good-faith exception); _United States v. Hart_, No. 16-CR-110 (M.D. Fla. Apr. 27, 2017) (D.50) (magistrate's report and recommendation) (finding

NIT Warrant authorized by Rule 41(b)(4) and, alternatively, holding evidence admissible pursuant to good-faith exception); *United States v. Taylor*, No. 16-CR-203, 2017 WL 1437511 (N.D. Ala. Apr. 24, 2017) (magistrate's report and recommendation) (finding NIT Warrant void ab initio but holding evidence admissible pursuant to good-faith exception). In one recent decision, the court recommended granted suppression. *United States v. Carlson*, No. 16-CR-317, 2017 WL 1535995 (D. Minn. Mar. 23, 2017) (magistrate's report and recommendation) (finding NIT Warrant void ab initio and holding good-faith exception categorically inapplicable to void warrants).[1]

As of this date, 50 federal courts have denied or recommended denying motions to suppress evidence resulting from the NIT Warrant; and only five courts, including the district court in this case, have granted or recommended granting suppression. For the reasons stated in the government's opening and reply briefs, this Court should reverse the district court's orders suppressing evidence.

Respectfully submitted,

WILLIAM D. WEINREB
Acting United States Attorney

By:    */s/ Kelly Begg Lawrence*
KELLY BEGG LAWRENCE
Assistant U.S. Attorney

Encls.

cc:    J. W. Carney, Jr., Esq.
Nathaniel Dolcort-Silver, Esq.
J. W. Carney, Jr. & Associates
20 Park Plaza, Suite 1405
Boston, MA 02116

---

[1] The government filed objections to the magistrate judge's report and recommendation on April 24, 2017. *See Carlson*, No. 16-CR-317, D.51.

E-FILED
Thursday, 27 April, 2017  10:50:20 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-30049 |
| | ) | |
| DONALD DOROSHEFF, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. District Judge.**

This matter comes before the Court on Defendant Donald Dorosheff's Amended Motion to Suppress Evidence (d/e [21])[1] (Motion).  For the reasons set forth below, the motion is DENIED.

## I. BACKGROUND

In his Motion, Defendant challenges the legality of the search of his residence, including his electronics, that led to law enforcement's recovery of images that form the basis of the charges in the Indictment in this case (d/e [1]).  On March 20, 2017, the Court held a hearing on Defendant's Motion.

---

[1] Defendant's amended motion supersedes his initial Motion to Suppress Evidence (d/e [12]).

Defendant's Motion concerns two warrants: one issued on February 20, 2015, in the Eastern District of Virginia (hereinafter the "NIT warrant," described below), and the other issued on March 1, 2016, in this district (hereinafter the residence warrant). Defendant seeks to suppress evidence obtained during the search of his residence on several grounds. Defendant argues: (1) the residence warrant affidavit failed to set forth sufficient facts to establish probable cause; (2) the good faith exception did not apply because the residence warrant was facially deficient and the executing officer could not reasonably rely on it; (3) the residence warrant affidavit was based on evidence obtained during a search pursuant to the NIT warrant, whose affidavit also failed to set forth sufficient facts to establish probable cause; and (4) the NIT warrant violated Federal Rule of Criminal Procedure 41(b).

The charges in this case arise from an investigation of a website called Playpen, a global online forum through which registered users distributed and accessed child pornography. Government's Response to Defendant's Motion to Suppress Evidence (d/e [18]) at 2 (Government's Response). Playpen operated on the Tor network, which allows users to maintain anonymity by

masking the user's actual Internet Protocol (IP) address by bouncing user communications around a network of relay computers called nodes.

In January 2015, the FBI seized the Playpen website and allowed it to continue to operate at a government facility in the Eastern District of Virginia from February 20, 2015 through March 4, 2015. The FBI obtained a warrant (the NIT warrant) from the Eastern District of Virginia to monitor the site users' communications and to deploy a Network Investigative Technique (NIT) on the site, in order to attempt to identify registered users.

Using the NIT, the FBI identified an IP address associated with Playpen user "Grite" and traced it to Defendant. On March 1, 2016, Judge Schanzle-Haskins issued a search warrant (the residence warrant) to FBI Special Agent David Harmon.

On March 3, 2016, agents executed the residence warrant at Defendant's home. The search yielded 1,114 images and 1 video of confirmed child pornography. Government's Response at 6. On October 5, 2016, a four-count indictment was filed against Defendant, charging him with two counts of Receiving Child Pornography in violation of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) and

two counts of Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). The indictment also asserted a forfeiture claim against Defendant for two laptops, five flash drives, and one media card.

## II.  LEGAL STANDARD

The Fourth Amendment to the Constitution guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  In the absence of certain circumstances that are not applicable in this case, it is a violation of the Fourth Amendment for a police officer to search a defendant's residence without a warrant.  A court may issue a search warrant only upon a finding that there is probable cause to believe that a crime has been committed and that the person in question has committed that crime.  See Maryland v. Pringle, 540 US 366, 372-73 (2003).

An affidavit establishes probable cause when, based on the totality of the circumstances, the affidavit sets forth sufficient evidence that would cause a reasonable person to believe that a search will uncover evidence of criminal activity.  United States v. Watzman, 486 F.3d 1004, 1007 (7th Cir. 2007).  Officers have

probable cause to conduct a search if "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996). "This common-sense, non-technical determination is based not on individual facts in isolation but on the totality of the circumstances known at the time a warrant is requested." United States v. Aljabari, 626 F.3d 940, 944 (7th Cir. 2010). Officers only need to have a "reasonable probability" of uncovering evidence of a crime, not an "absolute certainty" or a "preponderance of the evidence." Id. Probable cause "does not require direct evidence linking a crime to a particular place; reasonable inferences are permitted." Watzman, 486 F.3d at 1008 (internal quotation marks omitted).

### III.  ANALYSIS

**A. The Affidavit Supporting the Residence Warrant Set Forth Sufficient Facts to Establish Probable Cause.**

Special Agent Harmon sought the residence warrant after the NIT warrant led to the discovery that a user named "Grite" was accessing the Playpen site. Officers determined that Grite's IP address, obtained from the NIT, was operated by AT&T. In response

to the Government's subpoena, AT&T revealed that the subscriber was Defendant, the service address was Defendant's home address, and Defendant had received service from AT&T since December 2012.  The NIT program also determined that the computer's Host Name was Donald, which is Defendant's first name.  Officers confirmed with building management at Defendant's address that Defendant had resided alone in the apartment for the last three years.  These facts, set forth in the residence warrant affidavit, support a finding of probable cause.

1.  <u>The residence warrant was not based on stale information.</u>

Defendant argues that the year-old information from the NIT on which the residence warrant affidavit is based is stale and accordingly does not support probable cause.

The staleness of an affidavit is determined on a case-by-case basis.  <u>United States v. Newsom</u>, 402 F.3d 780 (7th Cir. 2005).  The age of the information alleged to be stale must be considered in conjunction with the age of the rest of the information in the affidavit and the circumstances of the offense.  <u>Watzman</u>, 486 F.3d at 1008 ("The age of information contained in an affidavit is only one factor a judge considers, and it is less important when the

criminal activity in question is apparently continuous."); see also United States v. Carroll, 750 F.3d 700 (7th Cir. 2014) (five-year old information about sexual molestation by defendant in affidavit supporting a search warrant of defendant's home was not stale when coupled with recent information that defendant showed child pornography to victim); cf. Prideaux-Wentz, 543 F.3d at 958-59 (information in affidavit was stale when four years may have lapsed between defendant's last upload of child pornography and the application for the warrant and the dates on which defendant uploaded the images was not included in the affidavit even though Government easily could have obtained those dates).

In the child pornography context, the time at which information becomes stale is much later than in other criminal contexts. This is because viewers of child pornography tend to maintain their collections for long periods of time, due to the difficulty in obtaining images, the ability to trade them, and their personal value. Carroll, 750 F.3d at 704 ("we recognize that a staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and modern technology."). The residence warrant affidavit at issue in this case

included a description of this behavior in child pornography

offenders.  <u>See</u> Residence Warrant at 32-33.

Given the retention tendencies of viewers of child

pornography, including the ongoing criminal activity of

continuously holding and repeatedly viewing the images, the

passage of one year from Defendant's access of child pornography

in 2015 to the issuance of the residence warrant on March 1, 2016,

is not critical.  This interval was not so long as to dispel a

reasonable belief that a search of Defendant's residence would

uncover evidence of illegal activity.

2. <u>The residence warrant did not need to establish that
Defendant had exclusive control of the premises to be
searched or that he had exclusive use of his internet
account.</u>

Defendant argues that probable cause is undermined by the

affidavit's failure to show that Defendant had exclusive control over

the premises to be searched or that no other individual used his

internet account.  Defendant argues that there was a reasonable

probability that someone else could have used Defendant's home or

internet service to access child pornography.

Exclusive control of the premises or internet service is not required for probable cause.  <u>United States v. Featherly</u>, No. 15-3854, 2017 WL 168859, at *2-3 (7th Cir. Jan. 17, 2017) (affidavit establishing that defendant's IP address was connected to an internet service account registered to defendant's name and address was sufficient to support probable cause even if IP address identified only a modem, not defendant's computer, such that another user could conceivably connect to the modem through an unsecured wireless network).  "[A] finding of probable cause does not require direct evidence linking a crime to a particular place," let alone to an exclusively-controlled place.  <u>Prideaux-Wentz</u>, 543 F.3d at 961 (affidavit established probable cause to search defendant's new home by showing that defendant owned a computer and maintained an internet account at new home).

Here, the Government established that Defendant lives alone by consulting with the management of Defendant's residence.  Further, Defendant offers no evidence to suggest that any other individual had access to his residence, computer, or internet service at the time his IP address accessed Playpen.  The connection between the IP address used to access the child pornography in this

case and Defendant's name and address registered to the
corresponding internet account was sufficient to support a finding
of probable cause.

### 3. Even if the residence warrant was not based on probable cause, suppression is not warranted due to the good faith exception.

The Government argues that even if the residence warrant
affidavit did not establish probable cause, the good faith exception
applies.  When a warrant is not supported by probable cause and
the resultant search accordingly violates a defendant's
constitutional rights, suppression is inappropriate where the
executing officer reasonably relied on the warrant.  Prideaux-Wentz,
543 F.3d at 959.  The key question is whether the face of the
warrant contains sufficient indicia of probable cause to render the
officer's belief reasonable.  Id.  Such indicia may include
descriptions of the images at issue, the relevant statutory
provisions, expert opinion on the behavior of viewers of child
pornography, and the officer's experience with pornography-related
searches.  Id. at 960.  The degree of detail in such descriptions also
affects the reasonableness of the officer's reliance.  Id.

The good faith exception does not apply in cases where the issuing judge "wholly abandoned his judicial role" by failing to perform his "neutral and detached function" and instead acted "merely as a rubber stamp for the police." Id. at 959; see e.g., Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326 (1979) (town justice who issued search warrant was not neutral and detached when he accompanied executing officers to the store to be searched, conducted a generalized search of store, and ordered certain items to be seized upon determining they were obscene). The exception also does not apply to cases involving officer misconduct, such as where an officer deliberately or recklessly makes a materially false statement or omission in the affidavit. United States v. Leon, 468 U.S. 897, 926 (1984).

The Court finds that the good faith exception applies to the residence warrant in this case even if it was not supported by probable cause. There is no evidence that the executing officer did not reasonably rely on the warrant. Nor is there any indication that Judge Schanzle-Haskins was anything but detached and neutral in issuing the warrant. Defendant has not alleged misconduct by any involved officer.

To the contrary, the affidavit may reasonably be read to support a finding of probable cause. The affidavit sets forth the purpose of the warrant, key definitions, an explanation of how the Playpen website and the Tor network operate, a summary of Playpen's illegal content, the investigation's identification of user "Grite," profile characteristics of those who view child pornography, and search methodology. Also attached are descriptions of the location to be searched and of the information to be seized. The breadth and depth of the information in the affidavit makes reasonable a probable cause finding.

## B. The NIT Warrant Was Supported by Probable Cause.

Defendant also asserts that the NIT warrant also lacked probable cause. Because the residence warrant affidavit included information obtained from the NIT, Defendant suggests that the NIT warrant affidavit's alleged failure to establish probable cause stripped the residence warrant of its basis to support probable cause under the fruit of the poisonous tree doctrine. See United States v. Calandra, 414 U.S. 338, 348 (1974).

Several courts have found that the NIT warrant was supported by probable cause. See, e.g., United States v. Broy, No. 16-cr-

10030, 2016 WL 5172853, *9 (I.L.C.D. Sept. 21, 2016); see
Government's Response at 13-14. The affidavit supporting the NIT
warrant described in detail the Playpen site, the TOR network, the
NIT program, the offenses under investigation, and definitions of
technical terms.

The affidavit described Playpen as a global online forum
through which registered users distributed and accessed child
pornography. The affidavit describes the site's contents including
details about its forum structure, which was organized by type of
sexual interest, gender, and age. The affidavit explained that
images and videos on Playpen were highly categorized according to
the victim's age and gender and the sexual content of the file.

The affidavit further explained that Playpen required users to
register an account by creating a username and password. The
affidavit noted the emphasis Playpen placed on anonymity in
registration. Playpen told users not to register a real email address
and that they should not post identifying information in their
profile. Playpen further advised users to turn off their JavaScript
and disable sending of the "refer" header. See NIT Warrant, (d/e

[18-2]) at 19-20.  The page also informed the user that the website
"is not able to see your IP . . . ."

The affidavit also stated that Playpen operated on the Tor
network, which allows users to maintain anonymity by masking the
user's actual Internet Protocol (IP) address by bouncing user
communications around a network of relay computers called nodes.
To access the Tor network, a user must install Tor software by
downloading either an add-on to their web browser or the free "Tor
browser bundle."

The affidavit explained that Playpen operated as a "hidden
service" website on the Tor network, which means the website's IP
address is hidden and replaced with a Tor-based web address.
The affidavit stated that a user cannot access a hidden service such
as Playpen unless he or she knows the particular web address.

The affidavit further described how NIT would work, what it
could do, and why it was useful.  The affidavit stated that NIT could
help FBI agents locate administrators and users of Playpen.  NIT
was an additional set of computer instructions that would be
downloaded to a user's computer along with typical Playpen content
that would be downloaded through normal operations of the site.

The instructions would cause a user's computer to transmit the following specified information to a government-controlled computer: (1) the actual IP address of the user's computer; (2) a unique identifier to distinguish the data from that collected from other computers; (3) the identification of the computer's operating system; (4) data on whether NIT had already been delivered to the computer; (5) the computer's Host Name; (6) the computer's active operating system username; and (7) the computer's Media Access Control (MAC) address.  The actual IP address could then be associated with an internet service provider (ISP) and a particular ISP customer, while the type of operating system, the Host Name, the active operating system username, and the MAC address helped to distinguish the user's computer from other computers located at the user's premises.

These facts set forth in the NIT warrant affidavit supported probable cause.

### C. The NIT Warrant Violated Federal Rule of Criminal Procedure 41(b), but Suppression Is Not an Appropriate Remedy.

Defendant has not argued that the NIT warrant violates Fed. R. Crim. P. 41(b), which authorizes a magistrate judge to issue a

warrant under five circumstances.  The Government concedes that the NIT warrant likely violated Rule 41(b), and many of the courts that have addressed whether the NIT warrant violated Rule 41(b) found that the warrant did.

Rule 41(b)(1) authorizes a magistrate to issue a warrant to search a person or property in the magistrate's district.  Although the NIT was deployed from the Eastern District of Virginia, the search it initiated took place in the user's computer, which could have been located in any district in the country.  Furthermore, while the user can be said to have virtually entered the Eastern District of Virginia when he accessed Playpen, the data obtained from the user's computer did not virtually enter the Eastern District of Virginia merely upon the user's accessing Playpen.  Rather, the data did not enter the Eastern District of Virginia until it was pulled from the user's computer by the NIT program.  Because the data would not otherwise have accompanied the user to the Eastern District of Virginia when he accessed Playpen, the magistrate's authority under Rule 41(b)(1) does not support the NIT warrant.

Neither does Rule 41(b)(2) apply.  Rule 41(b)(2) authorizes a magistrate to issue a warrant that will be executed outside the

magistrate's district if the person or property to be searched is located within the district when the warrant is issued. This authority does not apply to the NIT warrant because the property to be searched, users' computers, were located across the United States when the warrant was issued. Rule 41(b)(2) granted the magistrate authority to issue a warrant to search the computers only of Playpen users whose computers were located in the Eastern District of Virginia.

Rule 41(b)(3) is limited to cases involving terrorism and Rule 41(b)(5) is restricted to the District of Columbia, therefore, these authorities do not apply here.

Finally, Rule 41(b)(4) authorizes a magistrate to issue a warrant to install a device to track the movement of a person or property. Because the NIT program initiates a search of computer data and does not track movement, Rule 41(b)(4) does not apply.

Therefore, none of the authorities granted to the magistrate judge in Rule 41(b) authorized the issuance of the NIT warrant. See Broy, 2016 WL 5172853 at *7-8.

Despite the NIT warrant's Rule 41(b) violation, suppression of the evidence obtained as a result of the execution of the warrant is

not warranted. Although technical or ministerial violations of Rule 41 do not give rise to suppression unless the defendant demonstrates that he suffered prejudice as a result of the violation, the NIT warrant violated a substantive provision of Rule 41. <u>See United States v. Berkos</u>, 543 F.3d 392, 397 (7th Cir. 2008) (Rule 41(b) is "a substantive provision"); <u>United States v. Levin</u>, 186 F.Supp.3d 26, 35 (D. Mass. 2016). Nonetheless, the good faith exception applies.

The good faith exception, which is most commonly applied to warrants lacking probable cause, also may apply to a warrant issued in violation of Rule 41(b). <u>United States v. Leon</u> established an exception to suppression of evidence obtained pursuant to a warrant lacking probable cause where the warrant was issued by a detached and neutral magistrate and the executing officer reasonably relied on the warrant's validity. 468 U.S. 897, 926 (1984). The exception supports the public's interest in admitting all relevant and reliable evidence and the policy of deterring police misconduct. <u>See</u> <u>Nix v. Williams</u>, 467 U.S. 431, 443 (1984) ("the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a

crime are properly balanced by putting the police in the same, and not a <u>worse</u>, position than they would have been in had no police error or misconduct occurred.").  Suppression is inappropriate where reasonable minds could disagree as to whether the affidavit supported probable cause but the warrant was later invalidated.

In <u>United States v. Master</u>, the Sixth Circuit applied the good faith exception to a warrant issued without authority because it was issued by a retired judge.  614 F.3d 236 (6th Cir. 2010).  There, the court abrogated its earlier holding in <u>United States v. Scott</u>, 260 F.3d 512 (6th Cir. 2001), that the good faith exception could not apply to a warrant that was void <u>ab initio</u>.  The <u>Master</u> court found that such a rule was "no longer clearly consistent with current Supreme Court doctrine."  <u>Master</u>, 614 F.3d at 242.

The good faith exception prevents suppression of evidence obtained pursuant to the NIT warrant.  See <u>United States v. Cazares-Olivas</u>, 515 F.3d 726, 729 (7th Cir. 2008) ("violations of federal rules do not justify the exclusion of evidence that has been seized on the basis of probable cause."); <u>United States v. Berkos</u>, 543 F.3d 392, 396 (7th Cir. 2008) ("The remedy of allowing a defendant to go free based on a violation of Rule 41's requirements

for obtaining a proper search warrant would be wildly out of proportion to the wrong.") (internal quotation marks omitted).

Courts that have reviewed the NIT warrant are split as to whether the issuing magistrate had authority under Rule 41(b). See, e.g., United States v. Darby, 190 F.Supp.3d 520 (E.D.Va. 2016) (finding the NIT warrant was authorized under Rule 41(b)(4)); compare United States v. Croghan, 209 F.Supp.3d 1080 (S.D.Iowa 2016) (finding the NIT warrant was not authorized under Rule 41(b)). This split suggests that reasonable minds may disagree as to whether the magistrate had authority to issue the warrant.

Further, because nothing before the Court indicates that the executing officers did not act in good faith reliance on the validity of the warrant or that they acted culpably or deliberately in violating Rule 41, suppression is not warranted because it would not deter police misconduct and it would remove relevant and reliable evidence from the public. United States v. Master, 614 F.3d 236 (6th Cir. 2010) ("The Supreme Court has effectively created a balancing test by requiring that in order for a court to suppress evidence following the finding of a Fourth Amendment violation, 'the

benefits of deterrence must outweigh the costs.'") (quoting <u>Herring</u> <u>v. United States</u>, 555 U.S. 135, 142 (2009)).

Nor does the Rule 41 violation indicate that the issuing judge was not "detached and neutral." There is no indication that the magistrate deliberately violated Rule 41, nor that the officers misled the magistrate in their application.

The Court therefore finds that suppression is inappropriate despite the NIT warrant's Rule 41(b) violation.

## IV.  CONCLUSION

Based on the evidence and arguments presented by the parties, the Court finds that neither of the warrants in this case lacked probable cause.  Although this Court joins numerous others in finding that the NIT warrant was issued in violation of Rule 41(b), the Court finds that suppression is not an appropriate remedy for that violation.  Defendant's Amended Motion to Suppress (d/e [21]) is accordingly DENIED.

ENTER: April 26, 2017

FOR THE COURT:

<u>s/Sue E Myerscough</u><br>
SUE E. MYERSCOUGH<br>
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 APR 26  PM 4: 49

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA          )
                                  )
          v.                      )     Case No. 2:16-cr-73
                                  )
CHRISTOPHER JOSEPH SCANLON        )

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS EVIDENCE AND STATEMENTS
(Doc. 21)

This matter came before the court for a hearing on November 30, 2016 and
February 16, 2017 on Defendant Christopher Joseph Scanlon's motion to suppress
evidence and statements. (Doc. 21.) On January 27, 2017, the parties submitted a
stipulation of facts (Doc. 27) which the court adopted. The court also received into
evidence, without objection, government's exhibit 1, which is a transcript and exhibits
from a June 23, 2016 motion hearing held in the Western District of Arkansas in *United
States v. Anthony Allen Jean*, Case No. 5:15-cr-50087-001 and government's exhibit 2,
which is a transcript and exhibits from a January 22, 2016 motion hearing in the Western
District of Washington in *United States v. Jay Michaud*, Case No. 15-cr-5351RBJ.

Defendant filed a post-hearing memorandum on February 27, 2017, at which time
the court took his motion to suppress under advisement. (Doc. 29.)

Defendant is charged in a one-count Indictment with knowingly accessing with the
intent to view child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). He seeks
suppression of all evidence derived from the search of his computer and residence and
any inculpatory statements he made to law enforcement officers. He argues that
Magistrate Judge Theresa C. Buchanan of the Eastern District of Virginia lacked
jurisdiction to issue a search warrant for his property and that no exception to Fed. R.
Crim. P. 41 applies. The government opposes the motion, arguing that the warrant was

validly issued under Fed. R. Crim. P. 41(b) or, in the alternative, that the good faith exception to the exclusionary rule applies rendering suppression inappropriate.

The government is represented by Assistant United States Attorney Jonathan Ophardt. Defendant is represented by Federal Public Defender Michael L. Desautels and Assistant Federal Public Defendant Barclay T. Johnson.

## I.    Findings of Fact.

Defendant is alleged to have been identified by his Internet Protocol ("IP") address as a visitor to the Playpen website located on the Onion Router ("Tor") network. An IP address is "a unique number used by a computer to access the Internet." (Doc. 21-2 at 11.) An IP address is "dynamic" if a user's internet service provider ("ISP") assigns a different unique number to a computer every time it accesses the Internet. *Id.* An IP address is "static" if a user's ISP assigns a particular IP address to the user's computer which is used each time the computer accesses the Internet. *Id.* IP addresses are also used by computer servers, including web servers, to communicate with other computers.

The Tor network was originally designed and implemented as a project of the United States Naval Research Laboratory for the primary purpose of protecting governmental communications. It is now available to the public although it continues to receive support and funding from the federal government. The Tor network is designed to protect the anonymity of its users by employing a series of computers to prevent disclosure of the IP addresses of computers that access it. The Tor network can be used for both legal and illegal purposes.

Websites outside the Tor network generally maintain IP address logs that can be used to locate and identify a website's users. Law enforcement can use investigative methods to gain access to those logs and to perform a publicly available search to determine the ISP associated with a target IP address. Law enforcement may then subpoena the ISP for records that will enable it determine the identity of the user to whom an IP address was assigned at a specified date and time.

Because of the way Tor routes user communications, traditional IP identification techniques are not viable. For example, when a Tor network user accesses a website, the

2

IP address of a Tor "exit node," the last computer through which the user's communication was routed, appears in the website's IP log as opposed to the user's actual IP address. As a result, the IP address logs of a Tor-based website cannot be used to locate and identify administrators and users.

The Tor network includes certain websites known as "hidden services." A hidden service operates similarly to a traditional website except that the IP address for a hidden service's web server is concealed and replaced with a Tor-based algorithm ending in ".onion." In order to access a hidden service, a user must use special Tor software and the Tor network. Unlike a traditional website, law enforcement cannot use Tor-generated IP addresses and publicly available searches to identify the location of a hidden service host computer. Tor's search engine does not list hidden services located on the Tor network and actively bans child pornography websites from its search results.

During its operation, Playpen was a hidden service on the Tor network. In order to access it, a user had to download the Tor browser which is available from the Tor project website and install Tor software on his or her computer either by downloading an add-on to the user's web browser or by downloading the Tor browser bundle. A user could not simply perform a Google search to locate the Playpen website, but would instead need to find a link to it either on index sites that provide links to child pornography websites or by communicating with other users. In light of Playpen's status as a hidden service, in the opinion of FBI Special Agent Daniel Alfin: "It would be incredibly unlikely for someone to accidentally stumble on the Playpen website without knowing what its purpose was." Gov't Ex. 1, p. 20, lines 14-16.

After clicking on the link to the Playpen website, a user was presented with a homepage which depicts what appear to be two prepubescent females on either side of the Playpen logo: one wearing a short sleeve shirt and what appears to be underwear and the other wearing a bikini type costume. Both females are positioned with their legs spread so that their clothed crotch areas are visible. Underneath their images is the following statement: "No cross-board reports, .7z preferred, encrypt filenames, include preview. Peace out." *Id.* at 22, lines 18-24 (internal quotation marks omitted).

3

According to Special Agent Alfin, "these terms [are] a trade craft associated with child pornography websites. These terms and variations of them appear on multiple child pornography websites." *Id.* at 23, lines 1-4. He provided the following translation:

> [N]o cross-board reposts is a warning indicating that a user of Playpen should not go to another child porn website, find a link to an image or a video of child porn and then come back to Playpen and post that link there and claim credit for it themselves.
>
> ".7z preferred" indicate users who share child pornography on the Playpen website should use 7-Zip . . . compression software to share their material. 7-Zip is, again, certainly not illegal. It's freely available software that can be used to compress files, multiple files, into a smaller one. It also adds security benefits. Material provided in a 7-Zip encrypted file can be encrypted with fairly strong encryption that can be difficult or impossible to break, which is why it is the preferred method of distributing child pornography.
>
> "Encrypt filenames" is another reference to an option within the 7-Zip software and so if you have placed child pornography inside one of these 7-Zip archives, you encrypt both the material and the filenames of the material inside of it and so an outside observer who obtained that file, if they don't have the true password, they would have no idea what is contained in that file. It could be innocent material; it could be illegal material. They would have no way of knowing.
>
> "Include preview" is a reference to how users should post material on the website. Generally material that was distributed on Playpen and other such websites is done through an encrypted archives as described previously. However, users are encouraged to post a preview of the material that they are sharing. So generally if a user were to post[]. . . a 30-minute video, a user would post a link to the 7-Zip file that contains that video, and they would also post some screen captures from the video so a user could see what the video depicts before deciding whether or not they want to download the entire video. And so all of those lines up there, aside from "peace out" are, based on my training and experience, trade craft common to child pornography sites.

*Id.* at 23-24.

After a user arrives at the homepage of the Playpen website, a user must do one of two things to proceed further. If a user has previously accessed the contents of the Playpen website, he or she must enter a previously created username and password and log into the Playpen website using that established account. If a user has not visited the

Playpen website previously or wants to create a new account, he or she would have to click on the "register a new account" link which would take the user to another webpage.

In registering an account, the Playpen website cautions users not to enter a real e-mail address and provides the following instructions and guidance:

> VERY IMPORTANT.  READ ALL OF THIS PLEASE.
>
> I will add to this as needed.
>
> The software that we use for this forum requires that new users enter an email address, and checks that what you enter looks approximately valid. We can't turn this off but the forum operators do NOT want you to enter a real address, just something that matches the xxx@yyy.zzz pattern.  No confirmation email will be sent.  This board has been intentionally configured so that it WILL NOT SEND EMAIL, EVER.  Do not forget your password, you won't be able to recover it.
>
> After you register and login to this forum you will be able to fill out a detailed profile.  For your security you should not post information here that can be used to identify you.
>
> Spam, flooding, advertisements, chain letters, pyramid schemes, and solicitations are forbidden on this forum.
>
> Note that it is impossible for the staff or the owners of this forum to confirm the true identity of users or monitor in realtime all messages posted, and as such we are not responsible for the content posted by those users.  You remain solely responsible for the content of your posted messages.
>
> The forum software places a cookie, a text file containing bits of information (such as your username and password), in your browser's cache.  This is ONLY used to keep you logged in/out.  This website is not able to see your IP and [cannot] collect or send any other form of information to your computer except what you expressly upload.  For your own security when browsing . . . Tor we also recommend that you turn off javascript and disable sending of the 'referer' header.

(Doc. 21-1 at 18-19.)

After the user accepts the above terms, Playpen requires the user to enter a username, password, and email address to complete the registration process.  Only registered users are allowed to access the forum. *See id.* at 18 ("Warning!  Only registered members are allowed to access the section.  Please login below or 'register an account[.]'").

Once a user has logged into the Playpen using a registered account, he or she is presented with a index page which displays various forums and subforums including videos, photos, and webcams of : "Jailbait-Boy[,] Jailbait-Girl[,] Preteen-Boy[,] Preteen-Girl[,]" "Toddlers[,]" "Kinky Fetish[,]" "Bondage[,]" "Spanking[,]" "Girls H[ard]C[ore][,]" and "Boys H[ard]C[ore][.]" Some of these forums and subforums include thousands of posts. For example, there are 20,992 posts listed for "Girls HC." Gov't Ex. 2, *Michaud* – Ex. 5, at 00696-97. In addition to English, there are six foreign languages forums that enable Playpen users to communicate with other Playpen users in their own language.

According to Special Agent Alfin, although the posts on the Playpen website are not limited to child pornography, the "website in its entirety is dedicated to the advertisement and distribution of child pornography." Gov't Ex. 1, p. 28, lines 9-11. On this basis, he opined that there is probable cause that anyone accessing Playpen is doing so for unlawful purposes.

In 2014 and 2015, the FBI investigated Playpen and determined that it was operated from at least August 2014 until February 2015 on computer servers located in North Carolina. On February 19, 2015, the FBI identified and arrested the Playpen administrator in Naples, Florida. The following day, the FBI seized the computer server hosting the Playpen website and transferred the website to an FBI-controlled server located in the Eastern District of Virginia.

After gaining control of the Playpen server, because of the nature of the Tor network and Playpen's status as a hidden service, although the FBI could determine what each visitor to the Playpen website did, what posts he or she accessed, and which images of child pornography, if any, were downloaded, it had no ability to identify Playpen website users. *Id.* at 36. In order to complete this investigative step, the FBI sought judicial permission to operate the Playpen website from its server from February 20, 2015 until March 4, 2015 and sought to identify Playpen users through a "network investigative technique" ("NIT").

On February 20, 2015, pursuant to Fed. R. Crim. P. 41(c), the FBI presented to Magistrate Judge Buchanan a thirty-page search warrant application and affidavit which were reviewed by the U.S. Attorney's Office for the Eastern District of Virginia prior to their submission. With regard to its territorial limitations, the search warrant indicated that it was for persons or property located in the Eastern District of Virginia. It described the "[p]lace to be [s]earched" as "[t]he activating computers . . . of any user or administrator who logs into the TARGET WEBSITE by entering a username and password." (Doc. 21-1 at 3) (emphasis omitted). Based on the application presented, Magistrate Judge Buchanan found probable cause to authorize the FBI to deploy a NIT on Playpen from the government-controlled server in the Eastern District of Virginia (the "NIT warrant").

Although the NIT warrant authorized the FBI to deploy the NIT on any computer accessing Playpen, the FBI decided to narrow the warrant's scope by limiting the deployment of the NIT on only those "activating computers" that navigated to a Playpen post "that purported to advertise prepubescent female children engaged in penetrative sexual activity." Gov't Ex. 1, p. 45.[1] As Special Agent Alfin described it: "The user actively, they browse through the website and they open up that post. The NIT was deployed silently in the background without the user's knowledge." *Id.* at 46, lines 3-5.

Thereafter, the NIT and an "exploit"[2] obtained certain information from "activating computers" in a transmission generated by the NIT that took place in

---

[1] For certain moderators and administrators, the NIT was designed to deploy automatically once the Playpen website was accessed. Gov't Ex. 1, p. 46. There is no evidence this occurred in Defendant's case.

[2] Special Agent Alfin described the "exploit" as follows:

[T]he exploit can be thought of an open window on the computer. And so the government, obviously we know about this open window and that's what we're able to send the NIT through. And so we use this exploit, the open window, and we send the NIT. . . . The NIT collects the information and sends it back to the government. The state of the window, it was open when we got there; it was open when we left. We did not have any impact or make any change to the window. . . . [The exploit] was not capable of making changes to the computer.

approximately .27 seconds. The NIT neither made changes to "activating computers," nor was capable of making them. Instead, it operated through:

> very simple computer commands that would . . . essentially . . . send the MAC address, send the operating system, send the username. It didn't go searching through the computer. The NIT was designed in such a manner that it could only collect and report the information identified. It did not have the capability or give the government the capability to rummage through files on the computer. We had no ability to look at what files they had on there, legal or illegal. It did not have the ability to search the content of the computer.

*Id.* at 84, lines 15-25.

After it was deployed, the NIT obtained and relayed the following information to the FBI-controlled Playpen server in the Eastern District of Virginia: (1) the "activating computer's" IP address, and the date and time the NIT determined the IP address; (2) a unique identifier generated by the NIT to distinguish between data from different computers; (3) the type, version, and architecture of the computer's operating system; (4) information about whether the NIT had already been delivered to the computer; (5) the computer's host name; (6) the computer's active operating system user name; and (7) the computer's Media Access Control ("MAC") address.[3]

During the FBI's thirteen day period of operating the Playpen website, approximately 100,000 user accounts logged in and met the triggering condition for the NIT. Not all of those visits reflect individual users as it is common for Playpen users to create a new account with each login. The FBI's use of the NIT revealed over 1,300 IP addresses, including domestic and foreign users.

On February 25, 2015, the user "drscany" accessed Playpen and accessed the child pornography post containing the NIT. The NIT collected information from drscany's

---

*Id.* at 60-61. Although the NIT warrant did not use the term "exploit," "it did have a thorough breakdown of how the NIT was going to work and the information that was going to be collected." *Id.* at 62, lines 7-9.

[3] Computers connect to a network through a network adapter, most of which have a MAC address assigned by the adapter's manufacturer as a unique identifying number. Because a MAC address does not change and is unique, law enforcement can use it to identify whether communications sent or received at different times are associated with the same adapter.

computer and sent the information through the Internet to the FBI-controlled server in the Eastern District of Virginia. The NIT did not search the contents of drscany's computer files or allow the FBI or any other governmental entity to access drscany's computer at a later date.

Using the information obtained from the NIT, the FBI determined that drscany's IP addressed was operated by Comcast and was linked to an account located at 60 Rocky Road in Richmond, Vermont. On December 21, 2015, Magistrate Judge John Conroy authorized a search warrant for 60 Rocky Road in Richmond, Vermont, which was executed on December 22, 2015, and resulted in evidence incriminating Defendant.

## II. Legal Analysis and Conclusions.

### A. Standard of Review.

In a suppression hearing, "[i]t is well established that the burden of production and persuasion generally rest upon the movant[.]" *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (internal quotation marks omitted). "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

Where, as here, there is a challenge to a search warrant, the court begins with the presumption that the warrant is valid. *See United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) ("A search warrant issued by a neutral and detached magistrate is entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant") (internal quotation marks omitted); *United States v. Demosthene*, 326 F. Supp. 2d 531, 536 (S.D.N.Y. 2004) ("A search warrant is presumptively valid").

### B. Whether the NIT Warrant was Void Ab Initio.

Defendant contends that the NIT warrant was void ab initio because it authorized a search of property outside Magistrate Judge Buchanan's jurisdiction. He argues that suppression on that basis alone is required. The problem with this argument is twofold.

9

First, even if a magistrate judge in the Eastern District of Virginia does not have jurisdiction to issue a search warrant for "property"[4] located in Vermont, it is beyond dispute that Magistrate Judge Buchanan had jurisdiction to authorize a search of "property" located within her jurisdiction. *See United States v. Anzalone*, 2016 WL 5339723, at *11 (D. Mass. Sept. 22, 2016) ("Even if the magistrate judge in the Eastern District of Virginia lacked the authority to issue a warrant that allowed the FBI to deploy the NIT outside of that district, the magistrate judge did have authority to issue a warrant in which the NIT deployed in that district. The warrant was not void at its issuance."). It is further undisputed that the NIT was deployed in the Eastern District of Virginia and obtained IP addresses of computers there. *See, e.g., United States v. Matish*, 193 F. Supp. 3d 585, 612 (E.D. Va. 2016) (denying motion to suppress where NIT warrant obtained IP addresses and other information from computers in the Eastern District of Virginia); *United States v. Eure*, 2016 WL 4059663, at *1 (E.D. Va. July 28, 2016) (rejecting suppression where magistrate judge had jurisdiction to issue the NIT warrant where government "operated [the Playpen website] from a government facility in the Eastern District of Virginia"). Accordingly, at best, the NIT warrant was only partially invalid and was thus not void ab initio. *See Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 361 n.6 (6th Cir. 2013) ("Void ab initio is defined as null from the beginning") (internal quotation marks and italics omitted); Black's Law Dictionary (10th ed. 2014) (defining "void ab initio" as "[n]ull from the beginning, as from the first moment when a contract is entered into.").

Second, to the extent Defendant claims that Magistrate Judge Buchanan was required to limit the NIT warrant's reach to the Eastern District of Virginia, he does not explain how this could be achieved. The magistrate judge did not *choose* the computers

---

[4] Some courts have concluded that the NIT warrant authorized a "search" of a "computer" located in another jurisdiction. *See, e.g., United States v. Anzalone*, 2016 WL 5339723, at *6 (D. Mass. Sept. 22, 2016) (cautioning against a narrow scope of inquiry in deciding whether the NIT warrant was authorized and "asking 'whether the IP address should be the focus of this analysis or whether Defendant's expectation of privacy in his computer is the proper subject of this analysis.'") (quoting *United States v. Adams*, 2016 WL 4212079, at *4 (M.D. Fla. Aug. 10, 2016)).

on which the NIT was deployed, nor could she reasonably do so. Instead, the NIT was deployed on the "activating computers" of individuals located both within and outside the Eastern District of Virginia because those individuals reached out to the Playpen website and accessed the NIT embedded in a child pornography post. It was thus Playpen users who reached out to the Eastern District of Virginia, not the other way around. *See United States v. Darby*, 190 F. Supp. 3d 520, 536 (E.D. Va. 2016) ("Users of Playpen digitally touched down in the Eastern District of Virginia when they logged into the site."). Although Magistrate Judge Buchanan could have required the FBI to reject evidence from any IP addresses not located in the Eastern District of Virginia, this would not have prevented the NIT from allegedly searching for and seizing those IP addresses in the first instance.

Because the NIT strayed beyond the confines of the Eastern District of Virginia as a result of the technology used and the voluntary actions of Playpen users, and not because of Magistrate Judge Buchanan's willful disregard of the territorial limits of her jurisdiction, there is no basis for finding the NIT warrant was void ab initio. *United States v. Krueger*, 809 F.3d 1109, 1115 (10th Cir. 2015), on which Defendant relies, does not require a different result. There, the government conceded a violation of Fed. R. Crim. P. 41 when a magistrate judge issued a search warrant for property located in another district. The only issue was whether this Rule 41 violation caused the defendant prejudice. The Tenth Circuit cabined its decision to the unremarkable conclusion that the defendant proffered sufficient evidence of prejudice because, but for the Rule 41 violation, the search warrant would not have issued. The Tenth Circuit "expressly [did] not address the propriety of suppression when, at the time of issuance, it is genuinely unclear whether the federal magistrate judge has authority to issue an outside-of-district warrant." *Krueger*, 809 F.3d at 1113 n.4. The Tenth Circuit also did not determine whether the Rule 41 violation was of constitutional magnitude. However, it noted that: "Over the years, we have addressed many other provisions of Rule 41, never concluding that the alleged Rule 41 violation(s) at issue justified suppression." *Id.* at 1115 n.7 (collecting cases).

11

Reliance on *Krueger* for the proposition that the NIT warrant is void ab initio ignores the careful limits of that decision. Even as persuasive authority, *Krueger* does not dictate the outcome where, as here, there is a genuine dispute, not only among the litigants, but among the courts, regarding whether a Rule 41 violation occurred.[5]

### C.    Whether Fed. R. Crim. P. 41 Authorized the NIT Warrant.

At the time of the NIT warrant's issuance, Rule 41 stated in relevant part as follows:

> (b) Authority to Issue a Warrant.  At the request of a federal law enforcement officer or an attorney for the government:
>
> > (1) a magistrate judge with authority in the district -- or if none is reasonably available, a judge of a state court of record in the district -- has authority to issue a warrant to search for and seize a person or property located within the district;
> >
> > (2) a magistrate judge with authority in the district has authority to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed;
> >
> > . . .
> >
> > (4) a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both[.]

Fed. R. Crim. P. 41(b)(1),(2), & (4) (emphasis omitted).

Effective December 1, 2016, Rule 41 was amended to specifically authorize NIT warrants:

> (6) a magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote

---

[5]    [C]ourts have generally reached one of three results: either (1) the NIT warrant was unlawfully issued and suppression is required; (2) the NIT warrant was unlawfully issued, but suppression is not the appropriate remedy; or (3) the NIT warrant was lawfully issued, and there are no legal violations that require suppression.

*United States v. Dzwonczyk*, 2016 WL 7428390, at *6 (D. Neb. Dec. 23, 2016).

access to search electronic storage media and to seize or copy electronically
stored information located within or outside that district if:

> (A) the district where the media or information is located has been
> concealed through technological means; or

> (B) in an investigation of a violation of 18 U.S.C. § 1030(a)(5), the
> media are protected computers that have been damaged without
> authorization and are located in five or more districts.

Fed. R. Crim. P. 41(b)(6) (emphasis omitted).

Defendant argues that "the failure of the NIT warrant to comply with Rule 41(b) is
highlighted by the . . . amendments to Rule 41(b), which . . . authorize searches such as
that accomplished via the NIT" and that "[t]he fact that a new subsection [was] added to
Rule 41(b) to permit the issuance [of] warrants such as the NIT warrant at issue here,
strongly suggests that Rule 41(b) did not authorize such warrants in February 2015 when
the NIT warrant was issued." (Doc. 21 at 9-10.) Although this argument has some merit,
the amendments to Rule 41 do not purport to expand a magistrate judge's jurisdiction or
authorize warrants that were previously unlawful. Instead, as the Advisory Committee
Notes reveal, the amendments were intended only to reflect advances in technology that
render a "territorial" or "venue" restriction on certain types of search warrants
nonsensical:

> Rule 41's territorial venue provisions—which generally limit searches to
> locations within a district—create special difficulties for the [g]overnment
> when it is investigating crimes involving electronic information. The
> proposal speaks to two increasingly common situations affected by the
> territorial restriction, each involving remote access searches, in which the
> government seeks to obtain access to electronic information or an electronic
> storage device by sending surveillance software over the Internet.

> In the first situation, the warrant sufficiently describes the computer to be
> searched, but the district within which the computer is located is unknown.
> This situation is occurring with increasing frequency because persons who
> commit crimes using the Internet are using sophisticated anonymizing
> technologies[] . . . [such as] proxy services designed to hide their true IP
> addresses. Proxy services function as intermediaries for Internet
> communications: when one communicates through an anonymizing proxy
> service, the communication passes through the proxy, and the recipient of
> the communication receives the proxy's IP address, not the originator's true

IP address. Accordingly, agents are unable to identify the physical location
and judicial district of the originating computer. . . . The second situation
involves the use of multiple computers in many districts simultaneously as
part of complex criminal schemes.

Report of the Advisory Committee on Criminal Rules to the Committee on Rules of
Practice and Procedure (May 6, 2015).

It would produce an anomalous result if a search warrant that was invalid and
without jurisdiction on November 30, 2016 became valid and within a magistrate judge's
jurisdiction on December 1, 2016 simply because the amendments to Rule 41 took effect.
Certainly the amendments to Rule 41 do not purport to effect that dramatic change.
Moreover, although the NIT warrant was not clearly authorized by the plain language of
Rule 41, its issuance was nonetheless consistent with applicable law. The Supreme Court
has long held that Fed. R. Crim. P. 41 "is sufficiently flexible to include within its scope
electronic intrusions authorized upon a finding of probable cause." *United States v. N.Y.
Tel. Co.*, 434 U.S. 159, 169 (1977); *see also* 18 U.S.C. § 3103a(a) (authorizing a warrant
to "be issued to search for and seize any property that constitutes evidence of a criminal
offense in violation of the laws of the United States"). It is thus questionable whether
Defendant can prove that a Rule 41 violation took place.

The government fares no better in urging the court to find the NIT warrant
authorizes a "tracking device" under Rule 41(b)(4) because "[t]he NIT in this case
functioned in a similar manner in the context of the Internet." (Doc. 22 at 5.) A
"tracking device" under Rule 41 is defined by 18 U.S.C. § 3117(b) as "an electronic or
mechanical device which permits the tracking of the movement of a person or object."
Section 3117(a) provides that "[i]f a court is empowered to issue a warrant or other order
for the installation of a mobile tracking device, such order may authorize the use of that
device within the jurisdiction of the court, and outside that jurisdiction *if the device is
installed in that jurisdiction*." *Id.* at § 3117(a) (emphasis supplied).

In this case, the NIT did not "track" the movement of Defendant or his computer
and it did not "track" the movement of files or computer code. *See United States v.
Croghan*, 2016 WL 4992105, at *4 (S.D. Iowa Sept. 19, 2016) ("The NIT here at issue,

14

however, clearly did not 'track' the 'movement of a person or object.' Indeed, it did not 'track' the 'movement' of anything; rather, it caused computer code to be installed on the activating user's computer, which then caused such computer to relay specific information to the government-controlled computers in Virginia.").

In addition, the NIT was not "installed" in the District of Vermont. If it was "installed" anywhere, it was "installed" in the Eastern District of Virginia when Defendant allegedly electronically visited the Playpen website, accessed the NIT-containing post, and returned with computer code that compelled his computer to relay certain information to a FBI-controlled server. Rule 41(b)'s tracking device provision as applied to the NIT warrant therefore "stretches the rule too far." *United States v. Eldred*, Case No. 5:16-cr-89, Doc. 25 at 10 (D. Vt. Feb. 17, 2017) (quoting *United States v. Michaud*, 2016 WL 337263, at *6 (W.D. Wash. Jan. 28, 2016) (concluding that reliance on Rule 41(b)(4) "stretches the rule too far" because "[i]f the 'installation' occurred on the government-controlled computer, . . . applying the tracking device exception breaks down, because [defendant] never controlled the government-controlled computer" and "[i]f the installation occurred on [defendant's] computer, applying the tracking device exception again fails, because [defendant's] computer was never physically located within the Eastern District of Virginia")).[6]

Based on the foregoing, the court assumes without deciding that a Rule 41 violation occurred and proceeds to determine whether suppression is warranted. In the

---

[6] Most courts have reached a similar conclusion. *See, e.g.*, *United States v. Werdene*, 188 F. Supp. 3d 431, 442 (E.D. Pa. 2016) (holding that Rule 41(b)(4) did not authorize the NIT warrant because the computer targeted was at all times outside of the Eastern District of Virginia); *United States v. Henderson*, 2016 WL 4549108, at *4 (N.D. Cal. Sept. 1, 2016) (finding no authority under Rule 41(b)(4) in part because "the NIT was installed outside of the district, at the location of the activating computers, not within the district as required by Rule 41(b)(4)"); *United States v. Allain*, 2016 WL 5660452, at *11 (D. Mass. Sept. 29, 2016) ("Even if the [c]ourt agreed with the tracking device analogy, the NIT [w]arrant would still not be permitted under Rule 41(b)(4), since the NIT was not installed in the Eastern District of Virginia. . . . The NIT was downloaded from the Playpen server . . . and placed onto the 'activating' computers . . . . Given that the 'activating' computers never entered the Eastern District of Virginia, it stretches the rule too far to say that the installation occurred within the Eastern District of Virginia.").

Second Circuit, it is well-settled that, provided they are not of "constitutional magnitude":

> violations of Rule 41 alone should not lead to exclusion [of evidence] unless (1) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.

*United States v. Burke*, 517 F.2d 377, 386-87 (2d Cir. 1975) (footnotes omitted).  The court therefore turns to the whether the NIT warrant violated the Fourth Amendment.

### D.    Whether the NIT Warrant Violated the Fourth Amendment.

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]'" *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)).  "As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (internal quotation marks omitted).

Fourth Amendment rights "are personal, and may be enforced only by persons whose *own* protection under the Amendment has been violated." *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997); *see also Katz v. United States*, 389 U.S. 347, 351 (1967) (explaining that "the Fourth Amendment protects people, not places").  For this reason, a "defendant seeking to suppress the fruits of a search by reason of a violation of the Fourth Amendment must show that he had a 'legitimate expectation of privacy' in the place searched." *United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (defining "the scope of the interest protected by the Fourth Amendment" as "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place")).  "This inquiry involves two distinct questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable." *Id.*

Although the Second Circuit has held that "[i]ndividuals generally possess a reasonable expectation of privacy in their home computers[,]" *United States v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004), and has concluded that certain office computers offer this same expectation of privacy, *see Leventhal v. Knapek*, 266 F.3d 64, 73-74 (2d Cir. 2001) (finding defendant had a reasonable expectation of privacy in the contents of his computer located in a private office to which no one else had access), it has never been called upon to consider whether there is a reasonable expectation of privacy in the circumstances presented here.  Courts outside the Second Circuit have reached divergent conclusions regarding whether the NIT warrant authorized a "search" of the "contents" of a computer, or whether it retrieved only publicly available information in which no reasonable expectation of privacy exists.[7]

---

[7] *Compare United States v. Darby*, 190 F. Supp. 3d 520, 530 (E.D. Va. 2016) ("[I]f an individual has a reasonable expectation of privacy in the contents of his or her personal computer, as he or she does, and the deployment of the NIT invades that privacy, then the NIT is a search.  The NIT in this case caused [d]efendant's computer to download certain code without the authorization or knowledge of [d]efendant.  The 'contents' of a computer are nothing but its code.  In placing code on [d]efendant's computer, the government literally—one writes code—invaded the contents of the computer. . . .  [I]t is irrelevant that [d]efendant might not have a reasonable expectation of privacy in some of the information searched and seized by the government.  The government's deployment of the NIT was a Fourth Amendment search."), *and Allain*, 2016 WL 5660452, at *7 n.5 ("The [c]ourt . . . finds that the FBI did need to obtain a warrant in order to use the NIT.  The FBI's search not only implicated defendant's privacy interest in his IP address, but also in his computer.  Although an IP address may be obtained from a third party provider and therefore arguably carries with it a lower expectation of privacy, in this case, the FBI needed to install a program that searched through [defendant's] computer to get the IP address.  Regardless of whether and to what extent [defendant] had a privacy interest in his IP address, he most certainly had a reasonable expectation of privacy in the contents of his computer."), *with United States v. Acevedo-Lemus*, 2016 WL 4208436, at *3 (C.D. Cal. Aug. 8, 2016) ("The [c]ourt concludes that the FBI's acquisition of the key piece of information here—[d]efendant's IP address—was not a search under the meaning of the Fourth Amendment, and therefore did not require a warrant"); *United States v. Matish*, 193 F. Supp. 3d 585, 615 (E.D. Va. 2016) ("Defendant possessed no reasonable expectation of privacy in his computer's IP address, so the [g]overnment's acquisition of the IP address did not represent a prohibited Fourth Amendment search."); *Werdene*, 188 F. Supp. 3d at 446 ("Since [defendant] did not have a reasonable expectation of privacy in his IP address, the NIT cannot be considered a 'search' within the meaning of the Fourth Amendment"); *United States v. Lough*, 2016 WL 6834003, at *4 (N.D. W. Va. Nov. 18, 2016) (noting that whatever expectation of privacy defendant may generally have in the contents of his personal computer, "the FBI's use of the NIT to discover [defendant's] IP address was not a search of the contents of that computer.").

17

From a technological standpoint, the NIT warrant did not authorize a search of the contents of Defendant's computer. *See United States v. Acevedo-Lemus*, 2016 WL 4208436, at *6 (C.D. Cal. Aug. 8, 2016) (observing that "the NIT obtained *very* limited information from [d]efendant's computer" and "did not, for example, search for files containing child pornography or otherwise inspect the computer's contents" but rather its "crucial operation" was to obtain the defendant's IP address, which is information that is "normally public and often disclosed to third parties"). It also did not alter Defendant's computer, deposit code on it, or retrieve any information in which courts have recognized a reasonable expectation of privacy.

Any "search" occurred only after Defendant voluntarily connected his computer to the Internet, downloaded the browser and Tor software, registered a Playpen account, and accessed the NIT-containing child pornography post on the Playpen website. In engaging in these voluntary actions, a reasonable computer user may be deemed to have understood that he or she was potentially conveying certain information to third party computers and servers in order to allow the transfer of information to take place. *See United States v. Dzwonczyk*, 2016 WL 7428390, at *9 (D. Neb. Dec. 23, 2016) (finding no reasonable expectation of privacy in IP address and noting that "an individual 'necessarily shares the IP address assigned to his computer to and from third parties[.]'"). Indeed, Playpen warned its users not to use their real email addresses and cautioned that "[t]he forum software places a cookie, a text file containing bits of information (such as your username and password), in your browser's cache." (Doc. 21-1 at 19, ¶ 13.) It further advised: "[f]or your own security, you should not post information here that can be used to identify you" and "[f]or your own security[,] when browsing . . . Tor we also recom[m]end that you turn off javascript and disable sending of the 'referer' header." *Id.* (internal quotation marks omitted). Against this backdrop, any expectation by a Playpen user that his or her identity could not and would not be revealed while accessing child pornography on a publicly available website is not one society would deem reasonable. *See Hamilton*, 538 F.3d at 167 (holding no Fourth Amendment violation occurs if the "expectation of privacy is [not] one that society accepts as reasonable"). The court

18

therefore concludes that the NIT warrant did not violate the Fourth Amendment and any Rule 41 violation was not of constitutional magnitude.

The court assumes that Defendant will be able to show prejudice as, without the alleged Rule 41 violation, his identity would not have been discovered. *See United States v. Adams*, 2016 WL 4212079, at *8 (M.D. Fla. Aug. 10, 2016) ("The application in support of the NIT warrant makes it abundantly clear that law enforcement had no realistic chance of identifying the IP address associated with [d]efendant's computer without the NIT."). The court therefore examines whether any Rule 41 violation was intentional and deliberate and concludes that it was not.

At the time the NIT warrant was issued, only one magistrate judge in the country had concluded that Fed. R. Crim. P. 41 did not authorize a NIT search warrant. *See In re Warrant to Search a Target Comput. at Premises Unknown*, 958 F. Supp. 2d 753, 758 (S.D. Tex. 2013). This precedent was not controlling in the Eastern District of Virginia and government officials were not required to refrain from seeking NIT warrants while they sought amendments to Rule 41.

In seeking the NIT warrant, the government disclosed to Magistrate Judge Buchanan that the NIT warrant "involved sophisticated and novel technology—used both by the operators and users of Playpen as well as the federal investigators—and the FBI made a reasonable attempt to structure a search warrant that complied with rules that have not evolved as quickly as the technology." *United States v. Allain*, 2016 WL 5660452, at *12 (D. Mass. Sept. 29, 2016). As a result:

> [t]he FBI agents in this case did the right thing. They gathered evidence over an extended period and filed a detailed affidavit with a federal magistrate in support of their search warrant application. They filed the warrant application in the federal district that had the closest connection to the search to be executed. The information gathered by the warrant was limited: primarily the IP addresses of those that accessed Playpen and additional information that would aid in identifying what computer accessed the site and what individual used that computer. . . . [T]he officers in charge of this investigation are not at all culpable. . . . [T]here is no evidence that any failure by the FBI to understand the intricacies of the jurisdiction of federal magistrates was deliberate.

19

*Darby*, 190 F. Supp. 3d at 538. Any violation of Rule 41 was therefore neither flagrant nor deliberate.

On balance, although Defendant can show prejudice, the court concludes suppression is not warranted because: (1) the Eastern District of Virginia had the greatest connection to the Playpen server; (2) the magistrate judge could not control or limit where the NIT was deployed; (3) users of "activating computers" played an essential role in determining where the NIT was deployed; (4) probable cause for the NIT warrant is not challenged; (5) law enforcement sought and obtained judicial authorization for the NIT and operation of the Playpen website; and (6) Rule 41 as it existed at the time did "not directly address the kind of situation that the NIT [w]arrant was authorized to investigate, namely, where criminal suspects['] geographical whereabouts are unknown, perhaps by design, but the criminal suspects had made contact via technology with the FBI in a known location." *Michaud*, 2016 WL 337263, at *6. No different outcome is warranted if the court assumes *arguendo* that a Fourth Amendment violation took place.

Under *United States v. Leon*, 468 U.S. 897, 922 (1984),[8] the exclusionary rule is a "deterrent sanction" created by the Supreme Court to "bar[] the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231-32 (2011). The Supreme Court has cautioned that "exclusion '[should be] our last resort, not our first impulse[.]'" *Herring v. United States*, 555 U.S. 135, 140 (2009). The rule deters "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* at 144. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.*

In this case, the government obtained the NIT warrant only after truthfully advising Magistrate Judge Buchanan how the NIT would work, what information it would retrieve, and from where it would retrieve it. Thereafter, the government relied on

---

[8] Defendant's argument that the exclusionary rule does not apply is premised upon his erroneous assumption that the NIT warrant was void ab initio.

20

the NIT warrant in good faith and, indeed, narrowed the scope of the warrant so that the NIT generally only deployed when a user reached out to the Playpen website and accessed what appeared to be a child pornography post. Suppression of the evidence obtained through the NIT warrant would not deter future police misconduct—the sole purpose of the exclusionary rule. *See United States v. Broy*, 209 F. Supp. 3d 1045, 1058-59 (C.D. Ill. 2016) (observing that "the only benefit to suppression in this case would be ensuring magistrate judges are more careful about issuing NIT warrants in the future" and that "the exclusionary rule is designed to control the conduct of *law enforcement*, not the conduct of federal judges"); *United States v. Werdene*, 188 F. Supp. 3d 431, 452 (E.D. Pa. 2016) (stating that "to the extent a mistake was made in this case, it was not made by the agents in 'reckless . . . disregard for Fourth Amendment rights[]'" but instead "made by the magistrate when she mistakenly issued a warrant outside her jurisdiction"); *Michaud*, 2016 WL 337263, at *7 ("Because reliance on the NIT [w]arrant was objectively reasonable, the officers executing the warrant acted in good faith, and suppression is unwarranted.").

Because there was good faith reliance by law enforcement on a search warrant supported by probable cause, the court concludes that the exclusionary rule applies and that any violation of the Fourth Amendment that took place does not warrant the "last resort" of suppression. *See Herring*, 555 U.S. at 140.

## CONCLUSION

For the foregoing reasons, the court hereby DENIES Defendant's motion to suppress evidence and statements. (Doc. 21.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _26_th_ day of April, 2017.

Christina Reiss, Chief Judge
United States District Court

21

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA        :
                                :
v.                              :   NO. 3:15-CR-221(AVC)
                                :
TIMOTHY ALLEN                   :

## ORDER DENYING THE DEFENDANT'S MOTION TO SUPPRESS

The indictment in this case charges the defendant, Timothy Allen, with one count of possession of child pornography involving a child less than 12 years old, in violation of 18 U.S.C. § 2252A(a)(5)(b) and (b)(2). Allen filed the within motion to suppress, arguing that the evidence seized resulted from an unlawfully issued warrant in violation of the Fourth Amendment to the United States Constitution.

For the following reasons, Allen's motion to suppress (doc. no. 38) is DENIED.

## FACTS[1]

In the 1990s, the United States Naval Research Lab developed the "Tor" computer network. The Tor network allows users to anonymously view the internet. Tor users are provided internet anonymity because the Tor network uses a group of volunteer computers known as "nodes" or "relays". These volunteer computers bounce an individual user's Internet

---

[1] The relevant facts are taken from the parties' motions, the NIT search warrant affidavit, and the affidavit supporting the search warrant of Allen's residence.

Protocol (IP) address throughout the Tor network so that the user's actual IP address is not known.  The "exit" node is the only IP address that is known.  Thus, the Tor network provides anonymity because a user's original IP address cannot be determined.[2]

In order for a user to access the Tor network, they must either download the Tor software or use gateways available on the open internet; however, these gateways do not provide the full anonymity benefits of Tor.  Once a user has accessed the Tor network, one cannot view certain websites in the ordinary fashion of searching for a website's name.  A user can access websites known as hidden services only via a Tor based web address in the Tor network.  A Tor based web address is different than a normal web address as it is a set of algorithm-generated characters followed by ".onion", instead of a web address such as www.ctd.uscourts.gov.  Further, a user can access a hidden site only through knowing the exact web address. Therefore, an individual is highly unlikely to randomly find a hidden site.

In September 2013, the acting assistant attorney general ("AAG") of the Department of Justice wrote to the chair of the advisory committee on the Federal Rules of Criminal Procedure.

---

[2] A user's IP address can be traced to determine the user's location.

The AAG's letter contained a recommendation to amend Rule 41(b) of the rules. The AAG's proposed amendment authorized "a court with jurisdiction over the offense being investigated to issue a warrant to remotely search a computer if activities related to the crime under investigation have occurred in the court's district."

In December 2014, the FBI was informed by a foreign law enforcement agency that a particular United States IP address may be associated with a website called Playpen[3]. Playpen was a website that allowed registered users to advertise, distribute, and/or access child pornography. Playpen categorized the images and videos based on the victims' age, gender, and type of sexual activity. Playpen had more than 150,000 total members and thousands of postings related to child pornography.

In February 2015, the FBI apprehended the administrator of Playpen and seized control of the website. Sometime between February 18, 2015 and February 20, 2015, Playpen's logo changed from an image of two sexually suggestive minors to an image of only one minor. The one minor was not portrayed in as sexual a manner as the two minors in the prior logo. The FBI did not

---

[3] Playpen is the website's actual name, but it has also been referred to in documents and in other cases as Website A or the website.

note the change in Playpen's logo in the affidavit supporting the search warrant it submitted to the magistrate judge.

On February 20, 2015, the government applied for a search warrant from a federal magistrate judge located in the eastern district of Virginia that would allow for the deployment of a Network Investigative Technique ("NIT") against users of Playpen.  The NIT was computer software that would seize information from an activating computer, wherever the activating computer was located.[4]  The NIT seized the following information: the activating computer's actual IP address, a unique identifier generated by the NIT to distinguish between different activating computers, the type of operating system the activating computer used, information as to whether the NIT had already been deployed to the activating computer, the activating computer's host name, the activating computer's operating system username, and the activating computer's media access control address.

The magistrate judge signed the search warrant deploying the NIT the same day it was submitted.  On the same day the government applied for a search warrant from the magistrate judge, it also applied for an order from a United States district court judge seeking authorization pursuant to the Wiretap Act to intercept communications occurring on Playpen.

---

[4] An activating computer was any computer that logged into Playpen.

The district court judge signed the order the same day it was submitted.

From February 20, 2015 to March 4, 2015, the FBI continued to allow Playpen to operate in an attempt to identify users of the website.  During this time, Playpen was operated from a government controlled server at a government facility in the eastern district of Virginia.

On February 24, 2015, "yuyu" was registered as an account on Playpen.  From February 24, 2015 to March 5, 2015, "yuyu" was actively logged into Playpen for a total of 34 hours and 19 minutes.  "Yuyu" viewed explicit child pornography during this time period.  The NIT was able to determine "yuyu's" IP address and the FBI, using publicly available websites, was able to determine the internet service provider ("ISP") for that particular IP address.

In March 2015, the FBI served an administrative subpoena on the ISP regarding the specific IP address.  The ISP provided the FBI with information that indicated Allen received internet service affiliated with that specific IP address at a residence in Torrington, Connecticut. Therefore, it was evident that "yuyu" was Allen.

In August 2015, the FBI attained information from the United States Postal Service that Allen received mail at the

specified address in Torrington.  The FBI also conducted a
public records search for Allen, which revealed Allen was the
owner of the Torrington address.  On August 31, 2015, the FBI
obtained a search warrant from a magistrate judge in Connecticut
for the Torrington address.

On September 2, 2015, the FBI executed the search warrant
for the Torrington address.  Allen was present at the time the
warrant was executed.  Allen directed FBI agents to a room in
the basement of the residence where agents discovered a laptop
computer, external hard drives, thumb drives, compact discs,
phones, and phone SD cards.  The FBI found child pornography in
the seized devices upon examination.[5]  Allen also made several
admissions to the FBI regarding his viewing of child
pornography.[6]  Allen was arrested on the same day as the search
of his home pursuant to a criminal complaint that charged him
with receipt of child pornography in violation of 18 U.S.C. §
2252A(a)(2)(a) and (b), and possession of child pornography in
violation of 18 U.S.C. § 2252A(a)(5)(B).

On December 8, 2015, Allen was indicted and charged with
one count of possession of child pornography involving a child

---

[5] The FBI seized 19 electronic devices from Allen, of which 7 contained child
pornography. In total, Allen possessed more than 1,650 videos and more than
9,561 images that depicted child pornography.

[6] Allen assumes for the purposes of this motion that all facts contained in
the FBI's report of investigation are true.  Allen, however, has reserved the
right to dispute any facts in the report in future court proceedings.

less than 12 years old in violation of 18 U.S.C. §

2252A(a)(5)(b) and (b)(2).  In April 2016, the Supreme Court

approved the amendment to Rule 41(b).  On June 11, 2016, Allen

filed the within motion to suppress.

**DISCUSSION**

I.   **NIT Warrant**

A. **Magistrate's Authority**

Allen argues that the NIT warrant exceeded the magistrate

judge's authority.  Specifically, he argues that the NIT warrant

is not authorized under Rule 41(b).  The government responds

that the issuance of the NIT warrant did not violate the Federal

Magistrates Act or Rule 41 of the Federal Rules of Criminal

Procedure.

The Federal Magistrates Act provides in relevant part:

> Each United States magistrate judge . . . shall have
> within the district in which sessions are held by
> the court that appointed the magistrate judge . . .
> all powers and duties conferred or imposed upon
> United States commissioners by law or by the Rules
> of Criminal Procedure for the United States District
> Courts.

28 U.S.C. § 636(a).  Rule 41(b) of the Federal Rules of Criminal

Procedure authorizes a magistrate judge "with authority in the

district" to issue a warrant for a person or property under

particular circumstances.  Fed. R. Crim. P. 41(b)(1)-(5).

7

### i.   Rule 41(b)(1)

Allen first argues that "[t]he NIT Warrant was not authorized under Rule 41(b)(1) . . . because the computers searched and information seized by the NIT were located outside the Eastern District of Virginia."  Specifically, he argues that "[t]he only thing relevant to this case located in the Eastern District of Virginia was the Website A server and the child pornography it hosted – on an FBI-controlled server at a Government facility."  He contends that "[t]he property searched and information seized . . . rested on the users' computers, not on the server in the FBI's control in the Eastern District of Virginia."

The government responds that the NIT warrant was authorized under Rule 41(b)(1) because it "was issued by a judge in the district with the strongest known connection to the search: the Eastern District of Virginia . . . where the server for Playpen was located."  Specifically, the government argues that "Allen entered the [eastern district of Virginia] by accessing the Playpen server there, retrieved the NIT from that server, and the NIT sent his network information back to a server in that district, from which the agents retrieved the information."

Rule 41(b)(1) provides that "a magistrate judge with authority in the district . . . has authority to issue a warrant

to search for and seize a person or property within the
district." Fed. R. Crim. P. 41(b)(1).

In this case, the court concludes that the Network
Investigative Technique ("NIT") warrant was not authorized
pursuant to Rule 41(b)(1).  The plain language of Rule 41(b)(1)
authorizes a magistrate to issue a warrant to "search for and
seize a person or property within the district."  Here, however,
Allen's computer information was not seized in the eastern
district of Virginia, the district where the warrant was issued,
but instead it was seized in Connecticut, where Allen's computer
was located.  The NIT's seizure of information necessarily
occurred in Connecticut due to its functionality.  The NIT did
not seize information until it was deployed onto an activating
computer, at which time it would then seize and transmit the
sought after information back to the eastern district of
Virginia.

Therefore, the court concludes that the NIT warrant was not
authorized under Rule 41(b)(1).

### ii.  Rule 41(b)(2)

Allen also argues that the NIT warrant was not authorized
under Rule 41(b)(2) because "[t]here is no indication in the NIT
Affidavit that the Government's concern was computers located in
the Eastern District of Virginia that might be moved outside the

district before the warrant could be executed; to the contrary, the Affidavit states the Government's intent to deploy the NIT onto all users' computers, 'wherever located.'"  He further argues that there are no allegations that "the computer the Government alleges belonged to Mr. Allen was ever located in the Eastern District of Virginia."

The government responds that "for a period of time Allen, through his activating computer, was virtually present in the [eastern district of Virginia] and the Magistrate Judge has authority under Rule 41(b)(1) and (2) to issue a warrant to obtain information from him."  Specifically, the government argues that "through his computer Allen can reach into the District of Virginia, access a website located in a server within that district, download child pornography from that server and then view that child pornography on his computer located in the State of Connecticut just as if he had walked into a store in Virginia and purchased the images."

Rule 41(b)(2) provides that:

> a magistrate judge with authority in the district has authority to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed.

Fed. R. Crim. P. 41(b)(2).

10

Here, as discussed above, Allen's computer
information never entered the eastern district of Virginia
until the NIT was deployed.  The NIT's purpose was to
reach out to activating computers, wherever they may be
located, and transmit information back to Virginia.  Thus,
Rule 41(b)(2) is inapplicable pursuant to its plain
language because it was only after Allen's information was
seized and transmitted by the NIT that it entered the
eastern district of Virginia.[7]

The court concludes that the NIT warrant was not
authorized under Rule 41(b)(2).

### iii. Rule 41(b)(4)

Allen argues that "[t]he NIT Warrant was not authorized
under Rule 41(b)(4) because the NIT is not a 'Tracking Device'
and, even if it were, the installation did not occur within the
district."  He contends that "[i]f the 'installation' occurred
on the government-controlled computer, located in the Eastern
District of Virginia, applying the tracking device exception
breaks down, because [users of Website A] never controlled the
government-controlled computer, unlike a car with a tracking
device leaving a particular district."

---

[7] Allen's computer information did not enter the eastern district of Virginia
due to the anonymous nature of the Tor network.

11

The government responds that "Rule 41(b)(4) provided sufficient authority to issue the NIT warrant regardless of the location of the user or his computer because the NIT attached within the [eastern district of Virginia], when the defendant, through his computer, reached into that district."  The government contends that the NIT functioned in a manner similar to a physical tracking device case.  Specifically, the government explains that "[w]hen the defendant logged into Playpen by entering his username and password, thus reaching into the [eastern district of Virginia], and retrieved information from that server, he affirmatively retrieved both the illicit content and the NIT – just as he might have obtained other contraband such as illegal narcotics from a residence in the District."

Rule 41(b)(4) provides that "a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both."  Fed. R. Crim. P. 41(b)(4).

In this case, Rule 41(b)(4) did not authorize the NIT warrant.  The court recognizes that there is currently a split among the district courts regarding whether the NIT constituted

a tracking device for purposes of Rule 41(b)(4).[8]  The court,
however, concludes that the cases holding that the NIT was not a
tracking device are more persuasive, and therefore joins them in
concluding that the NIT was not authorized pursuant to Rule
41(b)(4).

The court reaches this conclusion because the NIT does not
meet the definition of a tracking device within the meaning of
Rule 41(b)(4).  Rule 41(a)(2) adopts the definition of tracking
device set forth in 18 U.S.C. § 3117(b).  Pursuant to 18 U.S.C.
§ 3117(b), a tracking device is "an electronic or mechanical
device which permits the tracking of the <u>movement of a person or
object</u>." (emphasis added).  Here, the NIT did more than merely
"track" the movement of a person or object.  The NIT
affirmatively sought out certain information from the activating
computer, seized it, and then transmitted it back to law
enforcement.  <u>See</u> <u>United States v. Anzalone</u>, 2016 WL 5339723, at

---

[8] <u>Compare</u> <u>United States v. Anzalone</u>, 2016 WL 5339723, at *9  (D. Mass. 2016)
("[T]he Court concludes the NIT is probably not a tracking device within the
meaning of Rule 41(b)(4) . . . ."), <u>and</u> <u>United States v. Henderson</u>, No. 15-
cr-00565-WHO-1, 2016 WL 4549108, at *4 (N.D. Cal. Sept. 1, 2016) ("The NIT
search does not meet the requirements of 41(b)(4) because, even though it was
analogous to a tracking device in some ways, it nevertheless falls outside
the meaning of a 'tracking device' as contemplated by the rule. Further, the
NIT was installed outside of the district, at the location of the activating
computers . . . ."), <u>with</u> <u>United States v. Laurita</u>, 8:13CR107, 2016 WL
4179365, at *6 (D. Neb. Aug. 5, 2016) ("Rule 41(b)(4) authorizes the
magistrate judge to issue a warrant such as the NIT warrant issued in this
case. That provision authorizes the use of a tracking device and the NIT is
analogous to a tracking device."), <u>and</u> <u>United States v. Matish</u>, 2016 WL
3545776, at *18 (E.D. Va. 2016) ("Because the NIT enabled the Government to
determine Playpen users' locations, it resembles a tracking device.").

*9 (D. Mass. 2016) ("Because the NIT relays more than just the location of a user's computer, the Court concludes the NIT is probably not a tracking device within the meaning of Rule 41(b)(4), but is certainly similar to a tracking device."); United States v. Croghan, 2016 WL 4992105, at *4 (S.D. Iowa 2016)("Indeed, [the NIT] did not 'track' the 'movement' of anything; rather, it caused computer code to be installed on the activating user's computer, which then caused such computer to relay specific information to the government-controlled computers in Virginia."). Thus, the NIT was not a tracking device within Rule 41(b)(4)'s plain language.[9]

The court concludes that the NIT search warrant was not authorized pursuant to the Federal Rules of Criminal Procedure Rule 41.

---

[9] The court, even assuming arguendo that the NIT was a tracking device within the meaning of Rule 41(b)(4), concludes that the installation of the NIT did not conform to the rule's requirements. The court finds instructive the decision in United States v. Michaud, No. 3:15-cr-05351-RJB, 2016 WL 337263 (W.D. Wash. Jan. 28, 2016). In Michaud, the court concluded that applying Rule 41(b)(4) to similar circumstances "stretch[ed] the rule too far." Id. at *6. The court noted, regarding the NIT's installation that:

> If the "installation" occurred on the government-controlled computer, located in the Eastern District of Virginia, applying the tracking device exception breaks down, because [the defendant] never controlled the government-controlled computer, unlike a car with a tracking device leaving a particular district. If the installation occurred on [the defendant]'s computer, applying the tracking device exception again fails, because [the defendant]'s computer was never physically located within the Eastern District of Virginia.

Id. Thus, the court concludes that regardless of where the NIT was installed Rule 41(b)(4) did not authorize the NIT's installation.

## II. Fourth Amendment

Allen argues that "[e]ven if the NIT warrant had been validly issued . . . , the search of Mr. Allen's computer would still be in violation of the 4th Amendment." Specifically, he argues that "the Government's search fell outside the scope of any warrant." He contends that "[b]y deploying the NIT from a website that was materially different from the website the magistrate judge (purportedly) authorized it to be deployed from, the FBI conducted what was, in essence, a warrantless search."

The government responds that "[t]he administrator's replacing two sexually suggestive images of prepubescent girls with one sexually suggestive image of a prepubescent girl" did not "transform[] the Playpen website into a materially different site not suggestive of child pornography and not subject to the NIT Warrant." Specifically, the government argues that "[t]he magistrate judge's probable cause finding rested on a host of facts and inferences resting upon the affiant's specialized training and experience that demonstrated a 'fair probability' that anyone who logged into Playpen did so intending to view and/or share child pornography."

The Fourth Amendment to the United States Constitution provides that:

15

> The right of the people to be secure in their
> persons, houses, papers, and effects, against
> unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon
> probable cause, supported by Oath or affirmation,
> and particularly describing the place to be
> searched, and the persons or things to be seized.

U.S. Const. amend. IV. "[T]he Fourth Amendment protects against 'wide-ranging exploratory searches' unsupported by probable cause, by mandating that a search warrant describe with particularity the place to be searched and the persons or things to be seized." United States v. Rosa, 626 F.3d 56, 61 (2d Cir. 2010)(citations omitted). However, "inaccuracies or ambiguities in a warrant do not necessarily render a warrant invalid under the Fourth Amendment." United States v. Voustianiouk, 685 F.3d 206, 212 (2d Cir. 2012). Moreover, "[e]very statement in a warrant affidavit does not have to be true." United States v. Canfield, 212 F.3d 713, 717 (2d Cir. 2000) (citation omitted). "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." Id. at 718 (citation omitted)(internal quotation marks omitted).

In this case, the FBI did not act outside the scope
of the Network Investigative Technique ("NIT") warrant or
without a warrant due to the change in Playpen's logo.
The FBI's failure to note Playpen's change in logo was an
inaccuracy in the warrant affidavit and the second circuit
has stated that "inaccuracies or ambiguities in a warrant
do not necessarily render it invalid."  Voustianiouk, 685
F.3d at 212.

The NIT warrant's supporting affidavit contained
enough information, without considering the logo change,
from which a probable cause determination could be made.
Playpen's major defining characteristics, as described by
the FBI agent in his search warrant affidavit, remained
the same.  Playpen, as a hidden site, still required
numerous affirmative steps to access it, so a user could
not simply stumble upon it.  Once a user logged into
Playpen, it would be immediately apparent that the content
of the site was illicit child pornography, based upon the
categorization of the site's content.  Thus, Playpen's
logo change from two sexually suggestive minors to only
one minor, who was not dressed as provocatively, but still
posed in a sexual manner, does not significantly impact
the probable cause determination.  Probable cause is a

17

fluid concept and the magistrate could have reasonably relied on other information in the FBI agent's affidavit. See Figueroa v. Mazza, 825 F.3d 89, 99 (2d Cir. 2016) ("Probable cause is a fluid standard that does not demand hard certainties or mechanistic inquiries . . . ." (citation omitted) (internal quotation marks omitted)).

Therefore, the FBI's error did not significantly alter the ultimate inquiry of "whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." Canfield, 212 F.3d at 718 (citation omitted)(internal quotation marks omitted).

The court concludes that the NIT warrant was supported by probable cause and that the resulting search was executed in a manner consistent with the warrant.

### III. Suppression

Since the court has concluded that there was a violation of Rule 41 of the Federal Rules of Criminal Procedure, it is necessary to determine whether suppression is appropriate.

Allen argues that "the fact that this warrant lay entirely outside the bounds of Rule 41 means that the violation was not merely ministerial or technical, but rather substantive,

18

jurisdictional, and constitutional, and therefore requires suppression of the NIT warrant." Allen further avers that he was prejudiced by the issuance of the warrant. He also contends that "this is not a case in which 'good faith' . . . can justify the admission of evidence . . . because the 'good faith' rule does not apply in the context of warrants . . . that are void from their very inception."

The government responds that "not all Rule 41 violations render a search constitutionally invalid." Specifically, the government argues that "[t]he defendant wrongly claims that jurisdictional flaws and other fundamental violations of non-ministerial requirements necessarily involved matters of constitutional magnitude." The government further avers that "[u]ltimately, agents acted reasonably in relying on the magistrate's authorization of the NIT warrant; therefor [sic], the evidence seized pursuant to that warrant should not be suppressed."

"To safeguard Fourth Amendment rights, the Supreme Court created 'an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial.'" United States v. Bershchansky, 788 F.3d 102, 112 (2d Cir. 2015) (quoting Herring v. United States, 555 U.S. 135, 139 (2009)). "Neither a personal constitutional right nor a means to redress the injury

19

of an unconstitutional search, the exclusionary rule is designed
to deter future Fourth Amendment violations." United States v.
Raymonda, 780 F.3d 105, 117 (2d Cir. 2015) (internal quotation
marks omitted).  "The rule specifically deters deliberate,
reckless, or grossly negligent conduct, or in some circumstances
recurring or systemic negligence." Bershchansky, 788 F.3d at
112 (quoting Herring, 555 U.S. at 144).  "Because the remedy
exacts a heavy toll on the justice system, however, the
exclusionary rule does not apply whenever suppressing evidence
might provide marginal deterrence." Raymonda, 780 F.3d at 117
(citation omitted) (internal quotation marks omitted).
Moreover, the second circuit has stated that "evidence should
not be suppressed for a violation solely of Rule 41 'unless (1)
there was prejudice in the sense that the search might not have
occurred or would not have been so abrasive if the Rule had been
followed, or (2) there is evidence of intentional and deliberate
disregard of a provision in the Rule.'" United States v.
Amendola, 558 F.2d 1043, 1045 (2d Cir. 1977) (quoting United
States v. Burke, 517 F.2d 377, 386-87 (2d Cir. 1975)).

     The second circuit has recognized that "the exclusionary
rule barring illegally obtained evidence from the courtroom does
not apply to evidence seized in 'objectively reasonable reliance
on' a warrant issued by a detached and neutral magistrate, even

where the warrant is subsequently deemed invalid." <u>United</u> <u>States v. Jasorka</u>, 153 F.3d 58, 60 (2d Cir. 1998) (quoting <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984)). Put differently, this exception, known as the "good faith exception," allows the admission of evidence "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." <u>United</u> <u>States v. Leon</u>, 468 U.S. 897, 920 (1984). Because "[w]hen an officer genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment, and thus nothing to deter." <u>United States v. Raymonda</u>, 780 F.3d 105, 118 (2d Cir. 2015).

However, "the good faith exception cannot shield even an officer who relies on a duly issued warrant in at least four circumstances: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." <u>United States</u> <u>v. Raymonda</u>, 780 F.3d 105, 118 (2d Cir. 2015) (citation omitted) (internal quotation marks omitted).

In this case, the court concludes that the warrant was void
ab initio, but that suppression is not required because the FBI
acted in good faith.[10]  The court concludes that the warrant was
void ab initio because the magistrate judge did not have the
authority to issue the Network Investigative Technique ("NIT")
warrant pursuant to Rule 41 and, thus, it was void from its
issuance.  See United States v. Ammons, 2016 WL 4926438, at *6
(W.D. Ky. 2016) ("Because Magistrate Judge Buchanan had no
jurisdiction or authority under the Federal Magistrates Act to
issue the NIT warrant, the Court holds that the NIT warrant was
void from the beginning (or ab initio, in Latin).").

The court must next determine whether the violation of Rule
41(b) amounted to a constitutional violation of Allen's Fourth

---

[10] The court recognizes that there is currently a split among the district
courts as to whether warrants in similar circumstances were void ab initio.
Compare United States v. Ammons, 2016 WL 4926438, at *6 (W.D. Ky. 2016)
("Because Magistrate Judge Buchanan had no jurisdiction or authority under
the Federal Magistrates Act to issue the NIT warrant, the Court holds that
the NIT warrant was void from the beginning (or ab initio, in Latin)."), with
United States v. Anzalone, 2016 WL 5339723, at *11 (D. Mass. 2016) ("The
Court holds that the warrant here was not void ab initio. Even if the
magistrate judge in the Eastern District of Virginia lacked the authority to
issue a warrant that allowed the FBI to deploy the NIT outside of that
district, the magistrate judge did have authority to issue a warrant in which
the NIT deployed in that district. The warrant was not void at its issuance."
(citation omitted)).
    The court also recognizes that there is a split among the courts as to
the appropriate remedy when a warrant is deemed void ab initio.  Compare
United States v. Werdene, 2016 WL 3002376, at *14 (E.D. Pa. 2016) ("The good
faith exception is not foreclosed in the context of a warrant that is void ab
initio ...."), with United States v. Levin, 2016 WL 2596010, at *7 (D. Mass.
2016) ("[T]he Court holds that the good-faith exception is inapplicable
because the warrant at issue here was void ab initio.").

Amendment rights.  Here, Allen suffered a constitutional
violation because the NIT warrant was void <u>ab initio</u>; therefore,
the FBI conducted a warrantless search and seizure of
information contained in Allen's computer, which was located in
his home.  See <u>United States v. Simmons</u>, 661 F.3d 151, 156 (2d
Cir. 2011) ("The core premise underlying the Fourth Amendment is
that warrantless searches of a home are presumptively
unreasonable.").  Allen also had a legitimate and reasonable
expectation of privacy in his computer.  See <u>United States v.</u>
<u>Fields</u>, 113 F.3d 313, 322 (2d Cir. 1997) ("The ultimate focus of
Fourth Amendment analysis remains whether the defendant had a
reasonable expectation of privacy in the place searched.").

Other courts have framed the Fourth Amendment privacy issue
from the standpoint of whether an individual had a reasonable
expectation of privacy in their IP address.  <u>United States v.</u>
<u>Werdene</u>, 2016 WL 3002376, at *10 (E.D. Pa. 2016) ("Since [the
defendant] did not have a reasonable expectation of privacy in
his IP address, the NIT cannot be considered a 'search' within
the meaning of the Fourth Amendment and the violation at issue
is therefore not constitutional.").  This court, however,
concludes that the proper inquiry is whether Allen had a
reasonable expectation of privacy in his computer and not his IP
address.  See <u>United States v. Adams</u>, No: 6:16-cr-11-Orl-40GJK,

2016 WL 4212079, at *4 (M.D. Fla. Aug. 10, 2016) ("The NIT
searches the user's computer to discover the IP address
associated with that device. Therefore, one's expectation of
privacy in that device is the proper focus of the analysis, not
one's expectation of privacy in the IP address residing in that
device."). The NIT searched and seized information from Allen's
computer, and one of the pieces of information seized was his IP
address, but six other pieces of information were seized as
well. Allen did have a reasonable expectation of privacy in his
computer information and it is a view that society can consider
legitimate. United States v. Lifshitz, 369 F.3d 173, 190 (2d
Cir. 2004) ("Individuals generally possess a reasonable
expectation of privacy in their home computers.").

Thus, since Allen had a reasonable expectation of privacy
in his computer and because the FBI seized information from his
computer without a warrant, Allen suffered a constitutional
violation of Rule 41.[11]

Even assuming Allen did not suffer a constitutional
violation, he suffered a violation of Rule 41 that would require

---

[11] The government argues that "even if the Court were to determine that the
deployment of the NIT constituted a warrantless search . . . ample exigent
circumstances existed to justify its use." The court concludes that there is
no merit to this argument because the FBI operated Playpen for approximately
two weeks before shutting it down. See United States v. Ammons, 2016 WL
4926438, at *7 (W.D. Ky. 2016) (rejecting a similar argument and stating: "In
this case . . . the Government not only obtained a warrant, but continued to
operate Playpen for some two weeks. Those facts belie any claim of exigency."
(footnote omitted)).

suppression.  Courts in this circuit will not suppress evidence
solely for a violation of Rule 41, unless prejudice or an
intentional and deliberate disregard of the rule's requirements
has occurred.  See United States v. Burke, 517 F.2d 377, 386-87
(2d Cir. 1975) ("[V]iolations of Rule 41 alone should not lead
to exclusion unless (1) there was 'prejudice' in the sense that
the search might not have occurred or would not have been so
abrasive if the Rule had been followed, or (2) there is evidence
of intentional and deliberate disregard of a provision in the
Rule.").

        Here, the magistrate judge violated Rule 41 and Allen
suffered prejudice as a result.  Allen was prejudiced because
without the use of the NIT it would have been unlikely that law
enforcement could have conducted a search of Allen's computer,
due to the anonymous nature of the Tor network.  See United
States v. Workman, 2016 WL 5791209, at *5 (D. Colo. 2016)
("[H]ad the NIT Warrant not been issued, the search of
[defendant]'s computer would not have occurred as it did."
(footnote omitted)); United States v. Adams, No: 6:16-cr-11-Orl-
40GJK, 2016 WL 4212079, at *8 (M.D. Fla. Aug. 10, 2016) ("Had
the magistrate judge followed Rule 41(b), the search of
Defendant's computer would not have occurred. Accordingly,
Defendant has clearly proven that he was prejudiced by the

violation of Rule 41(b)."). The government has conceded that it would have been nearly impossible to locate Allen without the use of the NIT. Therefore, Allen likely would not have been subject to the search at issue.

Allen, however, has proffered no evidence that would indicate the FBI acted in deliberate violation of Rule 41. Allen asserts that the FBI intentionally violated Rule 41 because the FBI and Department of Justice ("DOJ") were seeking an amendment to Rule 41, showing that they were aware that the NIT warrant was not properly authorized under the rule. The court does not find this argument persuasive. The court concludes that seeking a clarification of Rule 41 while still relying on the rule as currently stated does not indicate an intentional violation of the rule. See United States v. Henderson, No. 15-cr-00565-WHO-1, 2016 WL 4549108, at *6 (N.D. Cal. Sept. 1, 2016) ("The government's proposed amendment to the Rule demonstrates that it recognized ambiguities in the Rule, not that it acted with deliberate disregard for the Rule."); United States v. Eure, No. 2:16cr43, 2016 WL 4059663, at *9 (E.D. Va. July 28, 2016) (rejecting a similar argument and stating: "Defendant seeks to attribute to the FBI agents that sought the warrant the legal expertise of the DOJ lawyers but

nothing indicates that these agents knew that the warrant might violate Rule 41(b).").

Therefore, the court concludes that suppression is appropriate, unless the good faith exception to the exclusionary rule applies.

## A. Good Faith Exception to the Exclusionary Rule

In this case, the court concludes that the good faith exception to the exclusionary rule is applicable and that the Network Investigative Technique ("NIT") warrant being void ab initio does not bar its application.

The second circuit has recognized in dicta that "the basic insight of the Leon line of cases that exclusion should be limited to cases of deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, applies equally to searches conducted with or without a warrant." United States v. Raymonda, 780 F.3d 105, 118 n.5 (2d. Cir. 2015) (emphasis added). Moreover, the sixth circuit decision in United States v. Master, 614 F.3d 236 (6th Cir. 2010), while not binding precedent, is instructive. In Master, a state court judge issued a search warrant that exceeded his authority. Id. at 293. The sixth circuit, in light of recent Supreme Court precedent, distinguished its previous decision in United States v. Scott, 260 F.3d 512 (6th Cir. 2001), and held that the good

27

faith exception to the exclusionary rule was not categorically prohibited when the warrant in question was void ab initio. Master, 614 F.3d at 243 ("The holding of Herring and other recent Supreme Court cases does not directly overrule our previous decision in Scott. Nonetheless, we believe that the Supreme Court's evolving suppression rulings in Fourth Amendment cases require clarification or modification of our precedent in Scott."); United States v. Ammons, 2016 WL 4926438, at *8 (W.D. Ky. 2016) ("The holding of Master is clear: The good-faith exception to the exclusionary rule is not foreclosed in situations where a warrant is void ab initio.").  Thus, the court concludes that the good faith exception to the exclusionary rule is applicable where a warrant is void ab initio.

Here, the FBI acted in objectively reasonable reliance on the NIT warrant issued by the magistrate judge.  The magistrate was neutral and detached, and the NIT warrant was supported by probable cause and particularity.  A reasonable FBI agent could therefore have relied on the warrant.  The FBI also could have objectively relied on the NIT warrant as being valid because reasonable and experienced jurists have reached different

conclusions on the validity of the NIT warrant.[12]  See Ammons,
2016 WL 4926438, at *9 ("The FBI agents can hardly be faulted
for failing to understand the intricacies of the jurisdiction of
federal magistrates." (citation omitted) (internal quotation
marks omitted)).

The FBI also acted in good faith because there is no
evidence in the record indicating that they deliberately or
intentionally violated Rule 41 or misled the magistrate.[13]
Instead, the FBI conducted an investigation over a course of
months and submitted a detailed affidavit supporting the NIT
warrant to the magistrate judge.[14]  The FBI complied with the NIT
warrant once the magistrate issued it.  Therefore, the court
concludes that the good faith exception is applicable and that
suppression is not warranted.

Thus, the motion to suppress all evidence obtained from the
Network Investigative Technique and all of the fruits thereof,

---

[12] Compare United States v. Darby, 2016 WL 3189703, at *12 (E.D. Va. 2016)
("The magistrate judge did not violate Rule 41(b) in issuing the NIT
Warrant." (footnote omitted)), with United States v. Broy,  2016 WL 5172853,
at *8 (C.D. Ill. 2016) ("Because none of Rule 41(b)'s subsections authorized
the magistrate's actions, the Court is left to conclude the issuance of the
warrant violated Rule 41.").

[13] The fact that the FBI and DOJ sought an amendment to Rule 41 does not
change the court's analysis as discussed supra.

[14] United States v. Werdene, 2016 WL 3002376, at *15 (E.D. Pa. 2016) ("The FBI
agents did not misrepresent how the search would be conducted or, most
importantly, where it would be conducted. A magistrate judge's mistaken
belief that she had jurisdiction, absent any indicia of reckless conduct by
the agents, does not warrant suppression.").

including all evidence obtained from the search of Allen's residence and any statements made by Allen, is DENIED.

## CONCLUSION

For the foregoing reasons, Allen's motion to suppress (doc. no. 38) is DENIED.

It is so ordered this 8th day of March 2017, at Hartford, Connecticut.

```
_____/s/_____
Alfred V. Covello,
United States District Judge
```

United States v. Schuster, Slip Copy (2017)
2017 WL 1154088

2017 WL 1154088
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio, Western Division.

UNITED STATES of America,
v.
Eric Michael SCHUSTER, Defendant.

Case No. 1:16-cr-51
|
Signed 03/28/2017

**Attorneys and Law Firms**

Christy L. Muncy, United States Attorney's Office, Cincinnati, OH, for United States of America.

Ravert J. Clark, Cincinnati, OH, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Timothy S. Black, United States District Judge

**\*1** This criminal case is before the Court on Defendant's motion to suppress evidence (Doc. 29) and the parties' responsive memoranda (Docs. 31, 32). The Court held oral arguments on January 23, 2017. (Min. Entry, Jan. 23, 2017). [1]

[1]   At the Court's request, a transcript of the evidentiary hearing was prepared and docketed on February 6, 2017. (Doc. 33). Given the importance of the transcript for purposes of preparing this Order, the Court considers the motion to have come ripe for decision following receipt of the transcript.

## I. BACKGROUND

On May 18, 2016, Defendant Eric Michael Schuster was charged in a three-count indictment with: production of child pornography, in violation of 18 U.S.C. § 2251(a), (e) (Count 1); receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2), (b)(1) (Count 2); and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4), (b)(2) (Count 3). (Doc. 14).

Defendant moves to suppress the evidence against him in the instant case, arguing that the evidence was obtained as a result of a search warrant that is "void for want of jurisdiction." (Doc. 29 at 1).

In or around September 2014, federal agents began investigating a website known as Playpen ("Playpen" or "Website A"). (Doc. 29, Ex. 3 at ¶ 11; Doc. 31 at 3). Playpen served as an online global forum "dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children." (Doc. 29 at 2). [2] Playpen allowed individuals to register as users, and thereby gain access to the website's content, including approximately 100,000 postings containing images and videos of child pornography, as well as forums dedicated to discussing how to perpetrate child abuse. (*Id.*, Ex. 3 at ¶ 11; Doc. 31 at 3-4). By March 2015, Playpen had nearly 215,000 registered users. [3] (Doc. 29, Ex. 1 at ¶ 13).

[2]   As the Government points out, "[t]here was no doubt what purpose Playpen served; from September 2014 until February 19, 2015, its login page contained two images depicting partially clothed prepubescent girls with their legs spread apart." (Doc. 31 at 3).

[3]   The federal investigation revealed that <u>over 1,500 unique users visited the website daily</u> and <u>over 11,000 unique users visited the website per week</u>. (Doc. 29, Ex. 3 at ¶ 19).

Playpen operated on an anonymous network known as The Onion Router ("Tor"). (Doc. 29 at 2; Doc. 31 at 4). Tor creates anonymity by masking a user's Internet Protocol ("IP") address, which could otherwise be used to identify the user. [4] (*Id.*) And while Tor may serve many lawful purposes, it also works to prevent law enforcement from using traditional IP identification techniques to investigate online crimes (such as the distribution of child pornography). (Doc. 29 at 2, n.2; Doc. 31 at 4, n.2).

[4]   Tor was originally developed by the United States Naval Research Laboratory for the primary purpose of protecting government communications. (Doc. 29, Ex. 3 at ¶ 7). However, Tor is now available to the public simply by downloading the software from the Tor website. (*Id.*)

**\*2** In order to mask a user's IP address, Tor routes the user's communications through a network of relay

United States v. Schuster, Slip Copy (2017)
2017 WL 1154088

computers located all over the world, rather than through a more direct connection. (*Id.*) Stated simply:

> The idea is similar to using a twisty, hard-to-follow route in order to throw off somebody who is tailing you—and then periodically erasing your footprints. Instead of taking a direct route from source to destination, data packets on the Tor network take a random pathway through several relays that cover [the user's] tracks so no observer at any single point can tell where the data came from or where it's going.

Why We Need Tor, Tor: Overview, https://www.torproject.org/about/overview.html.en (last visited on Nov. 20, 2016). [5]

[5]     For example, when a user on the Tor network accesses a website, the IP address that appears in the website's IP log is that of a Tor "exit node" rather than the user's actual IP address. (Doc. 29, Ex. 3 at ¶ 8). An "exit node" is the last computer through which Tor routed the user's communication. (*Id.*) Thus, Tor's routing strategy obscures a user's true location, and there is no practical way to trace the user's actual IP back through the Tor exit node. (*Id.*)

Additionally, Tor allows users to utilize certain "hidden services," which include hosting websites that are inaccessible to those not using Tor and, further, are hidden from those who do not know of the website's existence and precise Tor-based web address. (Doc. 31 at 4-5). Moreover, Tor masks the IP address of the server hosting these hidden websites and, accordingly, the location of the server cannot be determined. (*Id.*) Playpen was one such "hidden" website. (*Id.*)

However, in December 2014, a foreign law enforcement agency provided federal agents with an IP address suspected to belong to the server hosting Playpen. (Doc. 29, Ex. 3 at ¶ 28). Through further investigation, the Federal Bureau of Investigations ("FBI") was able to verify the accuracy of the information and trace the IP address to a server hosting company headquartered in North Carolina. (*Id.*) On February 20, 2015, federal agents seized the server from its location in North Carolina and took it to Virginia, where the FBI assumed administrative control over Playpen. (Doc. 29 at 2).

As part of a larger effort to identify registered users, the FBI allowed Playpen to continue in operation until March 4, 2015. (Doc. 31 at 5). To that end, federal prosecutors and agents in the Eastern District of Virginia ("EDVA") proceeded to obtain two separate warrants. (*Id.*)

**First**, EDVA prosecutors obtained a Title III search warrant (the "Title III warrant") from an EDVA district judge. (Doc. 29 at 3). The Title III warrant permitted investigators to intercept electronic communications exchanged between unknown "target subjects" or "unidentified administrators and users" on Playpen's private chat and messaging services. (*Id.*) **Second**, EDVA agents obtained a search warrant from an EDVA magistrate judge, authorizing agents to use a Network Investigative Technique ("NIT") to identify Playpen users (the "NIT warrant"). (*Id.* at 4).

Specifically, a NIT is an investigative method used to circumvent Tor's anonymity features, thereby allowing law enforcement to identify the individuals who are visiting particular hidden websites. (Doc. 29, Ex. 3 at ¶¶ 31-35). In the affidavit in support of the NIT warrant application, the Affiant explained that:

> **\*3** In the normal course of operations, websites send content to visitors. A user's computer downloads that content and uses it to display web pages on the user's computer. Under the NIT ..., [Playpen], which will be located in Newington, Virginia [EDVA], would augment that content with additional computer instructions. When a user's computer successfully downloads those instructions from [Playpen], in the [EDVA], the instructions, which comprise the NIT, are designed to cause the user's "activating" computer to transmit certain [identifying] information to a computer controlled by or known to the government.

(*Id.* at ¶ 33). The identifying information to be transmitted included, *inter alia*, the computer's actual IP address, operating system and version, host name, active username, and unique media access control

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

("MAC") address. (*Id.* at ¶ 34). Further, the application in support of the NIT warrant specifically requested authorization to deploy the NIT in order to obtain the identifying information from "activating computers —wherever located...." (*Id.* at ¶ 46) (emphasis added).

EDVA agents obtained the NIT warrant and deployed the NIT on Playpen on February 20, 2015. (Doc. 29, Ex. 1 at ¶ 25). The NIT remained active, allowing EDVA agents to collect the identifying information of the registered users who logged into Playpen, until the website was taken offline on March 4, 2015.[6] (*Id.*)

[6]    As previously stated, Playpen was a hidden website on the Tor network, accessible only to registered Playpen users who were connected to the Tor network and who were privy to Playpen's precise Tor-based web address. Therefore, as an initial matter, it is highly unlikely that anyone would have accidentally stumbled unto Playpen. (*See* Doc. 29, Ex. 1 at ¶ 9). However, even assuming that some Tor users *had* accidentally come across Playpen, they still would not have been able to access Playpen's content unless and until they intentionally navigated past the prominently displayed child pornography on Playpen's homepage and deliberately registered as a Playpen user. (*Id.*; Doc. 31 at 3-4). In short, there is no doubt that the users identified by the NIT were knowingly and intentionally seeking out child pornography on Playpen.

As a result of the NIT, law enforcement obtained the identifying information of Playpen users, including one particular user who logged into Playpen on March 3, 2015 under the name "torlayer."[7] (Doc. 31 at 8). Law enforcement learned from the Internet Service Provider (Time Warner Cable) that the IP address used by "torlayer" to access Playpen was associated with Defendant Eric Schuster at 1500 Sherwood Drive, Apt. 4D, Fairfield, Ohio 45014 (the "Sherwood Drive residence"). (Doc. 29, Ex. 1 at ¶ 34). Agents verified that Defendant lived at the Sherwood Drive residence. (*Id.* at ¶ 35).

[7]    Federal agents were able to determine the IP address used by "torlayer" to access Playpen, the unique MAC address of the network adapter used by "torlayer," and that the computer used by "torlayer" had the host name "Eric-PC" and the log-on name "Eric." (Doc. 29, Ex. 1 at ¶ 28).

Based upon the foregoing information, on August 6, 2015, within the Southern District of Ohio ("OHSD"), a federal agent (the "OHSD affiant" or "OHSD agent") obtained from a federal magistrate judge in this district (the "OHSD magistrate judge"), a warrant to search the Sherwood Drive residence (the "OHSD warrant"). (Doc. 29, Ex. 1). The OHSD warrant was executed on August 7, 2016. (Doc. 31 at 9). As a result of the search, a total of 18 items of evidence were seized including, *inter alia*, four internal hard drives, which contained thousands of images and videos of suspected child pornography and child erotica. (*Id.*)

## II. STANDARD OF REVIEW

**\*4** The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and, further, requires a showing of probable cause before a warrant may issue. U.S. Const. amend. IV. "The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). The purpose of the exclusionary rule is to deter law enforcement from obtaining evidence through unconstitutional means. *Nix v. Williams*, 467 U.S. 431, 442-43 (1984).

A defendant may seek the suppression of evidence by filing a pretrial motion with the court. Fed. R. Crim. P. 12(b)(3) (C) and 41(h). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Patel*, 579 Fed.Appx. 449, 453 (6th Cir. 2014) (quoting *United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir. 2003)).

## III. ANALYSIS

Defendant moves to suppress "the evidence obtained as a result of the issuance of the NIT Warrant, arguing that the NIT Warrant is void for want of jurisdiction under the Federal Magistrates Act, 28 U.S.C. § 636(a), and additionally that it violated Federal Rule of Criminal

Procedure 41(b)." (Doc. 29 at 1). Defendant further argues that the good-faith exception under *United States v. Leon*, 468 U.S. 897 (1984), does not apply. (*Id.* at 13-19).

Conversely, the Government argues that Defendant's motion should be denied because Defendant did not have a reasonable expectation of privacy in his IP address and therefore no search occurred. (Doc. 31 at 10-13). Further, the Government argues that, even assuming that a search did occur, the magistrate judge had authority under Fed. R. Crim. P. 41(b) to issue the warrant. (*Id.* at 13-15). Alternatively, the Government asserts that, should the Court find issuance of the NIT warrant violated Rule 41, suppression is not the appropriate remedy. (*Id.* at 15-17). Finally, the Government argues that, regardless of the circumstances, suppression is not warranted because the *Leon* good-faith exception applies. (*Id.* at 20).

Before deciding whether a Fourth Amendment violation occurred, the Court may choose to determine first whether the exclusionary rule applies. "[C]ourts could reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith." *Leon*, 468 U.S. at 925. Whether it is necessary to address the Fourth Amendment question posed in a particular case is within the "informed discretion" of the Court. *Id.*

Here, the Court finds that there is no basis to resolve the Fourth Amendment issues before turning to the good-faith analysis.[8] Specifically, while Defendant's motion to suppress poses a complex and multi-faceted series of technical questions, the resolution of which has perplexed district courts across the country, the underlying issue has since been entirely resolved by amendment of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 41(b) (2016), *amended by* Fed. R. Crim. P. 41(b)(6) (Dec. 1, 2016).[9] Therefore, the Court finds that resolution of the Fourth Amendment issues serves no value to Fourth Amendment jurisprudence, as the potential risk of harm is no longer capable of repetition.

[8]     To be clear, the Court's finding does not imply that violation of an individual's Fourth Amendment rights ever lacks importance. Rather, the focus of importance, as referenced in *Leon*, is on the area of Fourth Amendment jurisprudence, such as where "resolution of a particular Fourth Amendment question is necessary to guide future action by law

enforcement officers and magistrates." *Leon*, 468 U.S. at 925.

[9]     The amendment to Rule 41(b), effective December 1, 2016, added subsection (6), and states as follows:
   (b) Venue for a Warrant Application. At the request of a federal law enforcement officer or an attorney for the government:
   ...
   (6) a magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district if:
       (A) the district where the media or information is located has been concealed through technological means; or
       (B) in an investigation of a violation of 18 U.S.C. § 1030(a)(5), the media are protected computers that have been damaged without authorization and are located in five or more districts.

**\*5** Accordingly, the Court declines to begin its analysis by addressing the specific Fourth Amendment issues raised in Defendant's motion. Instead, the Court turns to the question—whether the agents acted in good-faith in obtaining and executing the warrants at issue. As fully stated below, the Court finds that the agents **did** act in good-faith and that the exclusionary rule **does not** apply.

"The fact that a Fourth Amendment violation occurred —*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). Indeed, "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands...." *Leon*, 468 U.S. at 906. And the Supreme Court has "repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." *Herring*, 555 U.S. at 141 (noting that "**exclusion 'has always been our last resort, not our first impulse**'") (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (emphasis added)).

In that regard, "[t]he purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim: '[T]he ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late.' " *United States v. Calandra*, 414 U.S. 338, 347

(1974) (quoting *Linkletter v. Walker*, 381 U.S. 618, 637 (1965)). Instead, "the [exclusionary] rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* at 348. In other words, "[t]he rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217 (1960).

"As with any remedial device, the [exclusionary] rule's application has been restricted to those instances where its remedial objectives are thought most efficaciously served." *Arizona v. Evans*, 514 U.S. 1, 11 (1995). Courts must therefore make a case-by-case determination and grant suppression "<u>only</u> in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon*, 468 U.S. at 918 (emphasis added).

In particular, the " 'prime purpose' of the exclusionary rule 'is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.' " *Illinois v. Krull*, 480 U.S. 340, 347 (1987) (quoting *Calandra*, 414 U.S. at 347). More specifically, "the exclusionary rule serves to deter **deliberate, reckless, or grossly negligent conduct**, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144 (emphasis added). Indeed, even "when police mistakes are the result of negligence ... rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way' ... [and therefore], the criminal should not 'go free because the constable has blundered.' " *Id.* at 147-48 (quoting *People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926)). In short, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144.

**\*6** " '[A] warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.' " *Leon*, 468 U.S. at 922 (quoting *United States v. Ross*, 456 U.S. 798, 823, n. 32 (1982)). Thus, "[c]ourts should not ... suppress 'evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant.' " *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (quoting

*Leon*, 468 U.S. at 922). Significantly, "the exclusionary rule is designed to deter <u>police misconduct</u> rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916 (emphasis added).

Of course, an "officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant [that the magistrate judge] issue[d] must be objectively reasonable...." *Id.* at 922. Indeed, the exclusionary rule will "not apply in cases where the issuing magistrate wholly abandoned his judicial role ... [if under] such circumstances, no reasonably well trained officer should rely on the warrant." *Id.* at 923.

However, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient ... [and] [p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 922. Accordingly, "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.' " *Krull*, 480 U.S. at 348-49 (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)).

### A. The OHSD Warrant

As an initial matter, the question presently before the Court is whether <u>the evidence against Defendant *in the instant case*</u> should be suppressed pursuant to the exclusionary rule. It therefore bears noting that the evidence at issue in the instant case was seized from Defendant's home during the execution of <u>the OHSD warrant</u>. Thus, the Court finds the parties' emphasis on the validity of the EDVA NIT warrant (as opposed to the OHSD warrant) is misplaced.

In resolving whether to exclude evidence obtained during the execution of <u>the OHSD warrant</u>, the Court finds that the proper focus is on the propriety of <u>the OHSD warrant</u>. Unquestionably, the NIT warrant will factor into the Court's analysis of the OHSD warrant (*i.e.*, as the source of the probable cause upon which the OHSD warrant was issued). And the Court further acknowledges that it "must consider the actions of all the police officers involved." *Herring*, 555 U.S. 140 (citing *Leon*, 468 U.S. at 923, n. 24

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   5

United States v. Schuster, Slip Copy (2017)
2017 WL 1154088

("It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination")). Regardless, the question before the Court remains whether any deficiency exists <u>as to the OHSD warrant</u>, which would require exclusion of the evidence obtained during its execution. In that regard, this Court can simply assume, without deciding, that the EDVA magistrate judge lacked authority to issue the NIT warrant.

Focusing on the OHSD warrant, and assuming the NIT warrant is void because the EDVA magistrate judge lacked authority for its issuance, the Court must look to "whether there was good faith on the part of the agents." (Doc. 33 at 5:17-6:7). Defendant argued during oral arguments that the OHSD affiant is "an experienced FBI agent who is familiar with what happened in [EDVA], is familiar with Rule 41," and regardless of jurisdiction "should have known ... that the [NIT] warrant was invalid." (*Id.* at 6:10-16). More specifically, Defendant argued that, because Defendant is not the first to challenge the NIT warrant in the context of the Playpen investigation, the OHSD agent should have known the NIT warrant was invalid. (*Id.* at 7:1-25). Additionally, Defendant asserts that the agents should have been aware that the NIT warrant was not authorized under Rule 41(b), as written at the time, because "[a] memorandum addressed to the Committee on Rule of Practice and Procedure dated May 5, 2014, introduce [d] [the] proposed amendment to Rule 41(b) that would authorize the use of the NIT Warrant." (Doc. 29 at 18). Defendant alleges that holding the agent to such high standards of legal knowledge is in line with *Leon* and accomplishes the purpose of the exclusionary rule—that "the lesson is to be sent to the [agents]...." (Doc. 33 at 6:19-25). The Court rejects Defendant's position.

**\*7**  First, the EDVA agents obtained the NIT warrant on February 20, 2015, and the NIT remained active on the Playpen server until March 4, 2015. (Doc. 29, Ex. 1 at ¶ 25). Just five months later, on August 6, 2015, the OHSD agent obtained the OHSD warrant. (*Id.* at Ex. 1). And while Defendant argues that the OHSD agent should have known that the NIT warrant was invalid because of the ongoing challenges by other defendants, this Court is unable to find any case arising from the

Playpen investigation where a motion challenging the NIT warrant predates the August 6, 2015 OHSD warrant. [10]

10    The earliest challenge to the NIT warrant that this Court was able to find came out of a case from the Western District of Washington. *United States v. Michaud*, No. 3:15-cr-05351, 2016 WL 337263 (W.D. Wash. Jan. 28, 2016). In *Michaud*, the defendant's motion to suppress was filed in October 2015, and was decided in January 2016. (*Id.*) However, even if an earlier case exists, it is unreasonable to expect federal agents to find such a case when even this Court is unable to do so.

Second, the Court rejects Defendant's argument that the agents were on notice that the NIT warrant may be invalid, based on the existence of <u>a memorandum, to the **Judicial** Conference Committee on Rule of Practice and Procedure, **proposing** the amendment to Rule 41(b)</u>, just a few months before the NIT warrant was obtained. [11] The Court finds it entirely unreasonable to hold agents to such a standard of knowledge. Indeed, if *anyone* should have been charged with such specific legal knowledge, it would have been the magistrate judges, not the agents.

11    While Defendant cites to the memorandum as being dated May 5, 2014, it appears that the memorandum was revised in July 2014, and was only distributed in preliminary form on August 15, 2014. *See* <u>Preliminary Draft of Proposed Amendments to the Federal Rules of Appellate, Bankruptcy, Civil, and Criminal Procedure</u>, http://www.fpd-ohn.org/node/778.

Beyond the argument that the agents essentially 'should have known better,' there is no evidence that any agent acted unreasonably, let alone deliberately or recklessly. Indeed, the sheer number of agents who have relied upon the NIT warrant, and obtained subsequent warrants from magistrate judges in their own jurisdictions, as well as the inconsistent rulings by district courts across the country, shows that <u>no aspect of the NIT warrant's validity constitutes a simple question nor a close call</u>. [12] Accordingly, it is unreasonable to expect either the EDVA agent or the OHSD agent to have concluded, contrary to the findings of the magistrate judges, that the NIT warrant was invalid. *See Leon*, 468 U.S. at 922 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient"); *Massachusetts v. Sheppard*, 468 U.S. 981,

989–90 (1984) ("we refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested").

12    Some courts have found that the EDVA magistrate judge lacked authority to issue the NIT warrant and, further, found suppression to be the appropriate remedy. *E.g.*, *United States v. Workman*, 205 F. Supp. 3d 1256 (D. Colo. Sept. 6, 2016). Other courts have determined that the EDVA magistrate judge lacked authority, but have declined to suppress the evidence based on the good-faith exception. *E.g.*, *United States v. Ammons*, No. 3:16-CR-00011-TBR-DW, 2016 WL 4926438, at *9 (W.D. Ky. Sept. 14, 2016). Still other courts have found that the EDVA magistrate judge had authority to issue the NIT warrant pursuant to Rule 41(b)(4)'s tracking device provision. *E.g.*, *United States v. Matish*, 193 F. Supp. 3d 585, 612-13 (E.D. Va. May 5, 2016). Moreover, among the courts that found the issuance of the NIT warrant to have violated Rule 41(b), there is further disagreement as to whether the violation was constitutional or technical in nature, and still whether suppression is appropriate in either circumstance. *Compare United States v. Henderson*, No. 15-CR-00565-WHO-1, 2016 WL 4549108, at *4 (N.D. Cal. Sept. 1, 2016) (holding "suppression is not appropriate because the violation was technical, not constitutional ..."), *with United States v. Croghan*, No. 1:15-CR-48, 2016 WL 4992105, at *7 (S.D. Iowa Sept. 19, 2016) ("Assuming that the Rule 41(b) violation was merely technical, the Court would still find suppression appropriate ..."), *United States v. Werdene*, 188 F. Supp. 3d 431, 447–48 (E.D. Pa. May 18, 2016) ("Even if ... the Rule 41(b) violation [were] constitutional in nature—suppression is not the appropriate remedy"), *and United States v. Levin*, 186 F. Supp. 3d 26, 42 (D. Mass. 2016) ("[because] the conduct at issue here can be described as 'systemic error or reckless disregard of constitutional requirements,' ... suppression is appropriate"). Further still, there is even disagreement among the district courts as to whether the NIT constituted a 'search' at all. *Compare United States v. Acevedo-Lemus*, No. SACR 15-00137-CJC, 2016 WL 4208436, at *4 (C.D. Cal. Aug. 8, 2016) (holding the NIT's acquisition of Defendant's IP address was not a search because "Defendant could not have had a subjective expectation of privacy in his IP address" and "[s]ociety d[oes] n[ot] r[ecognize] Defendant's [e]xpectation as [r]easonable"), *with United States v.*

*Darby*, 190 F. Supp. 3d 520, 530 (E.D. Va. June 3, 2016) ("The government's deployment of the NIT was a Fourth Amendment search").

**\*8**    Thus, the Court finds the exclusionary rule inapplicable here, as there is no basis upon which to conclude that any agent involved in the Playpen investigation, or any derivative investigation, knew or should have known that the validity of the NIT warrant, or any subsequently obtained warrant, was unconstitutional or procedurally improper. *See Krull*, 480 U.S. at 348-49 ("evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment' ") (quoting *Peltier*, 422 U.S. at 542). Moreover, there is no evidence that any agent engaged in "**deliberate, reckless, or grossly negligent conduct**...." *See Herring*, 555 U.S. at 144 (emphasis added). Indeed, the simple fact alone, that district courts are unable to reach a firm consensus as to the validity of the NIT warrant, undermines any argument that the OHSD agent's (or any agent's) reliance on the NIT warrant was deliberate, reckless, or part of a "recurring or systemic negligence." *Id.*; *see also Ammons*, 2016 WL 4926438, at *9 ("The FBI agents can hardly be faulted for failing 'to understand the intricacies of the jurisdiction of federal magistrates' ... After all, there is disagreement among reasonable jurists on that very question") (quoting *Darby*, 190 F. Supp. 3d at 538).

In short, this Court finds it unreasonable to expect any agent to have made a definitive finding of law as to the NIT warrant, when magistrate judges and district judges across the nation have been and are unable to do so. Accordingly, the Court finds that the OHSD affiant acted in good-faith in relying upon the results of the NIT warrant as the basis for probable cause, as well as relying upon the findings of the OHSD magistrate judge as to the validity of the NIT and the OHSD warrants. Therefore, the exclusionary rule does not apply and suppression is not warranted.

### B. NIT Warrant

Despite the Court's focus on the OHSD warrant, the Court feels compelled to also separately address the NIT warrant, in light of Defendant's argument that the good-faith exception should not apply. Specifically, Defendant argues that, because the EDVA magistrate judge lacked

authority to issue the NIT warrant, it is void *ab initio*. (Doc. 29 at 13-19). Accordingly, Defendant suggests that the Court should treat the NIT as a warrantless search and, citing to the Sixth Circuit's decision in *United States v. Scott*, 260 F.3d 512 (6th Cir. 2001), argues that the good-faith exception does not apply. [13]

13    Defendant further cites to numerous out-of-circuit cases, as well as state court opinions, which are neither binding on this Court nor persuasive in this context. (*See* Doc. 29 at 14 n.7).

The Court finds Defendant's reliance on *Scott*, for the proposition that the good-faith exception does not apply, wholly unpersuasive in light of the fact that the Sixth Circuit subsequently acknowledged in *United States v. Master* that "the Supreme Court's evolving suppression rulings in Fourth Amendment cases require clarification or modification of our precedent in *Scott*." 614 F.3d 236, 243 (6th Cir. 2010). The Sixth Circuit recognized, in light of the Supreme Court's more recent decisions in *Herring*, 555 U.S. 135 and *Hudson* 547 U.S. 586, that in cases where a warrant is issued by a judge lacking legal authority, *Scott*'s categorical foreclosure of the good-faith exception is no longer viable. *Master*, 614 F.3d at 241-42. Rather, the Sixth Circuit explained that, "[t]he Supreme Court has effectively created a balancing test by requiring that in order for a court to suppress evidence following the finding of a Fourth Amendment violation, 'the benefits of deterrence must outweigh the costs.' " *Id.* at 243 (quoting *Herring*, 555 U.S. at 141).

Accordingly, this Court finds that the good-faith exception is not rendered automatically inapplicable simply because law enforcement officers relied upon a warrant that is subsequently found to be void *ab initio*. [14] Therefore, even if this Court were to find that the EDVA magistrate judge lacked authority to issue the NIT warrant in the first instance, the Court could still turn to the "balancing test" to determine whether application of the exclusionary rule is warranted.

14    Notably, in *Herring*, law enforcement seized evidence from the defendant's person, incident to arrest, which arrest was conducted based upon the officers' belief that the defendant had an outstanding warrant. 555 U.S. at 137. However, subsequent to the search, and after finding contraband and a weapon in the defendant's pocket and in his vehicle, the officers learned that the warrant they believed to be outstanding had been recalled five months prior. *Id.* at 137-38. The Supreme Court found that "the conduct at issue was not so objectively culpable as to require exclusion ... when [the] evidence [was] obtained in objectively reasonable reliance on a subsequently recalled warrant." *Id.* at 146. This Court finds the circumstances in *Herring* to be substantively akin to those in the instant case, as it can be argued that, in both instances, there was no warrant in place to justify law enforcement conduct.

**\*9** Accordingly, here, the Court follows the Supreme Court's clear instruction that the exclusionary rule is only applicable, **as a last resort**, to deter police misconduct. In doing so, and as previously stated, the Court finds no basis to conclude that the EDVA agents acted deliberately or recklessly in either obtaining or relying upon the NIT warrant. Rather, any deficiency in the NIT warrant was the result of judicial error, not law enforcement misconduct. Accordingly, the exclusionary rule serves no purpose and its application is therefore unwarranted.

## IV. CONCLUSION

Based upon the foregoing, Defendant's motion to suppress (Doc. 29) is **DENIED.**

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 1154088

---

End of Document    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1134814
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio, Western Division.

UNITED STATES of America, Plaintiff,
v.
James GAVER, Defendant.

Case No. 3:16-cr-88
|
Signed 03/27/2017

**Attorneys and Law Firms**

Andrew Hunt, United States Attorney's Office, Dayton, OH, for Plaintiff.

Thomas W. Anderson, Federal Public Defender, Dayton, OH, for Defendant.

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BASED ON UNCONSTITUTIONAL DEPLOYMENT OF GOVERNMENT-SPONSORED MALWARE DUBBED THE "NETWORK INVESTIGATIVE TECHNIQUE" (DOC. #9); OVERRULING DEFENDANT'S MOTION FOR DISCLOSURE OF DISCOVERY (DOC. #14); OVERRULING DEFENDANT'S SECOND MOTION TO SUPPRESS EVIDENCE AND MOTION FOR *FRANKS* HEARING (DOC. #21)

WALTER H. RICE, UNITED STATES DISTRICT JUDGE

**\*1** Defendant, James Gaver, a registered sex offender, is charged with numerous counts of possession of child pornography, and knowingly accessing with intent to view child pornography, in violation of 18 U.S.C. § 2252(a)(4)(b) and (b)(2), and knowing receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1). This matter is currently before the Court on three pending motions: (1) Defendant's Motion to Suppress Evidence Based on Unconstitutional Deployment of Government-Sponsored Malware Dubbed the "Network Investigative Technique" (Doc. #9); (2) Defendant's Motion for Disclosure of Discovery (Doc. #14); and (3) Defendant's

Second Motion to Suppress Evidence and Motion for *Franks* Hearing (Doc. #21). For the reasons set forth below, all three motions are overruled.

**I. Background and Procedural History**

In 2014, the Federal Bureau of Investigation ("FBI") began investigating a child pornography website called "PlayPen." This website, which had over 158,000 members and attracted more than 1,500 visitors each day, could be accessed only through the Tor network, a "hidden" network that allows users to mask their identity, IP address, and location. Once members logged onto the PlayPen website with a username and password, they had access to chat rooms, private messaging services and thousands of images of child pornography.

In December of 2014, a foreign law enforcement agency gave the FBI a suspected IP address for the PlayPen website, which the FBI determined was hosted on a server in Lenoir, North Carolina. The FBI obtained a search warrant, seized the server, and placed a copy of it onto a government-controlled server in Newington, Virginia.

On February 20, 2015, prosecutors in the Eastern District of Virginia obtained a search warrant from United States Magistrate Judge Theresa Carroll Buchanan. FBI Special Agent Douglas Macfarlane's warrant affidavit explained that the government wanted to continue operating the PlayPen website from the server in Newington, Virginia, for 30 days in order to locate and identify visitors to the website.

Because the PlayPen website was accessible only through the Tor network, this was not an easy task. In order to obtain the visitors' IP addresses, the government requested authorization to deploy a Network Investigative Technique ("NIT"). Any time a visitor signed onto the PlayPen website, the NIT would force the user's computer, wherever it was located, to collect certain information, including the computer's IP address, and transmit it back to the government-controlled server. [1]

---

1    Other information collected included: (1) a unique identifier; (2) the type, version and architecture of the computer's operating system; (3) information about whether the NIT had already been delivered to that computer; (4) the computer's host name; (5) the

operating system username; and (6) the computer's Media Access Control address.

For approximately two weeks, from February 20, 2015, until March 4, 2015, the FBI collected the IP addresses of more than one hundred people who accessed the PlayPen website, including Defendant James Gaver. On February 23, 2015, when he signed onto the PlayPen website, the NIT extracted data from his computer. The government then used this information to obtain his computer's physical address. Five months later, law enforcement officers obtained a traditional search warrant for his apartment in Dayton, Ohio. On July 27, 2015, the government executed the warrant and seized several computers, hard drives, thumb drives, a camera, a cellular phone and other personal property. Mr. Gaver also made several incriminating statements on that date, and again on September 14, 2015.

 **\*2**  On June 16, 2016, James Gaver was indicted on several charges of possession of child pornography, and knowingly accessing with intent to view child pornography, in violation of 18 U.S.C. § 2252a(a)(4)(b) and (b)(2), and knowing receipt of child pornography, in violation of 18 U.S.C. § 2252a(a)(2) and (b)(1).

Like dozens of other defendants across the country who were "stung" by the FBI in this operation, Gaver filed a Motion to Suppress Evidence Based on Unconstitutional Deployment of Government-Sponsored Malware Dubbed the "Network Investigative Technique." Doc. #9. He argues that the NIT search warrant issued by the magistrate judge in the Eastern District of Virginia was void, because she had no authority to authorize a search extending beyond the boundaries of the Eastern District of Virginia, Gaver moves to suppress, as "fruit of the poisonous tree," all evidence obtained from the illegal search of his computer, and all incriminating statements he made. But for the issuance of the defective NIT search warrant, the government would not have discovered Gaver's IP address and would not have obtained the warrant to search his apartment.

Pursuant to Federal Rule of Criminal Procedure 16, Gaver also filed a Motion for Disclosure of Discovery. Doc. #14. Gaver asks the Court to order the government to produce "all components to the NIT source code, including the payload, exploit, identifier, and server components."

On October 19, 2016, Gaver filed a Second Motion to Suppress Evidence and Motion for *Franks* Hearing. Doc. #21. In addition to the previously-asserted grounds for suppression, Gaver alleges that key facts in the NIT warrant application were false, and that the government either omitted or misrepresented other facts that were material to the probable cause determination. He also alleges that the NIT warrant was expressly limited to a location in Virginia, and did not authorize a search of his computer, which was located in Ohio. Finally, he alleges that the NIT warrant is an unconstitutional general warrant.

On January 17, 2017, the Court held a hearing on the pending motions. The parties then filed post-hearing briefs. Docs. ##29, 31. The Court turns first to Defendant's Motion for Disclosure of Discovery.

## II. Defendant's Motion for Disclosure of Discovery (Doc. #14)

Gaver asks the Court to order the government to produce "all components to the NIT source code, including the payload, exploit, identifier, and server components." He then wants to hire a computer expert to determine: (1) the full extent of information seized when the NIT was deployed; (2) how the government was able to compromise the computer's security setting; (3) whether the NIT compromised any data or computer functions; and (4) whether the government's representations about how the NIT works are complete and accurate.

Gaver argues that, to the extent any of the charges against him are based on images that were downloaded to his computer *after* February 23, 2015, when the NIT was deployed, he needs the NIT source code to determine whether the NIT could have surreptitiously installed malware that caused those images to be transmitted to his computer, altered those images, or otherwise left his computer vulnerable to attacks from third parties.[2] At the hearing, defense counsel admitted that this "may sound somewhat farfetched," but argued that "certainly it's not outside the realm of possibility." Hr'g Tr. at 25.

2       During a conference call held on February 7, 2017, the government indicated that Counts 4 and 5 involved images that were downloaded after March 4, 2015.

 **\*3**  The government is willing to produce: the "payload," which is the instructions sent to Gaver's computer to

gather the information; a list of all information collected by the NIT; the two-way network data stream; the computer code used to generate unique identifiers related to the NIT; and a forensic copy of Gaver's computer, which could be examined by an expert. The government maintains that this information is sufficient to allay Gaver's speculative concerns that the NIT may have somehow altered his computer. The government is also willing to let Gaver inspect the report containing a description of his activities on the site during the time the NIT was deployed.

The government, however, is not willing to produce the "exploit" or "server component" of the NIT source code. The "exploit" is the code that was used to circumvent the security features of the Tor browser so that the FBI could run commands on Gaver's computer. The server component stores the information gathered by the NIT. According to the government, the "exploit" and "server component" are immaterial to Gaver's defense and, in any event, are subject to a qualified law enforcement privilege.

Federal Rule of Criminal Procedure 16(a)(1)(E) requires the government to permit inspection of items within its control if: (1) the item is material to defense preparation; (2) the government intends to use it in its case-in-chief, or (3) the item belongs to the defendant. Only the first condition is at issue here. In order to establish materiality, Gaver must show that pretrial disclosure of this evidence would enable him to significantly alter the quantum of proof in his favor. *United States v. Caro,* 597 F.3d 608, 621 (4th Cir. 2010).

Even if Gaver can show that the information sought is material to his defense, he is not necessarily entitled to it. The government has asserted a qualified law enforcement privilege, applicable when the information sought pertains to sensitive law enforcement techniques and procedures. When such a privilege is asserted, the court must balance the defendant's need for the privileged information against the public interest in nondisclosure. *United States v. Pirosko,* 787 F.3d 358, 365 (6th Cir. 2015); *In re The City of New York,* 607 F.3d 923, 948 (2d Cir. 2010).

Having reviewed the relevant case law, the Court concludes that the exploit and server components of the NIT source code are not material to Gaver's defense and, even if they were, they are subject to the law enforcement privilege. As the government notes, it has offered to

produce enough of the NIT source code which, along with the forensic copy of Gaver's computer, would allow a computer expert to determine whether deployment of the NIT rendered Gaver's computer vulnerable to attacks by third parties. Because Gaver has not taken advantage of this offer, he has no evidence to support his claim that someone else could be responsible for some of the images found on his computer.

When faced with similar circumstances, numerous courts have denied defendant's requests for the entire NIT source code, finding them to be too speculative. *See United States v. Matish,* 193 F. Supp. 3d 585, 599 (E.D. Va. 2016) ("an examination of Defendant's computer may have uncovered evidence either of hacking or an alternate source of the child pornography, but, as it stands, the declarants' inaction leaves their hypotheses with no evidence to support them."); *United States v. Darby,* No. 2:16-cr-036, Doc. # 49, PageID##788-790 (E.D. Va. Aug. 12, 2016) (noting that Defendant failed to take advantage of information offered by the government, and had no evidence to support his hypothetical claim that the FBI had lied about how the NIT worked); *United States v. Jean,* No. 5:15-cr-50087, 2016 WL 6886871, *7 (W.D. Ark. Nov. 22, 2016) (noting that Jean's experts had failed to run any tests on his computer, and holding that he could not "rest his entire argument in support of compelling discovery on a virtually impossible hypothetical situation."); *United States v. Tippens,* No. 3:16-cr-5110, Doc. #106, at 28 (W. D Wash. Nov. 30, 2016) ("Defendants' speculation about what the remaining NIT code could show" was insufficient to compel discovery).

**\*4** These courts all found that the defendants failed to show that the information sought was material to their defense. [3] As one court noted, "[e]ssentially, the Defendant requests discovery in order to carry out an impermissible 'fishing expedition,' claiming that he cannot know what evidence he is looking for until he finds it." *United States v. McLamb,* —— F. Supp. 3d ——, 2016 WL 6963046, *8 (E.D. Va. Nov. 28, 2016). The same is true for Mr. Gaver. He has failed to show how, in light of all of the information that the government has *already* offered him, the exploit and the server component are material to his defense.

---

3    In *United States v. Michaud,* No. 3:15-cr-5351, Doc. # 223 (W.D. Wash. May 25, 2016), the same judge who

later decided *Tippens* found that the NIT code was material, but that it was privileged. The court did not force the government to produce it, but did suppress all evidence obtained as a result of the NIT. To this Court's knowledge, no court other than *Michaud* has found the entire NIT source code to be material to the defense.

Moreover, even if the exploit and server component were material, the government has satisfied its burden of proving that this information is privileged. The Court is persuaded by the government's argument that disclosure of the exploit and server component of the NIT would severely compromise future investigations, and could allow others to develop countermeasures. Courts have widely agreed that these portions of the code are protected by the law enforcement privilege, because the defendant's need for it is greatly outweighed by the government's need to keep it secret. *Darby,* Doc. #49, PageID#789; *Matish,* 193 F. Supp. 3d at 601; *Jean,* 2016 WL 6886871, at *7; *McLamb,* —— F. Supp. 3d ——, 2016 WL 6963046, *8 n.6.

For these reasons, the Court OVERRULES Defendant's Motion for Disclosure of Discovery, Doc. #14.

### III. Defendant's Motion for a *Franks* Hearing (Doc. #21)
Citing a number of alleged defects in the 33-page affidavit that FBI Special Agent Douglas Macfarlane presented to Magistrate Judge Buchanan in support of the NIT search warrant, Gaver has requested a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978). Doc. #21.

In *Franks,* the Supreme Court held as follows:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's

> false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 155-56.

Warrant affidavits are presumed to be valid, and allegations that they contain deliberately false or misleading statements or statements made with reckless disregard for the truth "must be accompanied by an offer of proof." *Id.* at 171. A statement is made "with reckless disregard for the truth" when viewing all the evidence, "the affiant in fact entertained serious doubts as to the truth of the affidavits or had obvious reasons to doubt the accuracy of the information contained therein," *United States v. Cican,* 63 Fed.Appx. 832, 835-36 (6th Cir. 2003).

 **\*5** Gaver argues that several false and misleading statements contained in Agent Macfarlane's affidavit were made knowingly and intentionally, or with reckless disregard for the truth, and that they were material to the finding of probable cause. Gaver maintains that, without these false and misleading statements, the affidavit was insufficient to establish probable cause to believe that any user, wherever located, who signed onto the PlayPen website knew that it was dedicated to child pornography, and knowingly accessed it with intent to view child pornography.

In addition to the exhibits attached to his motion, Gaver was given the opportunity at the January 17, 2017, hearing to proffer arguments and evidence in support of his request for a *Franks* hearing. Agent Macfarlane was present at the hearing to testify on the issue of whether he relied on the warrant in good faith. However, to the extent that some of this testimony overlapped with the question of whether his affidavit contained knowingly false or misleading statements, or statements made with reckless disregard for the truth, the Court will consider it for that purpose also.

Notably, Macfarlane's affidavit has been reviewed by many courts. *See*, *e.g., Matish,* 193 F. Supp. 3d at 603-07; *United States v. Darby,* 190 F. Supp. 3d 520, 533-34 (E.D. Va. 2016); *United States v. Attain,* —— F, Supp.

3d. ——, 2016 WL 5660452, at *7-8 (D. Mass. Sept. 29, 2016); *United States v. Owens,* No. 16-cr-38, 2016 WL 7079609, at **5-7 (E.D. Wis. Dec. 5, 2016). None has found sufficient cause to hold a *Franks* hearing. For the reasons set forth below, this Court likewise finds that Gaver has failed to show that the alleged inaccuracies meet the standard for a *Franks* hearing.

### A. False Description of PlayPen's Homepage

Paragraph 12 of Macfarlane's February 20, 2015, affidavit describes the homepage of the Play Pen website as follows: "On the main page of the site, located to either side of the site name were two images depicting partially clothed prepubescent females with their legs spread apart." Gov't Ex. 1. At the hearing, Macfarlane testified that this was the logo that appeared every time he viewed the homepage from September of 2014 through February 18, 2015. He did not access the site again between February 18, 2015, and February 20, 2015, when he submitted the warrant application. Hr'g Tr. at 72-76.

It is undisputed that, sometime in that two-day period, the logo was changed. On February 20, 2015, the homepage showed just one girl, perhaps slightly older than the girls previously depicted, wearing a short dress, fishnet stockings and posed in a sexually suggestive manner. Ex. C. Although one of the other agents may have signed onto the website on February 19, 2015, and observed this change, no one told Macfarlane about it. Hr'g Tr. at 75.

Gaver argues that the false statement in Macfarlane's affidavit was material to a finding of probable cause because, with the new logo, it was far less evident that this was a website dedicated to child pornography. He notes that the PlayPen name is also associated with adult pornography websites and periodicals. Ex. H. He also claims that the new logo was similar to many mainstream pictures of child models. Ex. I.

Gaver has not shown that the false statement was made knowingly and intentionally or with reckless disregard for the truth. Given that the logo had remained unchanged for months, Gaver's failure to access the website one last time prior to submitting the affidavit may have been somewhat negligent, but it cannot be deemed reckless.

**\*6** Moreover, in the Court's view, the old logo and the new logo are not materially different. As the other courts have found, both logos are highly suggestive of the website's illegal contents, particularly when paired with the website's name, and the fact that it was accessible only through the Tor network. *See Matish,* 193 F. Supp. 3d at 606-07; *Darby,* 190 F. Supp. 3d at 534; *Attain,* —— F. Supp. 3d. ——, 2016 WL 5660452, at *8; *Owens,* 2016 WL 7079609, at *6. In short, even with an accurate description of the website's logo, probable cause would have existed for the issuance of the warrant.

### B. Other False or Misleading Statements Related to PlayPen's Homepage

Gaver maintains that other statements contained in Macfarlane's affidavit, although "technically true," were presented in such a way as to create a false impression that anyone who found the PlayPen website was inevitably looking for child pornography.

For example, Macfarlane states that the website's "primary purpose is the advertisement and distribution of child pornography." Gov't. Ex. 1, at ¶ 11. Gaver notes, however, that the website is also a chat forum. Arguably, someone could access the site for the sole purpose of exercising their right to engage in protected speech.

Macfarlane describes the homepage as stating "No cross-board reposts, .7z preferred, encrypt filenames, include preview." Gaver maintains that these statements are not necessarily indicative of criminal activity, although Macfarlane presents them as such. For example, Macfarlane states that, based on his training and experience, he knows that "no cross-board reposts" refers to a prohibition against reposting material from other websites, and .7z "refers to a preferred method of compressing large files or sets of files for distribution." *Id.* at ¶ 12.

Gaver also challenges Macfarlane's suggestion that one cannot access the PlayPen website without knowing the exact URL address, and his statement that "[a]ccessing the [PlayPen website] therefore requires numerous affirmative steps by the user, making it extremely unlikely that any user could simply stumble across the [PlayPen website] without understanding its purpose and content." *Id.* at ¶ 10. Gaver maintains that, because the Tor network has its own search engine and indices, someone could, in fact, stumble across the PlayPen website by searching for legal content such as "sex chat" or "teen erotica."

Gaver has failed to make a preliminary showing that Macfarlane intentionally sought to mislead the magistrate judge either by making these statements, or by leaving out critical information that would have defeated a finding of probable cause. *See United States v. Khami,* 362 Fed.Appx. 501, 505-06 (6th Cir. 2010). As the court noted in *McLamb,* although it is possible that someone could innocently stumble across the PlayPen website, "[i]t is improbable that anyone would go to the trouble of registering for the site in order to look for [legal content] likely available elsewhere on the Internet." ––– F. Supp. 3d ––––, 2016 WL 6963046, at *5. As the government points out, probable cause is supported by the fact that PlayPen is accessible only through the Tor network, its suggestive name, the sexually suggestive photos of the young girls on the homepage, and the warnings to users to remain anonymous when registering.

### C. Misleading Statements About the Website's Content

Given that the NIT was deployed as soon as a user logged on to the PlayPen website, Gaver argues that Macfarlane's statements about what was available *after* a user logged on are largely irrelevant to the probable cause determination. Gaver also argues that those statements are misleading, because many "commonplace" features of the website, such as the ability to upload photographs and videos that are accessible only to registered users of the website, or the ability to exchange names and messages with other users on a Tor-based instant messaging service, Gov't Ex. 1, ¶¶ 15, 23, 24, are not necessarily indicative of criminal activity. Gaver argues that these statements were included in order to mask the absence of probable cause to search the computers of all individuals who accessed the PlayPen website.

**\*7** The Court disagrees. For the reasons set forth above, the Court finds that, even if these allegedly misleading statements are set aside, the remaining content of Macfarlane's affidavit is sufficient to show that probable cause exists to believe that the search would uncover evidence of criminal activity.

### D. False and Misleading Statements About the Location of the NIT Searches

Gaver also argues that the warrant affidavit contains false and misleading statements about the location of the NIT searches. He notes that the cover sheet indicates that the property to be searched is located in the Eastern District

of Virginia. It also refers to Attachment "A," which states that the server operating the website in question is "located at a government facility in the Eastern District of Virginia." Gov't Ex. 1.

Gaver claims that these statements are false and misleading. Although the NIT was deployed from the server that was located in the Eastern District of Virginia, the actual property to be searched, *i.e.,* the target computers, was scattered across the United States and abroad. Gaver maintains that Macfarlane's affidavit does not make this clear. It makes it appear that the server itself is the object of the search. According to Gaver, Macfarlane made these statements in an attempt to deceive the magistrate judge, who would have known that she had no authority to issue a warrant that extended beyond the boundaries of her own district.

The Court disagrees. Macfarlane's affidavit must be read as a whole. Although the "fill in the blank" cover sheet states that the property at issue is located in the Eastern District of Virginia, the cover sheet also refers to Attachment "A," which states that, after the NIT is deployed, it will obtain information from the activating computers. "The activating computers are those of *any user or administrator who logs into* the TARGET WEBSITE by entering a username and password." Gov't Ex. 1 (emphasis added). In addition, Macfarlane's affidavit describes how the NIT will cause the activating computer, "wherever located," to transmit certain information to a government computer to help identify the location of the activating computer and its user. *Id.* at ¶¶ 33-37, 46. These statements clearly indicate that data will be gathered from computers located outside of the Eastern District of Virginia.

Gaver has failed to make a substantial preliminary showing that any false or misleading statements knowingly and intentionally, or with reckless disregard for the truth, were included in Macfarlane's warrant affidavit. He has also failed to make a substantial preliminary showing that the allegedly offending statements were necessary to the magistrate judge's finding of probable cause. Accordingly, the Court OVERRULES Gaver's Motion for a *Franks* Hearing, Doc. #21.

### IV. Defendant's Motions to Suppress Evidence (Docs. ##9, 21)

Gaver argues that, for various reasons, the NIT warrant resulted in an illegal search and seizure of identifying information from his home computer. He has filed a Motion to Suppress, as "fruit of the poisonous tree," all evidence obtained by the FBI when it executed the derivative residential search warrant on July 27, 2015, and other incriminating statements he made to law enforcement officers on September 14, 2015. Doc. #9. Gaver's motion was supplemented by a Second Motion to Suppress Evidence, Doc. #21.

**\*8** The Sixth Circuit has held that individuals may have a reasonable expectation of privacy in the contents of their home computers. *Guest v. Leis,* 255 F.3d 325, 333 (6th Cir. 2001). The government concedes that the deployment of the NIT to extract information from Gaver's computer constituted a "search" within the meaning of the Fourth Amendment. *See* Doc. #27, PageID#543 n.2.

### A. Federal Rule of Criminal Procedure 41 (b)

### 1. Magistrate Judge Had No Authority to Issue NIT Warrant

Gaver contends that the February 23, 2015, search of his computer was unconstitutional, because Magistrate Judge Buchanan had no authority under the Federal Magistrates Act, 28 U.S.C. § 636, or under Federal Rule of Criminal Procedure 41(b), to issue the NIT warrant, authorizing a search outside the boundaries of the Eastern District of Virginia. The Court agrees.

Within the district where a magistrate judge is appointed, he or she has "all powers and duties" conferred by the Federal Rules of Criminal Procedure. 28 U.S.C. 5636(a) (1). In turn, Federal Rule of Criminal Procedure 41(b), as it existed on the date the NIT warrant was issued, gave magistrate judges authority to issue a warrant:

(1) "to search for and seize a person or property located within the district;"

(2) "for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed;"

(3) "for a person or property located within or outside that district," if connected to a terrorism

investigation where related activities may have occurred in the district;

(4) "to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both;" and

(5) on some federal property, regardless of where it is located, if the criminal activity occurred within the district of the issuing magistrate judge.

Fed. R. Crim. P. 41(b).

Gaver maintains that the NIT warrant fell outside the scope of these provisions. This Court now joins the majority of other courts that have held that the magistrate judge lacked authority to issue the NIT warrant under Rule 41(b). *See, e.g., United States v. Werdene,* 188 F. Supp. 3d 431, 441 (E.D. Pa. 2016) ("Even a flexible application of the Rule ... is insufficient to allow the Court to read into it powers possessed by the magistrate that are clearly not contemplated and do not fit into any of the five subsections."); *United States v. Ammons,* —— F. Supp. 3d ——, 2016 WL 4926438, at *5 (W.D. Ky. Sept. 14, 2016) ("Magistrate Judge Buchanan had no authority to issue the NIT warrant."); *United States v. Levin,* 186 F. Supp. 3d 26, 34 (D. Mass. 2016) (concluding that Rule 41(b) did not authorize issuance of the NIT warrant); *United States v. Michaud,* No. 3:15-cr-5351, 2016 WL 337263, at *6 (W.D. Wash. Jan. 28, 2016) (holding that Rule 41(b) "does not directly address the kind of situation that the NIT Warrant was authorized to investigate"); *United States v. Arterbury,* No. 15-cr-182, 2016 U.S. Dist. LEXIS 67091, at *22 (N.D. Okla. April 25, 2016) ("the NIT warrant was not authorized by any of the applicable provisions of Rule 41"); *United States v. Adams,* No. 6:16-cr-11, 2016 WL 4212079, at *6 (M.D. Fla. Aug. 10, 2016) (holding same); *Attain,* —— F. Supp. 3d ——, 2016 WL 5660452, at *11 ("the NIT warrant did not comply with Rule 41(b)"); *United States v. Croghan,* Nos. 1:15-cr-48, 1:1 5-cr-51, 2016 U.S. Dist. LEXIS 127479, at *18 (S.D. Iowa, Sept. 19, 2016) ("Magistrate Judge Buchanan lacked authority to issue the NIT Warrant pursuant to any provision of Rule 41(b)."); *United States v. Scarbrough,* No. 3:16-cr-35, 2016 U.S. Dist. LEXIS 141373, at *26 (E.D. Tenn. Aug. 26, 2016) (holding that the magistrate judge lacked authority to issue a warrant to search property located outside of her district); *United States v. Workman,* No. 15-

cr-397, 2016 U.S. Dist. LEXIS 133782, at *13 (D. Col. Sept. 6, 2016) (same).

**\*9** A handful of courts have found that issuance of the NIT warrant was authorized under Rule 41(b)(4), which permits a magistrate judge to issue a warrant to "install within the district a tracking device ... to track the movement of a person or property located within the district, outside the district, or both." These courts have reasoned that the NIT was akin to a "tracking device" that was installed in the Eastern District of Virginia to track the movement of information when the users logged onto PlayPen. *See, e.g., United States v. Jones,* No. 3:16-cr-26, Doc. #60 (S.D. Ohio February 2, 2017) (Rose, J.) (finding that the NIT operated as a virtual tracking device, and that the search took place in Virginia); *United States v. Jean,* —— F. Supp. 3d ——, 2016 WL 4771096, at *17 (W.D. Ark Sept. 13, 2016) (holding that the NIT was "not only authorized by Rule 41(b)(4), but is the very purpose intended by the exception."); *Darby,* 190 F. Supp. 3d at 536 ("Users of Playpen digitally touched down in the Eastern District of Virginia when they logged into the site."); *Matish,* 193 F. Supp. 3d at 612 (referring to a "virtual trip" to Virginia via the Internet); *McLamb,* —— F. Supp. 3d ——, 2016 WL 6963046, at *6 (finding the NIT analogous to a tracking device); *United States v. Austin,* —— F. Supp. 3d ——, 2017 WL 496374, at *4 (M.D. Tenn. Feb. 2, 2017) (same); *United States v. Sullivan,* No. —— F. Supp. 3d ——, 2017 WL 201332, at *5 (N.D. Ohio Jan. 18, 2017) (same).

The Court finds these cases unpersuasive. The NIT software did not "track" the movement of a "person or property" as those terms are commonly construed. Instead, it searched for information. *See Adams,* 2016 WL 4212079, at *6 ("the NIT does not track; it searches."); *Croghan,* 2016 U.S. Dist. LEXIS 127479, at *15 (finding that the NIT "did not 'track' the 'movement' of anything."). (Nor does the NIT "install" anything on the activating computer "in the sense that nothing was left behind after the NIT finished"); it simply gathers information and relays it back to the government-controlled computer. *See United States v. Kahler,* No. 16-cr-20551, 2017 WL 586707, at *6 (E.D. Mich. Feb. 14, 2017). Because this information goes far beyond providing location information, "[t]he NIT is more than just a 'tracking device'; it is a surveillance device." *Id. See also Attain,* —— F. Supp. 3d ——, 2016 WL 5660452, at *11 ("Given that the 'activating' computers never entered the

Eastern District of Virginia, it stretches the rule too far to say that the installation occurred within the Eastern District of Virginia."). Based on the plain language of this Rule, subsection (b)(4) is inapplicable.

Notably, on December 1, 2016, Rule 41(b) was amended to expand the authority of a magistrate judge to issue something akin to the NIT warrant:

> [A] magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district if: (A) the district where the media or information is located has been concealed through technological means; or (B) in an investigation of a violation of 18 U.S.C. § 1030(a)(5), the media are protected computers that have been damaged without authorization and are located in five or more districts.

Fed. R. Crim. P. 41(b)(6). On February 20, 2015, however, Magistrate Judge Buchanan lacked authority to issue such a warrant. This rendered the warrant void *ab initio.*

## 2. Suppression is Not an Appropriate Remedy for the Rule 41(b) Violation

Given that the NIT warrant was void, the search of Gaver's computer was akin to a warrantless search. Because none of the recognized exceptions to the warrant requirement applies (*i.e.,* consent, exigent circumstances, etc.), the search was *per se* unreasonable and violated the Fourth Amendment. *See United States v. Hudson,* 405 F.3d 425, 441 (6th Cir. 2005). Gaver argues that, because the search violated his constitutional rights, all fruits of the illegal search must be suppressed.[4] *See Wong Sun v. United States,* 371 U.S. 471, 484-85 (1963). This is not necessarily so. As the Sixth Circuit noted in *United States v. Master,* "the decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred."

614 F.3d 236, 242 (6th Cir. 2010) (citing *Herring v. United States,* 555 U.S. 135, 141 (2009)). [5]

4　In the alternative, Gaver argues that if the Court finds that issuance of the NIT warrant *technically* violated Rule 41(b), but did not rise to the level of a constitutional violation, he has nevertheless established the requisite prejudice to justify suppression of the evidence. He contends that, but for the wrongful issuance of the NIT warrant, his computers would not have been seized and he would not have been charged with these crimes. Because the Court finds that Gaver's Fourth Amendment rights were, in fact, violated, it does not reach this alternative argument.

5　"The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Illinois v. Gates,* 462 U.S. 213, 223 (1983).

**\*10** In *Herring,* the Supreme Court acknowledged that the exclusionary rule, "when applicable, forbids the use of improperly obtained evidence at trial." *Id.* at 139. This judicially-created rule exists to deter violations of the Fourth Amendment. *Id.* at 140. Nevertheless, even when a Fourth Amendment violation is found, "suppression is not an automatic consequence." *Id.* at 137.

The exclusionary rule applies only when the benefits of deterrence outweigh the costs to society. *Id.* at 141. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144. Accordingly, under the good faith exception to the exclusionary rule, evidence that is obtained under a search warrant that is later invalidated will not be suppressed if the officers acted in objectively reasonable reliance on that warrant. *United States v. Leon,* 468 U.S. 897, 922 (1984).

Gaver contends that the government's deliberate disregard of the jurisdictional restrictions placed on magistrate judges by Rule 41(b) justifies suppression. He further argues that, because the warrant was void *ab initio,* the good faith exception to the exclusionary rule cannot be applied. The Court rejects both of these arguments.

Gaver notes that, as early as 2013, a magistrate judge in Texas had rejected a similar warrant application because it was outside the scope of Rule 41 (b). *See In re Warrant to Search a Target Computer at Premises Unknown,* 958 F. Supp. 2d 753 (S.D. Texas 2013). Thereafter, largely because of that holding, the Department of Justice ("DOJ") began seeking changes to the Rule. These efforts ultimately led to the December 1, 2016, amendment expressly authorizing the issuance of warrants to use remote access to search electronic storage media and seize electronically-stored information located within or outside the district. *See* Fed. R. Crim. P. 41(b)(6). Gaver argues that, based on this history, there is no doubt that the DOJ knew that the NIT warrant it was requesting from Magistrate Judge Buchanan was unlawful.

At the hearing, however, Special Agent Macfarlane credibly testified that, prior to submitting the warrant affidavit, he was not aware that courts had denied similar warrant requests. Nor was he aware that the DOJ was lobbying to expand the scope of a magistrate judge's authority under Rule 41 (b) to encompass such a request. Hr'g Tr. at 77-78. When he presented Magistrate Judge Buchanan with the warrant affidavit, he believed that she had authority to sign it; after she did, he "absolutely" believed he had a valid warrant. *Id.* at 54.

In the Court's view, despite the fact that the magistrate judge lacked authority to issue the NIT warrant, suppression of the evidence obtained as a result of that warrant is not justified in this case. The odds that suppression would deter future violations by law enforcement officers are very low. There is no evidence to support a finding that Macfarlane deliberately or recklessly invited Magistrate Judge Buchanan to exceed the bounds of her authority. Notably, numerous courts across the country have held that Rule 41(b) *did* authorize Magistrate Judge Buchanan to issue the NIT warrant. If the courts themselves cannot agree on this issue, it can hardly be said that law enforcement officers acted in bad faith in seeking the warrant. *See Austin,* —— F. Supp. 3d ——, 2017 WL 496374, at \*8 ("there is nothing in the record in this case indicating that the FBI agents who sought the NIT Warrant deliberately, recklessly, or with gross negligence, selected a magistrate judge who did not have territorial jurisdiction under Rule 41 to issue the warrant.").

**\*11** Moreover, as many courts within the Sixth Circuit have noted, Macfarlane did what he was required to do. He gathered evidence, and then submitted a very detailed warrant affidavit, explaining exactly how the NIT would work, including the fact that it would gather information from the computer of anyone who logged onto the PlayPen website, regardless of where they were located. *See Sullivan,* 2017 WL 201332, at \*8 (finding that the FBI agents acted in good faith); *Ammons,* — F. Supp. 3d ——, 2016 WL 4926438, at \*9 (same); *Kahler,* 2017 WL 586707, at \*8 ("this is not a case where the FBA purposely avoided compliance with the law,"); *Scarbrough,* 2016 U.S. Dist. LEXIS 141373, at \*\*33-34 (concluding that the deterrent value to law enforcement is low).

In addition, to the extent that the NIT warrant was improperly issued, the blame lies not with the law enforcement officers, but with the magistrate judge. As the Supreme Court has noted, "[t]he exclusionary rule was crafted to curb police rather than judicial misconduct." *Herring,* 555 U.S. at 142. Moreover, because Rule 41 (b) has been amended to explicitly allow the issuance of such warrants, there is no longer any need to "deter" even the magistrate judges. *See Sullivan,* 2017 WL 201332, at \*8; *Austin,* —— F. Supp. 3d ——, 2017 WL 496374, at \*8 ("To the extent there was an error in determining the parameters of Rule 41's territorial jurisdiction, that error rests with the magistrate judge, not with the agents. Under these circumstances, there is little deterrent value to be gained through suppression.").

While the deterrent value of suppression is low, the cost to society is very high. As shown in all of these cases, individuals involved in the dark underworld of child pornography go to great lengths to avoid detection. But for tools like the NIT, law enforcement officers may never be able to identify these individuals to bring them to justice. *See Ammons,* —— F. Supp. 3d ——, 2016 WL 4926438, at \*9 (noting that society has a significant interest in deterring child pornography); *Scarbrough,* 2016 U.S. Dist. LEXIS 141373, at \*36 ("individuals accessing the Playpen website were victimizing the most vulnerable members of society, children, and were using the anonymizing technology of the Tor to evade detection.").

The Court finds that the costs to society of suppressing the evidence are significantly outweighed by the benefit of

deterrence. Moreover, the Court finds that the good faith exception to the exclusionary rule applies in this case.

In *Levin,* the District Court of Massachusetts held that the good faith exception was not available in cases where the warrant was void *ab initio* because the judge lacked authority to issue it. 186 F. Supp. 3d at 40. The court went on to say that, even if the good faith exception could be applied, suppression would be justified because it was not objectively reasonable for Macfarlane to believe that the magistrate judge had authority to issue the NIT warrant. *Id.* at 42. *See also Arterbury,* 2016 U.S. Dist. LEXIS 67091, at \*34 ("where the Rule 41 violation goes directly to the magistrate judge's fundamental authority to issue the warrant, ... the warrant is void *ab initio,* suppression is warranted and the good-faith exception is inapplicable."); *Croghan,* 2016 U.S. Dist. LEXIS 127479, at \*\*26-27 (holding that suppression was appropriate, and that the good faith exception did not apply); *Workman,* 2016 U.S. Dist. LEXIS 133782, at \*24 ("where the issuing judge acts outside her authority the good-faith exception should not apply."). [6]

[6]     Gaver also relies on a Report and Recommendation recently issued in *United States v. Carlson,* Crim. No. 16-317 (D. Minn. March 23, 2017), in which the magistrate judge recommended that the court find that the good faith exception cannot apply when the warrant is void *ab initio. See* Second Supp. Auth. to Defendant's Sealed Motion to Suppress at Docket #9. Doc. #32. A Report and Recommendation has no precedential value unless and until adopted by the district court but, in any event, like the other cases cited by Gaver, this Report and Recommendation is contrary to Sixth Circuit authority.

**\*12** These cases, however, are contrary to Sixth Circuit authority. Gaver relies on *United States v. Scott,* 260 F.3d 512, 515 (6th Cir. 2001), in which the court held that where the retired judge who signed the warrant lacked authority to do so, the good faith exception could not apply.

In *United States v. Master,* however, the Sixth Circuit held that *Scott* was no longer viable in light of the recent Supreme Court authority that "effectively created a balancing test." 614 F.3d 236, 242-43 (6th Cir. 2010) (citing *Herring,* 555 U.S. 135, and *Hudson v. Michigan,* 547 U.S. 586 (2006)). Although it was undisputed that the judge in *Master* lacked authority to issue the search warrant at issue, the Sixth Circuit held that this did

*United States v. Gaver, Slip Copy (2017)*
2017 WL 1134814

not necessarily foreclose application of the good faith exception. *Id.* In order to suppress evidence, the benefits of deterrence must outweigh the cost to society. The court noted that, "[a]rguably, the issuing magistrate's lack of authority has no impact on police misconduct, if the officers mistakenly, but inadvertently, presented the warrant to an incorrect magistrate." *Id.* at 242. [7]

[7]   In *Master,* the Sixth Circuit remanded the case so that the district court could re-examine the facts and balance the competing interests as required in *Herring.* On remand, the district court held that suppression was not warranted. The Sixth Circuit agreed, finding that the officer's actions were "neither deliberate nor sufficiently culpable that suppression would be warranted to deter similar behavior in the future." *United States v. Master,* 491 Fed.Appx. 593, 597 (6th Cir. 2012).

To this Court's knowledge, every court within the Sixth Circuit that has been asked to suppress evidence obtained as a result of the NIT warrant has found that the good faith exception to the exclusionary rule applies, following the *Herring* and *Master* line of decisions. *See Sullivan,* 2017 WL 201332, at *8; *Austin,* —— F. Supp. 3d ——, 2017 WL 496374, at *8; *Ammons,* ——F. Supp. 3d ——, 2016 WL 4926438, at *9; *Kahler,* 2017 WL 586707, at *8; *Scarbrough,* 2016 U.S. Dist. LEXIS 141373, at *33-36; *Jones,* No. 3:16-cr-26, Doc. #60, PageID#808 (S.D. Ohio Feb. 2, 2017) (Rose, J.); *United States v. Stamper,* No. 1:15-cr-109, Doc. #48, PageID#294 (S.D. Ohio, Feb. 19, 2016) (Barrett, J.). Likewise, numerous courts outside of the Sixth Circuit have held that the good faith exception applies. *See Main,* —— F. Supp. 3d ——, 2016 WL 5660452, at *11; *Darby,* 190 F. Supp. 3d at 538; *Michaud,* 2016 WL 337263, at *7; *United States v. Anzalone,* —— F. Supp. 3d ——, 2016 WL 5339723, at *10 (D. Mass. Sept. 22, 2016); *Werdene,* 188 F. Supp. 3d at 451-52.

The Court finds that the officers acted in objective good faith reliance on the NIT warrant. As previously discussed, given that courts have widely split on the question of whether Rule 41(b) authorized Magistrate Judge Buchanan to issue the NIT warrant, it cannot be said that Macfarlane's belief that the warrant was valid was objectively unreasonable. Accordingly, suppression is not warranted.

In Gaver's Second Motion to Suppress Evidence, Doc. #21, he asserts two additional grounds for suppression:

(1) the search of his computer in Ohio was not authorized by the NIT warrant; and (2) the NIT warrant was an unconstitutional, general warrant. The Court turns now to a brief discussion of those two grounds.

**B. Search of Gaver's Computer Was Authorized by NIT Warrant**

 **\*13** Gaver contends that, because the cover page of the search warrant application lists only the Eastern District of Virginia as the location of the property to be searched, the search of his computer, which was located in the Southern District of Ohio, fell outside the scope of the NIT warrant.

The Court rejects this argument for reasons previously discussed. Although the Eastern District of Virginia is listed as the location of the property to be searched, the cover page also refers to Attachment A, which is entitled "Place to be Searched." Gov't Ex. 1. Attachment A makes it clear that, although the computer server was located in Virginia, the NIT would operate to obtain information from the activating computers of "any user or administrator who logs into the TARGET WEBSITE." *Id.* Implicit in this statement is the concept that these "activating computers" may be located outside of the district. *See Michaud,* 2016 WL 337263, at *4 ("A reasonable reading of the NIT Warrant's scope gave the FBI authority to deploy the NIT from a government-controlled computer in the Eastern District of Virginia against anyone logging onto [the PlayPen website]."); *Owens,* 2016 WL 7079609, at **8-9 (same); *United States v. Jean,* No. 5:15-cr-50087, 2016 WL 4771096, at **11-12 (W.D. Ark. Sept. 13, 2016) (finding that the NIT warrant met the particularity requirement of the Fourth Amendment). Moreover, the body of Macfarlane's affidavit describes how the NIT will cause each activating computer, "wherever located," to transmit certain information to a government computer. Gov't Ex. 1 at ¶ 46.

**C. NIT Warrant Was Not an Unconstitutional General Warrant**

Finally, Gaver argues that the evidence must be suppressed because the NIT warrant was an unconstitutional, general warrant that allowed the FBI "to conduct a massive number of computer searches on unidentified targets in unknown locations." Doc. #21, PageID#482. He contends that the warrant is

not sufficiently specific. Numerous courts have rejected this argument. *See, e.g., Michaud,* 2016 WL 337263, at *5; *Darby,* 190 F. Supp. 3d at 533; *Matish,* 193 F. Supp. 3d at 607-08; *United States v. Acevedo-Lemus,* No. SACR15-137, 2016 WL 4208436, at *7 n.4; *Jean,* 2016 WL 4771096, at *11-12; *Anzalone,* —— F. Supp. 3d ——, 2016 WL 5339723, at *7; *Allain,* —— F. Supp. 3d ——, 2016 WL 5660452, at *8-9; *Owens,* 2016 WL 7079609, at *7. This Court finds that the NIT warrant sufficiently describes particular places and things to be searched, *i.e.,* the computers of anyone who logged onto the PlayPen website.

Gaver further argues that this broad warrant was not supported by probable cause. However, for the reasons explained above, the Court finds that there was ample probable cause to believe that evidence of criminal activity would be found on the computer of each individual who logged onto the PlayPen website. This was not an unconstitutional general warrant.

**V. Conclusion**

For the reasons set forth above, the Court OVERRULES Defendant's Motion for Disclosure of Discovery, Doc. #14. The Court also OVERRULES Defendant's Motion to Suppress Evidence Based on Unconstitutional Deployment of Government Sponsored Malware Dubbed the "Network Investigative Technique," Doc. #9, and Defendant's Second Motion to Suppress Evidence and Motion for *Franks* Hearing, Doc. #21.

**All Citations**

Slip Copy, 2017 WL 1134814

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO: 2:16-cr-110-FtM-29CM

ELIJAH HART

_____

### AMENDED[1]  REPORT AND RECOMMENDATION[2]

Before the Court is Defendant's Motion to Suppress Evidence (Doc. 24), filed

on December 30, 2015, which the Honorable John E. Steele referred to the

undersigned for a Report and Recommendation.   The United States filed its response

in opposition (Doc. 38) on February 13, 2017.   The undersigned held an evidentiary

hearing on March 9, 2017.   Doc. 44.   A transcript of the hearing was filed on March

29, 2017.   Doc. 48.

Defendant Elijah Hart is charged with knowingly accessing with intent to view

any visual depiction involving the use of a minor engaging in sexually explicit

conduct, in violation of 18 U.S.C. §§ 2252(a)(4)(B), (b)(1).   Doc. 3.   Defendant's

prosecution stems from an investigation by the Federal Bureau of Investigation

("FBI") of Playpen, a website dedicated to child pornography and operated as a

"hidden service" on an anonymous network.

Defendant seeks to suppress all evidence obtained as the result of a search

---

[1] *See infra* at 7 n.11.

[2] A party has fourteen days from this date to file written objections to the Report and
Recommendation's factual findings and legal conclusions. A party's failure to file written
objections waives that party's right to challenge on appeal any unobjected-to factual finding
or legal conclusion the district judge adopts from the Report and Recommendation. See 11th
Cir. R. 3-1.

warrant that allowed the FBI to employ a network investigative technique ("NIT") to remotely search for certain identifying information from "activating computers" – those computers of individuals who logged into the Playpen website and downloaded or attempted to download child pornography. Defendant also seeks to suppress evidence and statements obtained from a second court-authorized search warrant for Defendant's residence issued by United States Magistrate Judge Mac R. McCoy in the Middle District of Florida, and Defendant's interview during the execution of this warrant. Defendant argues that United States Magistrate Judge Theresa Carroll Buchanan in the Eastern District of Virginia issued the search warrant authorizing the deployment of the NIT (hereafter the "NIT Warrant") in violation of Title 28 of the United States Code, Section 636(a), and Rule 41 of the Federal Rules of Criminal Procedure. Defendant further argues that Judge McCoy issued the subsequent warrant authorizing the search of Defendant's home (hereinafter the "Residential Warrant") without probable cause. Moreover, Defendant argues the task force agents who searched Defendant's residence violated his rights pursuant to *Miranda*[3] and the Fifth Amendment to the United States Constitution by engaging in a custodial interrogation without first advising Defendant of his *Miranda* rights. For the reasons discussed below, the undersigned respectfully recommends that the motion be denied.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

## I.   Summary of the Evidence

The Government called two witnesses:   FBI Special Agent Daniel Alfin[4] and Collier County Detective and FBI Child Exploitation Task Force Officer Zachary Ewert.[5]   Doc. 48 at 3.   The Government introduced four exhibits, all of which the Court admitted into evidence: (1) search warrant application and affidavit from the Eastern District of Virginia[6] ("Gov't Ex. 1"); (2) search warrant application and affidavit from the Middle District of Florida ("Gov't Ex. 2"); (3) CD containing the audio recording of Defendant's interview ("Gov't Ex. 3"); and a transcript of the audio recording of Defendant's interview ("Gov't Ex. 3t").   *See* Doc. 43.   Defendant did not call any witnesses or introduce any exhibits.

### a.  The Tor Network

The Onion Router or "Tor network" is an anonymous online network that resulted from a research project of the United States Navy Research Laboratory for

---

[4] Agent Alfin has been employed with the FBI since 2009.   Doc. 48 at 6.   He is assigned to the criminal investigative division, violent crimes against children section, major case coordination unit.   *Id.*   He is trained in computer forensics and online investigative techniques, and his duties involve the investigation of individuals who utilize various types of technology to facilitate the production, advertisement, and distribution of child pornography.   *Id.* at 7.   Agent Alfin was one of the lead investigators in the Playpen website investigation.   *Id.* at 8.

[5] Officer Ewert has eighteen years of law enforcement experience.   Doc. 48 at 91.   He currently is a detective for the Collier County Sheriff's Office and is assigned to the FBI's child exploitation task force.   *Id.* at 90.

[6] The Government's Exhibit List (Doc. 43) lists the Search Warrant Application and Affidavit from the Eastern District of Virginia ("VA") as its Exhibit 1; however, the complete exhibit marked for identification and admitted into evidence also includes the Search and Seizure Warrant from the Middle District of Florida.   *See* Gov't Ex. 1.   The Court will cite the VA Affidavit as "Gov't Ex. 1, Aff.," the VA Search Warrant as "Gov't Ex. 1, NIT Warrant," and the Search and Seizure Warrant from the Middle District of Florida as "Gov't Ex. 1, Residential Warrant."

the primary purpose of protecting government communications.[7]   Doc. 48 at 10-13,

45;   Gov't Ex. 1, Aff. ¶ 7.   It is now available to the public at large, and its anonymity

benefits have resulted in its use for both lawful and unlawful purposes.   Doc. 48 at

11-12, 46-47.   Agent Alfin testified that the primary and lawful purpose of the Tor

network is to access the traditional or "open" Internet while concealing one's real

location.   Doc. 48 at 10-13; Gov't Ex. 1, Aff. ¶ 9.   Generally, when one accesses the

traditional Internet to visit a website, the website's Internet Protocol ("IP") address

is viewable to the user, and the user's IP address is viewable to the website.   *Id.*

Armed with this information, both the website and the user can determine each

other's location.   *Id.*   A user wishing to conceal his location while browsing the open

Internet can do so by obscuring his IP address, which may be accomplished through

the Tor network.

The Tor network conceals a user's location by bouncing user communications

around a distributed network of relay computers, called "nodes," that are run by

volunteers around the world.   Doc. 48 at 15-16; Gov't Ex. 1, Aff. ¶ 8.   In order to

access the Tor network, the user must install in his or her computer the Tor software,

which is available online at no cost.   Doc. 48 at 16; Gov't Ex. 1, Aff. ¶ 7.   Once

installed, a user accessing a website through the Tor network would not directly

connect to the website but would first bounce through different nodes located

anywhere in the world.   Doc. 48 at 12; Gov't Ex. 1, Aff. ¶ 8.   The last computer that

---

[7] As one court explained, "[t]he Onion Router is so named because of its onion-like layers of encryption that operate to obscure users' identities."   *United States v. Jean*, 207 F. Supp. 3d 920, 924 (W.D. Ark. 2016).

routes the user's communications is called the "exit node."   Gov't Ex. 1, Aff. ¶ 8.   IP logs of websites operating in the Tor network contain the IP addresses of the exit nodes, rather than the users' actual IP addresses, thereby obscuring the users' true location.[8]   Doc. 48 at 36; Gov't Ex. 1, Aff. ¶ 29.   Accordingly, the traditional IP identification techniques used by law enforcement on the open Internet are not viable with the Tor network.[9]   Doc. 48 at 12-13; Gov't Ex. 1, Aff. ¶ 8.

Despite its legal uses, the Tor network has another function, referred to as "hidden services," which has provided a forum for illicit activities.   Doc. 48 at 13-14; Gov't Ex. 1 Aff. ¶ 9.   Agent Alfin explained that hidden services provide the same anonymity for a website as they do for its users by concealing the website host's actual IP address.   Doc. 48 at 13-14.   Thus, Agent Alfin testified, an individual can host an illegal website, such as a child pornography website, configure it as a Tor hidden service, and operate it without detection by law enforcement.   *Id.* at 14.   To locate a hidden service, users must take certain affirmative steps because, unlike the traditional Internet, a user may not simply, for example, conduct a search on a search engine such as google.com and retrieve a link to a Tor hidden service.   *Id.* at 18-19.   Instead, a user would locate a directory of Tor hidden services related to the content

---

[8] Technically, however, even though the destination website cannot see a user's IP address, the user's IP address is disclosed to the Tor entry node, that is, the first computer to receive the search query from the user.   Doc. 48 at 17.

[9] Generally, once law enforcement officers seize a website whose users are suspected of engaging in unlawful activity, they can view the IP address logs of the seized website and, through a number of freely available public websites, determine what Internet Service Provider ("ISP") owns a particular IP address.   Doc. 48 at 36-37; Gov't Ex. 3 at 28.   The officers then subpoena the ISP to determine the user to whom the IP address was assigned at a given date and time.   Doc. 48 at 36-37.

of interest to the user, in this case, child pornography, and retrieve a link to the hidden service website. *Id.* at 18. Alternatively, a user might discover the link to a hidden service by directly communicating with other Tor users who are aware of the hidden service. *Id.* at 19. Agent Alfin testified that for these and other reasons, it would be "incredibly unlikely" for a user inadvertently or unintentionally to stumble upon a Tor hidden service such as Playpen. *Id.* at 19.

### b. Playpen[10]

The Playpen website operated in the Tor network and was configured as a Tor hidden service. Doc. 48 at 8, 14; Gov't Ex. 1, Aff. ¶ 10. Agent Alfin became aware of Playpen when it was created in August 2014 because he saw a link to Playpen listed on two different websites whose purposes were to advertise current and updated links to child pornography websites. Doc. 48 at 9, 18-19. Agent Alfin observed the Playpen website for its content and activities and discovered that everything on the website was dedicated either to child pornography, child abuse, or distribution of child pornography. *Id.* at 9-10, 83. Because the website operated as a hidden service, however, the FBI was unable to determine the location where Playpen was being hosted, the identity of its operator, or the identity of its users. *Id.* at 9, 14.

Between August 2014 and December 2014, the FBI's abilities were confined to

---

[10] The NIT warrant application refers to the Playpen website as "Target Website" and the Residential Warrant application refers to the Playpen website as "Website A." Gov't Ex. 1, Aff. ¶ 2 n.1; Gov't Ex. 2 ¶ 6 n.1; Doc. 48 at 98-99. Both warrant applications explain that because the website remained active at the time the applications were submitted, disclosure of the name of the website in the applications would alert potential users of the site to the government's investigation and thus undermine it. *Id.*

accessing the website and monitoring its activity. Doc. 48 at 14. In December 2014,[11] the FBI received a favorable break in their investigation when a foreign law enforcement agency alerted it that the Playpen website was misconfigured, and, because of this misconfiguration, briefly appeared on the open Internet. *Id.* at 14-15, 60. For this brief period, the FBI was able to see Playpen's actual IP address, which allowed investigators to locate a computer server that hosted the website in North Carolina. *Id.* at 15, 20. From then forward, using various forms of legal process (i.e., subpoenas, search warrants, pen registers), the FBI was able to identify the creator/administrator of Playpen, who resided in Naples, Florida. *Id.* at 15, 20-21. On or about February 20, 2015, FBI agents arrested the administrator of Playpen in Naples, gained access to the owner's administrative account, and seized control of the Playpen website from its web-hosting facility in North Carolina. *Id.* at 20-22.

The FBI then transferred a copy of the Playpen website from North Carolina to a government-controlled server in the Eastern District of Virginia. *Id.* at 22. Instead of immediately shutting down the website, the FBI operated the Playpen

---

[11] There is either an inconsistency in Agent Alfin's testimony or a typographical error in the transcript as to the date that the FBI became aware of the Playpen website's misconfiguration. In Agent Alfin's direct examination, he testified that the FBI was monitoring the website between August 2014 and December 2014. Doc. 48 at 14. Later on direct he testified the FBI became aware that the Playpen website was misconfigured in December *2015*. *Id.* During his cross examination, however, he testified that the date FBI became aware of the misconfiguration was in December *2014*. *Id.* at 60. Based on the remaining timeline of events, e.g., that Playpen's creator was arrested in February 2015 after which the FBI seized control of the server from February to March 2015 (*Id.* at 20-22), the Court believes the correct date is December 2014, and has amended its Report and Recommendation accordingly.

website from the Eastern District of Virginia for a brief period from February 20, 2015 through March 4, 2015 in an effort to identify its users/members. *Id.* at 21-22. As of February 2015, the Playpen website contained a total of 158,094 members, 9,333 topics and 95,148 posts. Gov't Ex. 1, Aff. ¶ 11. Agent Alfin testified that it was the largest child pornography website the FBI had ever known to exist at that time. Doc. 48 at 9.

### c. The NIT Warrant

On February 20, 2015, the FBI submitted an application for a search warrant to Judge Buchanan in the Eastern District of Virginia. Gov't Ex. 1. Special Agent Douglas Macfarlane signed a thirty-one-page affidavit in support of the application. Gov't Ex. 1, Aff. Agent Macfarlane listed the relevant statutes implicated in the investigation, defined the technical terms used in the affidavit, and explained why there was probable cause to believe that administrators and users of the Playpen website were committing crimes relating to the exploitation of children. *See id.* Agent Macfarlane explained the nature of the Tor network, the operation of the hidden services, and, in vivid detail, the Playpen website. *See id.* Agent Macfarlane explained that "the entirety of the [Playpen website] is dedicated to child pornography" and listed some of the sub-forums that contained some of the "most egregious examples of child pornography and retellings of real world hands on sexual abuse of children." Gov't Ex. 1, Aff. ¶ 27.

The affidavit explained that a copy of the Playpen server containing the contents of the Playpen website was located on a computer facility in the Eastern

District of Virginia, and Playpen would continue to operate from that server in Virginia. *Id.* ¶ 30. Agent Macfarlane requested Judge Buchanan to authorize the FBI to deploy a NIT from its server in Virginia for a period not to exceed thirty days.[12] *Id.* ¶¶ 30-34. Agent Macfarlane reasoned that the NIT was necessary to locate and apprehend the users of Playpen "who are engaging in the continuing sexual abuse and exploitation of children, and to locate and rescue children from the imminent harm of ongoing abuse and exploitation." *Id.* ¶ 30.

The NIT consisted of computer instructions attached to the content appearing on the Playpen website so that when a user downloaded any of the content from Playpen, which was located in the Eastern District of Virginia, into the user's computer — wherever it might be located — the instructions caused the user's computer, referred to as the "activating computer," to transmit certain identifying information back to the government's computer. *Id.* ¶ 33; Doc. 48 at 23-24. The information sought to be seized was:

1. the activating computer's actual IP address, and the date and time that the NIT determines what that IP address is;

2. a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish data from that of other activating computers, that would be sent with and collected by the NIT;

3. the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86);

---

[12] The Affidavit specified: "I request authority to use the NIT, which will be deployed on [Playpen] while [Playpen] operates in the Eastern District of Virginia, to investigate any user or administrator who logs into [Playpen] by entering a username and password." Gov't Ex. 1, Aff. ¶ 32.

4. information about whether the NIT has already been delivered to the activating computer;

5. the activating computer's Host Name;

6. the activating computer's active operating system username; and

7. the activating computer's media access control ("MAC") address;

Gov't Ex. 1, Aff., Attachment B (certain quotation marks omitted); Doc. 48 at 29-35. Agent Alfin characterized this information as "the digital information where the NIT ended up." Doc. 48 at 29-30.

Agent Macfarlane requested authority for the NIT to "cause an activating computer – *wherever located* – to send to a computer controlled by or known to the government . . . messages containing information that may assist in identifying the computer, its location, other information about the computer and the user of the computer." Gov't Ex. 1, Aff. ¶ 46(a) (emphasis added). Judge Buchanan issued the warrant authorizing the use of the NIT to be deployed on the computer server located at the government facility in the Eastern District of Virginia, and to obtain the identifying information from any activating computer user who logs into the Playpen website by entering a username and password. Gov't Ex. 1, NIT Warrant. Judge Buchanan limited the government's use of the NIT to thirty days. *Id.*

### d. The FBI's use of the NIT

Agent Alfin explained that the NIT was installed on the government-controlled server in the Eastern District of Virginia with the ultimate purpose of identifying members of the Playpen website by, most importantly, revealing their IP addresses. Doc. 48 at 22-23. As he explained, an individual's IP address does not reside on a

user's computer. *Id.* at 34-35. Rather, the ISP assigns a unique IP address to each of its subscribers for the purpose of directing the routing of information between the user's computer and the destination website. *Id.* The NIT, therefore, did not collect the IP address from the user's computer but rather caused the user's computer to communicate with the government's computer over the open Internet, thus bypassing the Tor anonymous features and revealing the user's real IP address. *Id.* The remaining information sought primarily was to distinguish the user's computer from other computers located at the user's premises. *Id.* at 29-35.

Although the warrant authorized the NIT to be deployed when a user logged into the Playpen website by entering a username and password, Agent Alfin testified that in the majority of cases, the FBI waited to deploy the NIT until someone (1) entered the Playpen website by entering a username and password, and (2) accessed a forum to begin downloading child pornography. *Id.* at 26-28. As the user was downloading the requested content from the Playpen website, such as text, graphics, or video, the user also downloaded the NIT, which was attached to that content. *Id.*

Agent Alfin testified that within "less than a second" the NIT transmitted the identifying information to the FBI, generally "before the images that [the user] requested even load[ed] on [his] screen." *Id.* at 83. After the NIT completed its function, it disappeared from the activating computer without a trace. *Id.* at 37, 76-77. Agent Alfin testified that if no one accessed the Playpen website and at least attempted to download content from the Playpen website, the NIT would remain dormant in the government-controlled server in Virginia. *Id.* at 26. Thus, the

user's actions of downloading information from the Playpen website to his computer
— wherever located — caused the NIT to travel from the server in Virginia to the
user's computer.  *Id.*  Agent Alfin specifically rejected the contention that the NIT
was installed in the Defendant's computer in the Middle District of Florida.  *Id.* at
42, 75, 79.

### e.  The investigation of Defendant and the Residential Warrant

After the FBI concluded its investigation of the Playpen website, it sent the
users' identifying information to the appropriate field offices.  *Id.* at 37.  In June
2015, Officer Ewert received information on the FBI's investigation of the Playpen
website, along with a "target DVD" that contained an IP address that was connected
to a username "thegabetrain."  *Id.* at 93; Gov't Ex. 2 ¶ 33.  Through independent
investigation, the agents learned that the IP address was assigned to Jose Cruz[13] at
Defendant's address located in the Middle District of Florida.  Gov't Ex. 2 ¶ 39.  The
target DVD also contained statistics of the number of hours "thegabetrain" had logged
into the Playpen website and the images and posts[14] that the user accessed.  *Id.*  On
July 27, 2015, Officer Ewert applied for a search warrant of Defendant's home and
submitted a thirty-four-page affidavit in support of the warrant application.  Gov't
Ex. 2.  On the same day, Judge McCoy issued the Residential Warrant authorizing
the search of Defendant's residence for evidence of child pornography.  Gov't Ex. 1,

---

[13] During his interview, Defendant stated that Jose Cruz is his mother's boyfriend
and lived with Defendant.  Gov't Ex. 3t at 9.
[14] "Postings can contain text messages, still images, video images, or web addresses
that direct other members to specific content the poster wishes. . . . A 'post' or 'posting' is a
single message posted by a user."  Gov't Ex. 2 ¶ 5(a).

Residential Warrant.

Officer Ewert's affidavit described the nature of the Tor network and described Playpen as a child pornography website "dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children, including the safety and security of individuals who seek to sexually exploit children online." Gov't Ex. 2 ¶¶ 7-11. The affidavit explained how accessing the Playpen website required numerous affirmative steps by the user, making it "extremely unlikely" to stumble upon it without understanding its content and primary purpose. *Id.* ¶ 8. Registration warnings included recommendations to hide the users' identity and automatic bans against anyone discussing law enforcement related activity. *Id.* ¶¶ 14, 17. The affidavit further stated that "[o]n the main page of [the Playpen website], located to either side of the site name were two images depicting partially clothed prepubescent girls with their legs spread apart, with a focus on the females' genitalia." *Id.* ¶ 14.

The affidavit further explained that between February 20, 2015 and March 4, 2015, law enforcement agents monitored the Playpen website and documented its contents and user activity. *Id.* ¶ 11. A user with the username "thegabetrain" originally registered an account on the Playpen website on January 9, 2015. *Id.* ¶ 31. This same user had been actively logged into the Playpen website for a total of sixteen hours between January 9, 2015 to March 4, 2015. *Id.* ¶ 32. The affidavit explained the FBI's deployment of the NIT to retrieve the identifying information from the activating computers. *Id.* ¶ 30. It further explained that on February 22,

2015, the user "thegabetrain," with IP address 73.54.81.121 and after logging into the website with a username and password, accessed a post on the Playpen website; however, the post was deleted before law enforcement could capture the data. *Id.* ¶ 34. On two subsequent sessions on February 24, 2015, the user "thegabetrain" accessed a post that contained a link to an image that depicted child pornography and another post that contained a link to an image that depicted child pornography.[15] *Id.* ¶¶ 36, 37. On those occasions, although the FBI determined that the "thegabetrain" signed in with a user name and password, it did not collect the IP address. *Id.* ¶ 35.

From the IP address initially associated with "thegabetrain," and using publicly available websites, FBI agents were able to determine that the ISP Comcast operated the IP address connected with the username "thegabetrain." *Id.* ¶ 38. The FBI served an administrative subpoena to Comcast, and Comcast provided the FBI with the name and residential address affiliated with the IP address of "thegabetrain." *Id.* ¶ 39. Officer Ewert relied on this information in seeking the Residential Warrant.

### f. Execution of the Residential Warrant and Defendant's Interview

Law enforcement officers executed the search warrant at Defendant's residence on July 30, 2015 at approximately 6:45 a.m. Doc. 48 at 105, 137. Officer Ewert testified that the officers knocked on the door of Defendant's residence for

---

[15] The posts are described in explicit detail in the affidavit and need not be repeated here. Gov't Ex. 1, Residential Warrant ¶¶ 36, 37.

approximately forty-five seconds and announced that they were law enforcement. *Id.* at 107, 138.   One of the home's occupants looked outside the window, stared at the officers, but declined to open the door.   *Id.* at 107.   After approximately twenty more seconds, out of concern for officer safety, the officers pried open the door with a halligan tool and entered the house with their guns drawn.   *Id.* at 107-08, 138.   At that time, Defendant was in his bedroom sleeping with his door closed.   *Id.* at 116; Gov't Ex. 3t at 91.   Officer Ewert testified that Defendant did not immediately open his door when the officers attempted to enter, and, due to safety concerns, the officers kicked Defendant's door open.   *Id.*

Officer Ewert further testified that once inside the house, the officers escorted its five occupants outside and conducted a sweep of the house, after which the officers holstered their weapons and permitted the occupants to return back inside.   Doc. 48 at 108, 140.   Officer Ewert and his partner, task force officer Kevin Bunch, requested to speak with Defendant.   Doc. 48 at 109.   With Defendant's consent, Officers Ewert and Bunch interviewed Defendant on the back lanai of his home.   *Id.* at 116.   Officer Ewert testified that he told Defendant that he was not required to speak with the officers and that he was free to leave at any point.   *Id.* at 117-18.

The officers' weapons were concealed during the interview, and Officer Ewert described the tone of the interview as "very laid back, lighthearted" with laughing and discussions about video games.   Doc. 48 at 110.   During the interview, Defendant admitted to using the username "thegabetrain," viewing child pornography, and accessing the Playpen website.   *Id.* at 115.   Defendant explained

that he found the Playpen website by accessing Hidden Wiki, a directory listing links to child pornography. *Id.* At no point during the interview did the officers read Defendant his *Miranda* rights. *Id.* at 142. Defendant was not arrested that day. *Id.* at 118. The interview was recorded and transcribed, and the transcript and recording were admitted into evidence at the suppression hearing as Government's Exhibits 3 and 3t, respectively. *See* Doc. 43.

## II. Analysis

### a. Whether Judge Buchanan lawfully issued the NIT Warrant

Defendant argues that the NIT Warrant issued by Judge Buchanan in the Eastern District of Virginia clearly violated the established jurisdictional limits of Rule 41 of the Federal Rules of Criminal Procedure and Title 28, Section 636(a), of the United States Code. Doc. 24 at 6-15. The Government responds that Rule 41(b)(4) [16] properly authorized the issuance of the NIT Warrant as a "tracking device," and the warrant complied with the Federal Magistrates Act, 28 U.S.C. § 636(a). Doc. 38 at 15-21. The undersigned recommends a finding that Rule 41(b)(4) authorized Judge Buchanan to issue the NIT Warrant as a "tracking device." Alternatively, even if there was a violation of Rule 41(b), the undersigned recommends that suppression is unwarranted and the motion should be denied. [17]

---

[16] Defendant discusses each of the subsections of Rule 41(b); however, because the Government only argues that the warrant was authorized under 41(b)(4), the Court will focus its analysis only on this subsection.

[17] In fact, the Court may choose to immediately consider whether the exclusionary rule applies. *United States v. Leon*, 468 U.S. 897, 925 (1984) ("[C]ourts could reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith. We have no reason to believe that our Fourth Amendment jurisprudence would suffer by allowing reviewing courts to exercise

Because the Playpen website investigation has led to the arrest of numerous defendants nationwide, the NIT Warrant issued by Judge Buchanan has been the subject of numerous motions to suppress on the same bases Defendant asserts here in federal district courts across the United States. Courts to have considered the same issue have reached varying conclusions: either (1) the NIT Warrant properly was issued under 41(b) as a tracking device;[18] (2) the NIT Warrant violated Rule 41(b), or the court assumed without deciding that it violated Rule 41(b), but nonetheless concluded that suppression was unwarranted;[19] or, what appears to be

---

an informed discretion in making this choice."). This approach has been used by courts considering the same NIT warrant. *See, e.g., United States v. Schuster*, No. 1:16-CR-51, 2017 WL 1154088, at *5 (S.D. Ohio Mar. 28, 2017) (employing this approach because "while [the d]efendant's motion to suppress poses a complex and multi-faceted series of technical questions, the resolution of which has perplexed district courts across the country, the underlying issue has since been entirely resolved by amendment of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 41(b) (2016), *amended by* Fed. R. Crim. P. 41(b)(6) (Dec. 1, 2016). Therefore, the Court finds that resolution of the Fourth Amendment issues serves no value to Fourth Amendment jurisprudence, as the potential risk of harm is no longer capable of repetition.") (emphasis in original).

[18] *See e.g., United States v. Austin,* No. 3:16-cr-00068, — F. Sup. 3d — 2017 WL 496374 (M.D. Tenn. Feb. 2, 2017)*; United States v. Sullivan*, No. 1:16-cr-270, 2017 WL 201332 (N.D. Ohio Jan. 18, 2017); *United States v. Bee*, No. 16-002, 2017 WL 424905 (W.D. Mo. Jan. 13, 2017), *report and recommendation adopted*, No. 16-00002-01-CR-W-GAF, 2017 WL 424889 (W.D. Mo. Jan. 31, 2017); *United States v. McLamb*, No. 16-cr-092, 2016 WL 6963046 (E.D. Va. Nov. 28, 2016); *United States v. Lough*, No. 16-cr-18, 2016 WL 6834003 (N.D. W.Va. Nov. 18, 2016); *United States v. Johnson*, No. 15-cr-00340, 2016 WL 6136586 (W.D. Mo. Oct. 20, 2016); *United States v. Laurita*, No. 8:13CR107, 2016 WL 4179365 (D. Neb. Aug. 5, 2016); *Jean,* 207 F. Supp. 3d 920; *United States v. Eure*, No. 2:16-CR-43, 2016 WL 4059663, at *4 (E.D. Va. Jul. 28, 2016); *United States v. Matish*, 193 F. Supp. 3d 585 (E.D. Va. 2016); *United States v. Darby*, No. 2:16-CR-36, 2016 WL 3189703 (E.D. Va. June 3, 2016).

[19] *United States v. Dzwonczyk*, No. 4:15-CR-3134, 2016 WL 7428390 (D. Neb. Dec. 23, 2016); *United States v. Duncan*, No. 3:15-cr-00414-JO, 2016 WL 7131475 (D. Or. Dec. 6, 2016); *United States v. Owens*, No. 16-CR-38-JPS, 2016 WL 7053195 (E.D. Wis. Dec. 5, 2016); *United States v. Stepus*, No. CR 15-30028-MGM, 2016 WL 6518427 (D. Mass. Oct. 28, 2016); *United States v. Scarbrough*, No. 3:16-CR-035, 2016 WL 5900152 (E.D. Tenn. Oct. 11, 2016); *United States v. Allain*, No. 15-cr-10251, —F. Supp. 3d — 2016 WL 5660452 (D. Mass. Sept. 29, 2016); *United States v. Anzalone*, 208 F. Supp. 3d 358 (D. Mass. 2016); *United States v. Broy*, 209 F. Supp. 3d 1045 (C.D. Ill. 2016); *United States v. Knowles*, 207 F. Supp. 3d 585

the minority view, (3) the NIT Warrant was unlawfully issued and suppression was a proper remedy.[20]   Having reviewed the briefs, testimony and evidence, and with the benefit of the varying interpretations of Rule 41(b) as applied to the NIT Warrant at issue here, the undersigned recommends that the NIT is more akin to a "tracking device" as contemplated by Rule 41(b)(4).

The Federal Magistrates Act, 28 U.S.C. § 636(a), provides that "[e]ach United States magistrate judge serving under this chapter shall have within the district in which sessions are held by the court that appointed the magistrate judge . . . (1) all powers and duties conferred or imposed . . . by law or by the Rules of Criminal Procedure for the United Sates District Courts."  28 U.S.C. § 636(a).  Rule 41(b)(4) of the Federal Rule of Criminal Procedure confers upon the magistrate judge the "authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both."   Fed. R. Crim. P. 41(b)(4).  The rule defines "property" to include "information" and "tracking device" as "an electronic or mechanical device which permits the tracking of the movement

---

(D.S.C. 2016); *United States v. Ammons*, 207 F. Supp. 3d 732 (W.D. Ky. 2016); *United States v. Torres*, No. 5:16-CR-285-DAE, 2016 WL 4821223 (W.D. Tex. Sept. 9, 2016); *Unitied States v. Henderson*, No. 15-cr-00565-WHO-1, 2016 WL 4549108 (N.D. Cal. Sept. 1, 2016); *United States v. Ryan Anthony Adams*, No. 6:16-cr-11-Orl-40GJK, 2016 WL 4212079 (M.D. Fla. Aug. 10, 2016); *United States v. Acevedo-Lemus*, No. SACR 15-00137-CJC, 2016 WL 4208436 (C.D. Cal. Aug. 8, 2016); *United States v. Werdene*, 188 F. Supp. 3d 431 (E.D. Pa. 2016); *United States v. Epich*, No. 15-CR-163-PP, 2016 WL 953269 (E.D. Wis. Mar. 14, 2016); *United States v. Michaud*, No. 3:15-CR-05351-RJB, 2016 WL 337263 (W.D. Wash. Jan. 28, 2016).

[20]   *See e.g.*, *United States v. Levin*, 186 F.Supp.3d 26 (D. Mass. 2016); *United States v. Workman*, 205 F. Supp. 3d 1256 (D. Colo. 2016); *United States v. Croghan*, 209 F. Supp. 3d 1080 (S.D. Iowa 2016).

of a person or object."   Fed. R. Crim. P. 41(a)(2)(A), (E); 18 U.S.C. § 3117(b).

Defendant makes two arguments against a finding that the NIT was a tracking device: first, that the NIT was installed on Defendant's computer in Florida, which never was physically located within the Eastern District of Virginia and, second, that Defendant never "controlled" the government-controlled computer.   Doc. 24 at 9. While it is true that neither Defendant nor his computer physically traveled to Virginia, it is equally true that the FBI did not physically travel to Florida to install the NIT in Defendant's computer.   The FBI installed the NIT in the Eastern District of Virginia by augmenting the content on the Playpen website with additional computer instructions comprising the NIT.   Those computer instructions transmitted electronically over the Internet to track the movement of property — in this case, intangible "information," appearing as content on the Playpen website. Although Defendant focuses on the location of his computer, in order to become an activating computer, it is undisputed that Defendant had to log into the Playpen website, which was located in the Eastern District of Virginia, and voluntarily download content from that website.   Thus, Defendant's voluntary actions of "virtually" visiting the Eastern District of Virginia and downloading the NIT, which was embedded in the Playpen content, caused the NIT to travel to Defendant's computer located in Florida.   Accordingly, but for Defendant's voluntary actions, the NIT would have remained dormant in the Eastern District of Virginia and never deployed in the Defendant's computer in Florida.

One district court in the Western District of Virginia aptly illustrated this

point with the following analogy:

> [Defendant] took a virtual trip to the Eastern District of Virginia, but rather than travel by car, he traveled digitally—his vehicle was comprised of packets of information. Once there, the FBI attached a digital electronic tracking device to those packets, which [Defendant] virtually rode back to the [Middle District of Florida]. Upon his virtual return, [Defendant] parked his digital vehicle built of those packets of information on his computer, rather than in his driveway. At that point, the NIT sent back his digital address, just as a GPS tracker would send back his coordinates.

*Lough*, 2016 WL 6834003, at *5.   Importantly, after the NIT completed its function, which Agent Alfin testified generally was within "less than a second," it disappeared from Defendant's computer without a trace.   Doc. 48 at 37, 69, 76-77.   It did not make any changes to Defendant's computer.   *Id.* at 76-77.   Furthermore, it did not provide the FBI the ability to access Defendant's computer.   *Id.* at 38.

Other courts similarly have analogized a user's actions of accessing the Playpen website by logging in and downloading information, thereby activating the NIT, as a "virtual trip" over the Internet from the user's location to the Eastern District of Virginia.   *Matish*, 193 F. Supp. 3d at 612-13 (explaining that "whenever someone entered Playpen, he or she made, in computer language, 'a virtual trip' via the Internet to Virginia, just as a person logging into a foreign website containing child pornography makes 'a virtual trip' overseas" and "[w]hen that computer left Virginia—when the user logged out of Playpen—the NIT worked to determine its location, just as traditional tracking devices inform law enforcement of a target's location."); *Darby*, 190 F. Supp. 3d at 536 ("Users of Playpen digitally touched down in the Eastern District of Virginia when they logged into the site. When they logged

in, the government placed code on their home computers.  Then their home computers, which may have been outside of the district, sent information to the government about their location."); *Sullivan*, 2017 WL 201332, at \*6 ("Defendant voluntarily and deliberately came to the Eastern District of Virginia when he took affirmative steps to log into the Playpen website by entering a username and password. . . . Once in the district, the NIT was embedded in the material defendant was downloading and he carried it back to Ohio much like he would have carried a tracking device attached to his car. Once deployed, the NIT functioned in much the same way as a traditional tracking device sending location information back to the monitoring agents.").

Courts that have rejected the idea of a virtual tracking device have done so on the grounds that the NIT did not obtain the website user's IP address by tracking information but did so by searching the user's computer, or because the defendant "never controlled the government-controlled computer unlike a car with a tracking device leaving a particular district."  *See e.g.*, *Adams*, 2016 WL 4212079, at \*6 ("[T]he NIT does not track; it searches"); *Michaud*, 2016 WL 337263, at \*6.  Because the undersigned finds that the NIT did not search but tracked information as contemplated by 41(a)(2)(A), and because the NIT would not have been deployed in Defendant's computer but for Defendant's actions, the undersigned respectfully disagrees with the rationales provided by these opinions.

Having recommended that Judge Buchanan had the authority to issue the NIT Warrant, the Court will briefly discuss whether the warrant was valid.  The Fourth

Amendment imposes three requirements for a valid warrant: (1) a search warrant must be issued by a neutral, disinterested magistrate judge; (2) it must be based on a showing of "probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense"; and (3) it must satisfy the particularity requirement. *Dalia v. United States*, 441 U.S. 238, 255 (1979) (citations omitted). Defendant does not contend that either of the first two requirements are unsatisfied. *See* Doc. 24. Defendant argues, however, that the Government failed to comply with the particularity requirement. *Id.* at 12-13. Specifically, Defendant argues, "[h]ad the government particularly described the place to be searched, i.e., a computer in Florida, no warrant could have issued. Instead, the search warrant erroneously described the place to be searched as the server, located in Virginia." *Id.* at 12.

The Fourth Amendment specifies that warrants must particularly describe the place to be searched. U.S. Const. amend. IV; *Dalia*, 441 U.S. at 255. A review of the affidavit and attachments submitted in the support of the NIT Warrant, however, reveals that Agent Macfarlane informed Judge Buchanan that the NIT would cause activating computers "*wherever located*" to send certain identifying information back to the FBI. Indeed, the need for the NIT Warrant arose precisely because individuals accessing the Playpen website were using the Tor network to conceal their true locations. The NIT Warrant described the "activating computers" subject to the search, the specific identifying information the NIT sought to obtain, the time period during which the NIT would be used, and how it would be used. The Court disagrees

with Defendant's contention that "the fact that countless other computers were also searched only bolsters [the] conclusion" that the NIT Warrant suffered from a lack of particularity.   Accordingly, the undersigned recommends against a finding of a clear constitutional violation.

Assuming, *arguendo*, that Judge Buchanan did not have the authority to issue the NIT warrant, in the absence of a clear constitutional violation, Rule 41 requires suppression of evidence "only where (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983) (per curiam) (quoting *United States v. Sefanson*, 648 F.2d 1231, 1235 (9th Cir. 1981)) (citations omitted).   Defendant claims that he was prejudiced because the search of his computer would not have occurred had Rule 41(b) been followed.   Defendant also argues that the officers acted in intentional and deliberate disregard of Rule 41 because "[i]t is evident from the plain language of Rule 41(b) that no interpretation would allow the search of potentially thousands of computers located outside the authorizing district."   Doc. 24 at 13.

Defendant argues that he was prejudiced because the search authorized by the Residential Warrant would not have occurred but for information derived from the improperly issued NIT Warrant.   Doc. 24 at 11-13.   Several courts, however, have determined – and the undersigned agrees – that even had United States Magistrate Judge Buchanan concluded she lacked authority under Rule 41(b) to issue the

warrant, a United States District Judge could have issued the NIT Warrant without incident. *Bee*, 2017 WL 424905, at *5; *Lough*, 2016 WL 6834003, at *7; *Jean*, 207 F. Supp. 3d at 944.

Defendant next argues that the FBI should have known that the NIT warrant exceeded the jurisdictional scope of Rule 41(b) and cites a Texas district court case, *In re Warrant to Search a Target Computer at Premises Unknown*, 958 F. Supp. 2d 753, 757 (S.D. Tex. 2013), and a proposed amendment to Rule 41(b) that was then pending and has since been adopted, to support his argument. Doc. 24 at 13-14. The undersigned disagrees that *In re Warrant* or the proposed amendment to Rule 41(b) provided a clear indication that there was no authority for Judge Buchanan to issue the NIT Warrant.

First, *In re Warrant* is too factually distinguishable from the facts here to have placed the FBI on clear notice that there was no authorization for Judge Buchanan to issue the NIT Warrant. The information sought to be seized in *In re Warrant* was considerably more extensive and intrusive than the identifying information sought in the instant case. There, the government applied for a Rule 41(b) warrant that would authorize the government to surreptitiously install data extraction software on a target computer and seize records of Internet activity, including firewall logs, caches, browser history and cookies, search terms that the user entered into any Internet search engine, saved user names and passwords, documents, browsing history, user profiles, e-mail contents, e-mail contacts, and more. 958 F. Supp. 2d at 755-56. Here, the NIT was deployed for the specific purpose of retrieving identifying

information from the activating computers, in an effort to pinpoint the location of the Playpen content's final destination. Doc. 48 at 75-76. Additionally, the location of the target computer in *In re Warrant* where the installation was to occur was unknown to the government. 958 F. Supp. 2d at 757. In this case, the installation of the NIT occurred on a government-controlled computer within the district in which the NIT Warrant was issued. Furthermore, the government's application in *In Re Warrant* contained little to no information on how the target computer would be found and provided no assurance that the technique would not affect innocent computers. *Id.* at 758-59. Here, the NIT deployed on the Playpen website that operated as a hidden service on the Tor network, which required several affirmative steps to reach; and only those with an intent to view child pornography would take those steps, making it unlikely that any innocent user would stumble upon the website. Moreover, the *In Re Warrant* decision does not clearly and unambiguously provide, as Defendant suggests, that the NIT Warrant would not satisfy the requirements of Rule 41(b)(4). In conducting its Rule 41(b) analysis, the court stated

> [t]here is a plausible argument that the installation of software contemplated here falls within the statutory definition of a tracking device, because the software will activate the computer's camera over a period of time and capture latitude/longitude coordinates of the computer's physical location. But the Government's application would fail nevertheless, because *there is no showing that the installation of the "tracking device" (i.e. the software) would take place within this district.* To the contrary, the software would be installed on a computer whose location could be anywhere on the planet.

*Id.* at 758 (emphasis added). As noted, in the instant case, the warrant application clearly showed that the NIT would be installed in the Eastern District of Virginia.

Second, the proposed amendment to Rule 41(b) that was then pending does not provide a clear indication, as Defendant suggests, that the agents who sought the NIT warrant knew that Judge Buchanan lacked the authority to issue it. Rule 41(b)(6), effective as of December 1, 2016,[21] states, in pertinent part: "a magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district if . . . the district where the media or information is located has been concealed through technological means . . . ." Fed. R. Crim. P. 41(b)(6). Defendant points to a May 5, 2014 memorandum from Honorable Reena Raggi, Chair of the Advisory Committee on Criminal Rules, addressed to the Committee on Rules of Practice and Procedure, which explained that the proposed amendment had its origins in a letter from Acting Assistant Attorney General Mythili Raman. *See* Hon. Reena Raggi, *Report Of Advisory Committee On Criminal Rules*, 477-488 (May 5, 2014).[22] The memorandum stated that "Rule 41's territorial venue provisions – which generally limit searches to locations within a district – create special difficulties for the Government when it is investigating crimes involving electronic information." *Id.* By way of example, the memorandum specifically addressed the scenario presented in this case and went on to state:

Although some judges have reportedly approved such searches, one

---

[21] The adopted text is identical to the proposed amendment to Rule 41(b). COMMITTEE ON RULES OF PRAC. AND PROC., 499 (May 29-30, 2014), http://www.uscourts.gov/sites/default/files/fr_import/ST2014-05.pdf

[22] Available at http://www.uscourts.gov/sites/default/files/fr_import/ST2014-05.pdf.

> judge recently concluded that the territorial requirement in Rule 41(b)
> precluded a warrant for a remote search when the location of the
> computer was not known, and he suggested that the Committee should
> consider updating the territorial limitation to accommodate
> advancements in technology. *In re Warrant to Search a Target
> Computer at Premises Unknown*, 958 F. Supp. 2d 753 (S.D. Tex. 2013)
> (noting that "there may well be a good reason to update the territorial
> limits of that rule in light of advancing computer search technology").

*Id.* at 483-84. The Court disagrees that the memorandum unequivocally establishes that the FBI agents knew the NIT Warrant would result in a clear violation of then-existing Rule 41(b). Neither party introduced any evidence that Acting Assistant Attorney General Mythili Raman was involved in the FBI's investigation of the Playpen website, or that the agents who requested the NIT Warrant were involved in requesting the proposed amendment to Rule 41(b). Instead, regarding the NIT Warrant application, Agent Alfin testified:

> This operation was conducted as a joint operation between the FBI and
> the Department of Justice Child Exploitation and Obscenity Section.
> Numerous lawyers from both entities were involved, lawyers from the
> FBI office of general counsel, lawyers from the Department of Justice.
> The affidavit was reviewed by these lawyers, it was submitted to a judge,
> we sought judicial oversight. At no time did anyone believe that this
> warrant was invalid or that we were doing something not permitted by
> the law.

Doc. 48 at 43-44. Absent any evidence that those involved in the Playpen investigation and the NIT Warrant application also were involved in requesting the proposed amendment to Rule 41(b), the Court cannot conclude that the FBI agents knew the NIT Warrant would result in a clear violation of then-existing Rule 41(b). Lastly, there is no indication that the FBI failed to deploy the NIT in the manner described in the affidavit in support of the application. To the contrary, the agents

took additional precautions than those the warrant authorized prior to deploying the NIT, such as waiting until someone actually attempted to download child pornography, rather than upon simply logging in.

Furthermore, even assuming *arguendo* that the NIT Warrant was issued in violation of the Fourth Amendment, under the good faith exception to the exclusionary rule as set forth in *Leon*, 468 U.S. 897, the undersigned recommends that the evidence obtained as a result of the search should not be excluded because of the officers' good faith reliance on the NIT Warrant. The good-faith exception to the exclusionary rule applies when a search warrant that was issued by "a detached and neutral magistrate" judge is declared invalid but an objectively reasonable law enforcement officer executing the warrant "reasonabl[y] rel[ied]" on it. *Leon*, 468 U.S. at 913, 920-21. The exception exists because "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922. Moreover, "the exclusionary rule is not an individual right and applies only where it result[s] in appreciable deterrence." *Herring v. United States,* 555 U.S. 135, 141 (2009). The rule is "designed to deter police misconduct rather than punish the errors of judges and magistrate[ judge]s." *Leon,* 468 U.S. at 916. The operative inquiry in determining whether an officer acted in an objectively reasonable manner is: "whether a reasonably well trained officer would have known that the search [or seizure] was illegal despite the magistrate[ judge's] authorization." *Id.* at 922 n.23. The court must consider the totality of the circumstances in making

this determination.  *United States v. Taxacher*, 902 F.2d 867, 871-72 (11th Cir. 1990).    The *Leon* good faith exception applies in all but four limited sets of circumstances.    468 U.S. at 923.    The four sets of circumstances are:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role . . . ; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) (internal citations and quotation marks omitted).

None of the exceptions to the *Leon* good faith exception exist here.    The agents sought the ruling of a neutral and detached magistrate judge that probable cause existed to deploy of the NIT.    There is no evidence that Agent Macfarlane knew that any of the information in the NIT Warrant affidavit was false or that he would have known it was false but for his reckless disregard for the truth.    Furthermore, there is no evidence that Judge Buchanan wholly abandoned her judicial role.    Agent Macfarlane's detailed and descriptive affidavit was not so lacking in probable cause as to render official belief in its existence entirely unreasonable.    Moreover, as the Court explained above, the NIT warrant was not so facially deficient that it failed to particularize the things to be seized.    The NIT warrant delineated the items to be seized from the activating computers and limited the NIT search to those items that would identify the location of the activating computer.

Additionally, as the Government points out, because Rule 41(b)(6) now specifically permits the use of the NIT, any need for deterrence is eliminated. On the other hand, "[t]he principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" *Herring*, 555 U.S. at 141 (citing *Leon*, 468 U.S. at 908)). Here, the marginal deterrence, if any, that would result from suppression does not outweigh the substantial societal cost of potentially allowing culpable defendants engaged in facilitation or distribution of child pornography to go free. The undersigned, therefore, recommends that even if the warrant is deemed deficient, the good faith exception to the exclusionary rule saves the evidence from suppression. After all, "[e]xclusion is a remedy of 'last resort,' justified *only* where the 'deterrence benefits of suppression' outweigh the 'substantial social costs' of 'ignor[ing] reliable, trustworthy evidence bearing on guilt or innocence.'" *United States v. Smith*, 741 F.3d 1211, 1219 (11th Cir. 2013) (citing *Davis v. United States*, 564 U.S. 229, 237 (2011)).

### b. Whether the Residential Warrant Was Supported by Probable Cause

Defendant next argues that the facts alleged in the Residential Warrant affidavit were insufficient for a finding of probable cause to believe that any child pornography, or any evidence of accessing child pornography, would be found in Defendant's residence. Doc. 24 at 15-18. In his brief, however, Defendant acknowledges that Officer Ewert advised Judge McCoy of the nature of the Tor network, the installation of the NIT warrant, and the FBI's determination that the

user "thegabetrain" accessed the Playpen website on three occasions. *Id.* at 16.

First, Defendant challenges whether Officer Ewert's description of the "thegabetrain" user's activity on the Playpen website on those three occasions constitutes probable cause to issue the Residential Warrant to search Defendant's home. *Id.* at 16-18. Regarding the first of those three occasions, Defendant contends that although Officer Ewert's affidavit advised Judge McCoy that on February 22, 2015, someone with the user name "thegabetrain" with a particular IP address accessed the Playpen website, it did not state whether any illegal material was viewed or downloaded on that occasion. Doc. 24 at 16. Regarding the next two occasions when "thegabetrain" accessed the Playpen website, which occurred on February 25, 2015, Defendant contends that although Officer Ewert explained that the user name "thegabetrain" accessed two separate posts that contained links to images depicting child pornography, he failed to state whether the user ever actually accessed those links. *Id.* at 17. Moreover, Defendant argues that there was no allegation that "thegabetrain" that accessed the website on February 25, 2015 was the same "thegabetrain" that the FBI identified when it previously captured its IP address on February 22, 2015 since the FBI was unable to capture the user's IP address on February 25. *Id.*

Second, at the suppression hearing Defendant elicited through cross-examination of both witnesses the fact that certain forums on the Playpen website did not contain images of child pornography and child erotica. Doc. 48 at 53-58, 126-28. During closing arguments, Defendant thus argued that the Playpen website was

not entirely dedicated to child pornography and the lack of allegation in Officer Ewert's affidavit that Defendant accessed or possessed child pornography rendered the Residential Warrant defective. Doc. 48 at 168-70. As to Defendant's arguments, the Government responds that to accept them would result in the Court requiring conclusive proof, beyond a reasonable doubt, before a search warrant is issued. Doc. 38 at 38. The Government argues that in this case, when read in context, the affidavit clearly establishes probable cause. *Id.*

The undersigned recommends that the affidavit in support of the search warrant provided probable cause for the issuance of the Residential Warrant. "A sufficient basis for probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011) (quotation marks omitted). A judge must "make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "A fair probability, in turn exists when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime." *Lopez*, 649 F.3d at 1245 (quotation marks omitted). "The connection between the objects to be seized and the premises to be searched can be established from the particular circumstances involved and need not rest on direct

observation." *Id.* (quotation marks omitted).

The Court agrees with the Government's contention that, when read in context, Officer Ewert's affidavit in support of the Residential Warrant established that there was a fair probability that child pornography, or evidence of accessing child pornography, would be found in Defendant's residence. As recited above, Officer Ewert's affidavit described the nature of the Tor network and the Playpen website specifically, "thegabetrain" user's activity on the Playpen website, and the IP connection between "thegabetrain" and Defendant's residence. Officer Ewert described the Playpen website as a child pornography website dedicated to the advertisement and distribution of child pornography. Gov't Ex. 2 ¶ 11. On the main page of the website, there were images of prepubescent girls wearing sexually provocative clothing and posing suggestively. *Id.* ¶ 14. Accessing the website required several affirmative steps, making it "extremely unlikely" to stumble upon it without understanding its content and primary purpose. *Id.* ¶ 8. Those steps required downloading the Tor software, obtaining Playpen's address from online postings describing both its content and location, and registering an account on the Playpen website by entering a username, password, and e-mail address; although a valid e-mail address was not required so as to protect user identity. *Id.* ¶¶ 8, 17. The user had to accept registration terms, which included recommendations to hide the users' identity and warnings of automatic bans against anyone discussing law enforcement related activity. *Id.* ¶¶ 14, 17.

To provide a nexus between Defendant's residence and the likelihood that

evidence of child pornography would be found there, Officer Ewert advised Judge McCoy that the agents were able to determine the physical address connected to "thegabetrain" user's IP address, which was the address of Defendant's residence. The Court is mindful that Officer Ewert's affidavit advised Judge McCoy that a username "thegabetrain" had logged into the Playpen website on three separate occasions between February 22-25, 2015, during one of which the FBI was able to determine its IP address but not the post accessed, and during two of which the FBI was able to determine the post accessed but not the IP address. Important to the Court's analysis, however, is the averment in the affidavit that "thegabetrain" user had been actively logged into the Playpen website *for a total of sixteen hours* between January 9, 2015 and March 4, 2015. *Id.* ¶ 32. Furthermore, the undersigned finds it unlikely that two or more individuals would log into the Playpen website using the same username and password, or that the individual user remained active for so long without clicking on any child pornography links.

The Court also finds unpersuasive Defendant's second argument – that the Playpen website was not entirely dedicated to child pornography – to support his contention that the Residential Warrant lacked probable cause. Defendant points to testimony elicited at the hearing and set forth in the Residential Warrant affidavit that, in addition to the topics clearly relating to child pornography, the Playpen website contained other topics or forums that did not appear on their face to contain child pornography, such as "General Discussion," "Security & Technology discussion," "How to," and "[Playpen] information and rules." Doc. 48 at 53-58, 126-28; *see also*

Gov't Ex. 2 ¶ 20.   Officer Ewert's affidavit, however, explained that a review of these topic forums "revealed that the majority contained general information in regards to the [Playpen] site, instructions and rules for how to post, and welcome messages between users."   Gov't Ex. 2 ¶ 24.   All other remaining topics, however, "contained discussions about, and numerous images that appeared to depict, child pornography and child erotica depicting prepubescent girls, boys, and toddlers."   *Id.* ¶ 25.   Considering the totality of circumstances, due to the nature of the Playpen website, the required steps to register an account, and the amount of time spent on the website over a period of multiple days, there was probable cause to believe that "thegabetrain" accessed at least one image of child pornography on at least one occasion.

In summary, a probable cause finding "does not deal with hard certainties, but with probabilities," and based on all the circumstances set forth in Officer Ewert's affidavit, the "practical, commonsense decision" was that there was a fair probability that evidence of child pornography would be found in Defendant's residence.   *See Gates*, 462 U.S. at 231, 238 (citation omitted) Accordingly, the undersigned recommends that the Residential Warrant was supported by probable cause.

Alternatively, even if the Residential Warrant was not supported by probable cause, the *Leon* good faith exception would apply to save the evidence from suppression.   468 U.S. 897.   Here, Officer Ewert relied on information provided by the FBI that was obtained as a result of the NIT warrant, which was issued by a neutral and detached magistrate judge.   There is no evidence that any information provided in Officer Ewert's affidavit was false or misleading.   With the information

provided, Judge McCoy found probable cause to issue the warrant.  Officer Ewert

could not be expected to question Judge McCoy's probable cause determination, which

was supported by factual assertions obtained as a result of a separately issued NIT

Warrant, which the undersigned recommends was lawful.  *Leon*, 468 U.S. at 921.

> c. *Whether Defendant was subject to a custodial interrogation without first being advised of his Miranda rights*

Finally, Defendant argues that he was "in custody" and therefore should have

received *Miranda* warnings before being questioned by agents on the back lanai of

his residence.    Doc. 24 at 18-23.   Defendant's argument rests in part on what he

called a "gratuitous[]" statement that Defendant did not have to speak to the

officers.[23]  *Id.* at 22.  The Government contends that no *Miranda* warnings were

---

[23] Specifically, the following exchange occurred at the beginning of the interview:
Officer Bunch: But you understand we're doin' a search warrant here, right?
Defendant: Yeah, you guys -- no one told me what – what's goin' on --
Officer Bunch: Yeah, but we're – we're doin' a search warrant. You're free to go and you don't have to talk to us, but we gotta limit where everyone kinda goes right now. We can't have you wanderin' around the house.
Officer Ewert: So for example --
Officer Bunch: That's why we're askin' with guns and everything, too --
Defendant: Right.
Officer Ewert: So, for example, we're on your lanai. You know, we're -- I mean you can go out either side. You know, it -- these doors are not locked to my knowledge, but you can unlock them from the inside where we are. So that's why we -- we kinda get that out there up front early, so that way you know that, uh, just like my partner said, you don't have to talk to us.
Officer Bunch: We're tryin' to figure out a couple things. If you wanna ask a question, ask us. But if any -- you know, at any time you could say, "Hey, Bunch, Zac, screw you. I'm not talkin' to you," and walk away. You know what I mean? It's, like, no hard feelings, but we're just tryin' to figure out a couple things.
Defendant: Okay.
Officer Bunch: Simple as that --
Officer Ewert: Right now we're just – it's just a fact finding mission right now.
Officer Bunch: Do you understand?
Officer Ewert: We're just havin' a discussion.
Officer Bunch: Do you understand me so far?

required because Defendant was free to leave and was not required to speak with the officers but chose to do so voluntarily. Doc. 38 at 39-42. The Court recommends that Defendant was not "in custody" for *Miranda* purposes, and therefore no *Miranda* warnings were required. Because Defendant's incriminating and inculpatory statements were not taken in violation of *Miranda*, they are not subject to suppression here.

When determining whether an individual is "in custody," courts look at the totality of the circumstances and whether, under those circumstances, a reasonable "innocent" person in the defendant's position would not have felt free to leave. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether defendant was free to leave are irrelevant." *Id.* (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)). In deciding whether a reasonable person would have felt free to leave, courts may consider several factors, including the location and duration of the questioning, whether the defendant was restrained and whether he was released after the interview. *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012).

"[T]he fact that an individual is told he is not under arrest and is free to leave is a fact of *substantial importance* in determining whether a reasonable person would have felt free to leave." *Brown*, 441 F.3d at 1347 (emphasis added). The Eleventh Circuit has found it "significant" that the interview took place in familiar and neutral surroundings and that the defendant acknowledged he understood officers'

---

Defendant: Yeah. Yeah.
Gov't Ex. 3t at 7-8.

statements that he was free to leave. *Id.* at 1348. Indeed, finding that a defendant not only was advised that he was not under arrest and was free to leave, but also *understood* that he was not under arrest and was free to leave, is "critical" to determining whether a defendant is in custody for *Miranda* purposes: "[u]nambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" *Id.* at 1346 (quoting *United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000)). The Court does not find such extensive restraints here.

Instead, each of the factors for consideration weigh in the Government's favor. First, Defendant was questioned by officers while on the back lanai of his home. The Court can think of few, if any, surroundings more familiar and neutral than one's home. The agents informed Defendant he was free to leave and need not speak with law enforcement at the beginning of the interview, and again later during the interview. *See* Gov't Ex. 3t at 7-8, 91. Similarly, when asked whether Defendant was talking to the agents of his own free will, Defendant confirmed that he was. *Id.* at 91. By the time Defendant agreed to be interviewed by agents, he was fully aware of the agents' true purpose at his residence and volunteered to speak with law enforcement even after being told that he was not required to do so. Although Defendant was told he was free to leave, he never expressed a desire or attempted to do so. Moreover, the officers' weapons were concealed during the interview, and

Defendant was released after questioning.   Doc. 48 at 110.

Officer Ewert testified that the interview took place on Defendant's lanai and described the interview as "very laid back, lighthearted" that contained laughing and discussions about video games.   Doc. 48 at 110.   The undersigned listened to the audio recording of the interview, as well as reviewed the transcript of the interview, and concludes that the interview was not inherently coercive.   Defendant agreed that the agents' treatment of him was "good."[24]   *See* Gov't Ex. 3t at 92.

"*Miranda* does not erect an absolute *per se* bar on any conversation with the accused by the investigating officer.   It must be applied instead with flexibility and realism."   *United States v. Castro*, 723 F.2d 1527, 1532 (11th Cir. 1984).   The "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."   *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)); *see also United States v. Phillips*, 812 F.2d 1355, 1359 (11th Cir. 1987) (noting the Supreme Court's position that the "ultimate inquiry" is whether there is a restraint on movement similar to that of formal arrest).   Based on the facts of this case, the undersigned recommends there was not.   Because the Court recommends that

---

[24] Specifically, this portion of the interview went as follows:
Officer Bunch: But really, since we've been here today, I mean how have we -- how have we been with you --
Defendant: It – it's – it's been good.
Officer Bunch: Okay. And it's -- that ain't never gonna change --
Officer Ewert: We haven't threatened you in any way or made any promises or --
Defendant: No. No, you're -- no, you guys are good.
Gov't Ex. 3t at 92.

Defendant was not "in custody," no *Miranda* warnings were required before agents began their interview with Defendant. Accordingly, the Court will not recommend suppression on this ground.

Accordingly, for the reasons described above, it is hereby **RESPECTFULLY RECOMMENDED** that Defendant's Motion to Suppress Evidence (Doc. 24) be denied.

**DONE** and **ENTERED** in Fort Myers, Florida on this 27th day of April, 2017.

CAROL MIRANDO
United States Magistrate Judge

Copies:

Honorable John E. Steele
Counsel of Record

2017 WL 1437511
Only the Westlaw citation is currently available.
United States District Court,
N.D. Alabama, Southern Division.

UNITED STATES of America
v.
James Ryan TAYLOR, Defendant.

2:16-cr-00203-KOB-JEO-1
|
Signed 04/24/2017

**Attorneys and Law Firms**

United States Marshal, US Attorney Joyce White Vance, Jacquelyn Mather Hutzell, United States Attorney's Office, US Probation, United States Probation Office, Birmingham, AL, for United States of America.

Kevin L. Butler, Federal Public Defender, Birmingham, AL, for Defendant.

## MEMORANDUM OPINION

KARON OWEN BOWDRE, CHIEF UNITED STATES DISTRICT JUDGE

**\*1** The United States filed this and many other child pornography criminal cases following an extensive FBI sting operation that resulted in the seizure of a website, "Playpen," dedicated to the advertisement and distribution of child pornography. After taking over Playpen, the FBI first obtained a warrant in the Eastern District of Virginia that enabled it to seize Defendant's Internet Protocol (IP) address and other identifying information. With that information, the FBI obtained and executed a second warrant in the Northern District of Alabama to search Defendant's home and seize certain property, including a solid state drive that contained child pornography. The Government charged Defendant James Ryan Taylor with receipt of child pornography under 18 U.S.C. § 2252A(a)(2) and with possession and accessing child pornography with intent to view under 18 U.S.C. §§ 2252A(a)(5)(B) & (b)(2). (Doc. 1).

This case comes before the court on Defendant's Motion to Suppress Evidence. (Doc. 21). The Government has filed a Response (doc. 26) and Supplemental Response.

(Doc. 30). The court **WILL DENY** the Motion to Suppress.

## I. Statement of Facts

From September 2014 to February 2015, FBI agents monitored "Playpen," a website dedicated to the advertisement and distribution of child pornography. The Playpen website was only accessible via "The Onion Router" or "Tor" network, which is part of what is sometimes referred to as the "Dark Web" because of its anonymity features. [1] On February 20, 2015, the FBI obtained a warrant in the Eastern District of Virginia to deploy a Network Investigative Technique ("NIT") on the Playpen website to obtain identifying information about the computers accessing the site. That warrant lies at the heart of this case. The FBI's warrant application included the affidavit of FBI Special Agent Douglas Mcfarlane, who investigated the Playpen website. Agent Mcfarlane's affidavit describes in detail the website, the Tor network, and other relevant facts from the FBI's investigation.

[1]     *See Hacker Lexicon: What is the Dark Web?*, WIRED, https://www.wired.com/2014/11/hacker-lexicon-whats-dark-web/ (Nov. 19, 2014).

### A. The Tor Network

Tor is a program designed to provide Internet privacy protections by restricting the kinds of information a website can collect from a user, particularly a computer's IP address. [2] The Tor software permits a user to access the Tor network, a network of computers that obscures the identity of users by rerouting a user's IP address through "layers" of relay points, so that the IP address at which a signal exits (the "exit node") is not the IP address at which the signal originated. This process makes it impossible to "peel back the layers of the onion" to discover the originating IP address, which in turn marks the user's geographic location and can be used to identify the user.

[2]     " 'Internet Protocol address' or 'IP address' refers to a unique number used by a computer to access the Internet. IP addresses can be 'dynamic,' meaning that the Internet Service Provider ('ISP') assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be 'static,' if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are also

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    1

used by computer servers, including web servers, to communicate with other computers." (Doc. 21-1 at 8–9).

**\*2** Websites accessible only on the Tor network, termed "hidden services," are not searchable through Google or other search engines; rather, a user must employ the Tor software and know the exact address of a particular hidden service to access it. A user could obtain the address from communications with other individuals who use the hidden service or from an Internet posting describing the hidden service and giving its address. The Playpen website, for example, was listed on a Tor hidden service page dedicated to pedophilia and child pornography. Website addresses on the Tor network consist of a randomized series of characters produced by an algorithm and end in ".onion." Tor obscures the IP addresses of hidden services, meaning that law enforcement cannot determine the location of the computer hosting a hidden service.

Originally designed and employed by the U.S. Navy, the Tor network is used for many legal purposes and is freely available for download at https://www.torproject.org.

### B. The Playpen Website

The Playpen website was located at different ".onion" URLs depending on when it was accessed; the administrator of Playpen periodically moved the website from one URL to another, without otherwise altering it, in part to avoid detection by law enforcement. The website's homepage featured the word "Playpen" and two images of partially clothed prepubescent females with their legs spread apart. Beneath the logo was text stating, "No cross-board reposts, .7z preferred, encrypt filenames, include preview, Peace out." Special Agent Mcfarlane's affidavit explains that "[n]o cross-board reposts" refers to not posting files from other websites and ".7z preferred" denotes a method of compressing large files for distribution. The homepage also included a login section and a link to the registration page. The registration terms on the registration page instructed users to not enter a real email address and stated that "[f]or your own security" users should not post identifying information and should disable other potentially identifying browser features.

Upon logging in, a user would be immediately directed to a Playpen directory that listed message boards divided into more than fifty topics and subtopics that largely

referred to child pornography, child erotica, and child sexual abuse. For example, the topics included "Pre-teen Videos" and "Pre-teen Photos," both subdivided into "Girls HC [hardcore]" and "Girls SC [softcore]/NN [non-nude]" and "Boys HC" and "Boys SC/NN"; "Kinky Fetish," and "Family [Playpen]—Incest." [3] Agent Mcfarlane's affidavit details numerous examples of child pornography posted on the Playpen message boards under these topics and others.

3    Agent Mcfarlane's affidavit explains that "hardcore" refers to depictions of sexually penetrative explicit conduct; "softcore" refers to depictions of non-penetrative sexually explicit conduct; and "non-nude" refers to depictions of fully or partially clothed subjects.

### C. The FBI Investigation & Network Investigative Technique ("NIT")

Upon receiving on a tip from a foreign law enforcement agency, the FBI identified the Playpen website's host IP address and seized a copy of the server containing the Playpen website, storing that copy on a server in the Eastern District of Virginia. The FBI arrested the Playpen website administrator and assumed administrative control of Playpen. Because traditional methods of obtaining IP addresses would only reveal the "exit node" IP addresses of Playpen users, the FBI sought and received permission to deploy a Network Investigative Technique (NIT) from the server in the Eastern District of Virginia to locate and identify Playpen users. A magistrate judge in the Eastern District of Virginia signed the warrant permitting the FBI to deploy the NIT.

The NIT consisted of computer code that instructed a user's computer to transmit specific information to a government-controlled computer. The NIT operated by downloading to a user's browser along with other content from the Playpen website. Though the warrant authorized the FBI to deploy the NIT to any computer logging into the Playpen website, in executing the warrant the FBI only deployed the NIT to computers accessing actual pornography in certain Playpen forums. *See* (Doc. 30-1 at 18–19). That is, when a user clicked on a designated pornographic image or video on Playpen, the website on the server in the Eastern District of Virginia transmitted the image or video along with the NIT code. Once downloaded to a user's browser, the NIT instructed

a user's computer—the "activating computer"—to send specific information to the government computer.

**\*3** In the section of the NIT warrant application requesting information about the person or property to be searched, the application refers to Attachment A. Attachment A explains that the warrant authorizes the use of a NIT on a computer server operating the Playpen website and that the server is located at a government facility in the Eastern District of Virginia. Attachment A also states that the NIT will obtain the information specified in Attachment B from the "activating computers" of any user or administrator who logs into the Playpen website.

Similarly, in the section requesting information about the property to be seized, the application refers to Attachment B. Attachment B explains that the NIT would collect the following seven pieces of information:

1. The "activating" computer's actual IP address, and the date and time that the NIT determines what that IP address is;

2. A unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish the data from that of other "activating" computers. That unique identifier will be sent with and collected by the NIT;

3. The type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86);

4. Information about whether the NIT has already been delivered to the "activating" computer;

5. The "activating" computer's "Host Name." A Host Name is a name assigned to a device connected to a computer network that is used to identify the device in various forms of electronic communication, such as communications over the Internet;

6. the "activating" computer's active operating system username; and

7. The "activating" computer's Media Access Control ("MAC") address. The equipment that connects a computer to a network is commonly referred to as a network adapter. Most network adapters have a MAC address assigned by the manufacturer of the adapter

that is designed to be a unique identifying number. A unique MAC address allows for proper routing of communications on a network. Because the MAC address does not change and is intended to be unique, a MAC address can allow law enforcement to identify whether communications sent or received at different times are associated with the same adapter.

Both Attachments A and B, along with Agent Mcfarlane's affidavit, were included with the NIT warrant application.

### D. Motions to Suppress in Other Cases

As of today, at least 44 district courts have ruled on motions to suppress the information seized pursuant to the NIT warrant. Twelve of these courts have found that the warrant did not violate § 636(a) of the Federal Magistrates Act and/or Rule 41 of the Federal Rules of Criminal Procedure. *U.S. v. Jones*, No. 3:16-cr-026, 2017 WL 511883 (S.D. Ohio February 2, 2017); *U.S. v. Austin*, No. 3:16-cr-00068, 2017 WL 496374 (M.D. Tenn. Feb. 2, 2017); *U.S. v. Bee*, No. 16-00002-01-CR-W-GAF, 2017 WL 424889 (W.D. Mo. Jan. 31, 2017) (adopting magistrate judge's report and recommendation); *U.S. v. Sullivan*, No. 1:16-cr-270, 2017 WL 201332 (N.D. Ohio Jan. 18, 2017); *U.S. v. Dzwonczyk*, No. 4:16-CR-3134, 2016 WL 7428390 (D. Neb. Dec. 23, 2016) (adopting magistrate judge's report and recommendation); *U.S. v. McLamb*, No. 2:16cr92, 2016 WL 6963046 (E.D. Va. Nov. 28, 2016); *U.S. v. Lough*, No. 1:16CR18, 2016 WL 6834003 (N.D.W. Va. Nov. 18, 2016); *U.S. v. Johnson*, No. 15-00340—01-CR-W-GAF, 2016 WL 6136586 (W.D. Mo. Oct. 20, 2016) (adopting in part magistrate judge's report and recommendation);*U.S. v. Smith*, No. 4:15-CR-00467 (S.D. Tex. Sept. 28, 2016); *U.S. v. Jean*, 207 F. Supp. 3d 920 (W.D. Ark. 2016); *U.S. v. Eure*, No. 2:16cr43, 2016 WL 4059663 (E.D. Va. July 28, 2016);*U.S. v. Matish*, 193 F. Supp. 3d 585 (E.D. Va. 2016); *U.S. v. Darby*, 190 F. Supp. 3d 520 (E.D. Va. 2016); *cf. U.S. v. Laurita*, No. 8:13CR107, 2016 WL 4179365 (D. Neb. Aug. 5, 2016) (adopting magistrate judge's report and recommendation) (finding no violation of the statute or Rule by a NIT warrant issued in a different pornography website investigation).

**\*4** Twenty-two district courts have found that the warrant did violate § 636(a) and/or Rule 41(b), but that the violation did not warrant suppression. *U.S. v. Gaver*, 3:16-cr-88, 2017 WL 1134814 (S.D. Ohio Mar. 27, 2017); *U.S. v. Perdue*, No. 3:16-CR-305-D(1), 2017

WL 661378 (N.D. Tex. Feb. 17, 2017); *U.S. v. Pawlak*, No. 3:16-CR-306-D(1), 2017 WL 661371 (N.D. Tex. Feb. 17, 2017); *U.S. v. Kahler*, No. 16-cr-20551, 2017 WL 586707 (E.D. Mich. Feb. 14, 2017); *U.S. v. Deichert*, No. 5:16-CR-201-FL-1, 2017 WL 398370 (E.D.N.C. Jan. 28, 2017);*U.S. v. Vortman*, No. 16-cr-00210-THE-1, 2016 WL 7324987 (N.D. Cal. Dec. 16, 2016); *U.S. v. Hammond*, No. 16-cr-00102-JD-1, 2016 WL 7157762 (N.D. Cal. Dec. 8, 2016); *U.S. v. Duncan*, No. 3:15-cr-00414-JO, 2016 WL 7131475 (D. Or. Dec. 6, 2016); *U.S. v. Owens*, No. 16-CR-38-JPS, 2016 WL 7053195 (E.D. Wis. Dec. 5, 2016) (adopting magistrate judge's report and recommendation); *U.S. v. Stepus*, No. 15-30028-MGM, 2016 WL 6518427 (D. Mass. Oct. 28, 2016);*U.S. v. Scarbrough*, No. 3:16-CR-35, 2016 WL 5900152 (E.D. Tenn. Oct. 11, 2016) (adopting magistrate judge's report and recommendation);*U.S. v. Allain*, No. 15-cr-10251, 2016 WL 5660452 (D. Mass. Sept. 29, 2016); *U.S. v. Broy*, 209 F. Supp. 3d 1045 (C.D. Ill. 2016); *U.S. v. Knowles*, 207 F. Supp. 3d 585 (D.S.C. 2016); *U.S. v. Ammons*, 207 F. Supp. 3d 732 (W.D. Ky. 2016); *U.S. v. Torres*, No. 5:16-CR-285-DAE, 2016 WL 4821223 (W.D. Tex. Sept. 9, 2016); *U.S. v. Henderson*, No. 15-cr-00565-WHO-1, 2016 WL 4549108 (N.D. Cal. Sept. 1, 2016); *U.S. v. Adams*, No. 6:16-cr-11-Orl-40-GJK, 2016 WL 4212079 (M.D. Fla. Aug. 8, 2016); *U.S. v. Rivera*, 2:15-cr-00266-CJB-KWR (E.D. La. July 20, 2016); *U.S. v. Werdene*, 188 F. Supp. 3d 431 (E.D. Penn. 2016); *U.S. v. Stamper*, No. 1:15cr109, 2016 WL 695660 (S.D. Ohio February 19, 2016); *U.S. v. Michaud*, No. 3:15-cr-05351-RJB, 2016 WL 337263 (W.D. Wash. Jan. 28, 2016).

A few courts have declined to decide whether the statute and/or the Rule authorized the warrant but found that exclusion was unwarranted regardless. *U.S. v. Schuster*, No. 1:16-cr-51, 2017 WL 1154088 (S.D. Ohio Mar. 28, 2017); *U.S. v. Tran*, No. 16-10010-PBS, 2017 WL 7468006 (D. Mass. Dec. 28, 2016);*U.S. v. Kienast*, No. 16-CR-103, 2016 WL 6683481 (E.D. Wis. Nov. 14, 2016); *U.S. v. Anzalone*, No. 15-10347-PBS, 2016 WL 5339723 (D. Mass. Sept. 22, 2016); *U.S. v. Acevedo-Lemus*, No. SACR 15-00137-CJC, 2016 WL 4208436 (C.D. Cal. Aug. 8, 2016); *U.S. v. Epich*, No. 15-CR-163-PP, 2016 WL 953269 (E.D. Wis. Mar. 14, 2016) (adopting magistrate judge's report and recommendation).

Four courts have suppressed the evidence. *U.S. v. Croghan*, 209 F. Supp. 3d 1080 (S.D. Iowa 2016); *U.S. v. Workman*, 205 F. Supp. 3d 1256 (D. Colo. 2016);

*U.S. v. Arterbury*, No. 15-CR-182-JHP (N.D. Okla. May 17, 2016) (adopting magistrate judge's report and recommendation); *U.S. v. Levin*, 186 F. Supp. 3d 26 (D. Mass. 2016).

### E. Search of Mr. Taylor's Residence & Indictment

The data gathered from the NIT revealed that Playpen user "Wilcox1" was linked to a computer with the host name "RyansComputer," with computer login name "Ryan." (Doc. 26-2 at 31). Wilcox1 accessed several images of child pornography on Playpen on March 1, 2015. Through an administrative subpoena, the FBI further determined that the IP address associated with "Wilcox1" was assigned to Mr. Taylor at his residence in Birmingham, Alabama. A magistrate judge in the Northern District of Alabama authorized a search warrant for Mr. Taylor's residence, which the FBI executed on January 4, 2016.

**\*5** The FBI seized a laptop, a hard drive, a solid state drive, and a USB drive from Mr. Taylor's residence. Both parties acknowledge that the initial FBI analysis of these devices did not reveal any child pornography stored on them; however, a second analysis of the devices at the FBI's Digital Analysis and Research Center found child pornography on the solid state drive. The Government subsequently indicted Mr. Taylor. (Doc. 1).

## II. Discussion

Mr. Taylor argues that the search and seizure of his property in the Northern District of Alabama exceeded the scope of the NIT warrant. He further argues that the warrant was invalid under the Fourth Amendment's probable cause and particularity mandates, Rule 41(b) of the Federal Rules of Criminal Procedure, and 28 U.S.C. § 636(a), a provision of the Federal Magistrates Act. Mr. Taylor asserts that the pornography seized pursuant to the residential warrant, which was authorized based on the information seized by the NIT, should be suppressed as fruit of the poisonous tree.

However, the court will first examine the question of whether the FBI's execution of the NIT warrant constituted a search within the meaning of the Fourth Amendment, such that the Government required a warrant at all. In addition to determining whether the Fourth Amendment governs this case, this inquiry addresses precisely what property was searched and

seized, which is necessary to the Rule 41(b) and § 636(a) analysis.

### A. Whether Execution of the NIT Constituted a Fourth Amendment Search

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. A search for purposes of the Fourth Amendment does not require a physical trespass to property. *See Katz v. U.S.*, 389 U.S. 347, 353 (1967). In the absence of a trespass, "the application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *See Smith v. Maryland*, 442 U.S. 735, 740 (1979).

Under the two-part *Katz* test, an individual must demonstrate both a subjective expectation of privacy in the object of the challenged search, and that society is prepared to accept that expectation as objectively reasonable. *California v. Ciraolo*, 476 U.S. 207, 211 (1986). The third-party doctrine applies when someone voluntarily disclosed information to a third party; an expectation of privacy in such information fails the objectively reasonable prong. *See Smith*, 442 U.S. at 743–44; *see, e.g.*, *U.S. v. Davis*, 785 F.3d 498, 511–12 (11th Cir. 2015).

The Supreme Court has applied the third-party doctrine to permit electronic tracking of certain information without a warrant. *See U.S. v. Knotts*, 460 U.S. 276, 285 (1983) (holding that officers' installation, prior to purchase, of a "beeper" in a barrel purchased by one of the codefendants and the officers' subsequent monitoring of the signals from that beeper as the codefendant transported it by vehicle to its final destination did not constitute a Fourth Amendment search, because a car's movements are public information); *but see U.S. v. Jones*, 565 U.S. 400, 404 (2012) (distinguishing *Knotts* and holding that the use of a GPS tracker to monitor a car's movements over 28 days constituted a search because the monitor installation was a physical trespass—the car was already in the defendant's possession at the time the tracker was installed). Even though the information acquired by the Government in *Jones* was public, like that in *Knotts*, the *place searched* was constitutionally protected. *See id.* at 409 (in dicta, noting that the Court knew of no case that would

support the position that "what would otherwise be an unconstitutional search is not such where it produces only public information").

**\*6** Similarly, the Government may not employ "sense-enhancing technology" that is not in general public use to obtain information that "could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area' ...." *Kyllo v. U.S.*, 533 U.S. 27, 34 (2001) (quoting *Silverman v. U.S.*, 365 U.S. 505, 512 (1961)). The technology at issue in *Kyllo* was a thermal imager that produced images showing heat distributions within the defendant's home and in comparison with his neighbors' homes. *Id.* at 29–30. Based on their thermal imaging scan of Kyllo's residence, officers determined that Kyllo was using halide lights to grow marijuana in his house. *Id.* at 30. Though the officers obtained additional information about Kyllo's increased electricity usage by subpoenaing his utility company, the Court determined that the officers' use of the thermal imager constituted a search under the Fourth Amendment. *See id.* at 40; *id.* at 44 (Stevens, J., dissenting).

Lower courts uniformly agree that, because of the third-party doctrine, computer users lack a reasonable expectation of privacy in their IP addresses, subscriber information, and similar descriptive information they disclose to third parties (such as ISPs) to facilitate Internet service. *See, e.g.*, *U.S. v. Carpenter*, 819 F.3d 880, 887 (6th Cir. 2016) (internal citations omitted) ("The Fourth Amendment protects the content of the modern-day letter, the email. But courts have not (yet, at least) extended those protections to the internet analogue to envelope markings, namely the metadata used to route internet communications, like sender and recipient addresses on an email, or IP addresses."); *U.S. v. Weast*, 811 F.3d 743, 748 (5th Cir. 2016) (holding that the Fourth Amendment does not protect IP addresses or peer-to-peer shared files); *U.S. v. Beckett*, 369 Fed.Appx. 52, 56 (11th Cir. 2010) (non-precedential) (holding that an individual has no reasonable expectation of privacy in identifying information transmitted for ISPs and phone providers to provide service).

In contrast, courts agree that individuals do have a reasonable expectation of privacy in the contents of their computers. *See, e.g.*, *U.S. v. Turner*, 839 F.3d 429, 434 (5th Cir. 2016) (citing *Riley v. California*, 134 S. Ct. 2473, 2485 (2014)) (noting the recognized privacy interest in the

electronic contents of computers and cell phones); *U.S. v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (citing *Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001)) (finding a reasonable expectation of privacy in password-protected files). In a case involving a remote search of a computer, the Ninth Circuit held that a reasonable privacy interest in a personal computer (password-protected and located in the owner's residence) was not extinguished by the owner's connecting to a wireless network, even though others occasionally had access to the computer, because the computer owner was not alerted that his computer usage might be monitored. *U.S. v. Heckencamp*, 482 F.3d 1142, 1147 (2007).

### 1. Nature of the Property Searched & Seized

In their briefs, both parties address Mr. Taylor's constitutional privacy interests in the property searched and seized in the context of a Rule 41 violation. Mr. Taylor maintains that the NIT search violated his reasonable expectation of privacy in his home and personal computers, while the Government argues that Mr. Taylor lacked a reasonable privacy interest in his IP address. Identification of precisely what property was searched and seized is a necessary prerequisite to making the reasonable expectation of privacy inquiry.

Like many of its sister district courts, this court concludes that the NIT searched the contents of Mr. Taylor's computer and seized the information that was listed in Attachment B to the NIT warrant. *Accord, e.g.*, *Adams*, 2016 WL 4212079, at *4 ("The NIT searches the user's computer to discover the IP address associated with that device."); *Arterbury*, No. 15-CR-182-JHP (N.D. Okla. May 17, 2016), at 14 (determining that the property searched and seized was the defendant's computer, not the "packets of data" he sent to the Eastern District of Virginia). Defendant's IP address and other identifying information were not exclusively "located" on his computer because (1) an IP address is, like a phone number to a phone, both internal and external to one's computer, and (2) by accessing the Internet and logging into Playpen Mr. Taylor transmitted some of his information on the "highways" of the Internet. [4] However, the FBI could not obtain Mr. Taylor's information without directing the NIT to "invade" his computer. *See Acevedo-Lemus*, 2016 WL 4208436, at *5–6 (describing the IP address as "a feature

of Defendant's connection," not something located on his computer).

[4]   For example, the Host Name, as described in the affidavit, would identify an activating computer in Internet communications.

### 2. Whether Mr. Taylor's Expectation of Privacy Was Reasonable

**\*7** First, the court finds that Mr. Taylor exhibited a subjective expectation of privacy in the information gathered by the NIT because he either did not disclose it to a third party at all [5] or employed the Tor software to conceal it from the public.

[5]   The court questions, for instance, whether and when the activating computer's username would be transmitted over the Internet.

The NIT warrant raises not simply the question of whether Mr. Taylor had a reasonable expectation that his IP address and other data would remain private, but whether Mr. Taylor held a reasonable privacy expectation in those pieces of information because of the extra steps he took to preserve the anonymity of his location and identifying information while he browsed the Internet. This Motion presents a different situation than most third-party doctrine questions, because the information seized could not be acquired directly from a third party. *See, e.g.*, *Miller*, 425 U.S. at 443 (noting that "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party *and conveyed by him to Government authorities*...." (emphasis added)).

Some other district courts ruling on the NIT warrant have found that the use of Tor does not create in the Tor user has a subjective and/or a reasonable expectation that his IP address remains private, because a Tor user must still disclose his real IP address to a third party ISP and to an initial Tor relay computer. *See, e.g.*, *Broy*, 209 F. Supp. 3d at 1053 (finding that the defendant lacked a reasonable expectation of privacy in his IP address because "[t]he fact that [the defendant] may have felt his identity was anonymous does not negate the fact that, in order to gain that feeling of anonymity, he voluntarily disclosed his IP address to the operator of the first Tor node."); *Michaud*, 2016 WL 337263, at *7 (finding that the defendant could have no reasonable expectation of

privacy in his IP address, which "was public information, like an unlisted telephone number, and eventually could have been discovered").

Other courts have rejected that analysis. Those courts found that the fact that the NIT required interaction with a user's private computer to obtain information, or the practical impossibility of peeling back the layers hiding a Tor user's original IP location without technology like the NIT, means that a Tor user has a subjective and objectively reasonable expectation of privacy in his IP address and other information gathered by the NIT. *See, e.g.*, *Adams*, 2016 WL 4212079, at *4 (citing *U.S. v. Lanford*, 838 F.2d 1351, 1353 (5th Cir. 1988)) ("[O]ne's expectation of privacy in [the user's computer] is the proper focus of the analysis.... a defendant has an expectation of privacy in his garage, even if that defendant lacks an expectation of privacy in the stolen vehicle parked in the garage."); *Arterbury*, No. 15-CR-182-JHP (N.D. Okla. May 17, 2016), at 12 n.6, 14–15, 22 n.10, 23 (noting that, absent the NIT's interaction with the defendant's computer, the Government could not have obtained the defendant's IP address, and finding that the defendant's expectation of privacy was reasonable).

This court agrees with the latter contingent of courts and finds that, given his use of Tor, Mr. Taylor's expectation in the privacy of the information seized by the NIT was objectively reasonable. Mr. Taylor could reasonably expect that his computer's contents would remain private. And his computer was located in his home at the time he accessed Playpen, making this case more like *Jones* and not *Knotts*—the NIT was deployed to Mr. Taylor's property (his computer) while it was already in his possession, in a place whose protection lies at the heart of the Fourth Amendment (the home). As the Court observed in *Jones*, no case law exists permitting the government to invade a constitutionally protected place (here, either the computer or the home) to obtain even public information. *See Jones*, 565 U.S. at 409. And though no physical trespass occurred here as it did in *Jones*, the reasoning in *Kyllo* demonstrates that the Government may not rely upon technology that is not in general public use (and the NIT certainly is not) to search locations that would otherwise remain private, even if similar information could be gathered from a third party. *See Kyllo*, 533 U.S. at 34.

**\*8** In addressing prejudice under Rule 41, the Government argues that Mr. Taylor cannot, after having employed Tor to shield his location from investigators, "wield it as a sword" to prevent the government from obtaining a warrant to search his computer. (Doc. 26 at 42). Similarly, some courts have stated that an individual can have no reasonable expectation of privacy in property used to conduct illegal activity. *See, e.g.*, *Werdene*, 188 F. Supp. 3d at 446; *cf. U.S. v. Stanley*, 753 F.3d 114, 120–21 (3d Cir. 2014) (finding that an individual who used his neighbor's wireless network to distribute child pornography had no objectively reasonable expectation of privacy in his wireless signal, especially because the purpose of the unauthorized connection was itself illegal). One district court ruling on the NIT warrant went a step farther and determined that, because of the ubiquity of hacking, an individual no longer has a reasonable expectation that his computer will not be hacked. *See Matish*, 193 F. Supp. 3d at 620 (comparing the NIT's exploitation of a vulnerability in the Tor system to a police officer peering through broken blinds).

But these conclusions are a bridge too far for this court. The nature of Mr. Taylor's privacy interest cannot depend on whether he was engaging in illegal activity, or the Fourth Amendment would lose all meaning. And the use of Tor itself is legal.

Moreover, this court declines to hold that an individual never has a reasonable expectation that the contents of his computer will remain private simply because hackers' skills may outpace the development of cybersecurity. Indeed, federal law reflects a strong stance that hacking violates personal privacy, and that individuals' personal information is entitled to protection by the parties with whom they share it. *See, e.g.*, Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a)(5) (2012) (criminalizing the knowing transmission of "a program, information, code, or command" to and the intentional access of a protected computer without authorization, so as to cause damage); Telecommunications Act of 1996, 47 U.S.C. § 222, 501 (2012) (requiring telecommunications carriers to protect the confidentiality of customers' information, including location data, and providing for criminal penalties). [6]

6        The court acknowledges that the Tor website cautions users that the Tor network cannot ensure total anonymity. *See Tor:*

*Overview*, TOR, https://www.torproject.org/about/ overview.html.en (last visited Feb. 14, 2016). However, that fact alone does not alter the conclusion that Defendant's interest in the privacy of his computer's contents is recognized by society as reasonable.

In sum, given the nature of the Tor program, the Government could discover the information seized here *only* by entering Mr. Taylor's personal computer through a back door—only by taking over the website itself. The NIT is not akin to a police officer peering through broken blinds into a house; it is more like a police officer acquiring a key to the house and entering through the back door to secretly observe activity in the living room. *Cf. Workman*, 205 F. Supp. 3d at 1265 (noting that the government could not conduct a warrantless search of the defendant's home to seize an IP address written on a piece of paper).

This court finds that, although Mr. Taylor may not have had a reasonable expectation in the privacy of his IP address in the abstract, he did have a reasonable expectation of privacy in information that could be gleaned only from his computer. Thus, the Government required a warrant to execute the NIT, and the guarantees of the Fourth Amendment apply to the NIT warrant issued in the Eastern District of Virginia, as well as to the residential warrant issued in the Northern District of Alabama. The fact that the Government obtained a warrant, however, does not end the analysis.

### B. Fourth Amendment Warrant Requirements

The focal point of analysis of this issue remains the Fourth Amendment: "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Mr. Taylor posits that the NIT warrant violated the Fourth Amendment in three different respects: officers' execution of the warrant exceeded its scope; the warrant lacked probable cause; and the warrant was insufficiently particular. Mr. Taylor also asserts that the Northern District of Alabama residential warrant operated as an unconstitutional general warrant.

### 1. Execution of the NIT Warrant

**\*9** Defendant argues that the NIT warrant on its face does not authorize the search of computers located outside of the Eastern District of Virginia. The Government responds that "[t]he warrant and accompanying attachments made clear to the magistrate that the NIT was to be deployed initially to the web server hosting Playpen in the Eastern District of Virginia and then obtain information from computers that logged into Playpen, wherever they may be located." (Doc. 26 at 16). The Government cites language from the warrant and Attachment A and particularly from the NIT warrant's attached affidavit, which explains that the NIT was necessary to obtain the identities and locations of Playpen users and would operate by deploying to computers of any users who logged into the site without reference to where those computers and users were located.

Whether the method of execution of the warrant was reasonable provides the touchstone of this issue. Absent "flagrant disregard" of the terms of the warrant, items seized outside the scope of the warrant should not be suppressed. *U.S. v. Wuagneux*, 683 F.2d 1343, 1354 (11th Cir. 1982) (internal citations omitted). "Flagrant disregard" means that "the executing officer's conduct exceeds any reasonable interpretation of the warrant's provisions." *See id.* (internal citation omitted). The court should consider "[s]uch things as the scope of the warrant, the behavior of the searching agents, the conditions under which the search was conducted, and the nature of the evidence being sought" in determining whether the search was reasonable. *U.S. v. Schandl*, 947 F.2d 462, 465 (11th Cir. 1991) (citing *U.S. v. Heldt*, 668 F.2d 1238, 1254 (D.C. Cir. 1981)). A warrant may incorporate by reference documents or affidavits attached to the warrant if the warrant uses proper words of incorporation. *See Groh v. Ramirez*, 540 U.S. 551, 557–558 (2004).

Like every other district court to examine this question, this court finds that the FBI's execution of the NIT warrant was objectively reasonable. *See, e.g.*, *Rivera*, 2:15-cr-00266-CJB-KWR (E.D. La. July 20, 2016), at 10; *Michaud*, 2016 WL 337263 at \*4. The warrant on its face makes clear that Attachment A to the warrant describes the place to be searched. Attachment A explains that the NIT was to be deployed on a computer server in the Eastern District of Virginia and that the activating computers were "those of any user or administrator who logs into [Playpen]"—regardless of where those computers were physically located. (Doc. 26-1 at 1, 33). The attached

affidavit further clarifies the nature of the NIT and specifies that deployment of the NIT is necessary *because* Playpen users' locations are unknown.

Given the text of the warrant, its attachments, and the circumstances surrounding the NIT search, this court cannot conclude that the FBI's reliance on the warrant to deploy the NIT to obtain Mr. Taylor's IP address and other identifying information was executed in flagrant disregard of the warrant's terms.

### 2. Probable Cause

Mr. Taylor argues that the FBI had probable cause to search and seize the website server itself but not computers that merely logged in to the server, because logging in does not necessarily mean that a user viewed child pornography; but under the warrant a computer was deemed an "activating computer" under the warrant if it merely logged in to the website. The Government responds that Agent Mcfarlane's affidavit, which describes the nature of the Playpen website and the steps a user had to take before logging into it, supported a determination of probable cause that any computer from which a person logged into the Playpen website would provide evidence of child pornography-related crimes.

In determining whether probable cause exists, a magistrate must "simply ... make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A district court's job is not to conduct a de novo review, but to consider whether the issuing magistrate judge had a "substantial basis" for concluding that probable cause existed. *Id.* at 236; 238–39 (quoting *Jones v. U.S.*, 362 U.S. 257, 271 (1960), *overruled on other grounds* by *U.S. v. Salvucci*, 448 U.S. 83 (1980)).

 **\*10**  Probable cause governs the warrant. A warrant must be tailored to provide for a search only of those places agents have probable cause to believe contain evidence of a crime:

> [T]he scope of a lawful search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found. Just as probable

cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase."

*Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (quoting *U.S. v. Ross*, 456 U.S. 798, 824 (1982)).

Like every other court to address this issue, the court finds that the NIT warrant was supported by sufficient probable cause. *See, e.g.*, *Henderson*, 2016 WL 4549108, at *4 (N.D. Cal. Sept. 1, 2016) (internal citations omitted) ("The courts that have analyzed the NIT warrant have all found that it was supported by probable cause."). First, Playpen existed to enable access to child pornography. Second, the nature of Playpen was such that "[a]ccessing [it] ... require[d] numerous affirmative steps by the user, making it extremely unlikely that any user could simply stumble upon [Playpen] without understanding its purpose and content." (Doc. 26-1 at 13–14).

Any user logging into the Playpen hidden service would have had to take these steps: (1) download Tor software; (2) acquire the website's unique algorithm-generated address (most likely from a Playpen user or from another Tor hidden service page, like the one dedicated to child pornography described in the affidavit); (3) navigate to the Playpen homepage, featuring suggestive images of prepubescent females with directions regarding file uploading and posting; (4) create a Playpen account, which required viewing the instructions to enter a fake email address and take other steps to preserve one's identity; and (5) arrive at the main Playpen directory, which included forum titles that clearly alluded to illicit pornographic content of children. These "numerous affirmative steps" provided a more than substantial basis for the magistrate judge to find sufficient probable cause that any user logging into Playpen did so with the intent to access, view, and/or distribute child pornography; i.e., to engage in criminal conduct. (Doc. 26-1 at 13).

Moreover, several circuit courts have held that membership in a child pornography website alone sufficiently establishes probable cause, reasoning that an individual who took the affirmative steps necessary to become a member probably accessed or contributed to the site's illegal content. *See, e.g.*, *U.S. v. Shields*, 458 F.3d 269, 278 (3d Cir. 2006) (finding sufficient probable cause to search the defendant's home where defendant

used a suggestive email address to join two online groups dedicated to exchanging child pornography); *U.S. v. Froman*, 355 F.3d 882, 890–91 (5th Cir. 2004) ("[I]t is common sense that a person who voluntarily joins a group such as Candyman [a website whose sole purpose was the exchange of child pornography], remains a member of the group for approximately a month without cancelling his subscription, and uses screen names that reflect his interest in child pornography, would download such pornography from the website and have it in his possession.").[7] This court finds these decisions persuasive and concludes that Playpen membership independently constituted sufficient probable cause for the magistrate judge to conclude that the computers of Playpen members who logged into the website would contain evidence of at least one child pornography-related crime.

[7]  The Eleventh Circuit has not directly addressed this membership question but cited the *Shields* and *Froman* reasoning in two opinions addressing different ultimate issues. *Davidson v. U.S.*, 213 Fed.Appx. 769, 771–72 (11th Cir. 2007) (citing *Shields* and *Froman*);*U.S. v. Williams*, 444 F.3d 1286, 1304 n.87 (11th Cir. 2006), *rev'd on other grounds*, *U.S. v. Williams*, 553 U.S. 285 (2008) (citing *Froman*).

**\*11**  Accordingly, the court concludes that the NIT warrant satisfied the probable cause requirement.

### 3. Particularity

Mr. Taylor argues that the warrant itself lacks sufficient specificity because it refers to "Attachment A" and "Attachment B" to describe the property to be searched and seized. The Government avers that these two documents were attached to the warrant, not the affidavit, and that the Supreme Court has specifically permitted this kind of incorporation by reference and attachment. (Doc. 26 at 20 (citing *Groh*, 540 U.S. 551 at 557–58)).

A warrant must particularly describe the place to be searched and the items to be seized. U.S. CONST. amend. IV. Regarding place, the warrant must only "describe the premises in such a way that the searching officer may 'with reasonable effort ascertain and identify the place intended.' " *U.S. v. Burke*, 784 F.2d 1090, 1092 (11th Cir. 1986) (quoting *U.S. v. Weinstein*, 762 F.2d 1522, 1532 (11th Cir. 1985)). Regarding items to be seized, "[a] description is sufficiently particular when it enables

the searcher to reasonably ascertain and identify the things authorized to be seized." *Wuagneux*, 683 F.2d at 1348 (citing *U.S. v. Cook*, 657 F.2d 730, 733 (5th Cir. 1981)). The Eleventh Circuit recognizes that "[e]laborate specificity is unnecessary." *U.S. v. Strauss*, 678 F.2d 886, 892 (11th Cir. 1982).

The court in *Anzalone* observed that "[e]very court to consider this question has found the NIT search warrant sufficiently particular." 2016 WL 5339723, at *7 (internal citations omitted). As discussed previously, the attachments were correctly incorporated into the NIT warrant by reference. Attachments A and B clearly identified the "place" to be searched (the NIT would be deployed to the computer server in the Eastern District of Virginia and then to computers logging into the Playpen website) and the information to be seized (Attachment B includes an itemized list of the seven pieces of information to be seized). Though the Constitution does not require elaborate specificity, the court finds it difficult to imagine how much more specific the descriptions of the place to be searched and the items to be seized could have been. The NIT warrant was sufficiently particular.

### 4. Northern District of Alabama Warrant

Additionally, Mr. Taylor maintains that the FBI's seizure of his personal property, pursuant to the Northern District of Alabama residential warrant, for offsite forensic testing when an initial search did not yield any pornographic images constituted unconstitutional exploratory "rummaging." *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). The Government correctly points out that the affidavit attached to the Northern District of Alabama residential search warrant included a non-exclusive list of techniques that might be used to search seized electronic information. *See* (Doc. 26-2 at 41–43). Further, as to electronic storage media or electronically stored information, the Federal Rules of Criminal Procedure specifically authorize "a later review of the media or information consistent with the warrant." FED. R. CRIM. P. 41(e)(2)(B). The court concludes that the Northern District of Alabama warrant and the officers' execution of it fell within constitutional bounds.

### C. Section 636(a) of the Federal Magistrates Act & Rule 41(b)

**\*12**  Mr. Taylor argues that the NIT warrant was issued without authorization from § 636(a) of the Federal Magistrates Act, 28 U.S.C. § 631 et seq. (2012), and Federal Rule of Criminal Procedure 41. He contends that the warrant was thus void *ab initio* and that he was prejudiced by the seizure of evidence pursuant to it, warranting suppression. The Government responds that Rule 41 and § 636(a) authorized the magistrate to issue the NIT warrant; that, alternatively, any violation was merely technical, not constitutional, in nature and did not prejudice Mr. Taylor and the officers did not act in bad faith; and that, alternatively, the good faith exception to the exclusionary rule should prevent suppression in any case.

### 1. Whether the NIT Warrant Was Issued in Violation of § 636(a)

Section 636(a) of the Federal Magistrates Act provides that "[e]ach United States magistrate judge serving under this chapter shall have **within the district** in which sessions are held by the court that appointed the magistrate judge ... all powers and duties conferred or imposed upon United States commissioners by law or **by the Rules of Criminal Procedure**...." 28 U.S.C. § 636(a)(1) (2012) (emphasis added).[8]  Many other district courts ruling on the NIT warrant have analyzed the alleged § 636(a) and Rule 41(b) violations together, reasoning that the statute incorporates Rule 41(b) by virtue of granting to magistrate judges the power given to them by the Federal Rules; thus, the purported Rule 41(b) violation becomes the ultimate question. *See, e.g., Levin*, 186 F. Supp. 3d at 31–32 (stating that "Section 636(a) expressly incorporates any authorities granted to magistrate judges by the Federal Rules of Criminal Procedure" and concluding that "Section 636(a)(1) is inapposite because Rule 41(b) did not confer on the magistrate judge authority to issue the NIT warrant"); *Tran*, 2016 WL 7468005, at \*5 (citing *Levin* for the proposition that "[w]hether the Federal Magistrates Act was violated can be answered by asking if the warrant complies with Rule 41").

8    The statute also provides that magistrate judges shall have power "at other places where that court may

function, and elsewhere as authorized by law," but neither such area is at issue here. *See* § 636(a).

This court declines to read the independent jurisdictional limitations out of the statute. The Act limits the exercise of magistrate judges' power and duties to "within the district" of the appointing court. "[T]he grammatical structure of the sentence indicates that magistrate judges shall have those powers specified by rule or other law (e.g., Rule 41), but those powers are effective only in certain specified geographic areas—and, as we've seen, none of those areas is implicated here." *U.S. v. Krueger*, 809 F.3d 1109, 1119 (10th Cir. 2015) (Gorsuch, J., concurring) (affirming the district court's grant of a motion to suppress evidence seized pursuant to a warrant to search property in Oklahoma that had been issued by a magistrate judge in Kansas). If the mandates of the statute and the rule are not examined separately, "[t]he statute might as well be written this way: Magistrate judges shall have all powers and duties conferred or imposed by law or by the rules." *See id.*

The Government argues that § 636(a) does not limit the locations in which a magistrate judge's exercise of power may have *effect*, which is correct; however, it presumes that the search and seizure here took place in the Eastern District of Virginia and had effects in the Northern District of Alabama. But the court has already determined that the search itself took place in Alabama. The Government's argument illustrates why most courts have analyzed the statute and Rule together—as goes the magistrate's authority under § 636(a), so goes her authority under Rule 41, because the Rule cannot give the magistrate more power than does the statute. *See* Rules Enabling Act, 28 U.S.C. § 2072 (2012) (providing that rules of procedure may not "abridge, enlarge or modify any substantive right"); *cf. Krueger*, 809 F.3d at 1125 (Gorsuch, J., concurring) (explaining that our government is one of divided power and that because magistrate judges do not enjoy Article III protections, Congress has curbed their geographic authority). Thus, whether the authority of the magistrate judge to issue the NIT warrant fell within the statute or the Rule, or neither, turns on where the search took place.

**\*13**  The court finds that the "within the district" language of § 636(a) is not surplusage; the magistrate judge had no jurisdiction to issue a warrant for a search in another district than where she sat. Because the NIT warrant authorized a search in a district different from

that in which the magistrate judge may exercise her Rule 41 power to issue a search warrant, it was "no warrant at all," or void *ab initio* for want of jurisdiction. *See Krueger*, 809 F.3d at 1118, 1123 (Gorsuch, J., concurring).

### 2. Whether the NIT Warrant Was Issued in Violation of Rule 41(b)

In the alternative, the court concludes that the warrant was issued without authority under Federal Rule of Criminal Procedure 41(b). Titled "Authority to Issue a Warrant," [9] that rule provides in relevant part that a magistrate judge has authority to issue a warrant (1) "to search for and seize a person or property located within the district"; (2) "for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed"; and (4) "to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both." [10]

[9]    The December 1, 2016 amendments to the Rule changed this title to "Venue for a Warrant Application." *See* FED. R. CRIM. P. 41(b).

[10]    Subsections (3) and (5) of Rule 41(b) are inapplicable here.

Sections 41(b)(1) and (b)(2) did not imbue the magistrate with issuing authority. Both these subsections require that the property to be searched/seized be located in the same district as the issuing magistrate at the time the warrant is issued; but the location of the property searched—Mr. Taylor's computer—and seized—his IP address and other identifying information—were unknown by the FBI at the time it applied for the warrant. Mr. Taylor's computer was at all relevant times located in the Northern District of Alabama, and many of the other activating computers were located outside of the Eastern District of Virginia. True, as the Government notes, the FBI installed the NIT on the server in the Eastern District of Virginia. But as the court has already determined, the Defendant's computer was the object of the search and that search occurred in Alabama.

Similarly, Rule 41(b)(4) did not empower the magistrate judge to issue the NIT warrant. First, the NIT is not

a "tracking device," which is defined in Rule 41(a)(2) (E) by reference to 18 U.S.C. § 3117(b) as "an electronic or mechanical device which permits the tracking of the movement of a person or object." FED. R. CRIM. P. 41(a)(2)(E); 18 U.S.C. § 3117(b) (2012). The NIT did not track **movement** like the beeper in *Knotts*; rather, it conducted a search for several pieces of identifying information from activating computers, each in one static location. *See Adams*, 2016 WL 4212079, at *6 ("[T]he NIT does not track; it searches."); *Rivera*, 2:15-cr-00266-CJB-KWR (E.D. La. July 20, 2016), at 15 (noting that "the NIT could do much more than simply track a computer's location").

Second, even if the NIT were a tracking device, it was not "installed" in the Eastern District of Virginia, but at the location of the activating computer, in this case, in the Northern District of Alabama. The Government characterizes the NIT as a tracking device because it was attached to Playpen content in the Eastern District of Virginia, traveled to Defendant's computer in the Northern District of Alabama, and permitted the Government to identify Mr. Taylor's computer and his location.

**\*14**  Though this question is a close call, the court concludes that the Government's position ultimately misconstrues the nature of the property tracked; the contents of Mr. Taylor's computer, not the Playpen content he downloaded, would be the property "tracked" by the NIT, and neither his computer nor its contents ever entered into the Eastern District of Virginia for installation of the tracking device. *See Michaud*, 2016 WL 337263, at *6 (observing that the tracking device analogy "breaks down" if the installation is deemed to have occurred on the server in the Eastern District of Virginia, because the defendant "never controlled the government-controlled computer, unlike a car with a tracking device leaving a particular district," and similarly fails if the installation occurred on the defendant's computer outside of the issuing district); *but see, e.g., Matish*, 193 F. Supp. 3d at 612 (describing the process of logging into Playpen as taking a "virtual trip" to Virginia and so permitting the installation of the NIT in the Eastern District of Virginia).

The Government additionally argues that the NIT warrant was issued by a magistrate judge in the district with the strongest known connection to the search. While this point may be true, it does not follow that Rule 41

authorized the magistrate judge to issue the warrant. The court is bound to interpret Rule 41 as it is written, not to approve any warrants for which the issuing venue merely appears reasonable. Further, the Government contends that Rule 41 has been interpreted flexibly and has been read as permitting searches not expressly prohibited by the rule or by statute. *See U.S. v. New York Tel. Co.*, 434 U.S. 159, 169 (1977); *U.S. v. Koyomejian*, 970 F.2d 536, 542 (9th Cir. 1992) (en banc).

However, the *New York Telephone* and *Koyomejian* cases both involved a *kind* of search not addressed one way or the other by the text of Rule 41 (the use of a pen register to collect telephone numbers when the definition of "property" did not yet include information and video surveillance, respectively), not the *location* of a search, which is addressed by the wording of Rule 41. This court in any case declines to legislate by reading into the statute language that Congress did not place there. [11]

[11]    Further bolstering this conclusion is the addition to Rule 41 that became law on December 1, 2016, permitting a magistrate judge to issue a warrant "to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district if: (A) the district where the media or information is located has been concealed through technological means...." FED. R. CRIM. P. 41(b)(6). The addition of this text suggests that the prior version of the Rule did not permit a magistrate judge to issue a warrant in such a situation.

### a. Nature of the Rule 41 Violation

A Rule 41 violation is either "technical" or "procedural," as courts have phrased it, or constitutional. *See, e.g.*, *Adams*, 2016 WL 4212079, at *6 ("The Court views a Rule 41(b) violation to be a technical or procedural violation...."). "[U]nless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where (1) there was prejudice in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *U.S. v. Gerber*, 994 F.2d 1556, 1560 (11th Cir. 1993) (quoting *U.S. v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983) (per curiam)).

First, the Rule 41 violation here was constitutional. True, as the Government points out, the Fourth Amendment does not impose a venue requirement; rather, it requires only that a warrant be (1) signed by a neutral, detached magistrate; (2) supported by probable cause; and (3) sufficiently particular. *See Dalia v. U.S.*, 441 U.S. 238, 255 (1979). But inherent in the notion of a "neutral, detached magistrate" is that the magistrate have **authority** to issue the warrant. *See Shadwick v. City of Tampa*, 407 U.S. 345, 352 (1972) (holding, in answer to "[t]he single question [of] whether power has been lawfully **vested**," that municipal court clerks may issue warrants) (emphasis added); *U.S. v. Glover*, 736 F.3d 509, 515 (D.D.C. 2013) (holding that a Rule 41(b) violation constituted a "jurisdictional flaw" inexcusable as a "technical defect"); *U.S. v. Master*, 614 F.3d 236, 241 (6th Cir. 2010) (holding that a warrant issued by a judge lacking authority violated defendant's Fourth Amendment rights).

**\*15**  Second, even if not a constitutional violation, Mr. Taylor was prejudiced by the Rule 41 violation. Although the Eleventh Circuit has not interpreted "the search might not have occurred" to the same extent as other circuits, this court concurs with the majority's reasoning in *Krueger* that the correct standard inquires "whether the issuing federal magistrate judge could have complied with the rule." *See Krueger*, 809 F.3d at 1116; *Adams*, 2016 WL 4212079, at *8 (M.D. Fla.) (holding that the defendant was prejudiced by the Rule 41 violation because "[h]ad the magistrate judge followed Rule 41(b), the search of Defendant's computer would not have occurred").

The use of Tor made recovering Defendant's IP address and other identifying information without the NIT impossible; Mr. Taylor had a reasonable expectation of privacy in the contents of his computer, meaning that the seven pieces of information seized by the NIT warrant could not have been obtained in the absence of the NIT warrant. The issuing magistrate judge could not comply with Rule 41 because it did not empower her to authorize searches outside of her district. Mr. Taylor, therefore, was prejudiced by the Rule 41(b) violation.

However, no evidence supports a finding of intentional and deliberate disregard of the Rule. The very existence of divergent interpretations of Rule 41(b) by district court judges across the country demonstrates that reasonable minds may interpret the Rule, and where the searches under the NIT took place, differently.

### 3. Suppression

#### a. Suppression of Evidence Seized Pursuant to a Warrant Void *Ab Initio*

Under the statute and Rule 41, both of which limit a magistrate judge's authority to issue a warrant, the NIT warrant was void *ab initio*, meaning that the FBI's search of Mr. Taylor's computer and the seizure of evidence pursuant to it were conducted without a valid warrant and thus were unreasonable in violation of the Fourth Amendment. But "[t]he fact that a Fourth Amendment violation occurred ... does not necessarily mean that the exclusionary rule applies" to "forbid[ ] the use of improperly obtained evidence at trial." *Herring v. U.S.*, 555 U.S. 135, 139–140 (2009). Rather, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144. This balancing test is an objective one that does not assess officers' subjective intent. *Id.* at 145.

The "good faith" line of cases, beginning with *U.S. v. Leon* in 1984, implements the balancing of these factors by carving out an exception to the exclusionary rule where the search was the result of objectively reasonable behavior by officers. *See Davis v. U.S.*, 564 U.S. 229, 238–39 (2011). The Supreme Court in *Leon* itself held that when officers are objectively reasonable in relying on a search warrant that is later invalidated, any evidence seized pursuant to that search warrant should not be suppressed. *U.S. v. Leon*, 468 U.S. 897, 922 (1984).

Whether the good faith exception is available for a warrant that is void *ab initio* is an open question in the Eleventh Circuit. Many of the district courts ruling on the NIT warrant have addressed the issue, as have a handful of other state and federal courts. *See, e.g.*, *Master*, 614 F.3d at 242–43 (overruling its previous holding that the good faith exception does not apply to a warrant issued without jurisdiction and remanding for consideration of the deterrent value and costs of suppression); *Werdene*, 188 F. Supp. 3d at 449–453 (following *Master* and ultimately finding suppression not warranted); *Levin*, 186 F. Supp. 3d at 41 (finding that the good faith exception did not apply to the void *ab initio* NIT warrant).

**\*16** The court concurs with the reasoning of the court in *Werdene* that, given the balancing test articulated in *Leon* and its progeny, including *Herring*, "the legal status of the warrant under the Fourth Amendment does not inform the decision of whether the good faith exception is available in a given case; that inquiry is separate and must be considered in light of the exclusionary rule's purpose and the officers' conduct at issue." 188 F. Supp. 3d at 451 (citing *Master*, 614 F.3d at 243). Thus, the court proceeds to the good faith inquiry.

#### b. Application of the Good Faith Exception

Assuming either a constitutional violation or prejudice under Rule 41(b), the court finds that the good faith exception to the exclusionary rule applies here; the officers were objectively reasonable in relying on the NIT warrant.

As the court in *Werdene* found:

> [T]o the extent a mistake was made in this case, it was not made by the agents.... Rather, it was made by the magistrate when she mistakenly issued a warrant outside her jurisdiction. The agents consulted with federal attorneys before preparing the warrant application. They presented the magistrate judge with all relevant information to allow her to make a decision as to whether Rule 41(b) permitted her to issue the warrant. The FBI agents did not misrepresent how the search would be conducted or, most importantly, where it would be conducted.

188 F. Supp. 3d at 452–453 (internal citations omitted). [12]

[12]   The court acknowledges that, contrary to this court, the court in *Werdene* concluded that no constitutional violation occurred in the issuance of the NIT warrant, but as an alternative ruling found good faith. *See Werdene*, 188 F. Supp. 3d at 446, 448, 451. This court finds the *Werdene* court's reasoning on the issue of good faith persuasive.

As to warrants, the good faith exception does not apply where (1) the issuing judge is "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) the judge "wholly abandoned his judicial role"; (3) the affidavit on which the warrant was based was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923 (internal citations omitted).

Defendant does not allege that any of these circumstances indicating bad faith are present here, and indeed none are supported by the record. None of the information in Special Agent Mcfarlane's affidavit was false. The magistrate judge in the Eastern District of Virginia did not wholly abandon her judicial role; the divergent results of the various motions to suppress resulting from the NIT warrant are themselves evidence that the magistrate judge did not make a determination completely outside the realm of reason. This court has already found that the NIT warrant was supported by probable cause. And the court has also determined that the warrant additionally complied with the particularity requirements of the Fourth Amendment, making it facially valid.

"A magistrate judge's mistaken belief that she had jurisdiction, absent any indicia of reckless conduct by the agents, does not warrant suppression." *Werdene*, 188 F. Supp. 3d at 453; *see Leon*, 468 U.S. at 916 ("[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."). Exclusion of the evidence seized pursuant to the NIT warrant would serve little deterrent purpose where the mistaken conduct of the magistrate judge, not the officers, invalidated the warrant. Accordingly, the court finds that suppression is an inappropriate remedy

for the Fourth Amendment and/or Rule 41 violation(s) that occurred here.

**III. Conclusion**

 **\*17**  The court **FINDS** that Mr. Taylor had a reasonable expectation of privacy in the contents of his computer, such that the FBI's actions in deploying the NIT constituted a search under the Fourth Amendment, mandating a warrant. The court **FINDS** that the executing officers did not exceed the scope of the warrant and that the NIT warrant was supported by probable cause and was sufficiently particular; additionally, the court **FINDS** that the Northern District of Alabama warrant was constitutionally issued and executed. However, the court **FINDS** that the NIT warrant was not authorized under 28 U.S.C. § 636(a) of the Federal Magistrates Act or, in the alternative, Federal Rule of Criminal Procedure 41(b).

The court **FINDS** that the statutory and Rule violations resulted in the NIT warrant being void *ab initio*, making the search of Mr. Taylor's computer unreasonable under the Fourth Amendment; further, the Rule 41(b) violation prejudiced Mr. Taylor. But the court **FINDS** that the good faith exception to the exclusionary rule applies to prevent suppression of the evidence seized pursuant to the NIT warrant, including the evidence seized pursuant to the secondary residential warrant issued in the Northern District of Alabama.

Accordingly, the court **WILL DENY** Defendant's Motion to Suppress. The court will enter a separate order consistent with this Opinion.

**DONE** and **ORDERED** this 24th day of April, 2017.

**All Citations**

Slip Copy, 2017 WL 1437511

---

End of Document                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   15

2017 WL 1535995
United States District Court,
D. Minnesota.

United States of America, Plaintiff,
v.
Terry Lee Carlson, Sr., Defendant.

Criminal No. 16-317 (JRT/FLN)
|
Filed 03/23/2017

**Attorneys and Law Firms**

Carol Kayser for Plaintiff.

Lee Johnson for Defendant Terry Lee Carlson, Sr.

**REPORT AND RECOMMENDATION**

FRANKLIN L. NOEL United States Magistrate Judge

**THIS MATTER** came before the undersigned United
States Magistrate Judge on February 8, 2017, on Terry
Lee Carlson Sr.'s motions to suppress statements (ECF
No. 22), and to suppress evidence obtained as a result of
search and seizure (ECF No. 23). This matter was referred
to the undersigned for Report and Recommendation
pursuant to 28 U.S.C. § 636 and Local Rule 72.1. At the
hearing, the Government offered testimony and entered
exhibits into evidence. [1] For the reasons that follow, the
Court recommends that Carlson's motions to suppress
statements (ECF No. 22) be **GRANTED in part** and
**DENIED in part,** and to suppress evidence obtained as a
result of search and seizure (ECF No. 23) be **GRANTED.**

[1]     *See* Exhibit and Witness List, ECF No. 30.

**I. THE INDICTMENT**

On November 16, 2016, a Grand Jury returned the
Indictment against Carlson, charging him with five
counts of production of child pornography, in violation
of 18 U.S.C. §§ 2251(a) and 2251(e); four counts of
distribution of child pornography, in violation of 18
U.S.C. §§ 2252(a)(2) and 2252(b)(1); one count of receipt
of child pornography, in violation of 18 U.S.C §§ 2252(a)
(2) and 2252(b)(1); and one count of possession of

child pornography, in violation of U.S.C. §§ 2252(a)
(4)(B) and 2252(b)(2). *See* Indictment, ECF No. 1.
The Indictment alleges that in 2007 and 2008, Carlson
produced five amateur, pornographic videos on an
Olympus FE10 camera and Western Digital hard drive,
depicting minor children engaged in sexual acts. *Id.*
at 1-4. Carlson allegedly distributed this pornographic
material via computer file sharing. *Id.* at 4-6. The
Indictment also alleges that in 2008, Carlson received a
computer file depicting child pornography, and in 2015,
knowingly possessed three computer files depicting child
pornography. *Id.* at 7-8.

**II. FACTUAL BACKGROUND**

**A. The "Dark Web" and The Tor Network**
This case involves a vast and highly publicized
investigation of child pornography on what some call, the
"dark web." [2] The "dark web," as described by researcher
and University of California at Hastings Law School
Professor Ahmed Ghappour, is a:

> private global network of computers that enables users
> to conduct anonymous transactions without revealing
> any trace of their location. One such private network ...
> is the Tor Network. Computers on [the] Tor Network
> use an encrypted communications protocol that cannot
> be accessed using normal web browsers; instead, they
> require the use of special software, like the Tor Browser.
> Proper use of the Tor Network makes it practically
> impossible for governments to trace the location of
> computers hosting "hidden" websites on the network,
> the location of computers accessing those hidden
> websites, or the location of computers that tunnel
> through the network to "anonymously" visit public
> websites on the [standard] World Wide Web.

> The Tor Network protects its users from two
> types of surveillance. First, it protects users from
> a common form of surveillance called "traffic
> analysis," which is the real time interception
> and examination of communications in order to
> deduce information. Second, it prevents governments
> from using communications "metadata"—information
> about a communication, such as its source, destination
> and size—acquired from third party service providers,
> to draw conclusions about the communication's parties
> and their behavior. As a technical matter, use of

the Tor Network protects its users' communications from government surveillance because it disassociates communications "metadata" from communications "content" and bounces message packets off several intermediate computers, or "proxies," before steering them to their originally intended destination. Proxy computers are scattered around the globe, provided by people who have volunteered their computers to the anonymity [of the Tor N]etwork....

Thus, someone located in Seattle who has anonymized his or her communications using a series of proxies, the last of which is located in Italy, will, to the destination webpage (e.g., www.google.com or www.facebook.com), appear to be a user in Italy [the exit node]. Likewise, someone in Iran who has run his or her communications through a series of proxies, the last of which is located in San Francisco, will appear to the destination website as a web surfer from San Francisco, and to the local Internet Service Provider ["ISP"] in Iran as though they were attempting to communicate with a proxy computer. [3]

Ahmed Ghappour, *Searching Places Unknown: Law Enforcement Jurisdiction on the Dark Web,* 69 Stan. L. Rev. XXX (2017) (in progress).

[2]   The investigation of this case has received substantial media coverage. *See, e.g.,* Orin Kerr, *Government 'Hacking' and the Playpen Search Warrant,* Wash. Post, Sept. 27, 2016; Ellen Nakashima, *This is How the Government is Catching People Who Use Child Porn Sites,* Wash. Post, Jan. 21, 2016; Joseph Cox, *The FBI Hacked Over 8,000 Computers in 120 Countries Based on One Warrant,* Motherboard, Nov. 22, 2016, https://motherboard.vice.com/en_us/article/fbi-hacked-over-8000-computers-in-120-countries-based-on-one-warrant; Elizabeth E. Joh, *The Government Shouldn't Distribute Child Pornography,* Jan. 17, 2016, N.Y. Times; Brad Heath, *FBI Ran Website Sharing thousands of Child Porn Images,* USA Today, Jan. 21, 2016, http://www.usatoday.com/story/news/2016/01/21/fbi-ran-website-sharing-thousands-child-pornimages/79108346/.

[3]   The Tor network was originally developed as a project of the United States Naval Research Laboratory for the purpose of encrypting Government communications, but is now available to the public.

Because the Tor network routes communications through a network of assorted computers and exit nodes, the Government claims traditional Internet Protocol ("IP") identification techniques are generally not viable. To investigate illegal activity on the Tor network, law enforcement has developed various network investigative techniques ("NIT") that surreptitiously access target computers remotely. *See* Brian L. Owsley, *Beware of Government Agents Bearing Trojan Horses,* 48 Loy. L. Rev. 315, 316 (2015).

## B. The Playpen Website

The Federal Bureau of Investigation ("FBI") began investigating a child-pornographic website known as the Playpen, which had been in operation since April of that year. The Government contends that the Playpen existed as a hidden Tor network service that could only be accessed by connecting to the Tor network and obtaining the specialized Playpen, Uniform Resource Locator ("URL"), from another user from within the Tor network.

In December 2014, a foreign government advised the FBI that it had obtained the IP address of the Playpen, which was being operated from a server owned by the Centriologic Company ("Centriologic") in Lenoir, North Carolina. On December 23, 2014, the FBI connected to the Playpen website through the Tor network and discovered that it hosted an active message board allegedly dedicated to advertising and distributing child pornography, and contained numerous links to uploaded child pornographic content. The website appeared to have approximately 150,000 users.

In January 2015, the same foreign law enforcement agency advised the FBI that the Playpen IP address had changed, but was still being operated from the Centriologic server. On January 15, 2015, FBI Special Agent Daniel Alfin applied for a warrant to search the Centriologic server, and seize, among other things, the Playpen URL and any information that may identify the Playpen administrator. After that warrant was executed on January 29, 2015, and through further investigation, the FBI determined that the suspected Playpen administrator resided in Naples, Florida. On February 19, 2015, the FBI executed another warrant at the Naples residence. The FBI apprehended Steven W. Chase, the alleged Playpen administrator, and assumed control of the website. [4] Rather than shut the

website down, the FBI continued to operate an identical copy of the Playpen, including distribution of the alleged child pornography housed on the website, through a Government controlled server, located in Newington, Virginia.

4    Chase was later convicted of engaging in a child exploitation enterprise and running a website dedicated to the sexual abuse of children. *See* Department of Justice Office of Public Affairs Announcement, https://www.justice.gov/opa/pr/florida-man-convicted-engaging-child-exploitation-enterprise, Sept. 16, 2016.

## C. The NIT Warrant

The FBI then obtained a Title III warrant pursuant to 18 U.S.C. § 2518, to monitor and intercept user communications on the Playpen website. Given the anonymizing capabilities of the Tor network, the FBI claims that it was unable to identify the website's users using traditional investigative techniques. On February 20, 2015, FBI Special Agent Douglas Macfarlane filed a warrant application to use what the Government calls an NIT to assist the FBI in identifying Playpen's users and other potential website administrators. The warrant application was presented to a United States Magistrate Judge for the Eastern District of Virginia.

In his affidavit in support of the warrant application, Special Agent McFarlane represented that the NIT would be deployed on the computer of any Playpen user entering the website through an individualized login name and password, regardless of the user's physical location. The NIT functions as a form of malware, implanting itself on a Playpen user's computer and forcing the computer to "activate," or to transmit identifying packets of information back to the Government controlled server in Virginia. When the search warrant was issued, neither the Government nor the issuing Magistrate Judge had any idea which computers, out of all of the computers on the planet, might be infected by the Government's invasive malware. The identifying packets of data that the NIT extracts from a user's activating computer include: the IP address; the date and time the NIT ascertained the IP address; a unique identifier generated by the NIT to distinguish data from different activating computers; the type of operating system running on the activating computer, including type, version, and architecture; information on whether the NIT had already

been delivered to the activating computer; the host name of the activating computer; the operating system used by the activating computer; and the Media Access Control address of the activating computer.

The Magistrate Judge approved the NIT warrant and authorized the FBI to deploy the NIT malware for thirty days. The Magistrate Judge further granted a request by the FBI to delay notice of the search until thirty days after any individual accessing the Playpen website had been identified to a sufficient degree as to provide the required notice pursuant to 18 U.S.C. § 3103(a)(b) and Federal Rule of Criminal Procedure 41 (f)(3).

The FBI deployed the NIT malware from February 20, 2015, through March 4, 2015, at which time it took the Playpen website offline. During that time, the Government itself operated the website and facilitated the global distribution of content containing depictions of child pornography. Although the Court is not aware of the precise number, testimony in other cases has established that during the period in which the FBI ran the illegal website, the NIT targeted tens of thousands of activating computers located in over 120 countries through the use of a satellite provider. *See, e.g., United States v. Michaud*, 15-cr-5351, 2016 WL 337263, (W.D. Wash. Jan. 28, 2016) ECF No. 126 at 18-19 ("I may say if this was only this defendant and the argument was outrageous government, conduct, it would be a much different argument than if this was 10,000 people, in terms of where it was outrageous or not. I mean it's one thing to go after one person that you think is committing a crime, and something different to go after everybody under the sun on the same premise") (quoting District Judge Robert J. Bryan); (*United States v. Tippens*, 16-cr-5110, ECF No. 103 at 17-18. (W.D. Wash. Nov. 1, 2016) ("[t]here's just another layer of fact there that we did not know about. I mean, we did not know this was a truly global warrant before. There are 120 countries and territories listed outside the United States that the FBI hacked into, and they also hacked into something called a 'satellite provider.' So now we are into outer space as well").

Stated differently, the Government claims legal authority from this single warrant, issued in the Eastern District of Virginia, to hack thousands of computers in 120 countries and to install malicious software for the purpose of investigating and searching the private property of uncounted individuals whose identities and crimes were

unknown to the Government before launching this massive worldwide search. *See e.g., United States v. Kahler,* 16-cr-2055, 2017 WL 586707 *1 (E.D. MI Feb. 14, 2017) (stating that "on February 20, 2015, a federal magistrate judge in the Eastern District of Virginia signed a warrant authorizing a FBI hacking operation designed to infiltrate a suspected child pornography website, named 'Playpen.'").

### D. Search and Statements

According to data obtained from the NIT deployment, a user named "waytocool" accessed the Playpen website for a total of 25.06 hours between December 2014, and March 2015. On February 23, 2015, "waytocool" entered the website and allegedly downloaded content on a post entitled "SOBRENAS," in the pre-teen section of the website. Through the NIT, the FBI was able to determine that user "waytocool" was connected to a server operating at IP address 173.23.28.89, and the activating computer named "Terryr-PC." Through public sources, the FBI determined that the IP address was operated by Mediacom Communications Corporation ("MCC"). On March 1, 2015, and March 4, 2015, "waytocool" again entered the Playpen website and allegedly downloaded multiple images that depict child pornography.

In mid-March 2015, an administrative subpoena was served on MCC requesting information related to the assigned user of IP address 173.23.28.89. MCC reported that the IP address was assigned to a private residence in Waseca, Minnesota. On July 10, 2015, FBI Special Agent Glenn Moule obtained postal records showing that Carlson is the only person who received mail at the Waseca, Minnesota address.

On October 22, 2015, Agent Moule presented a search warrant application to a Magistrate Judge in the District of Minnesota. The warrant requested authorization to search Carlson's residence. The affidavit supporting the warrant included much of the same facts as set forth in the affidavit supporting the NIT warrant application. In addition, Carlson's alleged entry and conduct on the Playpen website is described, as is the information seized pursuant to the NIT's deployment on Carlson's activating computer earlier that year.

On November 2, 2015, Agent Moule executed the search warrant at Carlson's Waseca, Minnesota residence. Testimony at the February 8, 2017, hearing, established

that Agent Moule and the search team arrived at Carlson's residence at approximately 9:00 a.m. Carlson was not home at that time, but he returned home soon after the search began. Carlson was promptly interviewed by Agent Moule and FBI Special Agent Christopher Blackmore when he returned. Shortly after the interview began, Carlson fainted and Agent Moule summoned an ambulance. Carlson quickly revived, and declined medical treatment once the ambulance arrived. The interview then immediately resumed.

Carlson was not handcuffed during the interview and moved freely about his residence. Approximately one hour into the interview, Carlson requested that the interview move to a local park. That request was granted and Carlson drove himself to the local park, where the interview continued. During the course of the interview, Carlson stated that he was attracted to, and fascinated by, child pornography and that he had struggled with his attraction for many years. In addition, Carlson admitted to entering the Playpen website.

During the search of Carlson's residence, the FBI seized twenty electronic devices. A forensic review of an Antec computer allegedly showed that Carlson had entered the Playpen website and downloaded child pornography. A subsequent review allegedly showed that Carlson had produced child pornography on a Western Digital hard drive.

A year later, on November 17, 2016, Agent Moule executed a second warrant, issued by a different United States Magistrate Judge in the District of Minnesota, for Carlson's residence, now located in Coleraine, Minnesota. At this time, Agent Moule arrested Carlson. Shortly thereafter, Agent Moule and FBI Special Agent Craig Hedidenreich interviewed Carlson in a breakroom at the Coleraine Police Department. Before the interview began, Carlson signed an Advice of Rights form, apprising him of his: right to remain silent; that anything he said could be used against him in court; the right to an attorney and to have an attorney appointed if he could not afford legal assistance; and the right to terminate the interview. During the interview, Carlson made inculpatory statements regarding the production and possession of child pornography.

### III. CONCLUSIONS OF LAW

**A. Motion to Suppress Evidence (ECF No. 23)**

Carlson moves to suppress all evidence seized pursuant to the NIT warrant, as well as derivative evidence, seized pursuant to the subsequent Minnesota warrants as fruits of the poison tree under *Wong Sun v. United States,* 371 U.S. 471 (1963), and its progeny. Def.'s Mem. in Supp. 6, 19, ECF No. 24. Sequentially, Carlson argues that: (1) the NIT warrant issued in the Eastern District of Virginia violated 28 U.S.C. § 636(a) of the Federal Magistrate Judge Act, Federal Rule of Criminal Procedure 41(b), and the Fourth Amendment particularity requirement, and the search of his computer in Minnesota exceeded the scope of the NIT warrant; (2) as a result of these violations, all evidence obtained pursuant to the NIT warrant must be suppressed; (3) evidence seized pursuant to the 2015 and 2016 Minnesota warrants must also be suppressed because the probable cause supporting their issuance was derived solely from the evidence seized pursuant to the NIT warrant; and (4) the *Leon* good-faith exception does not apply to the facts of this case. *Id.* at 19. The Government contends that the NIT warrant satisfies the Fourth Amendment particularity requirement, was authorized by Rule 41(b), and even assuming a violation occurred in the issuance of the NIT warrant, suppression is not required because of the *Leon* good-faith exception to the exclusionary rule. Opp'n Mem. 8, 13, 22, ECF No. 25.

As a threshold matter, the Government does not challenge Carlson's assertion that the deployment of the NIT malware on bis activating computer was a Fourth Amendment search. ECF No. 24 at 7. This Court is aware of no lawful way for the Government to deploy this investigative technique. Assuming without deciding that some lawful way could be devised to use the technology employed here, the Court concludes that the Government, by using the NIT malware to collect data from Carlson's activating computer conducted an unlawful search that was not supported by a lawful warrant. Likewise, the Government's attempted work around of the Fourth Amendment fails to qualify as a recognized warrant exception. *See United States* v. *Croghan,* No. 1:15-cr-48 (S.D. Iowa Sept. 19, 2016) (reasoning that because the NIT obtained identifying packets of information directly from the defendants' activating computers, a valid search warrant, or warrant exception was required). For the reasons set forth more fully below, the unlawful search of Carlson's computer is not saved by the good-faith exception to the exclusionary rule.

1. The NIT Warrant Violated the Federal Magistrate Judge Act and Federal Rule of Criminal Procedure 41(b)

Carlson argues that the Magistrate Judge, sitting in the Eastern District of Virginia, exceeded her territorial jurisdiction in authorizing the deployment of the NIT malware and consequent search and seizure of any activating computer located outside of that District *Id.* at 9. The Court agrees.

The Federal Magistrate Judge Act, 28 U.S.C. § 636(a), and Federal Rule of Criminal Procedure 41(b) limit a magistrate judge's territorial authority to issue warrants. 28 U.S.C. § 636(a) provides that a United States "Magistrate Judge ... shall have within the district in which sessions are held by the court that appointed the magistrate judge, at other places where the court may function, and elsewhere as authorized by law" certain duties, including among other things "all powers and duties conferred or imposed ... by the Rules of Criminal Procedure for the United States District Courts." 28 U.S.C. § 636(a)(1). Rule 41(b) provides, in relevant part:

**Authority to Issue a Warrant.** At the request of a federal law enforcement officer or an attorney for the Government:

(1) a magistrate judge with authority in the district ... has authority to issue a warrant to search for and seize a person or property located within the district;

(2) a magistrate judge with authority in the district has authority to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed;

...

(4) a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both ...

Fed. R. Crim. P. 41(b). [5]

[5]    Fed. R. Crim. P. 41 was amended on December 1, 2016.

Neither Rule 41(b)(1) nor 41(b)(2) authorized the Magistrate Judge, sitting in the Eastern District of Virginia, to issue the so called NIT warrant. Those provisions of Rule 41(b) limit a magistrate judge's authority to issue warrants for the search of property "located within the district" at the time the warrant issues. Here, only the Government controlled server housing the Playpen website was located in the Eastern District of Virginia. Crucially, the identifying packet of information sought through the NIT's deployment was stored on Carlson's activating computer, which at all relevant times was located in Minnesota.

The Government argues that the NIT warrant is a valid tracking-device under Rule 41(b)(4), because the NIT was an electronic tool deployed for the purpose of tracking the movement of information both within and outside the Eastern District of Virginia. ECF No. 25 at 13. However, a Rule 41(b)(4) "tracking device" is defined as any "electronic or mechanical device which permits the tracking of the movement of a person or object." Fed. R. Crim. P. 41(a)(2)(E); 18 U.S.C. § 3117(a)-(b). Here, the NIT malware did not track the movement of a person or object. Instead, the electronic information traveled to Carlson's activating computer in Minnesota, and once implanted, the NIT merely directed that an identifying packet of other electronic information be relayed back to the Government server in Virginia. In addition, even assuming the NIT was a tracking device, the Magistrate Judge in the Eastern District of Virginia still exceeded her territorial jurisdiction because the NIT was installed on Carlson's activating computer in Minnesota, not in the Eastern District of Virginia. *See* Fed. R. Crim. 41(b)(4) (providing that "a magistrate judge with authority in the district has authority to issue a warrant to install *within the district* a tracking device") (emphasis added).

In addition, the Court notes that the FBI "itself did not believe the NIT was a tracking device." Pl.'s Supp. Mem. 9, ECF No. 34. A tracking-device warrant must comply with procedures outlined in Rule 41(e)(2)(C) and 41(f)(2)(A)-(C). For example, Rule 41(e)(2)(C) requires that "a tracking device warrant must identify the person or property to be tracked, designate the magistrate judge to

whom it must returned, and specify a reasonable length of time that the device may be used." Fed. R. Crim. P. 41(e)(2)(C). Here, the return of the NIT warrant does not identify a device being installed or returned to the issuing Magistrate Judge. Similarly, an officer executing "a tracking-device warrant must enter on it the exact date and time the device was installed and the period in which it was used," Fed. R. Crim. P. 41(f)(2)(A), but, there is no mention of an exact date and time in which the NIT was installed on Carlson's activating computer. Given that the NIT warrant does not reference tracking procedures or the installation of tracking devices, the Court declines the Government's invitation to infer that the FBI sought authorization of the NIT warrant under Rule 41(b)(4).

This Court joins the several courts that have concluded that the Magistrate Judge in the Eastern District of Virginia lacked authority to issue the NIT warrant pursuant to Rule 41(b)(4). *See, e.g., United States v. Torres,* No. 5:16-cr-285, 2016 WL 4821223, at *6 (W.D. Tex. Sept. 9, 2016) (holding that it "is inappropriate for this Court to engage in a process of finesse justifying an ethereal presence of the defendant's computer in Virginia, where the plain language of [Rule 41 (b)(4)] as now written does not provide jurisdiction under these circumstances"); *United States v. Henderson,* No.l5-cr-565, 2016 WL 4549108, at *3 (N.D. Cal. Sept. 1, 2016) (reasoning that the NIT warrant search fails the requirements of 41(b)(4) because, "even though it was analogous to a tracking device in some ways, it nevertheless falls outside the meaning of a tracking device as contemplated by the rule. Further, the NIT was installed outside of the district, at the location of the activating computers, not within the district as required" by Rule 41(b)(4)); *United States v. Werdene,* No. 15-434, 2016 WL 3002376, at *7 (E.D. Pa. May 18, 2016) (finding Rule 41(b)(4) inapplicable because it is "premised on the person or property being located within the district" and because it is "uncontested that the computer information that the NIT targeted was at all relevant times located beyond the boundaries of the Eastern District of Virginia"); *United States v. Levin,* 186 F. Supp. 3d 26, 28 (D. Mass. May 5, 2016) (rejecting the argument that the transmittal of the NIT to activating computers to "the installation of a tracking device in a container holding contraband"); *United States v. Arterbury,* No. 15-cr-182 (N.D. Okla. Apr. 25, 2016) (concluding that the "NIT warrant was not for the purpose of installing a device that would permit authorities to track the movements of Defendant or his

property"); *Michaud,* 2016 WL 337263, at *6 (concluding that "applying the tracking device exception fails, because the defendant's computer was never physically located within the Eastern District of Virginia.").

In sum, the issuance of the NIT warrant violated the Federal Magistrate Judge Act and Federal Rule of Criminal Procedure 41(b).

### 2. All Evidence Derived From the Use of the NIT Warrant Must be Suppressed

Finding a violation of Rule 41(b), the Court must fashion an appropriate remedy. "Rule 41 and the Fourth Amendment are not coextensive," and "[noncompliance with [Rule] 41 prerequisites do not automatically require the exclusion of evidence in a federal prosecution." *United States v. Schoenheit,* 856 F.2d 74, 76-77 (8th Cir. 1988). "Absent a constitutional infirmity, the exclusionary rule is applied only to violations of Federal Rule 41 that prejudice a defendant or show reckless disregard of proper procedure." *United States v. Hyten,* 5 F.3d 1154, 1157 (8th Cir. 1993) (citing *United States v. Freeman,* 897 F.2d 346, 348-19 (8th Cir. 1990)); *see also United States v. Welch,* 811 F.3d 275, 280-81 (8th Cir. 2016) (stating that a defendant "must show, [that] the Rule 41 violation [1] was of constitutional import]; [or] 2) either that he was prejudiced by the violation or that the investigators recklessly disregarded proper procedure").

#### a. Constitutional Infirmity

Three Courts have held that the NIT warrant's violation of Rule 41(b) constituted a constitutional infirmity.[6] Specifically, those courts concluded that because the Magistrate Judge in the Eastern District of Virginia lacked territorial jurisdiction to issue the NIT warrant, the warrant was void *ab initio,* or as if the warrant never existed. This Court agrees.

[6]     *See Levin,* 186 F. Supp. 3d at 38; *Arterbury,* 15-cr-182 (N.D. Okla. Apr. 25, 2016); *Croghan,* 15-cr-48 (S.D. Iowa Sept. 19, 2016).

Rule 41, has presented both procedural and substantive provisions. Courts presented with violations of Rule 41's ministerial or technical procedural provisions have generally determined that suppression of evidence is unwarranted.[7]

This case, however, involves a violation of Rule 41(b), the provision of Rule 41 that defines the source and outer limits of a magistrate judge's authority to issue warrants under federal law. *See e.g., United States v. Berkos,* 543 F.3d 392, 398 (7th Cir. 2008) (reasoning that Rule 41(b) is a substantive, not procedural, provision, and unlike other provisions of Rule 41, Rule 41(b) is entitled "authority to issue warrants"); *see also United States v. Krueger,* 809 F.3d 1109, 1115 n.7 (10th Cir. 2015) (concluding that Rule 41(b)(1) "is unique from other provisions of Rule 41 because it implicates substantive judicial authority," and reasoning that cases involving violations of other subsections of Rule 41 "offer limited guidance") (internal quotation marks and citations omitted). The Rule 41 violation here was not simply technical or ministerial. *See United States v. Glover,* 736 F.3d 509, 515 (D.C. Cir. 2013) (concluding that a Rule 41(b) violation constitutes a fundamental jurisdictional flaw that cannot "be excused" as a technical defect); *Croghan,* 15-cr-48 (S.D. Iowa Sept. 19, 2016) (concluding that "because the magistrate judge lacked authority, and thus jurisdiction, to issue the NIT warrant as required by the Fourth Amendment,... the NIT warrant was void *ab initio,* akin to no warrant at all.").

[7]     *See Levin,* 186 F. Supp. 3d at 35, n.10 (collecting cases).

"Because the violation here involved 'substantive judicial authority' rather than simply 'the procedures for obtaining and issuing warrants,'" the Court concludes that the Rule 41(b) defect in the NIT warrant was substantive. *Levin,* 186 F. Supp. 3d at 36 (quoting *Krueger,* 809 F.3d at 1115 n.7). Indeed, because the Magistrate Judge in the Eastern District of Virginia lacked authority, and thus jurisdiction, to issue the NIT Warrant, there was no judicial approval of the NIT warrant. *See id.* (collecting cases in which the court held that an authorized signature on the search warrant by the person authorized to issue it is essential to a warrant's fundamental constitutional validity). Accordingly, the NIT warrant is void *ab initio.* Without an identifiable warrant exception (the Government offers none and the Court is aware of none) the Court concludes that the NIT warrant's violation of Rule 41(b) and 28 U.S.C. § 636(a) constitutes a constitutional infirmity. *See Hyten,* 5 F.3d at 1157.

#### b. Prejudice and Reckless Disregard of Proper Procedure

*United States of America, Plaintiff, v. Terry Lee Carlson,..., --- F.Supp.3d ---- (2017)*

In the Eighth Circuit, prejudice is found where "the search might not have occurred or would not have been so abrasive if the Rule had been followed," and reckless disregard may be found where "there is evidence of intentional and deliberate disregard of a provision in the Rule." *Freeman,* 897 F.2d at 346, 349-50 (quoting *United States v. Burke,* 517 F.2d 377, 386-87 (2d Cir. 1975)). Here, neither the search of Carlson's activating computer pursuant to the NIT warrant nor the searches pursuant to the two warrants issued in the District of Minnesota would have occurred without the violation of Rule 41(b). Had Rule 41(b) been complied with, the FBI would not have obtained the identifying information from Carlson's activating computer or Carlson's IP addresses, would not have been able to link that IP addresses to Carlson's residence through subsequent investigation and administrative subpoenas, and would not have had sufficient evidence to support a probable cause showing to obtain the warrants issued in the District of Minnesota. Carlson has satisfied his burden to prove that the several searches at issue would not have occurred if there had been compliance with Rule 41(b). *See Freeman,* 897 F.2d at 350.

The Government, relying on *Welch,* argues that the operative question is not whether the "same judge could have issued the NIT Warrant in compliance with Rule 41(b), but whether the search would have occurred had the rules been followed." ECF No. 25 at 20; *see Welch,* 811 F.3d at 281. The Government argues that Agent Macfarlane could have secured the NIT warrant by presenting it to a district court judge in the same district. *See id.* at 21.[8] The Court is not persuaded. First, *Welch* did not examine prejudice in the context of a magistrate judge's statutory authority to issue warrants under Rule 41(b), but instead under the procedural, notice provisions of Rule 41(f). As such, *Welch* is inapposite. The operative inquiry, rather, is whether the "search might not have occurred ... if the *Rule* had been followed." *Freeman,* 897 F.2d at 349-50 (emphasis added). Here, neither rule, 41(b) nor § 636(a), permitted the Magistrate Judge in the Eastern District of Virginia to approve the use of the NIT malware to search Carlson's activating computer in Minnesota.

[8]   This Court expresses no opinion on whether, under these circumstances, a district court judge in the Eastern District of Virginia has any more authority than a magistrate judge to issue a warrant to search property in Minnesota. Suffice it to say, no such warrant was issued here.

In addition, the Court concludes that in requesting the NIT warrant, Agents recklessly disregarded proper procedure. *Hyten,* 5 F.3d at 115. The Government argues that Agents should not be blamed for the Magistrate Judge's error in issuing a defective warrant, or for, ostensibly, not knowing the ambit of magistrate judge authority. *See* ECF No. 25 at 27. However, the Court will not impute that level of legal ignorance given that Agent Macfarlane, in applying for the NIT warrant, was familiar with the procedure for extending notice under 18 U.S.C. § 2705 and requested use of the NIT malware under Rule 41. Moreover, there was an obvious conflict between the issued warrant, which on its face, was limited to searches in the Eastern District of Virginia, and Agent Macfarlane's affidavit, which sought to search activating computers, wherever on the planet that they were located.

The search warrant application and the warrant, as issued, expressly limit themselves to the search of persons or property located in the Eastern District of Virginia. Yet paragraph forty-six of Agent Macfarlane's affidavit explains in some detail how the NIT malware might be deployed anywhere on earth. Specifically, paragraph forty-six provides that "the NIT may cause an activating computer - wherever located - to send to a computer controlled or known to the government, network level messages containing information that may assist in identifying the computer." Under these circumstances, Agent Macfarlane must have known that he was acting in reckless disregard of proper procedure. It was not objectively reasonable for Agent Macfarlane, a "law enforcement ... veteran" employed by the FBI "for 19 years" to believe that the NIT warrant, which he knew could reasonably reach any computer in the world, was properly issued given the specific territorial limits under Rule 41(b) and the language of the warrant itself, which limited searches to the Eastern District of Virginia. *See Levin,* 186 F. Supp. 3d at 43. Put differently, it was not objectively reasonable for Agents to believe that a single warrant, which by its terms was explicitly limited to searches in the Eastern District of Virginia, could be used to electronically search Carlson's computer in Minnesota or any of the other countless computers around the world. That the issuing Magistrate Judge recklessly disregarded the limits of her own authority under Rule 41(b) does nothing to change the fact that the Rule 41(b) violation was accompanied by reckless disregard for proper procedure. Indeed, in light of all of the facts and circumstances surrounding the issuance of the

extraordinary NIT warrant, it would not be unreasonable to infer that the disregard of proper procedure was deliberate given the inconsistencies between paragraph forty-six in Agent Macfarlane's affidavit and the cover sheet of the warrant application and the warrant itself.

In short, the Court concludes that the issuance of the NIT warrant in violation of Rule 41(b) was of constitutional magnitude, prejudiced Carlson, and was done in reckless disregard of proper procedure.

### c. Leon Good-Faith Does Not Apply

Having determined that the NIT warrant was void, the Court must determine whether suppression of the evidence found during the search of Carlson's activating computer and residence is warranted. "Only a 'fundamental' violation of Rule 41 requires automatic suppression, and a violation is 'fundamental' only where it, in effect, renders the search unconstitutional under traditional [F]ourth [A]mendment standards." *Freeman,* 897 F.2d at 349 (quoting *United States v. Luk,* 859 F.2d 667, 671 (9th Cir. 1988). In *United States v. Leon,* 468 U.S. 897 (1984), and its companion case, *Massachusetts v. Sheppard,* 468 U.S. 981 (1984), the Supreme Court established a good-faith exception to the Fourth Amendment exclusionary rule. Under the good-faith exception, evidence obtained pursuant to a warrant later determined to be invalid is admissible if the executing officer's reliance on the issued warrant, and belief that the issued warrant was valid, was reasonable. *See Leon,* 468 U.S. at 922; *see also United States v. Clay,* 646 F.3d 1124, 1127 (8th Cir. 2011) ("[T]he exclusionary rule should not be applied so as to bar the admission of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate, even if that search warrant is later held to be invalid.") (citing *Leon,* 468 U.S. at 900, 922)). The constitutional rationale for the good-faith exception is that there is inadequate deterrent value to justify application of the exclusionary rule when police obtain a warrant, reasonably relying on its validity, only to later learn that the magistrate judge erred in authorizing the search. *See Leon,* 468 U.S. at 921. The Court reasoned in *Leon,* that "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.*

Whether *Leon* should apply in instances of a void warrant is a matter of first impression in the Eighth Circuit. The Supreme Court has opined that "reasonable minds frequently may differ on the question of whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate judge's determination." *Leon,* 468 U.S. at 914. The Government argues that *Leon* and its progeny do not, "as a categorical matter limit the reach of the good-faith exception." ECF No. 25 at 23.

However, the good-faith exception, as constructed in *Leon,* does not stand for the improvident proposition that great deference should be extended to a magistrate judge deliberately or recklessly exercising authority inimical to the source of her statutory power to issue a warrant. Indeed, the *Leon* good-faith exception is predicated on a finding that a warrant, in fact, was issued. *See Levin,* 186 F. Supp. 3d at 38 (reasoning that *Leon* "contemplated two circumstances: one in which a warrant is issued and subsequently found to be unsupported by probable cause and the other in which a warrant is supported by probable cause, but is technically deficient."); *see also Herring v. United States,* 555 U.S. 135, 146 (2009) (explaining that in *Leon,* the Court "held that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search cannot justify the substantial costs of exclusion. The same is true when evidence is obtained in objectively reasonable reliance on a warrant subsequently recalled.").

Here, the NIT warrant was void *ab initio,* akin to no warrant at all. Therefore, there was no issued, but subsequently invalidated or recalled warrant for officers to objectively rely upon. "To hold that the good-faith exception is applicable here would collapse the distinction between a voidable and a void warrant." *Levin,* 186 F. Supp. 3d at 41. As other courts have reasoned, the distinction is significant, as a voidable warrant "involves judicial error, such as the misjudging the sufficiency of the evidence" or a finding of probable cause. *Id.* Conversely a void warrant, as is the case here, is a substantive, non-technical, defect that implicates the fundamental judicial authority and statutory power conferred upon a magistrate judge to issue warrants in the first instance. *See id.* (collecting cases that have held that the *Leon* good-faith exception presupposes that the disputed warrant was

issued by a neutral and detached magistrate judge imbued with the requisite legal authority). The Court notes that the good-faith exception left "untouched the probable-cause standard and the various requirements for a valid warrant." *Leon,* 468 U.S. at 923. To the extent that *Leon* cleaved a good-faith Fourth Amendment exception to the exclusionary rule, that exception cannot apply when the requirements for the very authority and jurisdiction of the magistrate judge to issue a warrant were abandoned. Therefore, the Court concludes that the *Leon* good-faith exception does not apply in this case.

### d. The Searches of Carlson's Residence

The searches of Carlson's residences in November 2015, and in November 2016, were fruits of the defective NIT warrant. The Government does not appear to contest that these searches were derivative of the NIT warrant. Therefore, evidence seized pursuant to the searches of Carlson's residences must be suppressed. *See Wong Sun,* 371 U.S. at 488.

### e. Summation

• The NIT Warrant was issued in violation of 28 U.S.C. § 636(a) and Federal Rule of Criminal Procedure 41(b)

• The violation was not ministerial nor technical because it implicated the substantive judicial authority of the issuing Magistrate Judge

• The NIT warrant was void *ab initio*

• That violation was of constitutional magnitude under the Fourth Amendment, prejudiced Carlson, and recklessly disregarded proper procedure

• The *Leon* good-faith exception to the exclusionary rules does not apply when the issued warrant is void *ab initio*

• Suppression of the evidence derived from the NIT warrant is the appropriate remedy on the facts of this case

• Carlson's motion to suppress evidence obtained as a result of search and seizure must be granted

### 3. The NIT Warrant Lacked Particularity

Independent of the foregoing, this Court concludes that all of the evidence derived from the NIT warrant must be suppressed because the NIT warrant also violated the Fourth Amendment's particularity clause. [9]

[9]   The Court acknowledges that every other court to consider the question of particularity under the facts of this case has concluded that the NIT warrant was sufficiently particular. *See United States v. Acevedo-Lemus,* No. SACR 15-137-CJC, 2016 WL 4208436, at *7 n.4 (C.D. Cal. Aug. 8, 2016) (collecting a sample of cases).

The Warrant Clause of the Fourth Amendment prohibits the issuance of a warrant, except one "particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In the Eighth Circuit, "[t]he particularity requirement 'is a standard of practical accuracy rather than a hypertechnical one." *United States v. Fiorito,* 640 F.3d 338, 346 (8th Cir. 2011) (quoting *United States v. Thurman,* 625 F.3d 1053, 1057 (8th Cir. 2010)). "[W]hether a warrant fails the particularity requirement cannot be decided in a vacuum. The court will base its determination on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *Milliman v. Minnesota,* 774 F.2d 247, 250 (8th Cir. 1985) (internal citations omitted); *see also Andresen v. Maryland,* 427 U.S. 463, 480 (1976).

This Court concludes that the NIT warrant lacks particularity because it is not possible to identify with any specificity, which computers, out of all of the computers on earth, might be searched pursuant to this warrant. Put differently, the NIT warrant fails to particularly describe the place to be searched. Attachment A to the NIT warrant purports to be the description of the "place to be searched," but rather than describe a place, the Attachment describes a process by which the place to be searched can in the future be ascertained by a Government controlled "computer server." In its entirety, Attachment A reads:

**Attachment A**

**Place to be Searched**

This warrant authorizes the use of a network investigative technique ("NIT") to be deployed on the computer server described below, obtaining information described in Attachment B from the activating computers described below.

The computer server is the server operating the Tor network child pornography website referred to herein as the TARGET WEBSITE, as identified by its URL - upf45jv3bziuctml.onion - which will be located at the government facility in the Eastern District of Virginia.

The activating computers are those of any user or administrator who logs into the TARGET WEBSITE by entering a username and password. The government will not employ this network investigative technique after 30 days after this warrant is authorized, without further authorization.

ECF No. 25, Ex. 1.

As there is no way to identify at the time the search warrant *was issued,* which computers, out of all the computers on planet earth might be used to log into the TARGET WEBSITE, the NIT warrant fails to particularly describe the place to be searched. The Government argues generally that the NIT warrant is sufficiently particular because it identifies the objects of the search, the activating computers that at some unknown point in the future will log into the Playpen website. However, the NIT warrant fails the particularity requirement because it does not identify which computers will be searched until the search is actually completed.

Identification of the particular place to be searched cannot depend upon facts that have not yet occurred. A warrant must particularly describe the place to be searched at the time it is issued. Just as a warrant must be supported by probable cause at the time it is issued, this Court concludes that the warrant must particularly describe the place to be searched when it is issued. As the Grubbs Court explained regarding the probable cause for anticipatory warrants, "[a]nticipatory warrants are, therefore, no different in principle from ordinary warrants. They require the magistrate to determine (1) that it is *now probable* that (2) contraband, evidence of a crime, or a fugitive *will be* on the described premises (3) when the warrant is executed." *United States v. Grubbs,* 547 U.S. 90, 96 (2006) (emphasis added).

Agent Macfarlane's affidavit in support of the NIT warrant described the process by which the NIT malware would be deployed by a computer server operating the TARGET WEBSITE. First, a user must take the necessary steps to enter the Tor network; second, a user must ascertain the Playpen URL via a Tor network hidden service; third, a user using a computer whose location and description are entirely unknown to the issuing Magistrate Judge or the affiant must log into the TARGET WEBSITE entering a username and password; fourth, the user's entry into the website would cause their computer, located anywhere in the world, to activate the deployment of the NIT malware from the Government server in Virginia; fifth, the NIT would travel via the internet to the user's computer, implant, and search for the identifying packet of information; sixth, the NIT would harvest the identifying packet of information; seventh, the NIT would force the activating computer to send the identifying packet of information back to the Government controlled server in Virginia. Only with that information could the Government begin to describe with any particularity the computers to be searched; however, at that point, the computer had already been searched. Put differently, neither the Magistrate Judge nor the affiant could know what computers might be searched, until after the search has already occurred.

Here, describing the place to be searched as "the computer ... of any user or administrator who logs into the TARGET WEBSITE," does not describe with particularity the computers to be searched at the time the warrant was issued because any computer on earth could be so used. As neither the Magistrate Judge nor the affiant know which computers are to be searched until after the search has already occurred, the NIT warrant fails to particularly describe the place to be searched.

Courts will often permit the issuance of anticipatory search warrants, where the existence of probable cause is dependent upon the occurrence of some triggering, condition precedent. *Id.* at 95 (quoting W. LaFave, Search and Seizure § 3.7(c), p. 398 (4th ed. 2004)). But in cases of an anticipatory warrant, the question is simply whether there is currently probable cause to believe that evidence will be found at the particularly described location, if the anticipated event occurs. *See, e.g., United States v. Tagbering,* 985 F.3d 946, 949 (8th Cir. 1993) (concluding that an affidavit, which stated

that "[the affiant] anticipates that the controlled delivery of [marijuana] to 10557 Cypress, Apt. D, will occur on 8-16-91. If delivery does not occur on 8-16-91 a second delivery attempt will be made to deliver the package on 8-17-91" sufficiently stated when the condition precedent would occur); *United States v. Schwarte,* 645 F.3d 1022, 1025 (8th Cir. 2011) (concluding that an affidavit, which provided "beginning April 9, 2007, the package [of child pornography recordings] would be attempted to be delivered to the [defendant's address] ... [i]f no one was at the [defendant's] address to accept the package, delivery would be attempted again ... up to the 10 days allowed by the requested search warrant" sufficiently stated when the condition precedent would occur). This Court is not aware of any case where a court has permitted the actual identification of the place to be searched to depend upon the occurrence of an anticipated event that has not yet occurred.

### 4. Even if the NIT Warrant Was Valid, Its Scope Was Limited to Computers in the Eastern District of Virginia

#### a. The Search of Carlson's Computer Was Excessive in Scope

In addition to particularity, Carlson argues that the NIT warrant explicitly limited searches to property, activating computers, located in the Eastern District of Virginia. ECF No. 24 at 8; ECF No. 34 at 13. As a result, Carlson argues that the search of his activating computer in Minnesota exceeded the scope of the issued NIT warrant. *Id.* The Government contends that while only "the NIT Warrant cover sheet explicitly references the [Eastern District of Virginia], it also reference Attachments A and B, which inform the scope of the NIT Warrant." ECF No. 36 at 11. The Government further argues that the Agent Macfarlane's affidavit, which stated that the NIT malware "may cause an activating computer - wherever - located to send" identifying packets of information, should be considered in contouring the scope of the NIT warrant. *Id.*

The Court concludes that the search of Carlson's activating computer in Minnesota was improper and exceeded the scope of the NIT warrant. The language in the NIT warrant was plain and distinctive: Attachment A provided the *what,* that any activating computer that entered the Playpen website would be subject to search

through the NIT deployment, but in no way altered the *where,* that searches of activating computers would take place in the Eastern District of Virginia. The Court cannot accept the Government's argument that because Attachment A does not qualify where searches will take place that NIT *warrant itself* should be read to permit the search of any activating computer. To do so, practically speaking, would be to contradictorily ignore the warrant's specific geographic limitation, that searches would be conducted in the Eastern District of Virginia, in favor of an attachment that is geographically silent. *See Fiorito* 640 F.3d at 346 (reasoning that Fourth Amendment particularity is a standard of practical accuracy).

In addition, assuming *arguendo* that Agent Macfarlane's affidavit should be considered in determining the scope of searches executed pursuant to the NIT warrant, the Court still concludes that Agents unconstitutionally expanded the scope of the NIT warrant by searching Carlson's computer located outside the Eastern District of Virginia. "[I]f officers unlawfully expanded the search beyond the scope permitted by the *warrant*" a defendant may "obtain suppression" of evidence. *United States v. Alexander,* 574 F.3d at 484, 488 (8th Cir. 2009) (emphasis added). To conclude otherwise would be to permit Agent MacFarlane's affidavit, which ambiguously states that identifying packets of information would be seized from activating computers, "wherever located," to shape the scope of the NIT warrant, when the text of the warrant itself cabined searches to the Eastern District of Virginia. The Court cannot conclude that the term "any" in Attachment A or "wherever" in Agent Macfarlane's affidavit expanded the scope of a single warrant, with identifiable and discrete territorial boundaries, to constitutionally authorize the search of any activating computer outside of that boundary, i.e., any activating computer on earth. Moreover, the Court is aware of no legal authority which stands for the proposition that an affidavit, whether incorporated or not, can expand the scope of a warrant beyond its express limitations; especially an affidavit in direct contradiction to the issued warrant.

#### b. Leon Good-Faith Does Not Apply

Where a warrant is sufficiently facially deficient, for example, where it "fail[s] to particularize the place to be searched or the things to be seized ... executing officers

cannot reasonably presume it to be valid." *Leon,* 468
U.S. at 923. "This exception relate[s] to alleged infirmities
with the warrant itself rather than the affidavit behind
the warrant." *United States v. Carpenter,* 341 F.3d 666,
673 (8th Cir. 2003). "It is incumbent on the officer
executing a search warrant to ensure the search is lawfully
authorized and lawfully conducted." *Groh v. Ramirez,*
540 U.S. 551, 563, n.8 (2004).[10] "[T]he officer's reliance
on the magistrate's probable-cause determination and
on the technical sufficiency of the warrant he issues
must be objectively reasonable ... and it is clear that in
some circumstances the officer will have no reasonable
grounds for believing that the warrant was properly
issued." *Leon,* 468 U.S. at 923. "The Fourth Amendment's
particularity requirement assures the subject of the search
that a magistrate has duly authorized the officer to
conduct a search of limited scope. This substantive right
is not protected" when an agent "fails to take the time
to ... detect a glaring defect that ... is of constitutional
magnitude." *Groh,* 540 U.S. at 565, n.9.

[10]    Although *Groh* was decided in the context of
qualified immunity, the Court explained that the same
standard of objective reasonableness is applied in
qualified immunity as in the context "of suppression
in ... *Leon.*" *Groh,* 540 U.S. at 566, n.8 (quoting
*Malley v. Briggs,* 475 U.S. 335, 344 (1986)).

Here, "[t]here was no ambiguity on the face of the
NIT warrant; the warrant "specifically identified" the
location of the searches of activating computers: the
Eastern District of Virginia. *Carpenter,* 341 F.3d at
673. No reasonable officer could believe that the
NIT warrant, which plainly limited searches to the
Eastern District of Virginia, issued by the Magistrate
Judge sitting in the Eastern District of Virginia,
could constitutionally authorize the search of activating
computers in Minnesota, or anywhere in the world. The
Government argues that Agents "can hardly be faulted
for failing to understand the intricacies of the jurisdiction
of federal magistrate judges." ECF No. 25 at 27.
However, Agents executing the NIT warrant are not being
'faulted' by this Court for failing to understand magistrate
jurisdiction. Rather, the *Leon* good-faith exception
does not apply on the facts of this case because the
constitutional defect in the execution of the NIT warrant
was a creation of the Agents themselves, impermissibly
expanding the scope and conducting searches outside the
area in which the NIT warrant plainly limited searches to.
That is a constitutional failure of the Agents neglecting

to "tailor" their search to the NIT warrant's expressed
limitations. *Garrison v. Maryland,* 480 U.S. 79, 84 (1987).
In addition, under the circumstances of this particular
case, the NIT warrant was so facially deficient in failing
to particularize what computers would be searched at the
time in which the warrant was issued that the executing
officer could not reasonably presume it to be valid,
precluding application of the *Leon* good-faith exception.
*Leon,* 468 U.S. at 923. Therefore, the evidence obtained
pursuant to the NIT warrant should be suppressed.

## B. Motion to Suppress Statements (ECF No. 22)
Carlson argues that his November 2, 2015, and November
17, 2016, statements constitute fruit of the defective
NIT warrant, and the statements were made without the
assistance of counsel in violation of the Fifth and Sixth
Amendments. *See* Mot. to Supp. 2, ECF No. 22. The
Government argues that Carlson was not in custody, and
therefore, not entitled to *Miranda* warnings during his
November 2, 2015, statement, and that he waived his Fifth
and Sixth Amendment rights during his November 17,
2016, statement. ECF No. 36 at 13-23.

### 1. The November 2, 2015, Statement
The Fifth Amendment ensures that no person "shall be
compelled in any criminal case to be a witness against
himself." U.S. Const. amend. V. "The basic rule of
*Miranda* is that an individual must be advised of the
right to be free from compulsory self-incrimination, and
the right to the assistance of an attorney, any time a
person is taken into custody for questioning." *United
States v. Griffin,* 922 F.2d 1343, 1347 (8th Cir. 1990) (citing
*Miranda v. Arizona,* 384 U.S. 436, 444 (1966)). In other
words, law enforcement officers must inform suspects of
their Fifth Amendment rights before subjecting them to
"custodial interrogations." *Id.* The term "interrogation"
under *Miranda* "refers not only to express questioning,
but also to any words or actions on the part of the police
(other than those normally incident to arrest and custody)
that the police should know are reasonably likely to elicit
an incriminating response from the suspect." *Rhode Island
v. Innis,* 446 U.S. 291, 301 (1980). Additionally, "[a]n
individual is in custody [for *Miranda* purposes] when
placed under formal arrest, or when his or her freedom is
restricted to a degree akin to formal arrest." *United States
v. Elzahabi,* 557 F.3d 879, 883 (8th Cir. 2009) (citing *United
States v. Ollie,* 442 F.3d 1135, 1137 (8th Cir. 2006).

*United States of America, Plaintiff, v. Terry Lee Carlson,..., --- F.Supp.3d ---- (2017)*

It is undisputed that prior to, and during, the November 2, 2015, questioning by Agents Moule and Blackmore, Carlson was not informed of his *Miranda* rights. *See* ECF No. 36 at 14. Thus the question before this Court is whether this statement was the product of: (1) an interrogation; (2) while "in custody" for Fifth Amendment purposes. *Griffin,* 922 F.2d at 1347.

The Court concludes that Carlson was interrogated by Agents Moule and Blackmore. Agents were present at Carlson's residence pursuant to the NIT warrant for the purpose of searching a residence connected to an IP address from which child pornography was allegedly downloaded and distributed. Agents Moule and Blackmore knew of the Playpen investigation, the alleged pornographic content connected to the IP address, and their questions were calculated to gather evidence connecting Carlson to that activity. Indeed, during the February 8, 2017, hearing, Agent Moule testified that his purpose in speaking to Carlson was to gain incriminating information from him. Agents Moule and Blackmore reasonably knew their questions were likely to elicit an incriminating response from Carlson. *See Innis,* 446 U.S. at 301.

Whether Carlson was in custody during the interview turns on whether, under the totality of the circumstances, "a reasonable person in [Carlson's] position would have felt free to end the interrogation and leave." *Elzahabi,* 557 F.3d at 883. The Eighth Circuit has invoked a nonexclusive, six-factor test to guide a court in making a custodial determination:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

(2) whether the suspect possessed unrestrained freedom of movement during questioning;

(3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4) whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) whether the atmosphere of the questioning was police dominated; or

(6) whether the suspect was placed under arrest at the termination of the questioning.

*Griffin,* 922 F.2d at 1349. However, "custody cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly ... the ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *United States v. Czichray,* 378 F.3d 822, 827-28 (8th Cir. 2004).

Based on the totality of the circumstances, the Court concludes that Carlson was not in custody during the November 2, 2015, interrogation. Testimony at the February 8, 2017, hearing, established that Agent Moule advised Carlson that he was not under arrest, the interview was voluntary, and that he could terminate the interview at any time. The recording of the interview corroborates Agent Moule's testimony; Carlson was advised that he was not under arrest, he was free to leave, he was free to terminate the interrogation, and he was free to go about his business. *See generally* Gov't. Ex. 1. Testimony further established that Carlson was not handcuffed, and his freedom of movement was not restrained. When Carlson requested that the interrogation move to a local park, Carlson's request was granted and he drove himself to the park where the interrogation continued. Carlson was not placed under arrest at the conclusion of the interrogation. That Agents padded Carlson down before the interrogation and when the interrogation resumed at the park, likely favors a finding that the interrogating atmosphere was police dominated. However, Carlson offers no evidence to counter Agent Moule's testimony that he was not threatened, punished, intimidated, or deceptively promised anything for his participation in the interrogation. Indeed, the Court notes that after being informed that he could terminate the interrogation, Carlson stated that he would be willing to talk with Agents. *See generally id.* "This is not a case where a suspect sought to exercise his option of terminating the interview, only to meet resistance from his interrogators." *Czichray,* 378 F.3d at 829. Therefore, the Court finds no Fifth Amendment violation.

In addition, the Court finds no violation of Carlson's Sixth Amendment rights. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. It is well-established that

"once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all critical stages of the criminal proceedings." *Montejo v. Louisiana,* 556 U.S. 778, 786 (2009). A defendant's Sixth Amendment right to assistance of counsel in a criminal proceeding begins when the prosecution is commenced. *See Rothgery v. Gillespie Cnty. Tex.,* 554 U.S. 191, 199 (2008). The Supreme Court has pegged prosecutorial commencement to "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id; see also United States v. Gouveia,* 467 U.S. 180, 188 (1984); *Kirby v. Illinois,* 406 U.S. 682, 689 (1972). "The rule is not 'mere formalism,' but a recognition of the point at which 'the government has committed itself to prosecute,' 'the adverse positions of [the] government and defendant have solidified,' the accused 'finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.'" *Rothgery,* 554 U.S. at 199 (quoting *Kirby,* 406 U.S. at 689).

Here, on November, 2, 2015, neither an indictment, information, or formal charge had been entered against Carlson, nor had a preliminary hearing or arraignment been held. The FBI was certainly investigating Carlson, but the Government had not committed itself to his prosecution. Consequently, Carlson's right to counsel under the Sixth Amendment had not yet attached. *Rothgery,* 554 U.S. at 199.

Concluding that November 2, 2015, statement was not violative Carlson's Fifth or Sixth Amendment rights, the question remains whether the statement must be suppressed as fruit of the NIT warrant violation. *See Wong Sun,* 371 U.S. at 488. The first question in making this determination is "whether there was a sufficient factual nexus between the constitutional violation"—the NIT warrant's defects under the Fourth Amendment—"and the challenged evidence"—Carlson's statement. *United States v. Yorgensen,* 845 F.3d 908, 913 (8th Cir. 2017); *see also United States v. Riesselman,* 646 F.3d 1072, 1079 (8th Cir. 2011). In this case, the issuance of the NIT warrant directly led to a search of Carlson's activating computer. Through that search, Agents obtained evidence of child pornography; evidence, which was used to secure the warrant to search Carlson's residence on November 2, 2015. Indeed, Agents would not have been present at Carlson's residence on November 2, 2015, but-for the

issuance of the NIT warrant, and would not have obtained Carlson's statement but-for their presence at his residence. *See e.g., Riesselman,* 646 F.3d at 1078 (holding that a defendant must at least making a showing that the alleged illegality was the but-for cause of obtaining the evidence). Thus, the Court concludes that there was a sufficient factual nexus between the predicate Fourth Amendment violation and Carlson's November 2, 2015, statement.

The second question is whether the attenuation doctrine applies under *Brown v. Illinois,* 422 U.S. 590, 601 (1975), and its progeny. *See Yorgensen,* 845 F.3d at 914. The attenuation doctrine provides that, "evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Utah v. Strieff,* ---- U.S.-------- , 136 S. Ct. 2056, 2061 (2016). The attenuation doctrine examines "whether the causal connection between incriminating statements and an arrest or *search* that violated the Fourth Amendment has been broken." *Yorgensen,* 845 F.3d at 914 (emphasis added). In *Brown,* the Supreme Court elucidated the relationship between the attenuation doctrine and the Fourth and Fifth Amendments in the context of statement suppression. *See Brown,* 422 U.S. at 601. The Court explained that:

[It has long] observed that the Fifth Amendment is in intimate relation with the Fourth, ... [t]hus even if. . . statements ... were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between [a Fourth Amendment violation] and the statement made subsequent thereto to be broken. *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness, but that it be sufficiently an act of free will to purge the primary taint. ... But the *Miranda* warnings, alone and per se, cannot always make the act sufficiently a product of free will [to] break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. ... *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of a [Fourth Amendment violation]. But they are not the only factor to be considered. [In addition:] [ (1) t]he temporal proximity of the arrest and the confession[;] (2) the presence of intervening circumstances[;] and, particularly, [3] the purpose and flagrancy of the official misconduct are all relevant.

*Brown,* 422 U.S. at 601-04 (internal citations omitted).

The Court concludes that the taint of the initial Fourth Amendment violation, the issuance of the NIT warrant, had not been purged at the time of Carlson's November 2, 2015, statement. First, the uncontroverted record shows that Carlson was not provided with a *Miranda* warning prior to the statement. *See Rawlings v. Kentucky,* 448 U.S. 98, 110 (1980). Second, Carlson's interrogation began immediately after the execution of the warrant. *But cf. United States v. Whisenton,* 765 F.3d 938, 941-12 (8th Cir. 2014); *United States v. Barnum,* 564 F.3d 964, 972 (8th Cir. 2009) (holding that fifteen minutes was sufficient to demonstrate an attenuation of illegality). Third, there were no intervening circumstances to purge the taint of the defective warrant. Specifically, there were no intervening circumstances between the NIT warrant and the execution of the search warrant of Carlson's residence to break the causal chain. Fourth, the purpose and flagrancy of the FBI's misconduct in attempting to obtain the NIT warrant and deploying the NIT malware is truly staggering. In order to identify Playpen users, the FBI operated a copied version of a dark web, child pornography website for two weeks. During that period, countless images and video content depicting child pornography were globally downloaded and distributed via the Playpen. In essence, the FBI facilitated the victimization of minor children and furthered the commission of a more serious crime—the distribution of child pornography—to primarily identify offenders committing less serious crimes—viewing and receipt of child pornography. Moreover, although the January 15, 2015, warrant obtained by Agent Alfin judicially authorized the FBI to seize the Playpen's domain URL, that warrant did not authorize the FBI to then independently operate the website and house and disseminate the very content it now accuses hundreds of defendants of receiving. Therefore, the Court concludes that Carlson's November 2, 2015, statement was not purged of the taint of the NIT warrant's Fourth Amendment violations and suppression of that statement is justified on the facts of this case. *See Brown,* 422 U.S. at 601-04.

### 2. The November 17, 2016, Statement

Carlson argues his November 17, 2016, statement was also the fruit of the Fourth Amendment violation and was given in violation of his Fifth and Sixth Amendment rights. ECF No. 22 at 2. The Government argues that

Carlson waived his Fifth and Sixth Amendment rights. ECF No. 36 at 20-23.

As a threshold matter, Carlson's November 17, 2016, statement was given after he was placed in custody on the arrest warrant issued the previous day. In order for evidence obtained as a result of a custodial interrogation to be used against a defendant at trial, the Fifth Amendment requires that law enforcement advise the defendant of his constitutional rights and that the defendant make a valid waiver of those rights. *See Miranda,* 384 U.S. at 444. Before questioning begins, a suspect in custody must be informed of the following: (1) that he has the right to remain silent; (2) that his statements may be used against him in a court of law; (3) that he has the right to an attorney; and (4) that if he cannot afford an attorney, one will be appointed. *Id.* at 444, 469-70, 478-79. After the warnings are given, if the suspect indicates that he wishes to assert these rights, the interrogation must stop. *See id.* at 473-74. Statements elicited from a suspect in violation of *Miranda* are inadmissible. *See Stansbury v. California,* 511 U.S. 318, 322 (1994).

Once advised of *Miranda* rights, a suspect's waiver of his Fifth Amendment privilege against self-incrimination is only valid if it is voluntarily, knowingly, and intelligently made. *See Miranda,* 384 U.S. at 444; *Berghuis v. Thompkins,* 560 U.S. 370, 382 (2010); *United States v. Syslo,* 303 F.3d 860, 866 (8th Cir. 2002). A waiver is made knowingly if it is "made with a full awareness of both the nature of the right abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421 (1986). It is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* It is the Government's burden to show that the suspect's waiver meets these standards. *Miranda,* 384 U.S. at 475.

A defendant's Sixth Amendment right is violated whenever, in the absence of counsel, federal Agents deliberately elicit statements from him. *See Massiah v. United States,* 377 U.S. 201, 204-205 (1964). The Supreme Court has consistently applied the "deliberate elicitation" standard to Sixth Amendment violations, and expressly distinguished it from the custodial interrogation standard applicable to Fifth Amendment violations. *See United States v. Fellers,* 540 U.S. 519, 524 (2004). While courts continue to apply different standards to the Fifth and

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Sixth Amendments to determine whether a violation has occurred, the standard for whether there has been a waiver of rights is the same under both the Fifth and Sixth Amendments; whether the waiver was voluntary, knowing, and intelligent. *See Montejo,* 556 U.S. at 786-87.

A defendant may waive his Sixth Amendment right "whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Id.* at 786. "And when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the *Fifth* Amendment." *Id.* (emphasis in original) (citing *Patterson v. Illinois,* 487 U.S. 285, 296 (1988) ("As a general matter ... an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.")).

The Court concludes that Carlson knowingly, voluntarily, and intelligently waived his Fifth and Sixth Amendment rights prior to his November 17, 2016, statement. Shortly after his arrest, but before the interrogation began, Carlson read and signed an Oral Warnings to be Given to a Suspect Prior to Interrogation Form, apprising him of his: right to remain silent; that statements may be used against him; right to counsel; and right to have an attorney provided. *See* Gov't. Ex. 3. Testimony at the February 8, 2017, hearing established that Carlson did not appear to be under the influence of drugs or alcohol, appeared to be oriented to time and place, and appeared to fully understand Agent Moule's questions.

After signing the form, Carlson stated that after the November 2, 2015, interview, he sought the advice of an attorney and was advised that he should not speak with Agents regarding the investigation. *See* Gov't. Ex. 2 at 1:13-1:17. The attorney also advised Carlson that speaking with law enforcement and making inadvertent inculpatory statements exposed him to potential criminal liability. *Id.* However, Carlson also stated that not talking with Agents "sucks because I am not that type of person ... and I want things to be right, and I'm incriminating myself by saying anything, ... [but] do I believe I need help, I do ... you know, I want things to be right, and to live this

life is crazy." *Id.* Later in the interview, Carlson identified a series of images allegedly depicting child pornography and stated that the images were captured in his former residence on an old camera that has since been stolen. *Id.* at 1:30-1:36.

The uncontroverted record shows that Carlson was aware of his right to counsel and his right against self-incrimination. Nonetheless, Carlson proceeded with the interrogation on his own volition because he wanted "things to be right." *Id.* Under the totality of the circumstances, the record supports a finding that Carlson abandoned his Fifth and Sixth Amendment rights. *See Patterson,* 487 U.S. at 296.

Concluding that the November 17, 2016, statement was not violative of the Fifth or Sixth Amendment, the question remains whether it must be suppressed as fruit of the Fourth Amendment violation. Specifically, whether there was a factual nexus between the Fourth Amendment violation and whether the taint of the violation had been attenuated applying the *Brown* factors. The Court concludes that there was a factual nexus between the constitutional violation—the NIT warrant's defects under the Fourth Amendment—and the challenged evidence—Carlson's statement. *See supra* at 34.

As to the *Brown* attenuation factors, first, although apprising a suspect of their *Miranda* rights is not controlling, that Carlson was given his *Miranda* warning is an *important* factor in the *Brown* analysis. *Brown,* 422 U.S. at 601 (emphasis added). Second, the Court observes the presence of several intervening factors. The NIT warrant had been issued over twenty months before his arrest, and Carlson's first NIT related interrogation had taken place over a year before. In the intervening period, Carlson had contacted an attorney, was advised not to speak with law enforcement, and was counseled on the potential incriminating consequences of doing so. *See* Gov't. Ex. 2 at 1:13. By November 17, 2016, Carlson was very much aware of the nature and purpose of the investigation, knew he was a suspect in that investigation, and had ample "opportunit[y] to pause and reflect, and to decline consent after deliberate consideration if [he] wished." *United States v. Brandwein,* 796 F.3d 980, 986 (8th Cir. 2015). Accordingly, Carlson's November 17, 2016, statement was sufficiently a product of free will to purge the taint of the NIT warrant's manifest constitutional defects and the purpose and flagrancy of the misconduct exhibited

United States of America, Plaintiff, v. Terry Lee Carlson,..., --- F.Supp.3d ---- (2017)

during the execution of the NIT warrant. Therefore, this statement must not be suppressed.

### III. RECOMMENDATION

Based upon the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Carlson's motion to suppress statements (ECF No. 22) be **GRANTED in part** and **DENIED in part** as follows:

    a. Carlson's request to suppress his November 2, 2015, statement be **GRANTED;**

    b. Carlson's request to suppress his November 17, 2016, statement be **DENIED.**

2. Carlson's motion to suppress evidence obtained as a result of search and seizure (ECF No. 23) be **GRANTED.**

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **April 6, 2017,** written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **April 6, 2017** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.

**All Citations**

--- F.Supp.3d ----, 2017 WL 1535995

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.